# United States Court of Appeals For The Seventh Circuit

No. 20-3229

ORLANDO CORDIA HALL,

*Petitioner-Appellant*,

v.

T.J. WATSON, WARDEN
UNITED STATES PENITENTIARY (USP) TERRE HAUTE,

*Respondent-Appellee*.

On Appeal from

The United States District Court for the Southern District of Indiana
Before the Honorable Judge James P. Hanlon

**BRIEF FOR PETITIONER-APPELLANT AND EMERGENCY MOTION
FOR STAY OF EXECUTION PENDING APPEAL**

PIETER VAN TOL
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
pieter.vantol@hoganlovells.com

KATHRYN MARSHALL ALI
KAITLYN GOLDEN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
kathryn.ali@hoganlovells.com
kaitlyn.golden@hoganlovells.com

November 18, 2020

*Counsel for Orlando Cordia Hall*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-3229

Short Caption: Hall v. Barr

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Orlando Cordia Hall

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Hogan Lovells US LLP

(3)     If the party, amicus or intervenor is a corporation:

i)        Identify all its parent corporations, if any; and

N/A

ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Kathryn M. Ali                    Date: 11/18/2020

Attorney's Printed Name:  Kathryn M. Ali

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☑ **No** ☐

Address:  Hogan Lovells US LLP, 555 Thirteenth Street, NW, Washington, DC 20004

Phone Number:  (202) 637-5771                    Fax Number:  (202) 637-5910

E-Mail Address: kathryn.ali@hoganlovells.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 20-3229

Short Caption: Hall v. Barr

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Orlando Cordia Hall

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Hogan Lovells US LLP

(3)     If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and

N/A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Pieter Van Tol     Date: 11/18/2020

Attorney's Printed Name: Pieter Van Tol

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☑ **No** ☐

Address: Hogan Lovells US LLP, 390 Madison Avenue, New York, NY 10017

Phone Number: (212) 909-0661     Fax Number: 212 918 3100

E-Mail Address: pieter.vantol@hoganlovells.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 20-3229

Short Caption: Hall v. Barr

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Orlando Cordia Hall

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Hogan Lovells US LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Kaitlyn A. Golden    Date: 11/18/2020

Attorney's Printed Name:  Kaitlyn A. Golden

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑ **No** ☐

Address:  Hogan Lovells US LLP, 555 Thirteenth Street, NW, Washington, DC 20004

Phone Number:  (202) 637-5864    Fax Number:  (202) 637-5910

E-Mail Address: kaitlyn.golden@hoganlovells.com

rev. 12/19 AK

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION .................................................................................................. 1

JURISDICTIONAL STATEMENT ...................................................................... 3

STATEMENT OF THE ISSUES ........................................................................... 4

STATEMENT OF RELATED CASES OR PROCEEDINGS ................................ 5

STATEMENT OF THE CASE ............................................................................... 6

      A.    During Mr. Hall's Trial, Prosecutors Struck Qualified Prospective Black Jurors on the Basis of Their Race in Violation of the Fifth Amendment and Batson. ...................................................................... 6

      I.    Mr. Hall's Trial, Conviction, and Post-Conviction Proceedings ............... 10

      II.    Mr. Macaluso's Adjudicated History of Racial Bias. .............................. 11

      III.    The Federal Death Penalty is Applied in Texas in a Racially-Discriminatory Manner. .................................................................. 15

SUMMARY OF ARGUMENT .............................................................................. 16

STANDARD OF REVIEW .................................................................................... 18

ARGUMENT .......................................................................................................... 19

      I.    THE SAVINGS CLAUSE APPLIES TO MR. HALL'S § 2241 PETITION ................................................................................................ 19

      A.    The Savings Clause is an Appropriate Vehicle to Bring Claims Arising from Unconstitutional Racial Bias. ........................................ 19

B. The Evidence Hall Proffers is "Newly Discovered" and Counsel was Reasonably Diligent in Seeking Such Evidence. ...............................21

1. Information Regarding Macaluso's Racist Conduct was not Reasonably Accessible to Counsel. ...........................................22

2. Statistical Analysis of the Death Penalty was not Available at Trial, though Underlying Facts Existed ..................................25

C. Precluding Mr. Hall's Claims Constitutes a Miscarriage of Justice. ..26

II. MR. HALL IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS. ..........................................................................................28

A. Mr. Hall Is Likely To Succeed On The Merits Of His Claims Related To His Batson Claim. ...............................................................28

B. Mr. Hall Is Likely To Succeed On His Claim that the Federal Death Penalty, Particularly as Applied in Texas, Discriminates on the Basis of Race. ...................................................................................34

III. THE BALANCE OF THE EQUITES WEIGHS IN FAVOR OF A STAY. .............................................................................................37

A. Any Perceived Delay Does Not Preclude a Stay ................................37

B. Mr. Hall Will Suffer Irreparable Harm if a Stay Is Not Granted. ........38

C. The Balance of the Equities and the Public Interest Both Weigh in Favor of a Stay. ................................................................................39

D. A Stay Is in the Public Interest. .......................................................40

IV. MR. HALL'S PETITION WARRANTS A STAY OF EXECUTION FOR CONSIDERATION OF HIS CLAIMS. .............................................41

CONCLUSION ..................................................................................42

CERTIFICATE OF COMPLIANCE

CIRCUIT RULE 30(d) CERTIFICATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Behr v. Ramsey*,
230 F.3d 268 (7th Cir. 2000) ...............................................................................4

*Brown v. Rios*,
696 F.3d 638 (7th Cir. 2012) .............................................................................28

*Buck v. Davis*,
137 S. Ct. 759 (2017).....................................................................................26, 36

*Cooey v. Taft*,
430 F. Supp. 2d 702 (S.D. Ohio 2006) ..............................................................40

*Duvall v. Keating*,
162 F.3d 1058 (10th Cir. 1998) ..........................................................................38

*In Re: Federal Bureau of Prisons' Execution Protocol Cases, Roane,
et al., v. Barr, et al.*,
No. 20-5329 (D.C. Cir., Nov. 18, 2020)...............................................................5

*Flowers v. Mississippi*,
139 S. Ct. 2228 (2019).................................................................................14, 31

*Gordon v. Holder*,
632 F.3d 722 (D.C. Cir. 2011)............................................................................38

*Hall v. Barr, et al.*,
No. 1:20-cv-03184-TSC (D.D.C.) .......................................................................6

*Hall v. Barr, et al.*,
No. 20-5340 (D.C. Cir.).......................................................................................6

*Hall v. United States*,
No. 4:00-cv-00422-Y, 2004 WL 1908242 (N.D. Tex. Aug. 24,
2004) ..................................................................................................................10

*Hall v. Watson*,
No. 2:20-cv-00599-JPH-DLP (S.D. Ind.)............................................................3

*Hall v. Watson*,
No. 20-3216 (7th Cir., pending) ...........................................................5

*Harris v. Johnson*,
323 F. Supp. 2d 797 (S.D. Tex. 2004)...............................................40

*Kyles v. Whitley*,
514 U.S. 419 (1995)..............................................................................18

*Lindstrom v. Graber*,
203 F.3d 470 (7th Cir. 2000) ................................................................4

*Mays v. Dart*,
974 F.3d 810 (7th Cir. 2020) ..............................................................18

*McCleskey v. Kemp*,
481 U.S. 279 (1987)..............................................................................36

*Miller-El v. Cockrell*,
537 U.S. 322 (2003).......................................................................14, 30

*Miller-El v. Dretke*,
545 U.S. 231 (2005)........................................................................*passim*

*Minney v. United States Office of Pers. Mgmt.*,
130 F. Supp. 3d 225 (D.D.C. 2015)....................................................41

*Nken v. Holder*,
556 U.S. 418 (2009)..............................................................................18

*McDermott ex rel. NLRB v. Ampersand Pub.*,
LLC, 593 F.3d 950 (9th Cir. 2010)....................................................38

*Pena-Rodriguez v. Colorado*,
137 S. Ct. 855 (2017)......................................................................27, 36

*Purkey v. United States*,
964 F.3d 603 (7th Cir. 2020) ..............................................19, 38, 40

*Reed v. Quarterman*,
555 F.3d 364 (5th Cir. 2009) .......................................................*passim*

*Thompson v. McNeil*,
556 U.S. 1114 (2009)......................................................................................18

*Turner v. Murray*,
476 U.S. 28 (1986)....................................................................................35, 41

*United States v. Hall*,
152 F.3d 381 (5th Cir. 1998), cert. denied, Hall v. United States,
526 U.S. 1117 (1999)......................................................................................10

*United States v. Hall*,
455 F.3d 508 (5th Cir. 2006), cert. denied, Hall v. United States,
549 U.S. 1343 (2007)......................................................................................10

*United States v. Hall*,
No. 4:94-cr-00121-Y, Doc. 958 (N.D. Tex. May 16, 2020) .............................10

*Wainwright v. Booker*,
473 U.S. 935. (1985) (Powell, J., concurring)..................................................39

*Wainwright v. Sykes*,
433 U.S. 72 (1977)..........................................................................................21

*Whitaker v. Kenosha United School Dist. No. 1*,
858 F.3d 1034 (7th Cir. 2017) ........................................................................38

*Williams v. Taylor*,
529 U.S. 420 (2000)..............................................................................23, 24, 26

**STATUTES:**

18 U.S.C. § 924(c) ............................................................................................5

18 U.S.C. § 3593..............................................................................................36

18 U.S.C. § 3593(f)..........................................................................................36

18 U.S.C. § 3595..............................................................................................36

18 U.S.C. § 3595 (c)(1).....................................................................................36

28 U.S.C. §§ 1291 and 2241(a)..........................................................................4

28 U.S.C. §§ 1331 and 2241(a)..........................................................................4

28 U.S.C. § 2241 ......................................................................*passim*

28 U.S.C. § 2253(c)(1)(A)–(B) ..............................................................4

28 U.S.C. § 2255 ....................................................................*passim*

## INTRODUCTION

Plaintiff Orlando Cordia Hall ("Mr. Hall") is a death-sentenced federal prisoner incarcerated at the United States Penitentiary, Terre Haute ("USP Terre Haute"), and scheduled to be executed tomorrow (November 19, 2020). Mr. Hall is Black. Every juror who convicted and sentenced him to death was White. This was no accident. Instead, it was the end result of a plan to minimize or exclude the presence of Black citizens on Mr. Hall's jury, a plan set in motion and actualized by two Assistant United States Attorneys ("AUSAs"), Richard Roper and Paul Macaluso, the latter of whom would later be found—by two different courts (including the United States Supreme Court)—to have violated *Batson v. Kentucky* in two other capital cases).

AUSAs Macaluso and Roper used peremptory strikes to remove four of five qualified Black jurors from Mr. Hall's jury (while knowing the defense would almost certainly strike the fifth due to her pro-death penalty views). But it was not until years after Mr. Hall's trial, and after Hall's § 2255 petition was denied, that AUSA Macaluso was outed as adjudicated a serial *Batson* violator.

On top of the tainted jury selection process in Mr. Hall's case, new evidence now shows that at the time he was tried, the application of the federal death penalty writ large, and as applied to Mr. Hall, is impermissibly influenced by race, in violation of the Fifth and Eighth Amendments, as well as the Federal Death

1

Penalty Act ("FDPA"). Since Mr. Hall's § 2255 petition was adjudicated, new statistical evidence has emerged showing that Black defendants eligible for the federal death penalty are significantly more likely to have the death penalty requested by prosecutors, authorized by the Department of Justice, and meted-out by a jury, and that all of these disparities are even more pronounced in Texas, where Mr. Hall was charged and tried. The statistical disparities are too stark to be explained away as mere happenstance, rather than racial discrimination. This evidence was not known or reasonably available to Mr. Hall during the pendency of his trial, direct appeals, or initial § 2255 petition.

No court has ever heard or considered the myriad was that racial bias distorted Mr. Hall's trial, conviction, and death sentence. And if the decision of the Court below is permitted to stand and Mr. Hall's execution is permitted to proceed as scheduled, no court ever will. The district court's decision is the epitome of a hindsight-is-2020 approach, and ignores the practical and very real constraints that prevented Mr. Hall from discovering and developing this evidence at the time he litigated his § 2255 petition. This is wrong, both factually and legally, and this Court must correct it. Mr. Hall's claims that his death sentence is the impermissible product of racial bias is far too important to be cast aside so blithely.

The lower court agrees that Mr. Hall has raised issues that are "extremely serious." But if the district court's ruling stands, Mr. Hall will be put to death without any court ever having reviewed them. Executing Mr. Hall without permitting him time to litigate his claims would be a fundamental miscarriage of justice. Race discrimination is so pernicious, so nefarious, and contrary to our values that any amount in a criminal trial is manifestly unjust that tolerating its influence in any criminal case, let alone one that will end in an execution, is manifestly unjust.

The lower court thus abused its discretion in declining to stay Mr. Hall's execution to allow him to litigate the "extremely serious" claims he has raised, and that decision should be reversed.

For the same reasons, Mr. Hall further moves this Court to stay his execution pending to permit him to litigate this appeal. A stay is warranted here because (i) Mr. Hall is likely to succeed on the merits of his appeal; (ii) he will suffer irreparable harm in the absence of a stay; (iii) the balance of the equities favor a stay; and (iv) the public interest would not be served by permitting Mr. Hall's execution to go forward while important constitutional questions remain regarding the imposition of his death penalty sentence. Executing Mr. Hall before he can fully and fairly litigate the merits of his appeal would be a miscarriage of justice this Court can, and must, prevent.

## JURISDICTIONAL STATEMENT

Mr. Hall seeks review of the district court's November 17, 2020 final judgment denying his petition for a writ of habeas corpus under 28 U.S.C. § 2241. App. 001-22.[1] Mr. Hall timely filed a Notice of Appeal on November 17, 2020. Dist. Ct. Dkt. 19.[2] Mr. Hall further sought a stay pending appeal and a stay pending resolution of his stay application with the Seventh Circuit, Dist. Ct. Dkt. 23, which the lower court denied on November 18, 2020. Dist. Ct. Dkt. 25.

Because the appeal is from a § 2241 petition, there is no requirement of a Certificate of Appealability, and none is attached hereto. 28 U.S.C. § 2253(c)(1)(A)–(B); Cir. R. 22(h)(3); *Lindstrom v. Graber*, 203 F.3d 470, 473 (7th Cir. 2000) (observing certificates of appealability are not required in habeas corpus cases brought solely under 28 U.S.C. § 2241); *Behr v. Ramsey*, 230 F.3d 268, 270 (7th Cir. 2000) (same). The district court had jurisdiction over Mr. Hall's petition under 28 U.S.C. §§ 1331 and 2241(a). This Court has jurisdiction to hear this appeal under 28 U.S.C. §§ 1291 and 2241(a).

## STATEMENT OF THE ISSUES

---

[1] All citations to "App." Refer to Petitioner-Appellant's Appendix, which is attached at the back of this brief.

[2] Citations to the proceedings below—*Hall v. Watson*, No. 2:20-cv-00599-JPH-DLP (S.D. Ind.)—are cited as "Dist. Ct. Dkt." unless otherwise referenced.

1.      Whether the district court erred in determining that Mr. Hall could not bring his claims under § 2241 when he presented evidence that was not only new, but also provided "something more" in that it went to the core of Mr. Hall's constitutional right to equal protection under the law.

2.      Whether the district court erred in determining that Mr. Hall had failed to make a sufficient showing of a likelihood of success on the merits of his *Batson* claim because it concluded (without an evidentiary basis) that his counsel should have discovered evidence of prosecutorial misconduct at some point in the past and presented it either on appeal of in § 2255 proceedings and, accordingly, § 2241 did not provide a pathway to present the claim now.

3.      Whether the district court erred in determining that Mr. Hall's claim regarding racial discrimination in application of the federal death penalty in Texas was foreclosed by the fact that the new studies he cited were available to him during his original habeas proceedings, or in the alternative based on the precise opposite of that:  on the basis that this information was available to him.

4.      Whether the district court erred in determining that the balance of the interests weighs against staying Mr. Hall's execution.

**STATEMENT OF RELATED CASES OR PROCEEDINGS**

Mr. Hall was a plaintiff in a lawsuit brought in the U.S. District Court for the District of Columbia challenging the lethal injunction protocol the government will

use for his execution. That case has just been decided by the United States Court of Appeals for the District of Columbia. *See In Re: Federal Bureau of Prisons' Execution Protocol Cases, Roane, et al., v. Barr, et al.,* No. 20-5329 (D.C. Cir., November 18, 2020). Mr. Hall anticipates seeking review in the Supreme Court.

Mr. Hall has a separate appeal pending before this Court from the dismissal of a separate petition for writ of habeas corpus under 28 U.S.C. § 2241 by the United States District Court for the Southern District of Indiana, challenging his conviction under 18 U.S.C. § 924(c). *Hall v. Watson*, No. 20-3216 (7th Cir., pending). Briefing in that appeal is complete. Mr. Hall has requested a stay of execution pending the resolution of that appeal; his stay motion remains pending.

Mr. Hall also filed a civil action in the United States District Court for the District of Columbia challenging the scheduling of his execution in the midst of a pandemic under a shortened timeframe on the grounds that he was denied certain enumerated constitutional and statutory rights. *Hall v. Barr, et al.*, No. 1:20-cv-03184-TSC (D.D.C.). On November 16, 2020, the district court denied Mr. Hall injunctive relief and Mr. Hall appealed. *Hall v. Barr, et al.*, No. 20-5340 (D.C. Cir.) That appeal is pending.

**STATEMENT OF THE CASE**

**A.     During Mr. Hall's Trial, Prosecutors Struck Qualified Prospective Black Jurors on the Basis of Their Race in Violation of the Fifth Amendment and *Batson v. Kentucky*.**

After strikes for cause, five qualified Black venire members remained in the pool from which the jury was struck. The defense predictably struck one Black juror because of her staunchly held views on the death penalty, and the government peremptorily struck the remaining four. As a result, Mr. Hall, who is Black, was convicted and sentenced to death by an all-White jury. Mr. Hall's defense counsel, Michael Ware, raised a *Batson* challenge at trial. *See generally* Dist. Ct. Dkt. 1-11 (*Batson* hearing transcript). In response, the government provided ostensibly "neutral" reasons for its strikes, though reasons that the record demonstrates were pretextual. The government further represented that it had only exercised its peremptory strikes after unsuccessfully challenging each of these four jurors as unqualified to sit on a capital jury. This was not true; the government had previously challenged only two of these jurors. *Id.* at 8:17-20. And of the two jurors not previously challenged, the evidence proffered is disproven by the record.

The first of these jurors, Amy Evans, wrote in her jury questionnaire that she was in favor of the death penalty "depend[ing] on the nature of the crime," that it was appropriate for "brutal senseless murders," and that it served "as a means of deterrent from committing the crime." Dist Ct. Dkt. 1-14 at Q.46, Q.48, Q.52a.

7

She testified that even if the option of a life sentence without parole was available, she could vote for the death penalty. Dist. Ct. Dkt. 1-13 at 92:8-20, 93:4-6. Despite this, the government used a peremptory strike on Ms. Evans, claiming that she "was very, very hesitant on her views on the death penalty." Dist. Ct. Dkt. 1-11 at 11:4-6. But the government seated other jurors who gave similar testimony.

The government also stated that Ms. Evans "had very long pauses in her answers and was very hesitant in what she said," which the record does not support. *Id.* at 11:8-9. And the prosecutor claimed that he was "concerned" that Ms. Evans had two brothers-in-law in prison, even though he asked her no questions about this topic, *id.* at 11:1-3, and seated multiple non-Black jurors with family members either currently in or released from prison, *see, e.g.*, Dist. Ct. Dkt. 1-23 at Q.73 (questionnaire of Mary Ann Herring indicating son-in-law "accused, arrested, indicted, charged by any means" or convicted" of a crime).

The second potential juror, Billie Lee, wrote in her questionnaire that she favored the death penalty for "extremely brutal" crimes and it should be available for "child molesters who kill their victims." Dist. Ct. Dkt. 1-29 at Q.45, Q.48. She testified that it was warranted for "[a]nything that involves children, murder of children, [and] cruelty to children." Dist. Ct. Dkt. 1-13 at 125:16-19. She also testified that, though she might initially lean toward a life sentence over death, she could impose a death sentence "depend[ing] on evidence, the cruelty of the act, all

8

of that would have to be considered." *Id.* at 127:19-21.  The government used a peremptory strike on Ms. Lee, claiming that her questionnaire indicated she did not believe in the death penalty but could assess it.  Dist. Ct. Dkt. 1-11 at 12:11-13:25.  However, the prosecution seated multiple White jurors who indicated misgivings about capital punishment.  *See, e.g.*, Dist. Ct. Dkt. 17 at 172:13-18; Dist. Ct. Dkt. 24 at Q.47.

The government also proffered as a reason to exclude Ms. Lee that she was "on a prior jury trial for robbery and found the defendant not guilty."  Dist. Ct. Dkt. 1-11 at 13:18-19.  Not only was this wrong, but the government actually *accepted* another juror who had served on a prior jury and acquitted a defendant charged with *murder*.  *See* Dist. Ct. Dkt. 1-32 at Q.87; Dist. Ct. Dkt. 1-33 at 91:9-14, 98:2-7.  Upon noticing this mistake, the prosecutor instead claimed that Ms. Lee was struck because she "had a brother-in-law who was a criminal defense attorney, which caused me some concern."  Dist. Ct. Dkt. 1-11 at 14:5-9.  But the prosecution asked Ms. Lee no questions about this topic, which belies a claim that it actually caused the government any concerns. *See Miller-El II*, 545 U.S. at 246 ("[F]ailure to engage in any voir dire on a subject the [government] alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.").  Moreover, the government seated another juror—who is White—whose brother was a public defender.  Dist. Ct. Dkt. 1-32 at Q.75.

9

**B. Mr. Hall's Trial, Conviction, and Post-Conviction Proceedings**

Trial proceeded from October 24–31. The defense presented no evidence and waived closing argument. On October 31, 1995, the all-White jury convicted Mr. Hall of all counts. The penalty phase commenced the following morning. From November 1–3, the same all-White jury heard testimony and argument regarding his sentence. On November 6, 1995, the jury recommended the death penalty.

The District Court entered judgment on February 12, 1996, formally sentencing Mr. Hall to death. It imposed a sentence of life imprisonment for the conspiracy conviction, and sixty-month sentences for each of the remaining two counts. Mr. Hall appealed and the Fifth Circuit affirmed, *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), cert. denied, *Hall v. United States*, 526 U.S. 1117 (1999), denying rehearing on October 1, 1998. In May 2000, Mr. Hall moved to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. *United States v. Hall*, No. 4:94-cr-00121-Y, Doc. 958 (N.D. Tex. May 16, 2020). The District Court ultimately denied his claims. *Hall v. United States*, No. 4:00-cv-00422-Y, 2004 WL 1908242, at *37 (N.D. Tex. Aug. 24, 2004). Mr. Hall sought permission to appeal from both the District Court and the Fifth Circuit. Leave to appeal was denied. *United States v. Hall*, 455 F.3d 508 (5th Cir. 2006), cert. denied, *Hall v. United States*, 549 U.S. 1343 (2007).

### C. Mr. Macaluso's Adjudicated History of Racial Bias.

Less than one year after Mr. Hall's 28 U.S.C. §2255 petition was resolved, the United States Supreme Court decided *Miller-El II*, where it held that the prosecutors, including Paul Macaluso (mentioned ten times in the majority opinion), had struck Black jurors on the basis of their race and then attempted to evade *Batson*'s strictures by proffering pretextual reasons for those strikes.. Macaluso was a key member of Mr. Hall's prosecution team and played a pivotal role in the selection of Mr. Hall's jury. The *Miller-El* trial took place prior to Mr. Hall's trial.

Of particular importance, the Supreme Court credited evidence that the Dallas County District Attorney's Office—where Macaluso trained and practiced for 15 years—"had adopted a formal policy to exclude minorities from jury service. . . . A manual entitled 'Jury Selection in a Criminal Case' [sometimes known as the Sparling Manual] was distributed to prosecutors. It contained an article authored by a former prosecutor (and later a judge) under the direction of his superiors in the District Attorney's Office, outlining the reasoning for excluding minorities from jury service." *Miller-El*, 545 U.S. at 264 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003)) ("*Miller-El I*").

The Sparling manual's discriminatory policy is unequivocal. It recommended the following:

11

a. "You are not looking for any member of a minority group which may subject him to oppression – they almost always empathize with the accused."

b. "Look at the panel out in the hall before they are seated. You can often spot the show-offs and the liberals by how and to whom they are talking."

c. "I don't like women jurors because I can't trust them. . . . Young women too often sympathize with the Defendant; old women wearing too much make-up are usually unstable, and therefore are bad State's jurors. It is impossible to keep women off your jury, but try to keep the ratio at least seven to five in favor of men."

d. "Race. Minority races almost always empathize with the Defendant."

e. "Jewish veniremen generally make poor State's jurors. Jews have a history of oppression and generally empathize with the accused."

Macaluso trained and practiced in the Dallas County District Attorney's Office between 1973 and 1988. April Castro, Race Is Key in Death Penalty Appeal, Midland Reporter-Telegram (Feb. 15, 2002 6:00 pm CST), https://www.mrt.com/news/article/Race-Is-Key-in-Death-Penalty-Appeal-7756301.php. The Sparling manual was in distribution at the District Attorney's Office during this time. As explained herein, the Supreme Court and Fifth Circuit

have both found that Macaluso's connection to the Sparling manual is persuasive history to consider when analyzing whether his actions constituted a *Batson* violation, and it must be considered here too.

In addition to the Sparling manual, the *Miller-El II* Court also noted that "[t]he prosecutors used their peremptory strikes to exclude 91% of the eligible African–American venire members . . . . Happenstance is unlikely to produce this disparity."

The Court also instructed that a "side-by-side comparison[] of some black venire panelists who were struck [with] white panelists allowed to serve" is "more powerful than . . . bare statistics." Thus, "[i]f a prosecutor's proffered reason for striking a Black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." *Miller-El II*, 545 U.S. 241. And the side-by-side comparisons showed the state had struck Black panel members but accepted White panel members offering similar testimony. *Id.* at 244-45.

Ultimately, the *Miller-El II* Court held that the "chosen race-neutral reasons for the [peremptory] strikes do not hold up and are so far at odds with the evidence that pretext is the fair conclusion, indicating the very discrimination the explanations were meant to deny." *Miller-El II*, 545 U.S. at 265.

Four years later, the same evidence that led the *Miller-El* Court to find that Macaluso had violated *Batson* also convinced the Fifth Circuit that Macaluso had engaged in racial bias in jury selection in yet another case. *See Reed v. Quarterman*, 555 F.3d 364, 371 n.3 (5th Cir. 2009) ("One of the same lawyers that conducted the voir dire in Miller–El's case, Paul Macaluso, also questioned prospective jurors for Reed's trial"). The *Reed* Court specifically noted that given "the historical evidence of racial bias among the[] prosecutors," including Macaluso, "we view this exact same evidence as persuasive here." *Id. See also Flowers v. Mississippi*, 139 S. Ct. 2228, 2246, (2019) ("The State's actions in [prior] trials necessarily inform our assessment of the State's intent going into [the trial on review.] We cannot ignore that history. We cannot take that history out of the case."). The *Reed* trial, too, took place before Mr. Hall's trial.

*Miller-El II* was the first case to capture the breadth of the Sparling manual and—critically—to tie it specifically to Paul Macaluso. While *Miller-El I* made passing reference to the manual, 537 U.S. at 334-35, the question before the Court was only whether the state trial court erred in refusing to consider the manual. The Court specifically stated that it "may or may not be the case" that a *Batson* violation could be established. Id. at 348. It was not until *Miller-El II* that Macaluso was identified by name, and that the manual was found to have informed the voir dire process. *See Miller-El II*, 545 at 266 ("If anything more is needed for

an undeniable explanation of what was going on, history supplies it."). Both *Miller-El II* and *Reed*, however, were decided after Mr. Hall's 28 U.S.C. § 2255 petition was denied. 545 U.S. 231 (2005); 555 F.3d 364 (5th Cir. 2009). Consequently, evidence of Macaluso's racial bias was not reasonably known to Mr. Hall during the pendency of his trial, direct appeal, or initial § 2255 proceeding.

> **D.** **The Federal Death Penalty Is Applied in a Racially-Discriminatory Manner, Particularly in Cases Arising Out of Texas Federal Courts.**

A statistical analysis of all criminal defendants eligible for the federal death penalty in Texas between 1988 (when the federal death penalty was reinstated) and 2010, conducted by an expert sociologist whose research focuses on how the death penalty is applied, shows that the federal death penalty, as applied, in Texas is disproportionately meted-out based on race. *See* Dist. Ct. Dkt. 5, Declaration of Scott Phillips ("Phillips Decl.").

For example, federal prosecutors in Texas were nearly **<u>six times</u>** more likely to request authorization to seek the death penalty against a Black defendant than a non-Black defendant. *Id.* ¶ 7. Authorization was nearly **<u>eight times</u>** more likely to be granted in cases with a Black defendant than a non-Black defendant. *Id.* And a death verdict was nearly **<u>sixteen times</u>** more likely to be rendered in a case with a Black defendant than a non-Black defendant. *Id.* In the Northern District of

Texas, where Mr. Hall was sentenced, the racial disparity was consistent with that seen across all four Texas federal districts and even "slightly greater.". *Id.* ¶ 8. As Dr Phillips explains, this disparity is almost certainly too extreme to have a benign explanation, and it is highly unlikely that any race-neutral factor could explain why Black defendants were sixteen times more likely to be sentenced to death than non-Black defendants. *Id.* ¶ 11. This expert analysis, however, was not available at the time of Mr. Hall's trial, appeal and § 2255 proceedings. The expert statistical analysis itself was not conducted until 2011—more than six years after Mr. Hall's § 2255 petition was denied. And it did not become publicly available until August 2020. This statistical analysis was therefore unavailable to Mr. Hall during the pendency of those proceedings and did not become available until very recently.

## SUMMARY OF ARGUMENT

The district court's denial of Mr. Hall's motion for a stay should be reversed. There was no basis upon which the court could find that the evidence presented in Mr. Hall's 2241 petition was available to him, and so the court's initial basis for determining that Mr. Hall's claims are barred was based on a false premise. Rather, Mr. Hall has raised new evidence touching on fundamental constitutional errors in both his sentence and administration of the death penalty. This is precisely the sort of The district court abused its discretion in denying Mr. Hall's motion for a stay." There was no basis for the could to find that the evidence

16

presented in Mr. Hall's § 2241 petition was available to him when he litigated his § 2255 petition, and so the court's initial basis for determining that Mr. Hall's claims are not cognizable on § 2241 review was predicated on a false premise. The "extremely serious" claims that Mr. Hall has raised, App. 021—both of which show that racial bias infected Mr. Hall's trial, conviction, and sentence—are based on precisely the sort of new evidence that this Court has held permits § 2241 review. *See Webster*, 784 F.3d at 1142 (noting that "new records shed additional light" on petitioner's claims).

Having cleared that procedural hurdle, Mr. Hall has demonstrated that a stay of his execution is warranted to allow him a full and fair opportunity to litigate these important claims.

*First*, the prosecutors who picked the all-White jury that convicted Mr. Hall and sentenced him to die—one of whom was Paul Macaluso, of *Miller-El* infamy—exercised peremptory strikes on the basis of race in violation of *Batson v. Kentucky*. These AUSAs struck four out of five Black qualified potential jurors (while knowing the defense would strike the fifth on account of her staunch pro death penalty views). The reasons they proffered for these strikes were (i) facially and factually untrue, (ii) disproven by a side-by-side comparison with White jurors they accepted for service, or (iii) both. But, as many courts have recognized, a cold trial record is all too often insufficient to prevail under *Batson*. And it was not

until years after Mr. Hall's trial, and after his § 2255 petition had been denied, that new evidence confirming what was going on during voir dire emerged. In its decision in *Miller-El II,* the Supreme Court identified AUSA Macaluso by name ten times, tying him—for the first time—to the racist "Sparling Manual" and expressly finding that the reasons he gave for the strikes in that case were pretextual and untrue. Several years later, on the basis of the same evidence, the Fifth Circuit reached a similar conclusion in *Reed v. Quarterman*. Mr. Hall's claim here, too, rests on that same evidence, and shows that he is likely to succeed on the merits of his *Batson* claim.

*Second*, Mr. Hall has come forward with new evidence that the death penalty is applied in an impermissibly race-based manner. That evidence demonstrates that Black defendants, like Mr. Hall, are far more likely to be sentenced to death (among other things) as compared to White defendants. While the raw data supporting these analyses may have been theoretically available to Mr. Hall at the time of his § 2255 petition, the analysis did not. As a result, Mr. Hall could not have conceivably brought forward this evidence until now.

When properly weighing all the factors, including the Mr. Hall's likelihood of success on his claims, a stay of execution is warranted and the district court abused its discretion in finding otherwise, particularly when balanced against the indisputable fact that Mr. Hall will suffer irreparable injury if his execution is not

18

stayed, for he will be deprived of any meaningful opportunity for review of his serious constitutional claims.

## STANDARD OF REVIEW

In reviewing a district court's denial of a motion for stay of execution, appellate courts must analyze the district court's weighing of four factors: (1) whether the movant has shown that he is likely to succeed on the merits; (2) whether he is likely to suffer irreparable harm in the absence of relief; (3) whether the balance of the equities tips in his favor; and (4) whether an injunction is in the public interest. *See Nken v. Holder*, 556 U.S. 418, 436 (2009). *Id.* When the Government is the non-moving party, the last two factors merge. *Id.* "While [this Court] review[s] the district court's balancing of the harms for an abuse of discretion, [it] review [the] legal conclusions de novo and [the] findings of fact for clear error." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). "[A] factual or legal error may alone be sufficient to establish that the court abused its discretion in making its final determination." *Id.* (quoting *Lawson Prod., Inc. v. Avent, Inc.*, 782 F.2d 1429, 1437 (7th Cir. 1986)).

In capital cases, courts are "dutybound to 'insure that every safeguard is observed' when 'a defendant's life is at stake.'" *Thompson v. McNeil*, 556 U.S. 1114, 1116 (2009) (quoting *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)). The "duty to search for

19

constitutional error with painstaking care is never more exacting than it is in a capital case." *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (internal quotation marks omitted).

## ARGUMENT

**I. THE SAVINGS CLAUSE APPLIES TO MR. HALL'S § 2241 PETITION**

    **A.    The Savings Clause Is an Appropriate Vehicle to Bring Claims Arising from Unconstitutional Racial Bias.**

This Court has recognized that the outer boundaries of availability of § 2241 have not been determined. *Purkey v. United States*, 964 F.3d 603, 611-12 (7th Cir. 2020) (admonishing that existing cases do not "rigidly describe the outer limits of what might prove that section 2255 is 'inadequate or ineffective to test the legality' of a person's detention."). The district court correctly recognized this, *See* App. 018, but failed to see that Hall has been unable "to use section 2255 to cure a fundamental problem." *Purkey*, 964 F.3d at 615. To show that a petition under § 2241 is available, the District Court asks Hall to demonstrate that "(1) there is a 'structural problem' with § 2255 that prevented him from raising the issues that he presents in this case and (2) he would be entitled to relief on the merits if the issues he raises were relitigated." *See* App. 007–008 (citing *Lee v. Watson*, 2019 WL 6718924, at *1 (7th Cir. Dec. 6, 2019).

20

The district court mischaracterizes Mr. Hall's § 2241 petition as bringing a claim that should have been litigated under § 2255 and fails to apply the correct standard to counsel's diligence in assessing whether evidence was reasonably available to them. If the district court had applied the correct standard of diligence to assess whether the evidence was previously available to counsel, it would have determined that the evidence of racial bias is "newly available." The district court further errs in suggesting that Mr. Hall's petition is simply seeking to correct an "error in the resolution of a collateral attack[.]" *See* App. 020 (quoting *Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002)). Hall has never had the opportunity to present the key evidence of Macaluso's outrageous conduct that has already led to two convictions being overturned in *Reed* and *Miller-El II*. As in *Webster*, the evidence serving as the lynchpin of the § 2241 petition's claim—the missing Social Security Administration records for Mr. Webster, the pattern of Macaluso's *Batson* violations for Mr. Hall—have never been presented to any judge or jury.

The structural problems in the present case trace directly to *Webster v. Daniels*. Like the petitioner in *Webster*, Hall has proffered new evidence demonstrating a substantial constitutional error in his conviction, but not one that goes to the petitioner's guilt of the crime charged. *See Webster*, 784 F.3d at 1138–40. Section 2255 is unavailable for Hall, as the new evidence was unavailable at the time of his initial § 2255 motion, as discussed below, and § 2255(h) would not

21

permit him to present this evidence as part of successive § 2255 motion because it neither undercuts "the movant['s] guilt[ ]" nor relies on a "new rule of constitutional law." Dist. Ct. Dkt. 1 at 17 (quoting 28 U.S.C. §§ 2255(h)(1)-(2)). That § 2255 would not permit Mr. Hall to bring new evidence of a constitutional violation at his trial demonstrates the "structural problem" preventing Hall from vindicating his constitutional rights.

Moreover, even assuming the evidence could have been discovered and presented at the time of Mr. Hall's § 2255 proceeding, § 2241 nonetheless should be available given the nature of Mr. Hall's claims. Racial bias in a criminal trial is so antithetical to constitutional values and so damaging to the appearance and actuality of justice that the Supreme Court has gone to great lengths to repeatedly condemn it. Because the execution of a death sentence imposed on the basis of racial discrimination works a fundamental "miscarriage of justice" upon that defendant, *see Wainwright v. Sykes*, 433 U.S. 72, 91 (1977), a habeas petitioner may prevail if he puts forth evidence tending to show that his case satisfies the "miscarriage-of-justice exception."

### B. The Evidence Hall Proffers is "Newly Discovered" and Counsel was Reasonably Diligent in Seeking Such Evidence.

The evidence that Hall seeks to present in his § 2241 petition is "newly discovered" in that it "existed at the time of the original proceedings" and was

"unavailable at the time of trial despite diligent efforts to obtain it." *Webster*, 784 F.3d at 1140 n.9.  As argued below, the import of this evidence is of sufficient severity to warrant access to § 2241 through the path of *Webster*, even though the evidence demonstrates racism infected his death sentence, as opposed to evidence of his intellectual capacity. *Id*.

The district court concluded that that Mr. Hall's counsel was not diligent in their efforts on the perverse basis that they did not actually discover evidence of Macaluso's history or obtain the funds required to hire an expert to conduct a statistical analysis of data relating to the use of the death penalty.  With the benefit of hindsight and modern technological capabilities, the district court faults counsel for failing to undertake essentially what would have been a fishing expedition— and likely one funded out of their own pockets. *See* App. 012–013. Furthermore, the district court found that statistical analysis can essentially never be brought in a habeas corpus petition under *Webster*, finding that the underlying facts supporting the analysis were available to counsel at trial, *id.* at 17, and that a later statistical analysis would be impermissible as not existing "at the time of the original proceedings," *id,* at 16.

## 1. Information Regarding Macaluso's Racist Conduct was not Reasonably Accessible to Counsel.

Information regarding Macaluso's connection to the Sparling Manual and the bigoted policies of the Dallas District Attorney's Office were not within the realm of evidence "reasonably available" to Hall's counsel. Though the trial record indicated that a potential *Batson* violation had occurred, there was no specific evidence from the face of the trial record relating specifically to Macaluso or his time at the Dallas District Attorney's office. Nothing drew his widespread misconduct to the attention of counsel until *Miller-El II*, which expressly linked Macaluso to such racist practices. While this evidence existed prior to Hall's trial and initial § 2255 motion, none was within the reasonable reach of his counsel.

In determining whether Hall's counsel were "diligent" in their efforts to obtain evidence, the District Court imposed too great a burden, particularly framed with the benefit of hindsight. This Court has explained that "[d]ue diligence . . . means reasonable diligence, not the maximum feasible diligence." *Webster v. Watson*, 975 F.3d 667, 683 (7th Cir. 2020) (quotation omitted). "Where counsel travels a path of particular inquiry and encounters information suggesting that "further investigation would [be] fruitless," limiting the investigation is reasonable." *Id*. (citing *Wiggins v. Smith*, 539 U.S. 510, 525 (2003)). This standard does not "force defense lawyers to scour the globe on the off chance

24

something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (citing *Wiggins*, 539 U.S. at 525). Hall's counsel was therefore only required to engage in the due diligence that was reasonable within their judgement at the time.

Similarly, in analyzing whether counsel is diligent for purposes of § 2254(e)(2),[3] the Supreme Court has determined that "[t]he question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts." *Williams v. Taylor*, 529 U.S. 420, 435 (2000). In that context, "[d]iligence . . . depends upon whether the prisoner made a reasonable

---

[3] Section 2254(e)(2) reads as follows:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

attempt, in light of the information available at the time, to investigate and pursue claims." *Id.*

While the lower court suggests that Mr. Hall could found evidence of Mr. Macaluso's wrongdoings before *Miller-El II* through "searches on the Internet and legal database" for "[n]ews articles, court opinions, and underlying briefs," Dist. Ct. Dkt 18 at 13, this ignores that Mr. Hall's trial and initial § 2255 motion were filed nearly 20 years ago. Today—in 2020—the court had ready access to an internet connection and legal databases to find news articles and other information. But this was not the case in 1995 when Mr. Hall was tried. As of June 1995, only 14 percent of Americans had accessed the Internet (and 42% of Americans had ever heard of it). Susannah Fox & Lee Rainie, *How the Internet Has Woven Itself into American Life*, Pew Research Ctr. (Feb. 27, 2014), https://www.pewresearch.org/internet/2014/02/27/part-1-how-the-internet-has-woven-itself-into-american-life.

And while online access increased by the time of Mr. Hall's direct appeal (1996) and initial § 2255 motion (1999), *id.*, the Internet was still in its nascent stages. That the district court currently has the ability to conduct such searches, and that the information it found is *currently* readily available on the Internet, does not demonstrate that the necessary tools or the currently available information were available to counsel at the time of the § 2255 proceedings. The district court's

26

factual finding that the tools and information were available is a factfinding made with the complete absence of proof.

Moreover, a reasonably diligent investigation did not require counsel to examine Paul Macaluso's employment history and then connect that employment history to press coverage about Mr. Macaluso's previous office. In fact, the Supreme Court has essentially expressly rejected the district court's analysis below. In *Williams*, the Court reversed the decision of the court of appeals finding that habeas counsel had not been diligent in failing to discover a relationship between two jurors, which was "a matter of public record." The court of appeals had found that "because [petitioner's] federal habeas counsel located those documents, there is little reason to think that his state habeas counsel could not have done so as well")." The Supreme Court rejected this out of hand, stating: "We should be surprised, to say the least, if a district court . . . were to hold that in all cases diligent counsel must check public records containing personal information pertaining to each and every juror." The same , of course, holds true for the employment history of the prosecutor. And the supposed lack of diligence is further undermined by the fact that the information that habeas counsel ]

## 2. Statistical Analysis of the Death Penalty was not Available at Trial, though Underlying Facts Existed

The district court's determination that § 2241 is not an available avenue for Mr. Hall to bring his claims based on discrimination in application of the federal death penalty is the very definition of a Catch-22. On the one hand, the district court says that Mr. Hall is precluded from raising this claim because it is based on evidence—a statistical analysis showing extreme racial bias in the application of the federal death penalty in Texas (the "Phillips Declaration")—that did not exist at the time of Mr. Hall's "original proceedings." Dkt. 18 at 16 ("The evidence in support of Mr. Hall's discriminatory application claim runs afoul of *Webster*'s first requirement: "the evidence sought to be presented must have existed at the time of the original proceedings."). On the other hand, the district court says that "[t]o the extent Mr. Hall" instead wishes to rely on the "underlying data," he cannot do that either because such evidence *was* available at the time of Mr. Hall's original proceedings. *Id.* at 17. If the district court's analysis is correct, then there simply is no avenue for Mr. Hall to obtain review of the racial discrimination that infected his trial process; the courthouse doors would instead be forever closed to these "extremely serious" claims. App. 021. That would be a fundamental miscarriage of justice.

The district court also abused its discretion in discounting substantial evidence that counsel lacked the resources that would have been required conduct a statistical analysis at the time Mr. Hall filed his § 2255 petition. The court acknowledged that Mr. Hall's counsel faced very "real" resource limitations at "trial, on appeal, and in litigating his initial § 2255 motion." App. 018. Statistical analyses require more than a lay person's access to data: They require an expert to examine and probe the relevant data. And such experts must be compensated. Counsel for Mr. Hall requested funding for such analysis, but were denied. Dist. Ct. Dkt. 1 at 43. Under *Williams*, it is sufficient that counsel sought funds to undertake investigation and review of the facts. 529 U.S. at 442–43. The District Court thus erred in finding that the evidence proffered here is not "newly discovered" such that it is cognizable on § 2241 review

### C. Precluding Mr. Hall's Claims Constitutes a Miscarriage of Justice.

The evidence that Hall seeks to proffer is of a character that cannot be ignored. Mr. Hall was convicted and sentenced to death by an all-White jury, crafted by a prosecutor trained to exclude minority jurors. "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Buck v. Davis*, 137 S. Ct. 759 (2017) (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)). The Supreme Court has specifically found that "[p]ermitting

racial prejudice in the jury system damages 'both the fact and the perception' of the jury's role as 'a vital check against the wrongful exercise of power by the State.'" *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 868 (2017) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

Indeed, the Court continues to move closer to recognizing that where a procedural rule would otherwise block consideration of a substantial claim of racial bias, that technical requirement must yield to "the imperative to purge racial prejudice from the administration of justice." *Pena-Rodriguez*, 137 S. Ct. at 867 (emphasis added). That overriding commitment to enforcing equal justice was the clear message of *Pena-Rodriguez*, where the Court held that the longstanding "no-impeachment rule" prohibiting jurors from testifying about their deliberations must yield where such testimony might show that the proceedings were affected by racial bias. Only thus, the Court explained, can our "maturing legal system" demonstrate that it seeks "to understand and to implement the lessons of history," a matter of increasing and urgent nationwide concern in the present historical moment. *See Pena-Rodriguez*, 137 S. Ct. at 871. In this context, the evidence that Hall seeks to present would overwhelming demonstrate that his death sentence was obtained in violation of the Constitution's prohibitions on racial discrimination. The gravity of racial discrimination outweighs concerns related to choice of venue or judicial economy. The District Court examined Congress's intent in passing the

Antiterrorism and Effective Death Penalty Act ("AEDPA") to interpret the "savings clause . . . in light of [§ 2255's] history."  App. 019 (quotation omitted).  While legislative history is often informative, to find that the savings clause does not permit a petitioner to bring evidence of systemic racism before the courts would be in error.  The history—and present state—of our Nation makes that error clear.  The AEDPA's safety valve in § 2255(e) is designed to prevent a "miscarriage of justice." *Brown v. Rios*, 696 F.3d 638, 640 (7th Cir. 2012) (citation omitted).  Executing a person on the basis of their race is entirely "intolerable" under any concept of justice and equality and inflicts fundamental damage on a legal system. *Webster*, 784 F.3d at 1139. The District Court below erred in finding that the safety valve in § 2255 does not open to provide access to § 2241 for a petition presenting evidence of racial discrimination in the context of a death sentence.

## II.   MR. HALL IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.

### A.   Mr. Hall Is Likely To Succeed On The Merits Of His Claims Related To His Batson Claim.

Mr. Hall is likely to prevail on the merits of his Batson claim.  Racism thoroughly contaminated the jury selection process in Mr. Hall's trial: the government chose to prosecute Mr. Hall in a forum with a paltry non-Black jury pool; employed a serial Batson violator to pick the jury and prosecute the case; and

gave pretextual reasons for striking the few qualified Black jurors who made it to voir dire; the result was that Mr. Hall was convicted and sentenced to death by an all-White jury engineered by the prosecution. Despite compelling evidence that impermissible racial bias guided the prosecutors selecting Mr. Hall's all-White jury, the District Court's decision fails to grapple with the compelling evidence brought forward by Mr. Hall that he would be able to establish a likelihood of success on his *Batson* claim. Accordingly, the Court should reverse the district court's denial of Mr. Hall's motion for a stay.

The first step in the government's strategy to dilute the presence of Black jurors was its decision to prosecute Mr. Hall in the Northern District of Texas, Fort Worth Division. This gambit paid off. Of the 100 prospective jurors questioned during *voir dire*, only seven were Black. Dist. Ct. Dkt. 1-9. Though the district court excused one of these potential jurors for cause (without attorney questioning) and the defense peremptorily struck another, the prosecution struck four of the five remaining death-qualified jurors and the only surviving Black juror, selected as the third alternate, never served on the jury. Counsel for Mr. Hall raised a *Batson* challenge at trial, which the trial court denied without giving Mr. Hall's counsel any opportunity to challenge the prosecution's stated reasons for the strikes. Even a cursory review of the trial record, however, reveals that the government's proffered reasons were pretextual.

That the government so ruthlessly struck Black jurors in Mr. Hall's trial is not surprising when its conduct is set against the background and practices of prosecutor Paul Macaluso. Macaluso was an integral figure in jury selection in Mr. Hall's case, and cut his legal teeth in the Dallas County District Attorney's Office, which "for decades . . . had followed a specific policy of systematically excluding Blacks from juries." *Miller-El II*, 537 U.S. at 264 (quoting *Miller-El I*, 537 U.S. at 334). As the Supreme Court explained, "[a] 1963 circular by the District Attorney's Office instructed its prosecutors to exercise peremptory strikes against minorities: 'Do not take Jews, Negroes, Dagos, Mexicans or a member of any minority race on a jury, no matter how rich or how well educated.'" *Miller-El I*, 537 U.S. at 334-35. The office's discriminatory pattern and practice was further fleshed out in a "manual entitled 'Jury Selection in a Criminal Case' [sometimes known as the Sparling Manual]" the office distributed to its prosecutors. *Id.*; *see also Miller-El II*, 545 U.S. at 264. When the Supreme Court found clear and convincing evidence to reject as "incredible" Macaluso's proffered reasons for striking Black jurors, *Miller-El II*, 545 U.S. at 265, it mentioned Macaluso by name no less than ten times. *Miller-El II*, 545 U.S. at 236, 248-50, 256. The Fifth Circuit followed suit four years later, specifically mentioning Macaluso three times in finding that he and his prosecution team had again struck Black jurors on the basis of their race in a separate capital trial. *See Reed*, 555 F.3d at 371, 371 n. 3,

33

382. That evidence is highly relevant here, in another of Macaluso's cases. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2246 (2019) ("The State's actions in [prior] trials necessarily inform our assessment of the State's intent going into [the trial on review.] We cannot ignore that history. We cannot take that history out of the case."). Macaluso's proclivity for striking Black jurors on the basis of race provides critical context for assessing the credibility of the reasons the prosecution provided in Mr. Hall's trial for striking four of the five qualified Black jurors.

Lastly, the prosecution's proffered reasons for striking qualified Black jurors were pretexts for the government's intentional discrimination on the basis of racial bias. And the prosecution's behavior with respect to White jurors is instructive: the very grounds prosecutors used to justify striking Black jurors Amy Evans and Billie Lee applied equally to White jurors the prosecution accepted.

**Amy Evans**. Prosecutors claim to have struck Ms. Evans because she: (1) "had two brothers-in-law in prison," Dist. Ct. Dkt. 1-11 at 11:1; and expressed equivocal views about the death penalty, *id.* at 11:4-5, 11:8-9. On the first of these proffered reasons, the prosecution did not ask Ms. Evans a single question on this topic, which "is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Miller-El II*, 545 U.S. at 246. And, the government accepted multiple non-Black jurors with family members in prison or who had recently been in prison, Dist Ct. Dkt. 1 at 33, which also demonstrates pretext. 545 U.S. at 241.

34

As for Ms. Evans' views about the death penalty, two White jurors seated for the trial, Mary Ann Herring and Linda Harrell, held similar views. Like Ms. Evans, Ms. Herring provided both "yes" and "no" answers in her questionnaire, Dist Ct. Dkt. 1-23 a Q.52a, writing that the application of the death penalty "would depend on the crime," id.; and she testified during voir dire that the death penalty should "depend on the circumstances" and "on the crime," Dist. Ct. Dkt. 1-20 at 118:24, 119:2-3. Ms. Harrell also said that the death penalty was "deserving in some cases under the right circumstances." *See* Dist Ct. Dkt. 12 at 27; Dist Ct. Dkt. 15 at 16. Accordingly, the government offered no non-pretextual reason for striking Ms. Evans.

**Billie Lee**. The government attempted to justify its peremptory strike against Ms. Lee by claiming that: (1) "[s]he had a brother-in-law who was a criminal defense attorney," Dist. Ct. Dkt. 1-11 at 14:7-8, and (2) she was "impaired just because of her questionnaire, *id.* at 13:10-11.[4] Neither reason is convincing. First, the prosecutor never questioned Ms. Lee about her brother-in-law's employment during voir dire, which, once again, undercuts any suggestion that the government had concerns about this fact. *See Miller-El II*, 545 U.S. at 246. And

---

[4] The government also offered that Ms. Lee was "on a prior jury for robbery and found the defendant not guilty." Dist. Ct. Dkt. 1-11 at 13:18-19. This is false, and when the prosecution noticed its mistake, it offered her brother-in-law's employment as a new justification. *Id.* at 14:5-9.

the government seated a White juror whose brother was a public defender, Dist. Ct. Dkt. 1 at 37, which is also evidence of pretext. *Miller-El II*, 545 U.S. at 241. Second, as to her questionnaire, the prosecution tried to construe Ms. Lee's answers as stating that she supported the death penalty only in a very limited set of circumstances. As an initial matter, this explanation omitted the fact that she gave as examples of crimes deserving the death penalty not only "serial killers" and "child molesters who kill their victims," as the prosecutor claimed, but also "people who kill for the sake of killing." Dist. Ct. Dkt. 1-29 at Q 48. Moreover, her testimony during voir dire made clear that her views about what types of offenses warranted the death penalty were far more expansive than AUSA Roper claimed. In response to a question as to "what sorts of crimes [she thought] the death penalty ought to be reserved for," she stated: "I thought about that. Anything that involves children, murder of children, cruelty to children, incorrigible kinds of acts perpetrated by someone repeatedly, to me that's the worse thing that you could do." Dist. Ct. Dkt. 1-11 at 125:16–19, Dkt. 9. Given the government's characterization of Mr. Hall as a "child murderer," the prosecutor's claim that Ms. Evans' views about the death penalty caused them concern is flatly incredible— even without considering that the prosecution accepted White jurors who expressed similar views.

36

In light of the Supreme Court's decision in *Miller-El II*—both the legal principles it articulated and its specific finding that one of the very same prosecutors responsible for seating the all-White jury that convicted and sentenced Mr. Hall had discriminated on the basis of race and then tried to conceal that discrimination by offering pretextual justifications—Mr. Hall has established a likelihood of success of establishing, at a minimum, that Ms. Lee and/or Ms. Evans were impermissibly struck on account of their race, in violation of *Batson*. Mr. Hall does not need to establish more than one race-based strike, as "[t]he 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)).

**B.     Mr. Hall Is Likely To Succeed On His Claim that the Federal Death Penalty, Particularly as Applied in Texas, Discriminates on the Basis of Race.**

Mr. Hall has demonstrated that he is likely to succeed on the merits of his claims that, as administered by the government, the federal death penalty violates the Fifth and Eighth Amendments and the FDPA because sentencing outcomes are impermissibly influenced by race. Data show that, in violation of the law, race discrimination pervades federal capital cases. The Constitution and the FDPA squarely forbid death sentences that are influenced by racial bias. For that reason, Mr. Hall is entitled to relief under Section 2241. The district court took too narrow

a view of this data, determining that Mr. Hall had sufficiently demonstrated that the evidence of the unequal application of the death penalty "existed but was unavailable at the time of trial or his initial § 2255 proceedings." App. 018.

Nationwide statistics create a strong inference that government decisions regarding who will face the death penalty are impermissibly influenced by the race of the defendant. *See* Dist. Ct. Dkt. 1-34 ¶¶ 7, 9. The federal death penalty is administered in Texas in an even more racially discriminatory manner. To date, federal prosecutors in Texas have sought the death penalty at trial against 23 defendants and obtained 16 death verdicts. *See id.* ¶ 19. Ten of those 16 men who received death sentences in federal prosecutions in Texas have been Black; only four have been White. *Id.*, Ex. A.

Newly available evidence demonstrates the statistical improbability of this result without the influence of racial bias in the federal system. In August 2020, the Inter-American Commission on Human Rights ("IACHR") issued a report in the case of another federal death row inmate, Julius Robinson. That report included expert sociologist Scott Phillips' analysis of the federal death penalty in Texas, which concluded that "[i]t is highly unlikely that a race-neutral factor or factors could explain why Black defendants were 16 times more likely to be sentenced to death. The racial disparities are almost surely too extreme to have a benign explanation." Dist. Ct. Dkt. 1-7 ¶ 11 (emphases added). Dr. Phillips' study

was not available to Mr. Hall until he learned of its existence from the August 2020 Report in Julius Robinson's IACHR case.

In a capital case, the right not to be discriminated against on the basis of race has roots in both the Eighth Amendment prohibition on arbitrary death sentences and the right to equal protection of the laws. *See, e.g.*, *Turner v. Murray*, 476 U.S. 28, 35 (1986) (because "[t]he risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence," the defendant's right to question prospective jurors regarding possible racial prejudice is a matter of constitutional dimension in cases involving interracial crimes); *Buck*, 137 S. Ct. at 775 (race is among the factors that are "constitutionally impermissible or totally irrelevant to the sentencing process") (citing *Zant v. Stephens*, 462 U.S. 862, 885 (1983)); *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 867-68 (2017) (discussing the Supreme Court's continuing commitment to eliminating racism in legal proceedings). When race influences a capital sentencing outcome, as it did in Mr. Hall's case, the Eighth Amendment and the Constitution's equal protection guarantee are violated.

The Federal Death Penalty Act evinces a commitment to preventing racial bias from influencing sentencing verdicts, and Mr. Hall's death sentence violates the statute. First, 18 U.S.C. § 3593 ("Special precaution to ensure against discrimination") erects an elaborate formal process for confirming that jurors'

deliberations were unaffected by (inter alia) race. *See* 18 U.S.C. § 3593(f). Second, 18 U.S.C. § 3595 ("Review of a sentence of death") provides that on reviewing a death verdict, a court of appeals must "address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor . . .". 18 U.S.C. § 3595 (c)(1). Mr. Hall is likely to succeed on the merits of his claim that his death sentence violates the FDPA. He sets out a racially disproportionate pattern of capital charging, which, by itself, might not be enough to demonstrate purposeful racial discrimination. *See McCleskey v. Kemp*, 481 U.S. 279 (1987). Critically, however, Mr. Hall pairs this pattern with compelling case-specific evidence of personal racial animus by the prosecution in his case, as exhibited by their race-based use of peremptory challenges to block four of five eligible Black jurors from service.

Mr. Hall is likely to succeed on the merits of his claims under *Batson*, the Fifth and Eighth Amendments, and the FDPA. At a minimum, the evidence Mr. Hall raises warrants discovery concerning the government's authorization process and other relevant decision-making in Mr. Hall's case.

## III. THE BALANCE OF THE EQUITES WEIGHS IN FAVOR OF A STAY.

In denying Mr. Hall's motion for a stay, the Court failed to properly weigh the factors and erroneously granted too much weight to the perceived delay

exhibited by Mr. Hall in filing these important claims.  That error constitutes an abuse of discretion and, as a result, the Court should reverse the district court's denial of Mr. Hall's stay application.

### A.  Any Perceived Delay Does Not Preclude a Stay

The district court erroneously determined that "Mr. Hall's delay in bringing his claims . . . weighs heavily against granting a stay."  App. 021.  It failed to even account for the other mandatory factors, other than to say "[t]here is no doubt that Mr. Hall faces irreparable harm," but nonetheless that "[t]he balance of interests weighs against staying Mr. Hall's execution."  *Id.*  Courts may, in certain circumstances, determine that delay is yet another factor that supports denying a stay, but delay cannot defeat an otherwise meritorious stay application.  "[E]ven if the filing was untimely (which it was not), a delay in filing is not a proper basis for denial of" interim relief.  *Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir. 2011); *see also, e.g.*, *McDermott ex rel. NLRB v. Ampersand Pub.*, LLC, 593 F.3d 950, 965 (9th Cir. 2010) ("Delay by itself" does not foreclose interim relief).  It is clear, then, that the district court accorded far too much weight, in contravention of the law, to its own view that Mr. Hall was dilatory in pursuing his claims.  (And the District Court's finding of "delay" itself was unreasonable given the many barriers that stood in the way of bring this claim at an earlier time.) Reversal is therefore warranted.

**B.      Mr. Hall Will Suffer Irreparable Harm if a Stay Is Not Granted.**

Mr. Hall faces manifestly irreparable harm without a stay. "[H]arm is considered irreparable if it 'cannot be prevented or fully rectified by the final judgment after trial.'" *Whitaker v. Kenosha United School Dist. No. 1*, 858 F.3d 1034, 1045 (7th Cir. 2017) (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008)).  Here, the harm is certain:  Mr. Hall's execution has been scheduled for November 19, 2020.  This most grievous injury has been described by the Seventh Circuit to be "the ultimate irrevocable action" and "categorically irreparable injury."  *Purkey,* 964 F.3d at 616, 618.  When a petitioner faces execution, there can be no doubt that the impending execution presents irreparable harm.  *See, e.g.*, *Duvall v. Keating*, 162 F.3d 1058, 1062 (10th Cir. 1998) (granting immediate review of denial of temporary restraining order to death row inmate because his impending execution guaranteed he would "suffer irreparable harm absent immediate review").  In capital cases, irreparable harm is "necessarily present," *Wainwright v. Booker*, 473 U.S. 935, 935 n.1. (1985) (Powell, J., concurring), and the urgency of that harm is even more so present where such an execution would result in the deprivation of enumerated constitutional rights.

There is insufficient time for Mr. Hall to litigate his claims prior to his execution date.  Without injunctive relief, Plaintiff will be unable to pursue his

claims, and would be executed without the opportunity to fully litigate his constitutional and statutory claims. Such a denial of Mr. Hall's rights is plainly foreclosed by the Constitution such that Mr. Hall's execution cannot proceed under the current circumstances.

**C.  The Balance of the Equities and the Public Interest Both Weigh in Favor of a Stay.**

The balance of equities tips in favor of granting injunctive relief. Without a stay, Mr. Hall will be unable to vindicate his constitutional rights, and his important claims that his trial was infected by racial animus will go unaddressed. Moreover, the harm Mr. Hall will suffer without a stay—loss of his life—is indisputably irreparable. Defendants, on the other hand, have an interest in the finality of Mr. Hall's case, the delay that will come from staying his execution to litigate this case will not cause substantial harm to Defendants. "A brief stay to permit the orderly conclusion of the proceedings in this court will not substantially harm the government . . . ." *Purkey,* 964 F.3d at 618. Moreover, the government additionally has an interest in making sure that racial bias does not irreparably taint a death sentence before that sentence is executed. *Berger v. United States*, 295 U.S. 78, 88 (1935) (noting that the government's obligation in a criminal prosecution is "that justice shall be done"). Mr. Hall has raised claims that his fundamental, constitutional rights have been infringed. Granting a stay so as to

allow him to fully and fairly litigate those claims greatly outweighs the Government's sole interest in finality.

**D.     A Stay Is in the Public Interest.**

Finally, a stay of execution is in the public interest.  It does not serve the public interest to execute individuals before they are able to fully litigate their constitutional rights.  *See Purkey,* 964 F.3d at 618) (observing "the public interest is surely served by treating this case with the same time for consideration and deliberation that we would give any case.  Just because the death penalty is involved is no reason to take shortcuts—indeed, it is a reason not to do so."); *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) ("The public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional rights."); *Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004) ("Confidence in the humane application of the governing laws ... must be in the public's interest.").  Indeed, "[a]pplying the law in a way that violates the Constitution is *never* in the public's interest."  *Minney v. United States Office of Pers. Mgmt.*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015) (emphasis in original).

A fundamental right such as that presented here, the right to a fair trial untainted by racial bias, must be safeguarded even more so.  *See Batson*, 476 U.S. at 86 n.8 (describing "the right to trial by jury in criminal cases" as a "fundamental

feature of the American system of justice"). As the Supreme Court made clear in *Batson*, "[d]iscrimination within the judicial system is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to [Black citizens] that equal justice which the law aims to secure to all others.'" *Id.* at 87–88 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 308 (1879)). Such an alleged harm cannot go unaddressed, for failure to do so infects the entire system.

There is a strong public interest in ensuring Mr. Hall is not put to death on the basis of a sentencing verdict contaminated by racial bias. His constitutional claims must be fully considered prior to his execution.

## IV. MR. HALL'S PETITION WARRANTS A STAY OF EXECUTION FOR CONSIDERATION OF HIS CLAIMS.

A brief stay of his execution for this Court to fully consider the claims raised in Mr. Hall's petition is warranted. For the reasons set forth above, Mr. Hall has demonstrated that the lower court erroneously denied his request for a preliminary injunction and he is likely to be successful on the underlying arguments of his claims. *See supra* at 40–44. And, like with Mr. Hall's underlying petition, the equitable factors favor granting a stay. Without a brief stay for this Court to consider his petition, Mr. Hall will be executed on November 19, 2020—the most irreparable of injuries. *See supra* at 41–42. The government, however, will not suffer any harm from a brief stay to allow this Court to consider the merits of Mr.

Hall's petition, *see supra* 42–44, and the public interest weighs in favor of allowing Mr. Hall to litigate to his constitutional rights.

Given the important constitutional and statutory rights at issue in this litigation, a brief stay of execution to allow the Court to fully consider Mr. Hall's petition is warranted.

## CONCLUSION

The decision of the District Court should be reversed and a brief stay of execution should be entered to permit Mr. Hall to pursue his constitutional claims regarding the imposition of his death sentence.

Respectfully submitted,

PIETER VAN TOL
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
pieter.vantol@hoganlovells.com

KATHRYN MARSHALL ALI
KAITLYN GOLDEN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
kathryn.ali@hoganlovells.com
kaitlyn.golden@hoganlovells.com

November 18, 2020

*Counsel for Orlando Cordia Hall*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 10,986 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 2010 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

s/ Kathryn Marshall Ali
KATHRYN MARSHALL ALI

November 18, 2020

# CIRCUIT RULE 30(d) CERTIFICATION

In accordance with Circuit Rule 30(d), the undersigned hereby certifies that all materials required by Circuit Rules 30(a) and (b) are included in Petitioner-Appellant's Appendix (bound herewith) and Supplemental Appendix (concurrently herewith).

s/ Kathryn Marshall Ali
KATHRYN MARSHALL ALI

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of November, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

s/ Kathryn Marshall Ali
KATHRYN MARSHALL ALI

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

**ORLANDO CORDIA HALL**,

            Petitioner-Appellant,

        v.

**T.J. WATSON, WARDEN OF USP TERRE HAUTE**,

            Respondent-Appellee.

CIVIL ACTION
Case No. 20-cv-3229

**DEATH PENALTY CASE**

**EXECUTION DATE:**
**November 19, 2020**

## SHORT APPENDIX[1]

### TABLE OF CONTENTS

1. Order Denying Motion for Stay of Execution, *Hall v. Watson*, No. 2:20-cv-00599-JPH-DLP (S.D. Ind. Nov. 17, 2020), Dist. Ct. Dkt. 18. **App. 001**.

.

---

[1] Per Cir. R. 30(d) this statement hereby certifies that all materials as required by parts (a) and (b) of Cir. R. 30 are hereby included in Petitioner's Appendix and Petitioner's Supplemental Appendix.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

ORLANDO CORDIA HALL,                       )
                                           )
                  Petitioner,              )
                                           )
        v.                                 )      No. 2:20-cv-00599-JPH-DLP
                                           )
T.J. Watson, in his official capacity as.  )
Complex Warded of U.S.P., Federal          )
Correctional Complex (FCC) Terre Haute     )
                  Respondent.              )

**ORDER DENYING MOTION FOR STAY OF EXECUTION**

Orlando Cordia Hall is a federal prisoner scheduled to be executed on November 19, 2020. In 1995, a federal jury in Texas convicted Mr. Hall of multiple crimes related to the kidnapping and murder of 16-year-old Lisa Rene and sentenced him to death on the charge of kidnapping resulting in death. The district judge imposed the death sentence for that conviction and imposed multiple terms of imprisonment for the other counts of conviction. The convictions and corresponding sentences imposed were upheld on appeal. Mr. Hall filed a petition for postconviction relief under 28 U.S.C. § 2255. In 2004, the district judge in Texas denied Mr. Hall relief, and that ruling was affirmed by the Fifth Circuit. In 2016 and 2020, the Fifth Circuit denied Mr. Hall's requests to file a successive § 2255 motion.

Less than a week ago, this Court denied Mr. Hall's petition for a writ of habeas corpus under 28 U.S.C. § 2241, and Mr. Hall filed a second § 2241 petition. Before the Court is Mr. Hall's motion for a stay of execution pending resolution of his second § 2241 petition. The Court considers several factors

1

App. 001

when evaluating this motion, and Mr. Hall must make a "strong showing" that (1) that there is a "structural problem" with § 2255 that prevented him from raising the issues that he presents in this case and (2) he would be entitled to relief on the merits if the issues he raises were relitigated. Because Mr. Hall has not demonstrated a strong likelihood that he can make the required showing, and because Mr. Hall has not demonstrated that he diligently pursued his claims, his motion for stay of execution must be denied.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

A full recitation of the facts and procedural background is set forth in *United States v. Hall*, 152 F.3d 381, 389–90 (5th Cir. 1998) ("*Hall I*"), *United States v. Hall*, 455 F.3d 508, 510–13 (5th Cir. 2006) ("*Hall II*"), and *In re: Orlando Cordia Hall*, --- F.3d ----, ----, 2020 WL 6375718, at *1–2 (5th Cir. 2020) ("*Hall III*").

### A. Factual Background

While the details of Mr. Hall's crime are not relevant to the ultimate resolution of his legal claims, a brief summary is appropriate for context. The following facts are summarized from Mr. Hall's direct appeal. *See Hall I*, 152 F.3d at 389–90. Mr. Hall and several confederates ran a marijuana trafficking enterprise in Pine Bluff, Arkansas. On September 21, 1994, they traveled to Dallas, Texas, where they paid two local dealers $4700 to purchase marijuana. After the dealers claimed the $4700 was stolen, Mr. Hall and his confederates began surveilling an apartment where they had seen the dealers and concluded

2

the dealers scammed them.  The men broke into the apartment and encountered one dealer's sister, Ms. Rene. They kidnapped Ms. Rene and dragged her to a car, where Mr. Hall raped her. The men drove from Arlington, Texas, to Pine Bluff, Arkansas. In Pine Bluff, they rented a motel room, tied Ms. Rene to a chair, and repeatedly raped her. The next day, they took her to a nearby park where they had dug a grave and beat her over the head with a shovel. One of the men covered Ms. Rene in gasoline, and they then buried her alive.

### B. Procedural Background

Unless otherwise noted, the following procedural history is summarized from the Fifth Circuit's decision denying a certificate of appealability following the denial of Mr. Hall's § 2255 motion. *Hall II*, 455 F.3d at 512–13.

### 1. Indictment, trial and sentencing

On October 26, 1994, Mr. Hall was charged in the United States District Court for the Northern District of Texas, Fort Worth Division, with kidnapping in violation of 18 U.S.C. § 1201 (a)(1). On November 4, 1994, a grand jury returned a six-count superseding indictment charging Mr. Hall with kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1) and five other offenses. On February 23, 1995, the government filed its notice of intent to seek the death penalty against Mr. Hall.

Mr. Hall's jury trial began on October 2, 1995. He was represented by two attorneys, Jeffrey Kearney and Michael Ware. Assistant United States Attorneys ("AUSAs") Paul Macaluso and Richard Roper represented the government.

App. 003

Voir dire was conducted from October 2 to October 19. Of the one hundred prospective jurors questioned during voir dire, seven were black. Dkt. 1-9. After strikes for cause, five qualified black prospective jurors remained. The defense struck one black juror due to her strong pro-death-penalty views, and the government peremptorily struck the remaining four, leaving no black jurors. Mr. Hall raised a *Batson* challenge at trial. Dkt. 1-11 at 8−9. The district court overruled Mr. Hall's objections based on the facially neutral reasons stated by the government in support of its strikes. *Id.* at 11–16.

The jury found Mr. Hall guilty of several counts, including kidnapping resulting in death. *Hall I,* 152 F.3d at 390. After a separate penalty phase of the trial, the jury recommended that he be sentenced to death. *Id.* The district court accepted the jury's recommendation and sentenced Mr. Hall to death.

### 2. Direct appeal of conviction and sentence

Mr. Hall challenged his conviction and sentence on direct appeal, raising 11 issues. *Hall I*, 152 F.3d at 390-391. The Fifth Circuit affirmed the conviction and sentence, *id.* at 427, and the Supreme Court declined review. *Hall v. United States*, 526 U.S. 1117 (1999).

### 3. Post-conviction challenges to conviction and sentence in the court of conviction

In May 2000, Mr. Hall filed a petition for postconviction relief under 28 U.S.C. § 2255 seeking to vacate his conviction and sentence. He later filed an amended § 2255 motion and a second amended § 2255 motion.

App. 004

In the second amended motion, Mr. Hall raised the following issues:

(1) Mr. Hall's rights under the Fifth Amendment were violated because the indictment did not allege any aggravating factors that rendered Mr. Hall eligible for the death penalty;

(2) Mr. Hall was denied his right to the effective assistance of counsel;

(3) a juror's contact with the victim's family and other extraneous information that entered into the jury's deliberations violated his Fifth, Sixth, and Eighth Amendment rights;

(4) the government failed to disclose exculpatory information concerning one of its witnesses;

(5) Mr. Hall's Fifth, Sixth, and Eighth Amendment rights were violated because of false testimony;

(6) Mr. Hall's Sixth Amendment rights were violated by using a jail inmate to elicit information from him;

(7) Mr. Hall's Fifth, Sixth, and Eighth Amendment rights were violated when the government provided a statement with false information to the defense to dissuade the defense from calling a witness;

(8) the government interfered with Mr. Hall's right to counsel by advising his first defense team about information that Mr. Hall planned to kidnap his attorneys in an escape attempt; and

(9) Mr. Hall's rights under the Fifth and Eighth Amendments were violated by the racially discriminatory effects of the federal capital sentence scheme.

5

App. 005

*Hall v. United States*, No. 4:00-cv-00422-Y, 2004 WL 1908242, at *4 (N.D. Tex. Aug. 24, 2004).

In support of the claim that the federal capital sentence scheme violates the Fifth and Eighth Amendments, Mr. Hall submitted an affidavit from Kevin McNally discussing racial disparities in the application of the death sentence in federal cases. *Hall v. United States*, No. 4:94-cr-00121-Y, dkt. 1071-2 ("McNally Affidavit May 12, 2000"). Mr. McNally noted that he had collected information, including the defendant's race, for "all potential federal death penalty cases" dating back to 1988. *Id.*, ¶¶ 2, 4.

After an evidentiary hearing limited to Ground 3, the district court denied Mr. Hall's § 2255 petition in an 89-page order that addressed each of the claims presented. The Fifth Circuit denied Mr. Hall leave to appeal, *Hall II*, 455 F.3d at 524, and the Supreme Court denied certiorari, *Hall v. United States*, 549 U.S. 1343 (2007).

In 2016 and 2019, Mr. Hall sought authorization from the Fifth Circuit to file successive § 2255 motions challenging the constitutionality of his firearm conviction under 18 U.S.C. § 924(c). In both instances, the Fifth Circuit denied leave to file. *In re Hall*, No. 16-10670 (5th Cir. June 20, 2016); *In re Hall*, --- F.3d ----, ----, 2020 WL 6375718, at *2 (5th Cir. Oct. 30, 2020).

**4. Post-conviction challenges in this Court**

Mr. Hall filed a § 2241 petition in this Court raising the same challenges to his firearms conviction that he raised in the Fifth Circuit. *Hall v. Watson*, No. 2:17-cv-00176-JPH-DLP. On November 14, 2020, the Court dismissed his

6

petition because the Fifth Circuit had ruled on the merits of his challenges to the firearms conviction. *Id.* at dkt. 48.

On November 12, 2020, seven days before the scheduled execution date, Mr. Hall filed another § 2241 petition in this Court raising two constitutional challenges. Dkt. 1. First, he alleges that "race-based peremptory strikes infected [his] trial at every stage." Second, he contends that statistical evidence shows race-based differences in application of the federal death penalty between black and non-black defendants. Along with the § 2241 petition, Mr. Hall filed a motion to stay execution. Dkt. 3. The Court entered a briefing schedule ordering Respondent to file a response by 5:00 p.m. on November 16, 2020, and for Mr. Hall to file any reply by 12:00 p.m. on November 17, 2020.

## II.

### DISCUSSION

A motion for stay of execution requires the Court to consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

#### A. Likelihood of Success on the Merits

Because this is a § 2241 petition, Mr. Hall must make a "strong showing" that (1) there is a "structural problem" with § 2255 that prevented him from raising the issues that he presents in this case and (2) he would be entitled to

App. 007

relief on the merits if the issues he raises were relitigated. *Lee v. Watson*, 2019 WL 6718924, at *1 (7th Cir. Dec. 6, 2019). While these are distinct issues, they are intertwined and analyzed together. The Court first sets forth the applicable Section 2255(e) framework, and then evaluates the merits of Mr. Hall's claims in the context of that framework.

### 1. Section 2255 and the Savings Clause

"As a general rule, a federal prisoner wishing to collaterally attack his conviction or sentence must do so under § 2255." *Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019). Congress created within § 2255 a narrow exception to the "general rule" that requires a federal prisoner to bring a collateral attack under § 2255. Section 2255(e), aptly described by the Seventh Circuit as the "savings clause" and the "safety valve," "recognizes a narrow pathway to the general habeas corpus statute, section 2241." *Purkey v. United States*, 964 F.3d 603, 611 (7th Cir. 2020); *see Webster v. Daniels*, 784 F.3d 1123, 1135 (7th Cir. 2015) (en banc).

Under the savings clause, a prisoner can seek a writ of habeas corpus under § 2241 only if the prisoner can show "that the remedy by [§ 2255] motion is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). Without that showing, a district court cannot reach the merits of the arguments raised in the petition. *Id.* (petition otherwise "shall not be entertained"); *Webster*, 784 F.3d at 1124 (petition "must be dismissed at the threshold" if § 2255(e) is not satisfied).

8

App. 008

Section 2255 is inadequate or ineffective as applied to a specific case only where there is "some kind of structural problem with section 2255." *Webster*, 784 F.3d at 1136. A structural problem requires "something more than a lack of success with a section 2255 motion." *Id.* Section 2255 is inadequate or ineffective where the court finds that the federal prisoner did not have "a reasonable opportunity [in a prior § 2255 proceeding] to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *Chazen*, 938 F.3d at 856 (alteration in original) (quoting *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998)).

Here, Mr. Hall relies on the path described by the Seventh Circuit in *Webster*. Dkt. 1 at 22 ("It is appropriate for this Court to hear this case under § 2241 through the path outlined in *Webster*."). In *Webster*, the Seventh Circuit held for the first and only time that the Savings Clause was met for a constitutional claim. The petitioner in *Webster* sought to challenge his death sentence as barred by *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the Eighth Amendment forbids the execution of a person with an intellectual disability. Although the petitioner had raised an *Atkins* claim in his § 2255 proceeding, he wished to present "newly discovered evidence" to support that claim in his § 2241 petition. *Webster*, 784 F.3d at 1125.

The Seventh Circuit found that "there is no categorical bar against resort to section 2241 in cases where new evidence would reveal that the Constitution categorically prohibits a certain penalty." *Id.* at 1139. The structural problem identified by the Seventh Circuit was based on at least two concerns. First,

9

App. 009

§ 2255(h)(1) only allows a second or successive § 2255 motion if newly discovered evidence meets a certain threshold to demonstrate that the petitioner is not guilty of the *offense. Id.* at 1134–35, 1138. It does not allow for such motions if the petitioner presents newly discovered evidence that the petitioner is ineligible to receive his *sentence. Id.* Second, Congress could not have contemplated whether claims of categorical ineligibility for the death penalty should be permitted in second or successive § 2255 motions because the relevant cases— *Atkins* and *Roper v. Simmons*, 543 U.S. 551 (2005)[1]—had not been decided when § 2255 was enacted. *Webster*, 784 F.3d at 1138 ("[T]he fact that the Supreme Court had not yet decided *Atkins* and *Roper* at the time AEDPA was passed supports the conclusion that the narrow set of cases presenting issues of constitutional ineligibility for execution is another lacuna in the statute."); *id.* at 1139 ("In Webster's case, the problem is that the Supreme Court has now established that the Constitution itself forbids the execution of certain people: those who satisfy the criteria for intellectual disability that the Court has established, and those who were below the age of 18 when they committed the crime.").

*Webster* is the first and only time the Seventh Circuit permitted a constitutional claim to proceed through the Savings Clause. Indeed, the court "took great care to assure that its holding was narrow in scope." *Poe v. LaRiva*, 834 F.3d 770, 774 (7th Cir. 2016). It limited its holding to the narrow legal and

---

[1] In *Roper*, the Supreme Court held that "imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed" violates the Eighth and Fourteenth Amendments. 543 U.S. at 578.

factual circumstances presented in the case, stating explicitly that the case "will have a limited effect on future habeas corpus proceedings." *Webster*, 784 F.3d at 1140 n.9; *see Poe*, 834 F.3d at 774 ("[T]here is nothing in *Webster* to suggest that its holding applies outside the context of new evidence.").

Evidence must meet three conditions to be considered "new" within the meaning of *Webster*:

> First, the evidence sought to be presented must have existed at the time of the original proceedings. . . . Second, the evidence must have been unavailable at the time of trial despite diligent efforts to obtain it. Third, and most importantly, the evidence must show that the petitioner is constitutionally ineligible for the penalty he received. Because the Supreme Court has declared only two types of persons (minors and the intellectually disabled) categorically ineligible for a particular type of punishment, our ruling is as a matter of law limited to that set of people—those who assert that they fell into one of these categories at the time of the offense. These three limitations are more than adequate to prevent the dissent's feared flood of section 2241 petitions[.]

*Webster*, 784 F.3d at 1140 n.9.

The Court now evaluates the evidence that Mr. Hall characterizes as "new evidence" in this context.

### 2. Likelihood of Meeting *Webster*'s Test

Mr. Hall has not made a strong showing that either of his claims relies on (1) evidence that existed at the time of his original proceedings but (2) was unavailable to him at those proceedings.

### a. *Batson* Claim

In support of his *Batson* claim, Mr. Hall points first to *Miller-El v. Dretke*, 545 U.S. 231 (2005) (*"Miller-El II"*), where the Supreme Court discussed a manual

entitled "Jury Selection in a Criminal Case," ("the Sparling Manual"), which was circulated in the Dallas County District Attorney's Office from 1968 to 1976, and explicitly urged prosecutors to exclude minorities from jury service. *Id.* at 264; s*ee also* dkt. 1-6 (Sparling Manual Excerpt). Mr. Hall argues this is material to his *Batson* claim because AUSA Macaluso worked in that office while the Sparling Manual was in use. Mr. Hall claims that at the time of his trial, this "critical evidence was unavailable, secreted away in the Dallas County District Attorney's Office," dkt. 1 at 10, insinuating that the manual's existence only came to light with the issuance of the Supreme Court's decision in *Miller-El II* in 2005. But the Sparling Manual was referenced by the Supreme Court in a February 2003 opinion involving the same litigants involved in *Miller-El II*, *see Miller-El v. Cockrell*, 537 U.S. 332, 334–35 (2003) ("*Miller-El I*"), and Mr. Hall's § 2255 petition was not ruled on until August 2004.[2] In fact, the Supreme Court cited the Sparling Manual excerpt referenced in *Miller-El II* while Mr. Hall's § 2255 petition was pending.

Mr. Hall also alleges that the judicial findings that AUSA Macaluso violated *Batson* in *Miller-El II* and *Reed v. Quarterman*, 555 F. 3d 364 (5th Cir. 2009), constitute new evidence because *Miller-El II* tied AUSA Macaluso to the Sparling Manual by name and both decisions demonstrated a pattern of his racist jury-selection practices. Dkt. 1 at 35 (citing *Flowers*, 139 S. Ct. at 2245). While the

---

[2] Indeed, the Sparling Manual and the controversy surrounding it has been a matter of public record since 1986, when it was discussed in a *Dallas Morning News* story about the Dallas County Office's practice of excluding black jurors. *See* Associated Press, *Racial Bias Pervades Jury Selection* (Mar. 9, 1986), *available at* https://apnews.com/article/15a4d9c91869b22db37feb26ba874718.

2005 *Miller-El II* opinion was the first Supreme Court opinion to reference AUSA Macaluso by name, AUSA Macaluso's employment history as a prosecutor in the Dallas County District Attorney's Office was a matter of public record easily discoverable by defense counsel well before 2005. And more specific to the precise claim presented by Mr. Hall, a 2002 article cited by Mr. Hall shows that AUSA Macaluso's ties to the Sparling Manual were also known while Mr. Hall's § 2255 petition was pending before the district judge in Texas. *See* Associated Press*, Race Is Key in Death Penalty Appeal* (Feb. 15, 2002), *available at* https://www.mrt.com/news/article/Race-Is-Key-in-Death-Penalty-Appeal-7756301.php; Sara Rimer, *In Dallas, Dismissal of Black Jurors Leads to Appeal by Death Row Inmate*, N.Y. Times, Feb. 13, 2002, *available at* https://www.nytimes.com/2002/02/13/us/in-dallas-dismissal-of-black-jurors-leads-to-appeal-by-death-row-inmate.html (discussing Macaluso's role in Miller-El's case).

News articles, court opinions, and underlying briefs are all matters of public record, discoverable through searches on the Internet and legal databases. Thus, Mr. Hall's situation is not comparable to Mr. Webster's, where defense counsel sought the relevant Social Security records but was told they did not exist when in fact they did. Nor is it comparable to that of the petitioner in *Foster v. Chatman*, where an open records request resulted in the accidental release of incriminating prosecution notes that revealed the prosecutor's discriminatory intent in striking black jurors. 136 S. Ct. 1737, 1744 (2016).

The other evidence in support of Mr. Hall's *Batson* claim also was available before he filed his § 2255 motion. This includes:

- The 1990 census data that shows only 10.41% of the population in the Fort Worth Division where Mr. Hall was tried was black, compared with 35.85% of the population in the Pine Bluff Division in the Eastern District of Arkansas, where Mr. Hall also could have been tried, dkt. 1-8 at 2;

- AUSA Roper's representation to the trial court that the government had challenged all four of the black jurors it peremptorily struck for cause, when, in fact, only two had been challenged for cause, dkt. 1-12;

- AUSA Roper's stated reasons for dismissing Juror Amy Evans, which were inconsistent with Ms. Evans's answers during voir dire and in her questionnaire, dkts. 1-11, 1-13, 1-14; and

- Side-by-side comparisons of the questioning of dismissed black jurors with seated white jurors, dkts. 1-11, 1-14, 1-20–1-33.

In short, the facts underlying Mr. Hall's *Batson* claims were available through diligent search during Mr. Hall's § 2255 proceedings. *Webster*, 784 F.3d at 1146 (To determine whether relevant evidence was previously unavailable, "the district court must also evaluate [prior] counsel's diligence."). Mr. Hall's current *Batson* claim does not involve evidence that is "newly discovered" but new lawyers looking at the same evidence that has been available to Mr. Hall for many years. And "nothing formally prevented him" from raising the claims

14

App. 014

earlier. Mr. Hall raised a multitude of issues on direct appeal and in his § 2255 petition, but the denial of his *Batson* challenge at trial was not among them. Mr. Hall therefore has not demonstrated a strong likelihood that he can show § 2255 was "structurally unavailable." *Purkey*, 964 F.3d at 615.

### b. Discriminatory Application of the Death Penalty

Mr. Hall argues that, as administered by the government, the federal death penalty is racially discriminatory and that this violates the Constitution. Dkt. 1 at 45, 50, 52. He asserts that data shows that federal capital cases are impermissibly influenced by race. *Id.* In support of this claim, Mr. Hall points to statistics maintained by the Kevin McNally of the Federal Death Penalty Resource Counsel Project, which he alleges demonstrate that "the authorization process by which the DOJ selects which defendants will face the death penalty . . . [is] impermissibly influenced by race." *Id.*

These statistics cited by Mr. Hall show that the death penalty is authorized by the DOJ 1.8 times as often against black defendants as compared to white defendants. Dkt. 1 at 46. With these statistics as the backdrop, Mr. Hall asserts that he was sentenced to death in federal court in Texas, "a state with a long and shameful history of racially discriminatory use of the death penalty." *Id.*

Mr. Hall points to a 2011 study by sociologist Scott Phillips, Ph.D., who was hired by another death row inmate to "conduct a statistical analysis regarding the possible effect of race on the federal death penalty in Texas." Dkt. 1 at 48; *see* dkt. 1-7 (Phillips Declaration Mar. 29, 2011). This study examined "all potential death penalty cases filed in the four federal judicial districts in Texas"

15

from 1988 to 2010. *Id.* The study revealed that during the relevant period, a death verdict was about sixteen times more likely to be returned for a black defendant. Dkt. 1 at 49. In the Northern District of Texas (where Mr. Hall was prosecuted), the disparities were "technically speaking, slightly greater" than those in other federal districts in Texas. Dkt. 1 at 49-50. According to Mr. Hall, this study was not available to him until it was discussed in an August 2020 report by the Inter-American Commission on Human Rights. *Id.* at 48.

Recognizing that "a racially disproportionate pattern of criminal charging, standing alone, is insufficient to demonstrate purposeful racial discrimination," dkt. 1 at 56, Mr. Hall asserts that his statistical evidence is buttressed here by "case-specific evidence of personal racial animus on the part of the prosecution team." *Id.*

The evidence in support of Mr. Hall's discriminatory application claim runs afoul of *Webster*'s first requirement: "the evidence sought to be presented must have existed at the time of the original proceedings." 784 F.3d at 1140 n.9. Without this requirement, "there would never be any finality" where a petitioner raises a claim, such as discriminatory application of the death sentence, for which new evidence is regularly created. *Id.* at 1140; *cf. Purkey*, 964 F.3d at 615 (holding that petitioner could not satisfy savings clause, in part, because his argument would open the door to "a never-ending series of reviews and re-reviews"). Mr. Hall therefore cannot rely on the study to satisfy § 2255(e) under *Webster*.

To the extent Mr. Hall relies on the underlying data Dr. Phillips used, particularly data that existed before Mr. Hall's § 2255 proceedings concluded, he fails to satisfy *Webster*'s second requirement: "the evidence must have been unavailable at the time of [the original proceedings] despite diligent efforts to obtain it." 784 F.3d at 1140 n.9. Dr. Phillips relied on data compiled and maintained by Kevin McNally "on the cases of all criminal defendants in Texas who were eligible for a federal death sentence from the reinstatement of the federal death penalty in 1988 through 2010." Dkt. 1-7 at 3 (Phillips Affidavit Mar. 29, 2011). Mr. Hall had access to Mr. McNally's data at the time of his § 2255 proceedings.[3] Indeed, he relied on it in support of the discriminatory application claim he raised in those proceedings. *See United States v. Hall*, No. 4:94-cr-00121-Y, dkt. 1071-2 at 124−32 (McNally Affidavit May 12, 2000). Because Mr. Hall had this data and relied upon it in his § 2255 proceedings, it was not previously unavailable as required by *Webster*.

Mr. Hall has not made a strong showing that his discriminatory application claim relies upon any evidence that existed but was unavailable at the time of trial or his initial § 2255 proceedings. Therefore, he has not made a strong showing that he can satisfy § 2255(e) as to this claim.

Last, Mr. Hall cannot satisfy the third *Webster* factor because he is not categorically ineligible for the death penalty. The Supreme Court has declared

---

[3] To be sure, some of Mr. McNally's 2010 data did not yet exist at the time of Mr. Hall's § 2255 proceedings. Mr. Hall cannot rely on this data for the same reason he cannot rely on the Phillips study: because "the evidence sought to be presented must have existed at the time of the original proceedings." *Webster*, 784 F.3d at 1140 n.9.

17

only two types of persons (minors and the intellectually disabled) categorically ineligible to be executed. *Webster*, 784 F.3d at 1140 n.9. Persons in those categories cannot be executed—ever. Here, even if Mr. Hall were to prevail on the merits of his claims, he would still be eligible for the death penalty.

### 3. Additional § 2255(e) arguments

Mr. Hall further argues that § 2255 was ineffective or inadequate due to lack of funding in his initial § 2255 litigation and the slim hopes for bringing a successful *Batson* challenge in the Fifth Circuit before *Miller-El II*, *see* dkt. 15 at 5–6, but he has not made a strong showing that he is likely to succeed on the merits of these arguments.

The bounds of the savings clause are not "rigidly defined" by *Webster* and the other cases where the Seventh Circuit has found that the savings clause is satisfied. *Purkey*, 964 F.3d at 611. But to move beyond those cases, a petitioner must make "a compelling showing that, as a practical matter, it would [have been] impossible to use section 2255 to cure a fundamental problem." *Id.* at 615.

Mr. Hall identifies and explains many of the limitations that his counsel faced at trial, on appeal, and in litigating his initial § 2255 motion. These limitations, while real, did not make it practically impossible for Mr. Hall to litigate his *Batson* and discriminatory application claims. Instead, they forced counsel to make difficult strategic decisions about how to litigate in an uncertain legal environment with limited resources, including choosing which claims to bring and which claims to forego.

18

Allowing Mr. Hall's claims to be brought now in this § 2241 proceeding would be contrary to the framework Congress created for federal prisoners seeking postconviction relief. Congress amended § 2255 in 1996 as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA") to limit federal prisoners to one § 2255 motion unless they receive authorization from the Court of Appeals to file a second or successive § 2255 motion. 28 U.S.C. § 2255(h). This limitation was designed to curtail the problem of "repetitive filings" from federal prisoners challenging their convictions. *Garza v. Lappin*, 253 F.3d 918, 922 (7th Cir. 2001).

Congress chose to "steer[] almost all [federal] prisoner challenges to their convictions and sentences toward § 2255." *Shepherd v. Krueger*, 911 F.3d 861, 862 (7th Cir. 2018). It did so by requiring § 2255 motions to be filed in the district of conviction, *Light v. Caraway*, 761 F.3d 809, 812 (7th Cir. 2014), and limiting federal prisoners' access to § 2241 by way of the Savings Clause. *See Davenport*, 147 F.3d at 609 ("The purpose behind the enactment of section 2255 was to change the venue of postconviction proceedings brought by federal prisoners from the district of incarceration to the district in which the prisoner had been sentenced." (citing *United States v. Hayman*, 342 U.S. 205, 212–19 (1952)). Section 2255 "not only relieved the district courts where the major federal prisons were located from a heavy load of petitions for collateral relief; it also enhanced the efficiency of the system by assigning these cases to the judges who were familiar with the records." *Webster*, 784 F.3d at 1145.

The savings clause "must be applied in light of [§ 2255's] history." *Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002); *see Unthank v. Jett*, 549 F.3d 534, 535

App. 019

(7th Cir. 2008) (same). It cannot be interpreted so expansively that it undermines "the careful structure Congress has created." *Garza*, 253 F.3d at 921; *see Chazen*, 938 F.3d at 865 (Barrett, J., concurring) (expressing "skeptic[ism]" of an argument that, if accepted, "risks recreating some of the problems that § 2255 was designed to fix"). To allow Mr. Hall to now raise these claims in a § 2241 petition would undermine the structure of § 2255. "If error in the resolution of a collateral attack were enough to show that § 2255 is inadequate or ineffective, many of the amendments made in 1996 would be set at naught." *Taylor*, 314 F.3d at 836.

### B. Other *Nken* factors

Mr. Hall argues that the other factors also weigh in favor of a stay. First, he will be irreparably harmed without a stay because he faces death. Dkt. 3-1 at 21. Second, he argues that a brief delay to allow him to litigate him claims will not result in substantial harm to the government. Dkt. 3-1 at 22. Finally, Mr. Hall argues that the public interest is served by a stay because when racial discrimination impacts criminal sanctions it "poisons public confidence in the judicial process." Dkt. 3-1 at 7. (quoting *Buck v. Davis*, 137 S. Ct. 759, 778 (2017)).

The government argues that the harm to Mr. Hall is outweighed by the interest of the government and the public in timely enforcement of criminal judgments, including the death sentence. Dkt. 12 at 44. Moreover, the government accuses Mr. Hall of "sitting on his claims until the eve of his

20

App. 020

scheduled execution" and argues that Mr. Hall should not benefit from this practice. *Id.*

There is no doubt that Mr. Hall faces irreparable harm if a stay is denied, and that the issues he raises are extremely serious. Mr. Hall's delay in bringing his claims, though, weighs heavily against granting a stay. *See Lee v. Watson*, 2019 WL 6718924, at *2 (7th Cir. Dec. 6, 2019) ("The grant of a stay entails equitable as well as legal considerations. . . . [S]omeone who waits years before seeking a writ of habeas corpus cannot, by the very act of delay, justify postponement of the execution."). The balance of interests weighs against staying Mr. Hall's execution.

### III.

### CONCLUSION

Mr. Hall's motion for stay of execution, dkt. [3], is **DENIED**. The motion for oral argument, dkt. [4], is **DENIED** as moot.

**SO ORDERED.**

Date: 11/17/2020

James Patrick Hanlon
United States District Judge
Southern District of Indiana

21

App. 021

App. 022

Distribution:

Kaitlyn A. Golden
HOGAN LOVELLS US LLP
kaitlyn.golden@hoganlovells.com

Jonathan Glen Bradshaw
DEPARTMENT OF JUSTICE
jonathan.bradshaw@usdoj.gov

Timothy Wayne Funnell
UNITED STATES ATTORNEY'S OFFICE
tim.funnell@usdoj.gov

James Robert Wood
UNITED STATES ATTORNEY'S OFFICE
bob.wood@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*s/ Kathryn Marshall Ali*
KATHRYN MARSHALL ALI