# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

**ORLANDO CORDIA HALL**,

        Petitioner-Appellant,

        v.

**T.J. WATSON, WARDEN OF USP TERRE HAUTE**,

        Respondent-Appellee.

CIVIL ACTION
Case No. 20-cv-3229

**DEATH PENALTY CASE**

**EXECUTION DATE:
November 19, 2020**

## SUPPLEMENTAL APPENDIX[1]

## TABLE OF CONTENTS

1. *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998). **Supp. App. 001**.

2. Memorandum Opinion and Order Denying Amended Motion to Vacate Conviction and Sentence, *Hall v. United States*, No. 4:00-cv-422-Y (N.D. Tex. Aug. 24, 2004). **Supp. App. 044.**

3. *United States v. Hall*, 455 F.3d 508 (5th Cir. 2006). **Supp. App. 133.**

4. Order Denying Motion for Authorization, *In re Orlando Cordia Hall*, No. 16-10670 (5th Cir. June 20, 2016) (per curiam). **Supp. App. 146.**

5. Opinion, *In re Orlando Cordia Hall*, No. 19-10345 (5th Cir. Oct. 30, 2020). **Supp. App**. **149**.

---

[1] Per Cir. R. 30(d) this statement hereby certifies that all materials as required by parts (a) and (b) of Cir. R. 30 are hereby included in Petitioner's Appendix and Petitioner's Supplemental Appendix.

i

6. Order Granting Motion to Dismiss Petition for Writ of Habeas Corpus, *Hall v. Daniels*, No. 2:17-cv-00176-JPH-DLP (S.D. Ind. Nov. 14, 2020).  **Supp. App. 177.**

KeyCite Red Flag - Severe Negative Treatment

Abrogated by U.S. v. Martinez-Salazar, U.S.Ariz., January 19, 2000

152 F.3d 381
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of
America, Plaintiff–Appellee,
v.
Orlando Cordia HALL, also known
as Lan, Defendant–Appellant.

No. 96–10178.
|
Aug. 21, 1998.
|
Rehearing and Suggestion of
Rehearing Denied Oct. 1, 1998.

**Synopsis**

Defendant was convicted in the United States District Court for the Northern District of Texas, Terry R. Means, J., of kidnapping resulting in death, conspiring to kidnap, traveling in interstate commerce to promote possession of marijuana with intent to distribute, and using and carrying a firearm during a crime of violence, and was sentenced to death. He appealed. The Court of Appeals, King, Circuit Judge, held that: (1) defendant did not have right of allocution before jury; (2) any error in admission of nontestimonial victim impact statements was harmless; (3) trial court acted within its discretion in refusing to strike certain venirepersons for cause; (4) aggravating factors were constitutional; and (5) trial court acted within its discretion in refusing to poll jury regarding mid-trial news broadcast.

Affirmed.

West Headnotes (69)

**[1]** **Sentencing and Punishment** 🔑 Actual or potential punishment

Under rule requiring district court to address defendant personally and determine whether defendant wishes to make statement and

to present any information in mitigation of sentence, defendant does not have a right to make an unsworn statement before jury in capital cases. 18 U.S.C.A. § 3593(c); Fed.Rules Cr.Proc.Rule 32(c)(3)(C), 18 U.S.C.A.

10 Cases that cite this headnote

**[2]** **Sentencing and Punishment** 🔑 Requisites and sufficiency

In capital proceeding, district court adequately complies with rule requiring district court to address defendant personally, and to determine whether defendant wishes to make statement and to present any information in mitigation of sentence, by allowing defendant to make statement to court after jury returns its recommendation but before court imposes sentence. 18 U.S.C.A. § 3593(c); Fed.Rules Cr.Proc.Rule 32(c)(3)(C), 18 U.S.C.A.

2 Cases that cite this headnote

**[3]** **Sentencing and Punishment** 🔑 Actual or potential punishment

Capital defendant possessed no federal-law common right to allocute before jury; such a right would have been inconsistent with procedural framework for capital sentencing hearings established by Federal Death Penalty Act (FDPA). 18 U.S.C.A. § 3593(c).

3 Cases that cite this headnote

**[4]** **Constitutional Law** 🔑 Proceedings
**Sentencing and Punishment** 🔑 Actual or potential punishment

A criminal defendant in a capital case does not possess a due process right to make an unsworn statement of remorse before the jury that is not subject to cross-examination. U.S.C.A. Const.Amend. 5.

25 Cases that cite this headnote

**[5]** **Sentencing and Punishment** 🔑 Harm or injury attributable to offense

Supp. App. 001

District court's decision to admit victim impact statements offered by government but to exclude defendant's request to make unsworn statement in allocution to jury did not unconstitutionally skew balance of procedural advantage in government's favor; defendant was allowed to introduce hearsay evidence of his own remorse in form of his sister's testimony of his statements of remorse to her, defendant declined to cross-examine victim's mother during victim impact testimony, and defendant suffered nothing more than a marginal procedural disadvantage.

4 Cases that cite this headnote

**[6]**    **Criminal Law** 🔑 Requisites of fair trial

The constitutionally required balance between prosecution and defense is a balance between the total advantages enjoyed by each side rather than an insistence on symmetry at every stage in the process.

**[7]**    **Sentencing and Punishment** 🔑 Actual or potential punishment

**Sentencing and Punishment** 🔑 Requisites and sufficiency

In capital sentencing hearing, district court acted within its discretion in declining to allow defendant to make an unsworn statement of remorse and plea for mercy before the jury; district court could properly conclude that danger that defendant's unsworn, uncross-examinable testimony would mislead jury outweighed probative value of information conveyed in testimony, particularly given fact that such information was readily available through defendant's sworn testimony. 18 U.S.C.A. § 3593(c).

11 Cases that cite this headnote

**[8]**    **Sentencing and Punishment** 🔑 Discretion of court

The district court has considerable discretion during a capital sentencing hearing in controlling the presentation of the information to the jury in both content and form. 18 U.S.C.A. § 3593(c).

4 Cases that cite this headnote

**[9]**    **Criminal Law** 🔑 Compelling Self-Incrimination

District court did not violate defendant's Fifth Amendment privilege against self-incrimination by ordering him to undergo psychiatric examination as a condition upon his offering psychiatric evidence during sentencing hearing. U.S.C.A. Const.Amend. 5.

7 Cases that cite this headnote

**[10]**    **Criminal Law** 🔑 Compelling Self-Incrimination

Defendant did not waive his Fifth Amendment privilege against self-incrimination merely by giving notice of his intention to submit expert psychiatric testimony at the sentencing hearing. U.S.C.A. Const.Amend. 5.

3 Cases that cite this headnote

**[11]**    **Criminal Law** 🔑 Compelling Self-Incrimination

District court was not required, in order to adequately safeguard defendant's Fifth Amendment privilege against self-incrimination, to seal results of government psychiatric examination until penalty phase of trial before ordering such an examination. U.S.C.A. Const.Amend. 5; Fed.Rules Cr.Proc.Rule 12.2(c), 18 U.S.C.A.

10 Cases that cite this headnote

**[12]**    **Criminal Law** 🔑 Reception and Admissibility of Evidence

Court of Appeals reviews district court's evidentiary rulings for an abuse of discretion.

1 Cases that cite this headnote

**[13]**    **Criminal Law** 🔑 Necessity and scope of proof

Supp. App. 002

**Sentencing and Punishment** 🗝️ Documentary evidence

Photographs of victim's body in grave and after its removal were not unduly prejudicial, even though defendant offered to stipulate to identity of victim and her cause of death. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

5 Cases that cite this headnote

**[14]** **Sentencing and Punishment** 🗝️ Demonstrative evidence

Videotape depicting walk through park in which victim was killed, area where her burned clothes were recovered, and exhumation of her body was not unduly prejudicial in penalty phase; videotape was relevant to aggravating factor that killing was committed in a heinous, cruel, or depraved manner, and depiction of grave site demonstrated amount of planning that went into murder and was thus probative regarding aggravating factor that murder was committed with substantial planning and premeditation. 18 U.S.C.A. § 3593(c).

4 Cases that cite this headnote

**[15]** **Sentencing and Punishment** 🗝️ Harmless and reversible error

Any error during penalty phase was harmless with respect to admission of videotape depicting walk through park in which victim was killed, area where her burned clothes were recovered, and exhumation of her body; contents of tape were largely cumulative of testimony and photographs admitted during guilt phase.

1 Cases that cite this headnote

**[16]** **Criminal Law** 🗝️ Rulings as to Evidence in General

An erroneous evidentiary ruling constitutes "harmless error" if it does not affect the substantial rights of the complaining party; an error is deemed to have affected a criminal defendant's substantial rights if it had substantial and injurious effect or influence in determining the jury's verdict.

3 Cases that cite this headnote

**[17]** **Criminal Law** 🗝️ Necessity of Objections in General

Under the plain error standard, the Court of Appeals may reverse only if (1) there was error (2) that was clear and obvious and (3) that affected defendant's substantial rights. Fed.Rules Cr.Proc.Rule 52(b), 18 U.S.C.A.

**[18]** **Criminal Law** 🗝️ Necessity of Objections in General

Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the "affecting substantial rights" prong of the plain error inquiry. Fed.Rules Cr.Proc.Rule 52(b), 18 U.S.C.A.

**[19]** **Criminal Law** 🗝️ Necessity of Objections in General

Even when the criteria for plain error are satisfied, the Court of Appeals should exercise its discretion to reverse only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. Fed.Rules Cr.Proc.Rule 52(b), 18 U.S.C.A.

**[20]** **Criminal Law** 🗝️ Issues related to jury trial

Any error was not plain error in district court's decision to allow jury to view, during deliberations, videotape depicting walk through park in which victim was killed, area where her burned clothes were recovered, and exhumation of her body, even though videotape had not been played at trial. Fed.Rules Cr.Proc.Rule 52(b), 18 U.S.C.A.

**[21]** **Sentencing and Punishment** 🗝️ Other offenses, charges, misconduct

In penalty phase, testimony of defendant's girlfriend that she was robbed while attempting to purchase crack cocaine on defendant's behalf

while he was on parole, and that defendant continued to send her to purchase drugs after these incidents, was generally relevant to defendant's future dangerousness; testimony demonstrated lengths to which defendant would go to continue his drug trafficking activities and demonstrated that defendant was an organizer and leader of criminal activity.

**[22]** **Sentencing and Punishment** 🔑 Harmless and reversible error

In prosecution for kidnapping resulting in death, any error in penalty phase was harmless with respect to admission of testimony of defendant's girlfriend that she was robbed while attempting to purchase crack cocaine on defendant's behalf while he was on parole, and that defendant continued to send her to purchase drugs after these incidents, given heinousness of offense of which defendant was convicted.

**[23]** **Sentencing and Punishment** 🔑 Other offenses, charges, or misconduct

Evidence of capital defendant's prior unadjudicated offenses was not per se inadmissible under Eighth Amendment in penalty phase. U.S.C.A. Const.Amend. 8.

7 Cases that cite this headnote

**[24]** **Sentencing and Punishment** 🔑 Instructions

When the government offers evidence of an unadjudicated offense in support of an aggravating factor, there is no requirement that the jury must be instructed that it cannot consider this evidence in determining whether the government has carried its burden of proving the aggravating factor beyond a reasonable doubt unless it has first determined that the evidence establishes by some quantum of evidence that the unadjudicated offense occurred.

3 Cases that cite this headnote

**[25]** **Sentencing and Punishment** 🔑 Presentation and reservation in lower court of grounds of review

In penalty phase of capital murder trial, trial court did not commit plain error by failing to instruct jury on existence of threshold evidentiary burden regarding unadjudicated offenses. Fed.Rules Cr.Proc.Rule 52(b), 18 U.S.C.A.

6 Cases that cite this headnote

**[26]** **Sentencing and Punishment** 🔑 Victim impact

Admission of victim impact statements in penalty phase of capital trial did not violate Eighth Amendment; statements did nothing more than generally describe victim's character and her aspirations of becoming a doctor as well as the pain that her family members felt as a result of her senseless death. U.S.C.A. Const.Amend. 8.

1 Cases that cite this headnote

**[27]** **Sentencing and Punishment** 🔑 Sentencing proceedings

Victim impact evidence and argument based upon it does not, by virtue of its substance, abridge a defendant's Eighth Amendment rights unless it is so unduly prejudicial that it renders the trial fundamentally unfair. U.S.C.A. Const.Amend. 8.

2 Cases that cite this headnote

**[28]** **Criminal Law** 🔑 Nature or stage of proceeding

A criminal defendant's Sixth Amendment right of confrontation is sharply circumscribed in non-capital sentencing proceedings. U.S.C.A. Const.Amend. 6.

2 Cases that cite this headnote

**[29]** **Criminal Law** 🔑 Reception of evidence

Confrontation clause errors, like other trial errors, are subject to harmless-error analysis;

Supp. App. 004

such an error is harmless if it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. U.S.C.A. Const.Amend. 6.

3 Cases that cite this headnote

**[30]    Sentencing and Punishment** 👉 Harmless and reversible error

Any error in admission of nontestimonial victim impact statements was harmless in penalty phase of capital trial; victim's mother presented emotionally charged testimony that demonstrated with abundant clarity to jury the devastating impact of defendant's crime upon victim's family, and there was powerful evidence regarding heinous, cruel, and depraved nature of offense.

3 Cases that cite this headnote

**[31]    Jury** 👉 Competence for Trial of Cause

**Jury** 👉 View of capital punishment

The Sixth Amendment right to an impartial jury requires the exclusion of a potential juror if his views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath; a prospective juror is substantially impaired in his ability to perform his duties in accordance with his instructions and oath if he will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. U.S.C.A. Const.Amend. 6.

1 Cases that cite this headnote

**[32]    Criminal Law** 👉 Selection and impaneling

Court of Appeals will only second-guess district court's decision that a juror is unbiased if there is an abuse of discretion.

2 Cases that cite this headnote

**[33]    Criminal Law** 👉 Selection and impaneling

In defendant's Sixth Amendment challenge to district court's failure to excuse venireperson

for cause, which required defendant to use peremptory challenge, determination on appeal began and ended with determination of whether district court abused its discretion in determining that juror did not possess views that would prevent or substantially impair performance of her duties as a juror in accordance with her instructions and her oath. U.S.C.A. Const.Amend. 6.

4 Cases that cite this headnote

**[34]    Jury** 👉 View of capital punishment

**Jury** 👉 Punishment prescribed for offense

Defendant's Sixth Amendment right to impartial jury was not violated by district court's refusal to dismiss venireperson for bias, based on her statement that growing up in dysfunctional family did not give a person the right to go out and commit violent acts; venireperson also stated that upbringing could be a factor but that its mitigating effect would depend upon what was brought to light. U.S.C.A. Const.Amend. 6.

1 Cases that cite this headnote

**[35]    Jury** 👉 Punishment prescribed for offense

District court acted within its discretion in refusing to strike for cause venireperson who stated that she supported death penalty, that defendant's abusive childhood would not have much bearing on her sentencing recommendation, and that she probably could not impose life sentence if government established all aggravating factors and defendant established no mitigating factors; venireperson stated that she would be able to base her decision solely on evidence, and venireperson stated that she could consider possibility of life imprisonment even in absence of mitigating factors.

**[36]    Jury** 👉 View of capital punishment

The Constitution does not require that a juror be willing to give a mitigating factor any particular amount of weight; it only requires that the juror manifest an ability to consider such factors in

determining whether death is an appropriate punishment.

1 Cases that cite this headnote

**[37]    Jury** 🔑 Punishment prescribed for offense

District court acted within its discretion in refusing to strike for cause venireperson who stated that she believed that person who took another life should be punished to fullest extent of the law, that people can overcome physically abusive families, and that she would lean toward death penalty if government proved aggravating factors and defendant proved no mitigating factors; venireperson also stated that she would give honest consideration to any mitigating factors, and that in some cases, people could not overcome abusive families.

**[38]    Jury** 🔑 Punishment prescribed for offense

District court acted within its discretion in refusing to strike for cause venireperson who stated that life without parole was a waste and a burden to state, and that she did not consider the existence of equally culpable defendants who did not receive the death penalty to be a mitigating factor; venireperson made it abundantly clear that she considered herself fully capable of weighing aggravating and mitigating factors in determining appropriate sentence, and venireperson ultimately stated that she could consider existence of equally culpable defendants who did not receive death penalty as a mitigating factor.

**[39]    Jury** 🔑 Opinion which will yield to evidence

District court acted within its discretion in refusing to strike for cause venireperson who indicated that she had been exposed to pretrial publicity and that she had developed an opinion that defendant and his associates committed the crime; venireperson indicated that she could prevent pretrial exposure from playing a role in her decision-making process and that she could not remember specifics of crime or names of alleged perpetrators.

**[40]    Jury** 🔑 Pretrial publicity

A person is not automatically rendered unqualified to serve as a juror merely because he has been exposed to media coverage of the charged crime; the issue becomes whether exposure to media publicity will preclude the individual from returning a verdict based solely on the person's application of the law as stated to the evidence presented.

3 Cases that cite this headnote

**[41]    Jury** 🔑 Weight and effect of evidence
      **Jury** 🔑 Punishment prescribed for offense

District court acted within its discretion in refusing to strike for cause venireperson who allegedly demonstrated an extremely negative attitude toward life imprisonment without the possibility of parole, demonstrated discomfort with notion of acquitting defendant who was probably guilty even if she entertained a reasonable doubt about guilt, and stated she could not consider evidence of a defendant's abusive childhood as mitigating; venireperson stated that she could set her personal feelings aside and follow court's instructions

**[42]    Jury** 🔑 Punishment prescribed for offense

District court acted within its discretion in refusing to strike for cause venireperson who stated that death penalty was appropriate for intentional murder and for repeat violent criminals, that she favored more frequent executions, and that she considered the lethal injection "too good/easy for people convicted of capital murder"; venireperson stated that she would be able to set aside her opinions regarding death penalty and render verdict based solely upon evidence and court's instructions, and venireperson stated that she could give fair and honest consideration to mitigating factors.

1 Cases that cite this headnote

Supp. App. 006

**[43]** **Jury**  Punishment prescribed for offense

District court acted within its discretion in refusing to strike for cause venireperson who stated that death penalty was appropriate for all kidnappings resulting in death and that he would have difficulty giving mitigating weight to the existence of equally culpable defendants who did not receive the death penalty; venireperson assured court that he could follow its instructions and could weigh aggravating factors against mitigating factors, and venireperson ultimately stated that he could give consideration to mitigating factor of existence of equally culpable defendants who did not receive death penalty.

**[44]** **Sentencing and Punishment**  Special issues

Federal Death Penalty Act (FDPA) does not require the jury to return special findings regarding which mitigating factors the jury found to exist or the number of jurors who found that a particular mitigating factor existed. 18 U.S.C.A. § 3593(d).

5 Cases that cite this headnote

**[45]** **Criminal Law**  Sentencing

Assuming that Court of Appeals possesses the authority to review the jurors' special findings regarding mitigating factors, Court must accept the jurors' factual determinations unless no reasonable juror could have arrived at the conclusion reached by the juror in question.

2 Cases that cite this headnote

**[46]** **Criminal Law**  Weight and Sufficiency of Evidence in General

Determining the weight and credibility of the evidence is within the sole province of the jury.

**[47]** **Sentencing and Punishment**  Sufficiency

Reasonable jurors could have concluded that defendant failed to establish by a preponderance of the evidence the mitigating factor that he

experienced a childhood that rendered him in some degree less deserving of death penalty than he might otherwise be; defendant offered only the testimony of two of his family members, and that testimony indicated that defendant himself was not the object of his father's abuse and that, through his childhood, defendant attended school and church and was properly housed, fed, and clothed.

1 Cases that cite this headnote

**[48]** **Sentencing and Punishment**  Vileness, heinousness, or atrocity

"Especially heinous, cruel, or depraved" aggravating factor is not unconstitutionally vague. 18 U.S.C.A. § 3592(c)(6).

5 Cases that cite this headnote

**[49]** **Sentencing and Punishment**  Instructions

"Especially heinous, cruel, or depraved" aggravating factor was not rendered overbroad by district court's definition of "serious physical abuse" as "a significant or considerable amount of injury or damage to the victim's body which involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty"; remainder of instruction made it clear that "serious physical injury" contemplated something more than amount of injury necessary to cause death. 18 U.S.C.A. § 3592(c)(6).

8 Cases that cite this headnote

**[50]** **Sentencing and Punishment**  Instructions

District court's instructions did not improperly invite jury to consider conduct of defendant's coconspirators in concluding that killing was especially heinous, cruel, or depraved; wording of aggravating factor itself provided that jury had to conclude that "the defendant" committed offense in that manner, and instructions provided that "the defendant" had to have specifically intended to inflict severe pain or suffering and

Supp. App. 007

that "the defendant" must have intended the abuse apart from the killing. 18 U.S.C.A. § 3592(c)(6).

11 Cases that cite this headnote

**[51]** **Sentencing and Punishment** Dual use of evidence or aggravating factor

Following conviction of kidnapping resulting in death, "especially heinous, cruel, or depraved" aggravating factor was not duplicative of factor that death occurred during course of kidnapping; fact that defendant raped victim prior to killing her was unnecessary to jury's conclusion that death occurred during course of kidnapping, but was clearly germane to determination that defendant committed offense in an especially heinous, cruel, or depraved manner. 18 U.S.C.A. §§ 1201, 3592(c)(6).

6 Cases that cite this headnote

**[52]** **Sentencing and Punishment** Killing while committing other offense or in course of criminal conduct

In prosecution for kidnapping resulting in death, jury's discretion in imposing death penalty was sufficiently narrowed by statutory aggravating factor that death occurred during commission of another offense. 18 U.S.C.A. §§ 1201, 3592(c) (1).

2 Cases that cite this headnote

**[53]** **Sentencing and Punishment** Harmless and reversible error

Following conviction of kidnapping resulting in death, any error was harmless with respect to submission of nonstatutory aggravating factor of effect of offense on victim's family; jury found aggravating factors that defendant intentionally killed victim during course of a kidnapping, that he killed victim in an especially heinous, cruel, or depraved manner, and that defendant constituted a future danger to lives and safety of other persons. 18 U.S.C.A. §§ 1201, 3595(c)(2).

9 Cases that cite this headnote

**[54]** **Sentencing and Punishment** Harmless and reversible error

Under a death penalty framework pursuant to which the sentencer weighs aggravating factors against mitigating factors in determining whether death constitutes the appropriate sentence, the consideration of a constitutionally infirm aggravating factor constitutes harmless error if, beyond a reasonable doubt, the sentence would have been the same had the sentencer never considered the invalid aggravating factor. 18 U.S.C.A. § 3595(c)(2).

2 Cases that cite this headnote

**[55]** **Constitutional Law** Adequacy of time to prepare; continuance

**Criminal Law** Want of time for preparation by counsel

**Criminal Law** Denial of continuance; time for preparation

District court did not deny defendant his rights to due process and the effective assistance of counsel under the Fifth and Sixth Amendments by denying his motion for a continuance to allow his counsel an additional thirty days to prepare for trial; defendant's second team of attorneys had over six months in which to prepare for trial, case was not one of exceptional complexity, district court found that prejudice was unlikely to result from denial of continuance, and there was no deficiency in representation that defendant received during stage of trial at which only one of defendant's appointed counsel could be present. U.S.C.A. Const.Amends. 5, 6.

1 Cases that cite this headnote

**[56]** **Criminal Law** Time of trial; continuance

The Court of Appeals reviews a district court's denial of a motion for a continuance for an abuse of discretion.

3 Cases that cite this headnote

**[57]** **Criminal Law** Time for trial or hearing; continuance

Supp. App. 008

A district court's denial of a continuance will warrant reversal only upon a showing that the denial caused the defendant to suffer serious prejudice.

3 Cases that cite this headnote

**[58]** **Criminal Law** 🔑 Want of Preparation

In determining whether to grant a continuance, the district court should examine (1) the amount of preparation time available, (2) whether the defendant took advantage of the time available, (3) the likelihood of prejudice from a denial, (4) the availability of discovery from the prosecution, and (5) the complexity of the case.

1 Cases that cite this headnote

**[59]** **Criminal Law** 🔑 Objections and disposition thereof

District court acted within its discretion in declining to poll jury regarding its possible exposure to television news broadcast during deliberations in penalty phase of trial; portion of broadcast directly related to trial did little more than recount procedural posture of case, and district court had repeatedly admonished jury to avoid media coverage of trial.

2 Cases that cite this headnote

**[60]** **Criminal Law** 🔑 Issues related to jury trial

The Court of Appeals reviews a district court's decision not to conduct a voir dire of the jury regarding its possible exposure to mid-trial publicity for an abuse of discretion.

1 Cases that cite this headnote

**[61]** **Criminal Law** 🔑 Initiation by defendant

Defendant reinitiated interrogation that led to his custodial statement, and thus interrogation did not violate defendant's Fifth or Sixth Amendment rights; defendant told agent that defendant wished to speak with law enforcement officials when he arrived at state in which he was arraigned, and when agents arrived at jail to interview defendant, defendant asked agents what had taken them so long to get there. U.S.C.A. Const.Amends. 5, 6.

**[62]** **Criminal Law** 🔑 Other offenses

Once a suspect invokes his Fifth Amendment right to counsel with respect to one offense, law enforcement officials may not reapproach him regarding any offense unless counsel is present. U.S.C.A. Const.Amend. 5.

**[63]** **Criminal Law** 🔑 Other offenses

An invocation of the Sixth Amendment right to counsel applies only with respect to the charged offense as to which it is invoked. U.S.C.A. Const.Amend. 6.

**[64]** **Criminal Law** 🔑 Other offenses

If an uncharged offense is extremely closely related to or inextricably intertwined with a charged offense, a defendant's invocation of his Sixth Amendment right to counsel with respect to the charged offense will also preclude further custodial interrogation regarding that uncharged offense. U.S.C.A. Const.Amend. 6.

**[65]** **Criminal Law** 🔑 What constitutes voluntary statement, admission, or confession

A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice. 18 U.S.C.A. § 3501(b).

**[66]** **Criminal Law** 🔑 Purging taint in general

The presence or absence of any of the statutory factors is not dispositive of the inquiry regarding the voluntariness of a confession. 18 U.S.C.A. § 3501(b).

**[67]** **Criminal Law** 🔑 Questions of Law or of Fact

**Criminal Law** 🗝 Admission, statements, and confessions

The ultimate determination of whether a confession was voluntary constitutes a question of law, but the Court of Appeals accepts the factual conclusions upon which the district court predicates its voluntariness determination unless they are clearly erroneous. 18 U.S.C.A. § 3501(b).

[68] **Criminal Law** 🗝 Voluntariness

Evidence supported finding that defendant's confession was voluntary; defendant had been arraigned before state court judge before he made his incriminating custodial statements, defendant had been advised of his right not to make a statement and right to have assistance of counsel, defendant requested interview at which he made his statement, and defendant chided agents for taking so long to come and talk to him. 18 U.S.C.A. § 3501(b).

[69] **Criminal Law** 🗝 Particular cases

Defendant's confession was not rendered involuntary by fact that he was not taken before federal magistrate judge until 28 days after he was taken into custody, where defendant was in custody solely on state charges at time of confession and there was no evidence that federal and state authorities were working in tandem in investigating defendant. 18 U.S.C.A. § 3501(c).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*388** Christopher Allan Curtis, Asst. U.S. Atty., Fort Worth, TX, Delonia Anita Watson, Dallas, TX, for Plaintiff–Appellee.

Marcia Adele Widder, Philadelphia, PA, Michael Logan Ware, Fort Worth, TX, Neal Walker, New Orleans, LA, for Defendant–Appellant.

David W. DeBruin, Thomas J. Perrelli, Elizabeth Appel Blue, Jenner & Block, Washington, DC, for American Orthopsychiatric Ass'n and American Ass'n on Mental Retardation, Amicus Curiae.

Appeal from the United States District Court for the Northern District of Texas.

Before KING, SMITH, and STEWART, Circuit Judges.

**Opinion**

KING, Circuit Judge:

Defendant–Appellant Orlando Cordia Hall challenges his conviction and sentence for kidnapping resulting in death, conspiring to kidnap, traveling in interstate commerce to promote possession of marijuana with intent to distribute, and using and carrying a firearm **\*389** during a crime of violence. For the reasons set forth below, we affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND

Orlando Cordia Hall, along with Bruce Webster and Marvin Holloway, ran a marijuana trafficking enterprise in Pine Bluff, Arkansas. They purchased marijuana in varying amounts in the Dallas/Fort Worth area with the assistance of Steven Beckley, who lived in Irving, Texas. The marijuana was transported, typically by Beckley, to Arkansas and stored in Holloway's house.

On September 21, 1994, Holloway drove Hall from Pine Bluff to the airport in Little Rock, Arkansas, and Hall took a flight to Dallas, Texas to engage in a drug transaction. Beckley and Hall's brother, Demetrius Hall (D. Hall), picked Hall up at the airport. Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis and Neil Rene (N. Rene), at a car wash and gave them $4700 for the purchase of marijuana. Later that day, Beckley and D. Hall returned to the car wash to pick up the marijuana, but Vitalis and N. Rene never appeared. Later, when Hall got in touch with Vitalis and N. Rene by telephone, they claimed that they had been robbed of the $4700. Using the telephone number that Beckley had used to contact Vitalis and N. Rene, Hall procured an address at the Polo Run Apartments in Arlington, Texas from a friend who worked for the telephone company. Hall, D. Hall, and Beckley began conducting surveillance at the address and saw Vitalis and N. Rene exit an apartment and approach the same car that they had driven to the car wash, which they claimed

Supp. App. 010

was stolen from them along with Hall's $4700. Hall therefore deduced that Vitalis and N. Rene had lied to him about being robbed.

On September 24, 1994, Hall contacted Holloway and had him drive Webster to the Little Rock Airport. From there, Webster flew to Dallas. That evening, Hall, D. Hall, Beckley, and Webster returned to the Polo Run Apartments in a Cadillac Eldorado owned by Cassandra Ross, Hall's sister. Hall and Webster were each armed with handguns, D. Hall carried a small souvenir baseball bat, and Beckley had duct tape and a jug of gasoline. The four men approached the apartment that they had previously seen Vitalis and N. Rene leave.

Webster and D. Hall went to the front door of the apartment and knocked. The occupant of the apartment, Lisa Rene, N. Rene's sixteen-year-old sister, refused to let them in and called her sister and 911. After Webster unsuccessfully attempted to kick in the door, he and D. Hall went around to a sliding glass door on the patio and saw that Lisa Rene was on the telephone. D. Hall shattered the glass door with his baseball bat, Webster entered the apartment, tackled Lisa Rene, and dragged her to the car. Hall and Beckley had returned to the car when they heard the sound of breaking glass. Webster forced Lisa Rene onto the floorboard of the car, and the group drove to Ross's apartment in Irving, Texas. Once there, they exited the Cadillac and forced Lisa Rene into the backseat of Beckley's car. Hall got in the backseat as well. Beckley got in the driver's seat, and Webster got in the front passenger seat. The group then drove off again. During the drive, Hall raped Lisa Rene and forced her to perform oral sex on him. The group later returned to Ross's apartment.

From there, Beckley, D. Hall, and Webster drove Lisa Rene to Pine Bluff. Hall remained in Irving and flew back to Arkansas the next day. Once Beckley, D. Hall, and Webster reached Pine Bluff, they obtained money from Holloway to get a motel room. In the motel room, they tied Lisa Rene to a chair and raped her repeatedly.

Hall and Holloway arrived at the motel room on Sunday morning, September 25, 1994. They went into the bathroom with Lisa Rene for approximately fifteen to twenty minutes. When Hall and Holloway came out of the bathroom, Hall told Beckley, "She know too much." Hall, Holloway, and Webster then left the motel.

Later that afternoon, Hall and Webster went to Byrd Lake Park and dug a grave. That same evening, Hall, Webster, and Beckley took Lisa Rene to Byrd Lake Park, but could not find the grave site in the dark. **\*390** They then returned to the motel room. In the early morning of Monday, September 26, 1994, Beckley and D. Hall moved Lisa Rene to another motel because they believed that the security guard at the first motel was growing suspicious.

Later the same morning, Webster, Hall, and Beckley again drove Lisa Rene to Byrd Lake Park. Lisa Rene's eyes were covered by a mask. Hall and Webster led the way to the grave site, with Beckley guiding Lisa Rene by the shoulders. At the grave site, Hall turned Lisa Rene's back toward the grave and placed a sheet over her head. He then hit her in the head with a shovel. Lisa Rene screamed and started running. Beckley grabbed her, and they both fell down. Beckley then hit Lisa Rene in the head twice with the shovel and handed it to Hall. Webster and Hall then began taking turns hitting her with the shovel. Webster then gagged Lisa Rene and dragged her into the grave. He covered her with gasoline and shoveled dirt back into the grave. Hall, Beckley, and Webster then returned to the motel and picked up D. Hall.

On September 29, 1994, an arrest warrant issued out of the City of Arlington for Hall, D. Hall, and Beckley for Lisa Rene's kidnapping. D. Hall, Beckley, and Webster were subsequently arrested. On September 30, 1994, Hall surrendered to Pine Bluff authorities in the presence of his attorney. On the advice of counsel, he did not give a statement at the time of his arrest, but indicated that he would talk with law enforcement agents after he was transported to Texas. On October 5, 1994, following his transfer to the Arlington County jail, Hall gave a written statement to FBI and Arlington County officials in which he substantially implicated himself in the kidnapping and murder.

On October 26, 1994, the United States District Court for the Northern District of Texas issued a criminal complaint charging Hall, D. Hall, Webster, and Beckley with kidnapping in violation of 18 U.S.C. § 1201(a)(1). On November 4, 1994, a six-count superseding indictment was returned, charging Hall, D. Hall, Webster, Beckley, and Holloway with kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1) (count 1), conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c) (count 2), traveling in interstate commerce with intent to promote the possession of marijuana with intent to distribute in violation of 18 U.S.C. § 1952 (count 3), using a telephone to promote

Supp. App. 011

the unlawful activity of extortion in violation of 18 U.S.C. § 1952 (count 4), traveling in interstate commerce with intent to promote extortion in violation of 18 U.S.C. § 1952 (count 5), and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (count 6). On February 23, 1995, the government filed its notice of intent to seek the death penalty against Hall pursuant to the Federal Death Penalty Act of 1994 (FDPA), 18 U.S.C. §§ 3591–3598. On April 6, 1995, the district court granted Hall's motion to sever his trial from that of his codefendants, and trial commenced on October 2, 1995.

The jury returned a verdict of guilty as to counts 1, 2, 3, and 6. After the penalty phase of the trial, the jury returned a recommendation that a sentence of death be imposed. The district court sentenced Hall to death on count 1, life imprisonment on count 2, sixty months imprisonment on count 3 to run concurrently with the life sentence imposed on count 2, and sixty months imprisonment on count 6 to run consecutively to the sentences imposed on counts 2 and 3. Hall filed a timely notice of appeal.

## II. DISCUSSION

Hall appeals his judgment of conviction and sentence on the following grounds:

1. The district court's failure to allow Hall to allocute before the jury violated his right to due process, violated Rule 32 of the Federal Rules of Civil Procedure, and was an abuse of discretion under the evidentiary standards governing the penalty phase of a capital trial under the FDPA.

2. The district court violated Hall's Fifth and Eighth Amendment rights by conditioning the admission of psychiatric testimony in mitigation of punishment upon Hall's submission to a government psychiatric examination prior to **\*391** conviction without restricting the government's access to the results of the examination until after the guilt phase of trial.

3. The district court abused its discretion by admitting certain materials and testimony into evidence because they were unfairly prejudicial.

4. The admission of evidence regarding unadjudicated offenses during the penalty phase and a lack of a jury instruction requiring the jury to apply some burden of proof to this evidence rendered the death sentence unreliable.

5. The admission of nontestimonial victim impact statements during the penalty phase violated Hall's Sixth Amendment right of confrontation, due process, and the FDPA's evidentiary standards.

6. The district court's rejection of defense challenges for cause to impaired and biased venirepersons denied Hall due process, an impartial jury, and his statutory right to free exercise of peremptory challenges.

7. The jury's failure to consider the circumstances surrounding Hall's upbringing as a mitigating factor was clearly erroneous and requires vacation of his death sentence.

8. Several of the aggravating factors submitted to the jury were unconstitutionally vague, overbroad, and duplicative.

9. The district court's denial of Hall's motions for continuance denied Hall his rights to due process and effective assistance of counsel under the Fifth and Sixth Amendments.

10. The district court erred in denying Hall's request to poll the jury regarding a news report and debate that aired during penalty-phase deliberations.

11. The district court erred in denying Hall's motion to suppress his oral and written statements as violative of his Fifth and Sixth Amendment rights as well as applicable federal statutes and rules.

We address each of these issues in turn.

### A. Allocution

Hall first contends that the district court's denial of his request to make an unsworn statement of remorse to the jury during the penalty phase of his trial constitutes reversible error.[1] In this regard, Hall advances a number of arguments. First, he contends that Rule 32(c)(3)(C) of the Federal Rules of Criminal Procedure afforded him a right to allocute before the jury. Second, he claims that, even if Rule 32(c)(3)(C) does not specifically create a right to allocute before the jury, such a right was recognized at common law, and the FDPA does not clearly abrogate this right. Third, he contends that he possesses a constitutional right to allocute. Fourth, he

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

claims that, even if no constitutional right to allocute exists per se, the district court's refusal to allow him to allocute in this case nonetheless violated his due process-based right to procedural parity because the district court unfairly allowed the government to present victim impact statements that were not subject to cross-examination. Fifth, he argues that the district court's refusal to allow him to make an unsworn statement of remorse before the jury constituted an abuse of discretion under the FDPA's evidentiary standards. We address each of these arguments in turn.

1. Statutory Right of Allocution

 **[1]**   Hall contends that Rule 32(c)(3)(C) of the Federal Rules of Criminal Procedure afforded him the right to make an unsworn statement of remorse before the jury. Rule 32(c)(3)(C) provides that, "[b]efore imposing sentence, the court must ... address the defendant personally and determine whether the defendant wishes to make a statement **\*392** and to present any information in mitigation of the sentence." Fed.R.Crim. P. 32(c)(3)(C).

In support of his contention that Rule 32(c)(3)(C) creates a right to make an unsworn statement before the jury in capital cases, Hall relies upon the following language from 18 U.S.C. § 3593(c), which establishes the procedures for sentencing hearings in capital cases:

> Notwithstanding rule 32(c) of the Federal Rules of Criminal Procedure, when a defendant is found guilty or pleads guilty to an offense under section 3591, no presentence report shall be prepared. At the sentencing hearing, information may be presented as to any matter relevant to the sentence....

18 U.S.C. § 3593(c). Hall argues that, because the statute expressly states that the portion of Rule 32 requiring the preparation of a presentence report is inapplicable in capital cases and makes no similar reference to any other portion of Rule 32, the doctrine of *expressio unius exclusio alterius* indicates that Congress did not intend for the FDPA to displace other provisions of Rule 32, including the right to allocute created by subsection (c)(3)(C).[2]

 **[2]**   We need not decide whether § 3593 was intended to displace Rule 32(c)(3)(C) because we conclude that, regardless of whether it was required to do so, the district court complied with the plain language of Rule 32(c)(3)(C) by inquiring of Hall whether he wished to make a statement

before it announced his sentence. The text of the rule provides no basis for concluding that the defendant has a right to make a statement to the jury prior to the jury's arriving at its sentencing recommendation. Compliance with the strict language of the rule is achieved when, as was the case here, the district court allows the defendant to make a statement to the court after the jury returns its recommendation but before the district court imposes sentence.[3]

Hall responds that this interpretation of Rule 32(c)(3)(C) would render allocution an empty gesture because the district court has no discretion to disregard the jury's recommendation. However, other circumstances exist in which allocution is equally devoid of practical impact. This is the case when the statutory mandatory minimum sentence for a particular offense exceeds the maximum sentence under the otherwise applicable U.S. Sentencing Guidelines range. In that circumstance, "the court is required to impose the statutory minimum sentence." *Santana v. United States, 98 F.3d 752, 756 (3d Cir.1996)*; *see also* u.S. Sentencing Guidelines Manual § 5G1.1(b) ("Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutory minimum sentence shall be the guideline sentence.").[4]

Furthermore, § 3593(c) counsels against construing Rule 32(c)(3)(C) as establishing an unconditional right for the defendant to make an unsworn statement of remorse to the jury. Section 3593(c) sets forth with great specificity the type of information that may be submitted to the jury during the penalty phase of a capital trial and the circumstances under **\*393** which it may be presented.[5] In this regard, the statute provides as follows:

> At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. The defendant may present any information relevant to a mitigating factor. The government may present any information relevant to an aggravating factor for which notice has been provided.... Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials *except that information may be excluded if its probative value*

Supp. App. 013

*is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.*

18 U.S.C. § 3593(c) (emphasis added). Construing Rule 32(c)(3)(C) as granting a defendant the unconditional right to make an unsworn statement of remorse to the jury would contravene § 3593's mandate that the district court exercise discretion in determining whether to exclude any information offered by the parties on the basis that its probative value "is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Id.* Section 3593(c) does not contemplate exempting any type of information offered at a sentencing hearing from the district court's gatekeeping function, and we decline to interpret Rule 32(c)(3)(C) to have this effect when the plain language of the rule does not dictate such an interpretation.

Furthermore, both Hall and the government concede that § 3593 authorized Hall to make a sworn statement of remorse that would have been subject to cross-examination.[6] Construing Rule 32(c)(3)(C) as creating a per se right to make an unsworn statement of remorse to the jury that is not subject to cross-examination would in no sense increase the accuracy and reliability of the capital-sentencing process. When the district court receives a statement in allocution, it recognizes the legal effect of the fact that the statements are not sworn and the attendant potential effect of this fact upon the credibility of the defendant's statements; the same cannot be said for a jury. *Cf. State v. Williams,* 688 So.2d 1277, 1284 (La.Ct.App.1997) ("The right of allocution has normally been reserved to a defendant addressing the sentencing judge."); *Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846, 858 (1989) ("We find no reason in law or logic why the defendant's presentation of evidence in support of his claim that life imprisonment is the appropriate sentence should be shielded from testing for truthfulness and reliability that is accomplished by cross-examination."). We therefore conclude that the district court did not violate Rule 32(c)(3)(C) by denying Hall's request to make an unsworn statement of remorse before the jury.

### 2. Common–Law Right of Allocution

**[3]**     Hall next contends that, even if Rule 32(c)(3)(C) does not expressly provide him with a per se right to make an unsworn statement of remorse before the jury, he possesses a common-law right to do so. He further argues that we should not construe § 3593 as abrogating this common-law right because "[i]t is a well-established principle of statutory construction

that '[t]he common law ... ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this purpose.' " *Norfolk Redev. & Housing Auth. v. Chesapeake & Potomac Tel. Co.,* 464 U.S. 30, 35, 104 S.Ct. 304, 78 L.Ed.2d 29 (1983) (quoting **\*394** *Fairfax's Devisee v. Hunter's Lessee,* 11 U.S. (7 Cranch) 603, 623, 3 L.Ed. 453 (1813) (second set of brackets and ellipses in original)). We conclude, however, that no such common-law right exists.

At common law, a felony defendant had a right to have the court formally inquire " 'what he had to say why judgment should not be given against him.' " Paul W. Barrett, *Allocution,* 9 mo. L.Rev. 121 (1944) (quoting *Rex & Regina v. Geary,* 2 Salk. 630 (K.B.1689–1712)); *see also State v. Green,* 336 N.C. 142, 443 S.E.2d 14, 42 (1994). The right of allocution developed in a time in which the common-law judge had no discretion as to the punishment for felonies; as such, the point of the question to the defendant was not to elicit mitigating information. *See* Barrett, *supra,* at 120–21. Rather, the question was designed to afford the defendant a formal opportunity to present certain strictly-defined common-law grounds requiring the avoidance or delay of sentencing, including a claim that the defendant was not the person convicted, had the benefit of clergy, was insane, or was pregnant. *See id.;* 1 joseph Chitty, The Criminal Law 698, 761–62 (1841); 3 charles Alan Wright, Federal Practice and Procedure § 525, at 82 (2d ed. 1982) ("The common law for many centuries has recognized the right of a defendant to 'allocution,' a formal statement by the defendant of any legal reason why he could not be sentenced.").

Since the mid-nineteenth century, however, modern developments in criminal procedure, including the advent of sentencing discretion, the right of the accused to counsel, and the right of the accused to testify on his own behalf, have led to varied treatment of the right of allocution. *See* Barrett, *supra,* at 126–43. Some jurisdictions have concluded that the common-law right of allocution encompasses the right of the defendant to make unsworn statements to the jury that are not subject to cross-examination. *See, e.g., Harris v. State,* 306 Md. 344, 509 A.2d 120, 127 (1986) ("We conclude that, under the common law applicable to capital sentencing proceedings at the time [the defendant] was sentenced, a defendant who timely asserts his right to allocute [before the jury], and provides an acceptable proffer, must be afforded a fair opportunity to exercise this right."); *Homick v. State,* 108 Nev. 127, 825 P.2d 600, 604 (1992) ("We conclude that capital defendants in the State of Nevada enjoy the common law right of allocution [before the jury]."); *State v. Zola,*

Supp. App. 014

112 N.J. 384, 548 A.2d 1022, 1046 (1988) (recognizing under the court's supervisory power the right of a capital defendant to make an unsworn plea for mercy to the jury); *State v. Lord,* 117 Wash.2d 829, 822 P.2d 177, 216 (1991) (indicating that the defendant had a right to make an unsworn plea for mercy before the jury that was not subject to cross-examination). However, other jurisdictions have held that no such common-law right exists. *See, e.g., People v. Robbins,* 45 Cal.3d 867, 248 Cal.Rptr. 172, 755 P.2d 355, 369 (1988) ("Given [that a capital defendant possesses the right to testify and offer other mitigating evidence], we fail to see the need, much less a constitutional requirement, for a corresponding 'right to address the sentencer without being subject to cross-examination' in capital cases."); *People v. Kokoraleis,* 132 Ill.2d 235, 138 Ill.Dec. 233, 547 N.E.2d 202, 224 (1989) (declining to exercise its supervisory power to recognize a rule "allowing defendants in capital sentencing hearings ... to make a brief, unsworn plea for leniency without being subject to cross-examination"); *State v. Whitfield,* 837 S.W.2d 503, 514 (Mo.1992) (en banc) ("Despite defendant's claim to the contrary, the right of allocution in Missouri does not extend to addressing the jury."); *State v. Perkins,* 345 N.C. 254, 481 S.E.2d 25, 41 ("[W]e have held that a defendant does not have a constitutional, statutory, or common law right to make unsworn statements of fact to the jury at the conclusion of a capital sentencing proceeding."), *cert. denied,* 522 U.S. 837, 118 S.Ct. 111, 139 L.Ed.2d 64 (1997); *Duckett v. State,* 919 P.2d 7, 22 (Okla.Crim.App.1995) ("[W]e conclude that there is no statutory, common-law or constitutional right of a defendant to make a plea for mercy or otherwise address his sentencing jury, in addition to closing argument by counsel." (footnote omitted)); *State v. Stephenson,* 878 S.W.2d 530, 551 (Tenn.1994) (holding that no common-law right of allocution exists in Tennessee because the right is nothing more than an empty formality in **\*395** light of the criminal defendant's right to counsel).

Suffice it to say, Hall stands on shaky ground when he asserts that a general common-law right exists entitling a capital defendant to address the sentencing jury unsworn and not subject to cross-examination. Moreover, even if such a common-law right existed, its continued recognition in federal capital cases would be inconsistent with the procedural framework for capital sentencing hearings established by the FDPA. As noted earlier, § 3593(c) vests the district court with a gatekeeping role in determining what information—both mitigating and aggravating—reaches the jury. It may exclude information "if its probative value is outweighed by the danger of creating unfair prejudice,

confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). The Pennsylvania Supreme Court interpreted that state's capital sentencing scheme, which vests the trial court with similar authority, to abrogate any common-law right of the defendant to make unsworn statements to the jury on the following grounds:

> Whatever force the common law of allocution has with respect to other criminal cases, the General Assembly has abrogated that law and replaced it with statutory law devised specifically for first degree murder cases. The legislature has provided that a sentencing hearing is required at which evidence may be presented to the jury, or the judge as the case may be. The court is given discretion to determine what evidence will be received as relevant and admissible on the question of the sentence to be imposed. Following the presentation of evidence, counsel are permitted to argue to the sentencing body for or against the death sentence.

> It is apparent from the structure provided that this evidentiary hearing is intended to serve as part of the "truth-determining process" to enable the sentencer to discern and apply the facts bearing on the determination of the appropriate sentence. Implicit in the fact that the statute assigns to the defendant the burden of proving mitigating circumstances by a preponderance of evidence is the understanding that the jury is to asses[s] the evidence for credibility. It must be left open for the Commonwealth to challenge the veracity of facts asserted and the credibility of the person asserting those facts, whether that person is a witness or the defendant. We find no reason in law or logic why the defendant's presentation of evidence in support of his claim that life imprisonment is the appropriate sentence should be shielded from the testing for truthfulness and reliability that is accomplished by cross-examination.

*Abu–Jamal,* 555 A.2d at 857–58. We find this analysis persuasive in construing the FDPA. We therefore conclude that Hall possessed no federal common-law right to allocute before the jury.

### 3. Allocution as an Independent Constitutional Right

Hall next asserts that he possesses a constitutional right to allocute before the jury. The Supreme Court has never squarely addressed the issue of whether a defendant who affirmatively requests the opportunity to allocute, either before the court or the jury, is denied due process by the trial court's refusal to grant the request. In *Hill v. United*

Supp. App. 015

*States,* 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), the Court held that a district court's failure to *expressly ask* a defendant represented by counsel whether he wished to make a statement before imposition of sentence was not an error of constitutional dimension and therefore provided no basis for a § 2255 collateral attack upon the defendant's sentence. *See id.* at 428, 82 S.Ct. 468. The court expressly declined to consider whether the district court's denial of an affirmative request by a defendant to make a statement prior to the imposition of sentence would rise to the level of constitutional error. *See id.* at 429, 82 S.Ct. 468; *see also McGautha v. California,* 402 U.S. 183, 219 n. 22, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) (noting that whether a trial court's denial of a defendant's request to plead for mercy rises to the level of a constitutional violation remains an open question), *vacated in part on other grounds, Crampton v. Ohio,* 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972).

**\*396** **[4]** We conclude that a criminal defendant in a capital case does not possess a constitutional right to make an unsworn statement of remorse before the jury that is not subject to cross-examination. In *Green v. United States,* 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961), Justice Frankfurter observed that the ultimate value of allocution as a procedural right in the context of modern criminal procedure rests in the fact that "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Id.* at 304, 81 S.Ct. 653. Neither the government nor Hall contends that Hall would not have been permitted to testify at the sentencing hearing and thereby in his own words introduce "any information relevant to a mitigating factor." 18 U.S.C. § 3593(c). We simply cannot conclude that fundamental fairness required that Hall be allowed to make such a statement without being sworn or subject to cross-examination.[7] This conclusion is bolstered by the varied conclusions that the states have reached, discussed *supra,* as to whether a criminal defendant has a right to make an unsworn statement of remorse or plea for mercy before a sentencing jury. *Cf. Medina v. California,* 505 U.S. 437, 446, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) ("Historical practice is probative of whether a procedural rule can be characterized as fundamental.").

4. Denial of Procedural Parity

**[5]** Hall next contends that, even if the Constitution does not vest criminal defendants with an independent, per se right to make an unsworn statement in allocution before the jury, the

district court's denial of his request to make such a statement was nonetheless unconstitutional because the district court allowed the government to introduce similarly nontestimonial victim impact statements. Hall contends that such disparate treatment constitutes an unconstitutional disruption of "the balance of forces between the accused and his accuser." *Wardius v. Oregon,* 412 U.S. 470, 474, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973). We disagree.

**[6]** The constitutionally required balance between prosecution and defense is "a balance between the total advantages enjoyed by each side rather than an insistence on symmetry at every stage in the process." *Tyson v. Trigg,* 50 F.3d 436, 441 (7th Cir.1995). In this case, we conclude that no significant imbalance existed in the total advantages afforded Hall and the government at sentencing. First, contrary to Hall's contention, the district court actually allowed him to present evidence of a type similar to the victim impact statements. Specifically, the district court allowed Hall to introduce hearsay evidence of his own remorse in the form of his sister's testimony of his statements of remorse to her when she visited him in prison. The government was not allowed to cross-examine Hall as to the contents of these statements.

Second, Agnes Rene, Lisa Rene's mother and the author of one of the three victim impact statements introduced at sentencing, testified during the sentencing hearing regarding the impact of the loss of her daughter. Hall declined to cross-examine her. This provides a strong indication that Hall did not consider cross-examination of the makers of the victim impact statements to be vital—or, for that matter, even beneficial—to his defense.

Third, the district court's refusal to allow Hall to make an unsworn statement that was not subject to cross-examination constituted at best a marginal procedural disadvantage. Had Hall taken the stand and offered limited testimony in substance equivalent to his proffered **\*397** statement in allocution, he would have waived his Fifth Amendment privilege against self-incrimination only as to matters reasonably related to the contents of that statement. *See Brown v. United States,* 356 U.S. 148, 156, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958) (holding that a criminal defendant "could not take the stand to testify in her own behalf and also claim the right to be free from cross-examination *on matters raised by her own testimony on direct examination* " (emphasis added)); *United States v. Hernandez,* 646 F.2d 970, 979 (5th Cir. Unit B June 1981) (noting that, in cross-examining a criminal defendant who chooses to testify, "[t]he government's questions must be

Supp. App. 016

reasonably related to the subjects covered by the defendant's direct testimony." (internal quotation marks omitted)).

A great deal of the type of information that the government would have likely sought to admit to impeach Hall's testimony or directly refute his claims of remorse and acceptance of responsibility was admitted as direct evidence of aggravating factors during the sentencing hearing, particularly the nonstatutory factor that "Hall constitutes a future danger to the lives and safety of other persons." Specifically, the government offered evidence of Hall's prior convictions and unadjudicated offenses. Additionally, the government introduced the testimony of Larry Nichols, one of Hall's fellow inmates at the correctional facility where Hall was incarcerated prior to trial. Nichols testified that Hall joked and bragged about repeatedly raping Lisa Rene. He also testified that Hall told him that, given the opportunity, he would kill Steven Beckley because, were it not for Beckley's assistance, the government would have had no case against him. Additionally, Nichols testified that Hall informed him of his plans to attempt to escape from the correctional facility in which they were incarcerated by taking his lawyer hostage using a "shank," a homemade knife. Hall has pointed to no information that would have been rendered relevant by virtue of his offering testimony similar in substance to his proffered statement in allocution which the government did not present as direct support of the aggravating factors the existence of which it sought to prove during the sentencing hearing. Thus, we conclude that the district court's decision to admit victim impact statements offered by the government but to exclude Hall's request to make an unsworn statement in allocution to the jury did not unconstitutionally skew the balance of procedural advantage in the government's favor.

5. Violation of § 3593's Evidentiary Standards

 **[7]**    **[8]**    Hall next argues that the district court abused its discretion in declining to allow him to make an unsworn statement of remorse and plea for mercy before the jury. Section 3593(c) provides that information need not be admissible under the Federal Rules of Evidence in order to be admissible at a hearing conducted pursuant to the statute. However, the statute provides that the district court may exclude information "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). The district court has "considerable discretion in controlling the presentation of

the 'information' to the jury in both content and form." *United States v. McVeigh,* 944 F.Supp. 1478, 1487 (D.Colo.1996).

Assuming that an unsworn statement such as the one Hall proffered is theoretically admissible during an FDPA sentencing hearing,[8] we conclude that the district court did not abuse its discretion in declining to admit it. The district court could properly conclude that the danger that Hall's unsworn, uncross-examinable testimony would mislead the jury outweighed the probative value of the information conveyed in the testimony, particularly given the fact that such information was readily available in a superior form:  **\*398**  Hall's sworn testimony, which would have been subject to testing for truthfulness and accuracy through cross-examination by the government.

B. Conditioning the Presentation of Psychiatric Evidence on Submission to a Psychiatric Examination

 **[9]**    Hall next contends that the district court erred in conditioning his right to present psychiatric evidence in mitigation of punishment upon his submission to a government psychiatric examination prior to trial. Hall first argues that the district court could not properly compel him to undergo a government psychiatric examination as a condition upon his being allowed to introduce psychiatric evidence at sentencing because doing so unconstitutionally forced him to choose between exercising his Fifth Amendment privilege against self-incrimination and his Eighth Amendment right to present evidence in mitigation of punishment. We disagree.

This court has long recognized that "a defendant who puts his mental state at issue with psychological evidence may not then use the Fifth Amendment to bar the state from rebutting in kind." *Schneider v. Lynaugh,* 835 F.2d 570, 575 (5th Cir.1988). This rule rests upon the premise that "[i]t is unfair and improper to allow a defendant to introduce favorable psychological testimony and then prevent the prosecution from resorting to the most effective and in most instances the only means of rebuttal: other psychological testimony." *Id.* at 576.

 **[10]**    Hall correctly notes that he did not waive his Fifth Amendment privilege against self-incrimination merely by giving notice of his intention to submit expert psychiatric testimony at the sentencing hearing. *See Brown v. Butler,* 876 F.2d 427, 430 (5th Cir.1989) (holding that the state could not introduce expert testimony based upon

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Supp. App. 017

a previous psychological examination of the defendant where the defendant announced an intention to offer expert psychological evidence but never actually did so). However, had he actually offered such evidence, the district court would not have violated Hall's privilege against self-incrimination by admitting psychiatric testimony subsequently offered by the government. Hall's claim that the district court could not condition his right to introduce expert psychiatric evidence based upon out-of-court examination of Hall upon his submission to a government psychiatric examination therefore lacks merit. In the same sense that Hall could not himself testify at the sentencing hearing regarding his remorse or acceptance of responsibility and then refuse cross-examination on this issue, he could not offer expert psychiatric testimony based upon his own statements to a psychiatrist and then deny the government the opportunity to do so as well in rebuttal. *See Estelle v. Smith,* 451 U.S. 454, 461–69, 472, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (holding that the admission of statements made by the defendant during a pretrial psychiatric examination violated his Fifth Amendment privilege against compelled self-incrimination because he was not advised before the examination that he had a right to remain silent and that any statement that he made could be used against him at a capital-sentencing hearing, but noting that "a different situation arises where a defendant intends to introduce psychiatric evidence at the penalty phase"); *Vanderbilt v. Collins,* 994 F.2d 189, 196 (5th Cir.1993) ("If a defendant requests a [psychiatric] examination on the issue of future dangerousness or presents psychiatric evidence at trial, the defendant may be deemed to have waived the fifth amendment privilege.").[9]

 **[11]**  Hall, along with the American Orthopsychiatric Association and the American Association on Mental Retardation as amici curiae, argues in the alternative that, in order to adequately safeguard his Fifth Amendment privilege against self-incrimination, the district court could not order a **\*399** government psychiatric examination unless it sealed the results of the examination until the penalty phase of trial. Otherwise, he argues, he could have no guarantee that the government would not utilize the results of the examination or the fruits thereof as evidence in the guilt phase of his trial. This argument lacks merit.

The Supreme Court has held that, when a defendant claims that the government has sought to introduce the fruits of a coerced confession, the defendant "must go forward with specific evidence demonstrating taint," upon which the government "has the ultimate burden of persuasion to show

that its evidence is untainted." *Alderman v. United States,* 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *see also Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939) ("[T]he trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin."); *United States v. Cherry,* 759 F.2d 1196, 1207 (5th Cir.1985) ("It is firmly established that, once the defendant goes forward with specific evidence demonstrating taint, the government has the final burden of persuasion to show that the evidence is untainted."); 5 wayne R. LaFave, Search and Seizure § 11.2(b), at 45 (3d ed.1996).

We are convinced that this evidentiary framework provides all of the protection against the introduction of the fruits of the government psychiatric examination prior to Hall's introduction of psychiatric evidence that the Constitution requires. Had Hall undergone the government psychiatric examination and believed that the government was improperly seeking to introduce evidence that it derived from the examination, he could have precluded the introduction of such evidence by offering some evidence of taint. The district court would have been required to exclude the evidence unless the government could carry its burden of persuading the court that the evidence was not tainted.

The only specific safeguard that Hall requested in his motion opposing the government's request for a psychiatric examination and oral argument on this motion was the sealing of the results of the examination until the penalty phase of his trial. Hall has cited several cases in which district courts have imposed such a safeguard. *See United States v. Beckford,* 962 F.Supp. 748, 761 (E.D.Va.1997); *United States v. Haworth,* 942 F.Supp. 1406, 1408–09 (D.N.M.1996); *United States v. Vest,* 905 F.Supp. 651, 654 (W.D.Mo.1995). While we acknowledge that such a rule is doubtless beneficial to defendants and that it likely advances interests of judicial economy by avoiding litigation over whether particular pieces of evidence that the government seeks to admit prior to the defendant's offering psychiatric evidence were derived from the government psychiatric examination, we nonetheless conclude that such a rule is not constitutionally mandated.

Our conclusion in this regard is bolstered by Rule 12.2(c) of the Federal Rules of Criminal Procedure, which provides that, when a defendant intends to rely upon an insanity defense during the guilt phase of his trial, the district court may order

Supp. App. 018

a mental examination upon motion by the government. *See* [Fed.R.Crim.P. 12.2(c)](). In order to safeguard the defendant's privilege against self-incrimination, the rule provides as follows:

> No statement made by the defendant in the course of any examination provided for by this rule, whether the examination be with or without the consent of the defendant, no testimony by the expert based upon such statement, and no other fruits of the statement shall be admitted in evidence against the defendant in any criminal proceeding except on an issue respecting mental condition on which the defendant has introduced testimony.

*Id.* Noticeably absent from the rule is any requirement that the government be denied access to the results of the examination until after the defendant actually introduces testimony regarding his mental condition. Rather, the rule merely precludes the government from introducing as evidence the results of the examination or their fruits until after the **\*400** defendant actually places his sanity in issue. Yet the rule has consistently been held to comport with the Fifth Amendment. *See, e.g., United States v. Lewis,* 53 F.3d 29, 35 n. 9 (4th Cir.1995); *United States v. Stockwell,* 743 F.2d 123, 127 (2d Cir.1984) ("[W]hile we do not wish to encourage the practice of requiring defendants to submit to a psychiatric examination in the prosecutor's presence (either in person or through the use of a tape recording), such a procedure cannot be said to constitute a *per se* violation of [Rule 12.2(c)]() and the defendant's Fifth Amendment rights."). Given that the government presents its case-in-chief during the guilt phase prior to the defendant, we perceive no functional distinction between the risk that the government will improperly utilize the fruits of a psychiatric examination undertaken pursuant to [Rule 12.2]() during its case-in-chief (and thus prior to the defendant's offering psychiatric evidence of insanity) and the risk that the government in this case would improperly utilize the fruits of the court-ordered psychiatric examination prior to Hall's introduction of psychiatric evidence during the penalty phase.[10] We therefore reject Hall's contention that the district court violated his Fifth Amendment privilege against self-incrimination by ordering him to undergo a psychiatric examination as a condition upon his offering psychiatric evidence during the sentencing hearing or by declining to order the results of the examination sealed until the sentencing hearing.[11]

### C. Admission of Unduly Prejudicial Evidence

**[12]** Hall next claims that the district court abused its discretion by admitting certain evidence which he claims was irrelevant and highly prejudicial. Specifically, he complains of the district court's admission of (1) graphic photographs of Lisa Rene's body; (2) a videotape depicting a walk through Byrd Lake Park to the grave site, surveillance of the area where Lisa Rene's burned clothing was recovered, and an examination of the grave site during the exhumation of Lisa Rene's body; and (3) testimony by Hall's girlfriend in which she claimed to have been robbed at gunpoint while purchasing drugs for Hall. We review a district court's evidentiary rulings for an abuse of discretion. *See United States v. Torres,* 114 F.3d 520, 525–26 (5th Cir.), *cert. denied,* 522 U.S. 922, 118 S.Ct. 316, 139 L.Ed.2d 244 (1997).

### 1. Photographs

**[13]** Hall claims that the district court abused its discretion by admitting photographs of Lisa Rene's body in the grave and after its removal during the guilt phase of his trial. Hall first argues that the photographs were rendered legally irrelevant by the fact that he offered to stipulate to the identity of the victim and her cause of death. Additionally, Hall complains that the photographs were particularly gruesome because they depicted Lisa Rene's body in a state of decomposition. He also argues that the photographs were cumulative of detailed testimony of a medical examiner regarding the condition of Lisa Rene's body. As such, he argues that the district court's admission of the photographs violated [Rule 403 of the Federal Rules of Evidence]() because any probative value the photographs might have possessed was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or **\*401** misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." [Fed.R.Evid. 403]().

We note as an initial matter that the photographs were relevant to Lisa Rene's identity and the cause of her death, and Hall's offer to stipulate to these facts did not render them irrelevant. The advisory committee notes to [Rule 401 of the Federal Rules of Evidence](), which establishes the definition of legal relevance, speak directly to this issue:

> The fact to which the evidence is directed need not be in dispute. While situations will arise which call for the exclusion of evidence offered to prove a point conceded by the opponent, the ruling should be made on the basis of such considerations as waste of time and undue prejudice

Supp. App. 019

(see Rule 403), rather than under any general requirement that evidence is admissible only if directed to matters in dispute.

Fed.R.Evid. 401 advisory committee notes. The reason that a criminal defendant cannot typically avoid the introduction of other evidence of a particular element of the offense by stipulation is that the government must be given the opportunity "to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight." *Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997) (internal quotation marks omitted). Our sole inquiry, then, is whether admission of the photographs violated Rule 403. *See id.*, 117 S.Ct. at 650 ("If ... relevant evidence is inadmissible in the presence of other evidence related to it, its exclusion must rest not on the ground that the other evidence has rendered it 'irrelevant,' but on its character as unfairly prejudicial, cumulative or the like, its relevance notwithstanding."). We conclude that admission of the photographs did not violate Rule 403.

In *United States v. McRae,* 593 F.2d 700 (5th Cir.1979), this court addressed a Rule 403 challenge to the district court's admission in a murder trial of numerous photographs of the victim and the death scene which the district court had described as "gross, distasteful and disturbing." *See id.* at 707. One of these photographs was "a view of [the victim's] corpse, clothed in her bloody garments, bent forward so as to display an exit wound in the back of her skull produced by part of [the defendant's] dum-dum bullet, which exploded in her brain"; another was "a front view of [the victim's] body, seated in the chair where she died, her left eye disfigured by the bullet's entry and her head broken by its force." *Id.* In holding that the admission of these photographs did not violate Rule 403, we observed,

> Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing.

*Id.* We see no basis for distinguishing between the photographs at issue in *McRae* and those at issue here. We therefore conclude that the district court did not abuse its discretion in concluding that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice or by concerns regarding the needless presentation of cumulative evidence. *See United States v.*

*Rezaq,* 134 F.3d 1121, 1138 (D.C.Cir.1998) (upholding a district court's admission of an autopsy photograph showing the removal of a bullet from a hijacking victim's head even though the photograph was only probative of the fact that the victim was shot in the head, a "point [that] did not especially need elucidation"); *United States v. Analla,* 975 F.2d 119, 125–26 (4th Cir.1992) (holding that the district court did not abuse its discretion in admitting photographs depicting two gunshot wounds to a robbery victim's head and another photograph depicting an individual murdered during the robbery lying in a pool of blood); *United States v. Bowers,* 660 F.2d 527, 529–30 (5th Cir. Unit B Sept.1981) (holding that the district court did not abuse its discretion in admitting a color photograph of a child's lacerated heart to prove cause of death and noting "that the mere fact that appellant stipulated **\*402** with the government as to the cause of death did not preclude the government from offering proof on that issue").

2. Videotape

**[14]** Hall next contends that the district court abused its discretion in admitting during the penalty phase of his trial a videotape depicting a walk through the park in which Lisa Rene was killed, the area where her burned clothes were recovered, and the exhumation of her body. He further complains that the district court erred by allowing the jury to view the tape during deliberations when they had not previously viewed it in open court.

We conclude that the district court did not abuse its discretion in concluding that the videotape's "probative value [was not] outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). As the government points out, the videotape was relevant to the aggravating factor that the killing was committed in a heinous, cruel, or depraved manner in that it depicted the path through the woods toward the grave site that Hall and his cohorts forced Lisa Rene to walk barefoot on two occasions. Moreover, the depiction of the grave site demonstrated the amount of planning that went into the murder and was thus probative regarding the aggravating factor that the murder was committed with substantial planning and premeditation.

**[15] [16]** Even if we were to conclude that the district court abused its discretion in admitting the videotape, such error was harmless. An erroneous evidentiary ruling constitutes harmless error if it does not affect the substantial rights of

the complaining party. *See Torres,* 114 F.3d at 526; *see also United States v. Asibor,* 109 F.3d 1023, 1032 (5th Cir.), *cert. denied,* 522 U.S. 902, 118 S.Ct. 254, 139 L.Ed.2d 182 , *and cert. denied,* 522 U.S. 1034, 118 S.Ct. 638, 139 L.Ed.2d 617 (1997). An error is deemed to have affected a criminal defendant's substantial rights if it " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *United States v. Lowery,* 135 F.3d 957, 959 (5th Cir.1998) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

We conclude that the videotape could not have had a substantial and injurious effect or influence on the jury's sentencing recommendation because, as Hall concedes, the contents of the tape were largely cumulative of the testimony and photographs admitted during the guilt phase of Hall's trial. *See United States v. Allie,* 978 F.2d 1401, 1409 (5th Cir.1992) (stating that the improper admission of evidence that is merely cumulative constitutes harmless error); 3A Charles Alan Wright, Federal Practice and Procedure § 854, at 311 (2d ed.1982) ("Error in the admission of evidence is harmless if the facts shown by that evidence are already before the jury through other properly-admitted evidence.").

As to Hall's claim that the district court improperly allowed the jury to view the videotape during deliberations even though the jury had not previously viewed the tape in open court, our review is sharply circumscribed by the scope of Hall's objection when the district court admitted the tape into evidence. Hall objected to the admissibility of the tape; however, he did *not* object to the district court's decision to allow the jurors to view the tape only at their discretion during deliberations. Accordingly, we review Hall's claim that the jury should not have been allowed to view the tape during deliberations when they had not previously viewed it in open court for plain error. *See* Fed. R.Crim. P. 52(b); *United States v. Jones,* 132 F.3d 232, 243 (5th Cir.1998).

 **[17]**   **[18]**   **[19]**   Under the plain error standard, we may reverse only if "(1) there was error (2) that was clear and obvious and (3) that affected [Hall's] substantial rights." *United States v. Dupre,* 117 F.3d 810, 817 (5th Cir.1997), *cert. denied,* 522 U.S. 1078, 118 S.Ct. 857, 139 L.Ed.2d 756 (1998); *see also United States v. Olano,* 507 U.S. 725, 731–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). "Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of [the plain error inquiry]." *Olano,* 507 U.S. at 735, 113 S.Ct. 1770. Even **\*403** when these

criteria are satisfied, we should exercise our discretion to reverse only if the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 732, 113 S.Ct. 1770 (internal quotation marks and brackets omitted); *see also Dupre,* 117 F.3d at 817.

 **[20]**   Assuming that the district court erred in allowing the jury to view the videotape only during deliberations, we cannot say that such error was open or obvious nor that it affected Hall's substantial rights. The only prejudice that Hall alleges resulted from the fact that the jurors did not view the tape in open court was that his counsel was prevented from making a record of any excessive or prejudicial responses to the evidence. However, Hall has cited no cases in which this court's evaluation of evidentiary rulings hinged upon the jury's actual reactions to the purportedly inadmissible evidence. Moreover, we note that, by giving the jury discretion as to whether to view the videotape, Hall was, at least in a limited sense, benefitted by the fact that the jury may *not* have viewed the tape. This is a possibility that would not have existed had the district court chosen to play the tape in open court. That may very well have been the reason that Hall's attorneys did not object to the district court's decision not to play the videotape in open court in the first place. Hall thus has not established that the district court's decision not to play the videotape in open court rises to the level of plain error.

3. Testimony Regarding Robbery of Hall's Girlfriend

 **[21]**   **[22]**   Hall next complains of the district court's admission of the testimony of LaTonya Anders, Hall's girlfriend, that she was robbed while in Houston attempting to purchase crack cocaine on Hall's behalf while he was on parole and that he continued to send her to purchase drugs after these incidents. This testimony was generally relevant to Hall's future dangerousness in that (1) it demonstrated the lengths to which Hall would go to continue his drug trafficking activities and (2) it demonstrated that he was an organizer and leader of criminal activity. While the small amount of testimony regarding Anders's robbery may have had little, if any, relevance to the aggravating factors that the government sought to prove, we are confident that, given the heinousness of the offense of which Hall was convicted, this isolated testimony could not have had a substantial and injurious effect or influence on the jury's sentencing recommendation. As such, any error in its admission was harmless.

Supp. App. 021

### D. Evidence of Unadjudicated Offenses

Hall contends that the district court improperly admitted evidence of unadjudicated offenses during the penalty phase. Specifically, Hall complains of the district court's permitting the government to introduce the testimony of Erma Willis and her son, Geren Willis, that, in May 1994, Hall waited in a car outside their home with a gun on the dashboard while Hall's cousin forced another individual to attempt to obtain money from Ms. Willis. David Baker, who at that time was employed as an Arkansas parole officer, testified that Ms. Willis reported the incident to him and that he forwarded the information to Hall's parole officer in Pine Bluff. Additionally, Hall complains of the testimony of Larry Nichols, an inmate in the same correctional facility where Hall was held prior to his trial, regarding Hall's plans to escape from prison and his threats against Beckley, discussed in Part II.A.4, *supra.*

Hall complains that introduction of the above testimony violated due process and the Eighth Amendment's "heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Caldwell v. Mississippi,* 472 U.S. 320, 340, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (quoting *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)). He contends that this problem was compounded by the fact that the district court did not instruct the jury that, in order to consider unadjudicated criminal offenses in determining whether the government had established a particular aggravating factor, it was required to conclude that the government had proven the occurrence of the unadjudicated offense by a particular quantum of proof. With respect to Nichols's testimony, Hall contends that the district court's failure **\*404** to instruct the jury regarding the evidentiary standard by which it was required to determine whether the conduct about which Nichols testified actually occurred allowed the jury to "conflate the process of fact-finding and risk assessment" by concluding that "the nature of the conduct Nichols alleged was so menacing that only a marginal amount of proof would suffice to warrant consideration of that conduct in support [of] the government's claim of future dangerousness."

 **[23]**    To the extent that Hall alleges that evidence of prior unadjudicated offenses is per se inadmissible on constitutional grounds, his claim lacks merit. *See Harris v.*

*Johnson,* 81 F.3d 535, 541 (5th Cir.1996) ("We previously have held that the use of evidence of unadjudicated extraneous offenses, at the sentencing phase of Texas capital murder trials, does not implicate constitutional concerns."); *Williams v. Lynaugh,* 814 F.2d 205, 208 (5th Cir.1987) (holding "that the admission of unadjudicated offenses in the sentencing phase of a capital trial does not violate the eighth and fourteenth amendments"); *Milton v. Procunier,* 744 F.2d 1091, 1097 (5th Cir.1984) (same).

 **[24]**    We are likewise unpersuaded by Hall's contention that the absence of an instruction regarding the evidentiary standard by which the government must prove the existence of unadjudicated offenses and other conduct that it advances in support of an aggravating factor constitutes reversible error. As we understand it, Hall's argument appears to be that, when the government offers evidence of an unadjudicated offense in support of an aggravating factor, the jury must be instructed that it cannot consider this evidence in determining whether the government has carried its burden of proving the aggravating factor beyond a reasonable doubt unless it has first determined that the evidence establishes by some quantum of evidence that the unadjudicated offense occurred.[12] Hall has offered no legal support for this proposition, and the only precedent that we have found militates against it. *See Harris,* 81 F.3d at 541 ("Fully aware that the due process clause clearly requires that for conviction the state must prove the elements of the offense charged beyond a reasonable doubt, neither we nor the Supreme Court has stated that a similar burden exists regarding the admission of evidence of unadjudicated offenses in a capital case sentencing hearing.").

 **[25]**    In any event, Hall neither proffered a proposed jury instruction informing the jury of the existence of the government's purported threshold evidentiary burden regarding unadjudicated offenses nor objected to the absence of such an instruction. He therefore did not preserve any error regarding the absence of this instruction. *See* Fed.R.Crim.P. 30 ("No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection."). The dearth of authority supporting Hall's position indicates that, even if the district court erred in failing to instruct the jury on the existence of a threshold evidentiary burden regarding unadjudicated offenses, such error was far from clear and obvious and thus did not constitute plain error

Supp. App. 022

warranting reversal. *See* Fed.R.Crim.P. 52(b); *Dupre,* 117 F.3d at 817.

E. Victim Impact Statements

Hall next contends that the district court committed reversible error by admitting three victim impact statements from Lisa Rene's relatives during the sentencing hearing. In this regard, Hall contends that (1) the victim impact statements introduced an arbitrary element into the jury's sentencing recommendation, thereby violating the Eighth Amendment and (2) admission of the statements violated his Sixth Amendment right to confrontation. We address each of these arguments in turn.

1. Eighth Amendment Arbitrariness

**[26]** Hall contends that the victim impact statements "injected emotional considerations **\*405** that had no relevant purpose in the proceedings" and thereby violated the Eighth Amendment. We disagree.

**[27]** In *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court held that the Eighth Amendment erects no per se barrier to the admission of victim impact evidence during the sentencing phase of a capital trial. *See id.* at 827, 111 S.Ct. 2597. In so doing, the Court observed that "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Id.* at 825. The Court went on to observe that "[t]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Id.* (internal quotation marks omitted). The Court thus concluded that "[t]here is no reason to treat [victim impact] evidence differently than other relevant evidence is treated." *Id.* at 827, 111 S.Ct. 2597. Victim impact evidence and argument based upon it therefore does not, by virtue of its substance, abridge a defendant's constitutional rights unless it "is so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* at 825; *see also Castillo v. Johnson,* 141 F.3d 218, 224 (5th Cir.1998).

The victim impact statements admitted here were not so unduly prejudicial that they rendered the trial fundamentally unfair. By and large, the statements did nothing more than generally describe Lisa Rene's character and her aspirations of becoming a doctor as well as the pain that her family members felt as a result of her senseless death. Hall specifically complains of the following statement in the victim impact statement of Nicholson Rene, Lisa Rene's father:

> I feel I have nothing to look forward to[ ].... If I was going to live twenty more years it will proba[b]ly be ten years. The loss of my daughter is killing me slowly inside. Since after the death of my daughter, I became a strong drinker.

We are confident that "this brief statement did not inflame [the jury's] passions more than did the facts of the crime." *Payne,* 501 U.S. at 832, 111 S.Ct. 2597 (O'Connor, J., concurring). As such, the contents of the victim impact statements did not render Hall's trial fundamentally unfair.

2. Sixth Amendment Right to Confrontation

**[28]** Hall next argues that the admission of nontestimonial victim impact statements violated his Sixth Amendment "right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). It is well established in this circuit that a criminal defendant's Sixth Amendment right of confrontation is sharply circumscribed in non-capital sentencing proceedings. *See United States v. Rodriguez,* 897 F.2d 1324, 1328 (5th Cir.1990). However, this circuit has not determined whether similar restrictions on a defendant's right to confrontation exist at a capital sentencing hearing.

In *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), the Supreme Court held that the imposition of a death sentence "based upon information supplied by witnesses with whom the accused had not been confronted and as to whom he had no opportunity for cross-examination or rebuttal" did not violate the defendant's right to due process under the Fourteenth Amendment where the defendant had not requested the opportunity for cross-examination or otherwise impugned the accuracy of the statements. *See id.* at 243–44, 252, 69 S.Ct. 1079. However, since its decision in *Williams,* the Supreme Court has "held that many of the protections available to a defendant at a criminal trial also are available at a sentencing hearing ... in a capital case."[13] *Bullington* **\*406** *v. Missouri,* 451 U.S. 430, 446, 101 S.Ct.

Supp. App. 023

1852, 68 L.Ed.2d 270 (1981). The Supreme Court's more recent jurisprudence regarding capital sentencing proceedings has led one circuit to conclude that the Sixth Amendment right to confrontation applies with full force in capital sentencing hearings. *See Proffitt v. Wainwright,* 685 F.2d 1227, 1254 (11th Cir.1982) ( "The Supreme Court's emphasis in [its recent] capital sentencing cases on the reliability of the factfinding underlying the decision whether to impose the death penalty convinces us that the right to cross-examine adverse witnesses applies to capital sentencing hearings. The Supreme Court has recognized cross-examination as 'the "greatest legal engine ever invented for the discovery of truth." ' " (quoting *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (quoting 5 john Henry Wigmore, Evidence § 1367 (3d ed.1940)))). *But see Bassette v. Thompson,* 915 F.2d 932, 939 (4th Cir.1990) (rejecting *Proffitt* and concluding that *Williams* dictates that a criminal defendant in a capital case has no right to cross-examine those who contribute information to the presentence report). We therefore assume without deciding that the Confrontation Clause applies to the sentencing phase of a capital trial with the same force with which it applies during the guilt phase.

 **[29]** **[30]** Confrontation Clause errors, like other trial errors, are subject to harmless-error analysis. *See Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *United States v. Ismoila,* 100 F.3d 380, 391 (5th Cir.1996), *cert. denied,* 520 U.S. 1219, 117 S.Ct. 1712, 137 L.Ed.2d 836, *and cert. denied,* 520 U.S. 1247, 117 S.Ct. 1858, 137 L.Ed.2d 1060 (1997). Such an error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Assuming that the admission of the victim impact statements constituted a violation of Hall's right to confrontation, we conclude that the error in this case meets this standard. During the sentencing hearing, Agnes Rene, Lisa Rene's mother, presented emotionally charged testimony that doubtless demonstrated with abundant clarity to the jury the devastating impact of Hall's crime upon Lisa Rene's family. This testimony, coupled with the powerful evidence regarding the heinous, cruel, and depraved nature of this offense, leads us to conclude beyond a reasonable doubt that the jury's sentencing recommendation would not have changed had the district court not admitted the victim impact statements.[14] We therefore reject Hall's contention that the district court's admission of the victim impact statements requires vacatur of his sentence.

## F. Rejection of Cause Challenges to Venirepersons

Hall claims that the district court committed reversible error by denying several of his challenges for cause to certain venirepersons, thereby forcing him to utilize his peremptory challenges to keep these individuals off the jury. He further alleges that this error was of constitutional dimension because one juror against whom he asserted a challenge for cause actually served on the jury.

 **[31]** The Sixth Amendment right to an impartial jury requires the exclusion of a potential juror if his "views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v.* **\*407** *Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). A prospective juror is substantially impaired in his ability to perform his duties in accordance with his instructions and oath if he "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

 **[32]** The Supreme Court has observed that a trial court's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." *Witt,* 469 U.S. at 429, 105 S.Ct. 844; *see also Fuller v. Johnson,* 114 F.3d 491, 500 (5th Cir.) ("A trial judge's finding of bias during voir dire is a determination of fact ...."), *cert. denied,* 522 U.S. 963, 118 S.Ct. 399, 139 L.Ed.2d 312 (1997). As such, "deference must be paid to the trial judge who sees and hears the [prospective] juror." *Witt,* 469 U.S. at 426, 105 S.Ct. 844. "We will only second-guess the court's decision that a juror is unbiased if there is an abuse of discretion." *United States v. Flores,* 63 F.3d 1342, 1357 (5th Cir.1995).

At this point, it is important to distinguish between the types of claims that Hall has asserted with respect to the district court's denial of his challenges for cause. Hall has asserted that the district court's denial of his challenges for cause violated (1) his Sixth Amendment right to an impartial jury and (2) his statutory right to free exercise of his peremptory challenges and his due process right not to have that statutory right denied arbitrarily. Disposition of these claims requires the application of distinct legal analyses.

Supp. App. 024

1. Sixth Amendment Right to Impartial Jury

 **[33]**   In *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), a direct criminal appeal from the Oklahoma Court of Criminal Appeals, the petitioner claimed that the trial court violated his Sixth Amendment right to an impartial jury, made applicable to the states via the Fourteenth Amendment Due Process Clause, by forcing him to expend one of his peremptory challenges to remove a venireperson who properly should have been removed for cause. *Id.* at 88, 108 S.Ct. 2273. The Supreme Court rejected this argument because, although the trial court erroneously failed to strike the challenged venireperson for cause, he "was in fact removed and did not sit." *Id.* The Court acknowledged that the petitioner "was undoubtedly required to exercise a peremptory challenge to cure the trial court's error," *id.,* but nonetheless concluded that this fact of itself did not establish a constitutional violation:

> [W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated. We conclude that no violation of petitioner's right to an impartial jury occurred.

*Id.* (citations omitted); *see also Herman v. Johnson,* 98 F.3d 171, 174 (5th Cir.1996), *cert. denied,* 520 U.S. 1123, 117 S.Ct. 1262, 137 L.Ed.2d 341 (1997); *United States v. Prati,* 861 F.2d 82, 87 (5th Cir.1988).

*Ross* makes clear that, in disposing of Hall's Sixth Amendment claim, our inquiry is limited to an evaluation of the impartiality of the venirepersons who actually served on Hall's jury. Hall has claimed that only one of his jurors, Stacey Leigh Donaldson, was not impartial. Therefore, our determination of whether Hall was denied his Sixth Amendment right to an impartial jury begins and ends with a determination of whether the district court abused its discretion in determining that Donaldson did not possess "views [that] would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Witt,* 469 U.S. at 424, 105 S.Ct. 844 (internal quotation marks omitted). We conclude that it did not.

 **\*408**   **[34]**   Hall claims that the district court should have struck Donaldson for cause solely because, when asked whether she could consider the fact that a defendant grew up in a dysfunctional, abusive family as a mitigating factor, she responded as follows:

> I don't know if I could or not. I would say my family was not exactly perfect, you know, and might to a degree be dysfunctional, but that doesn't give me the right to go out and commit violent acts.

This statement, particularly when taken in the context of the rest of Donaldson's voir dire indicates nothing more than that the degree of weight that Donaldson would afford family background as a mitigator depended upon the level of abuse the defendant was forced to endure during childhood. Specifically, Donaldson stated, "I think upbringing does, you know, to a degree have a factor, but it[s mitigating effect] would just depend upon what was brought to light as to what ... happened to the person." Clearly, the district court did not abuse its discretion in concluding that Donaldson lacked any bias that would substantially impair her ability to fulfill her oath as a juror and follow the court's instructions. Because the district court did not abuse its discretion in finding that Donaldson was impartial and because Hall has not alleged partiality on the part of any of the other individuals who served on his jury, he has failed to establish a violation of his Sixth Amendment right to an impartial jury.

2. Statutory Right to Free Exercise of Peremptory Challenges and Due Process

We have observed that, "[w]hile peremptory challenges, or the number provided by Fed.R.Crim.P. 24(b) may not be constitutionally required, it does not follow that a trial court's wrongful reduction of the number so provided is not reversible error on direct appeal." *United States v. Munoz,* 15 F.3d 393, 395 n.1 (5th Cir.1994); *see also United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976) ("[A]s a general rule it is error for a court to force a party to exhaust his peremptory challenges on persons who should be excused for cause, for this has the effect of abridging the right to exercise peremptory challenges."). We have further held that "[t]he denial or impairment of the right to exercise peremptory challenges is reversible error without a showing of prejudice." *United States v. Broussard,* 987 F.2d 215, 221 (5th Cir.1993); *see also Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Knox v. Collins,* 928 F.2d 657, 661

Supp. App. 025

(5th Cir.1991); *Nell,* 526 F.2d at 1229 ("Since the effect of the [district court's erroneous denial of a challenge for cause by the defendant] was to reduce the number of peremptory challenges allowed the defense, we have no choice but to reverse.").

Hall contends that the district court impaired his free exercise of his peremptory challenges by forcing him to use seven of his peremptory challenges to exclude venirepersons whom the district court should have excused for cause. These venirepersons included Diane Schwartz George, Susan Norman, Vicki Lane, Judith Dallinger, Joyce McGough, Linda Faye Palmer, and Randal Davis. We consider Hall's arguments with respect to each challenged venireperson in turn.[15]

a. Diane Schwartz George

 **[35]**    Hall claims that Diane Schwartz George should have been struck for cause because (1) she stated in her juror questionnaire that she supported the death penalty because she believed it saved taxpayer money and that, as a taxpayer, she did not "appreciate paying the[ ] 'bills' " of "certain criminals"; (2) during voir dire, she stated that the fact that a defendant had an abusive **\*409** childhood was "not something that would have much bearing" on her sentencing recommendation; and (3) when asked whether she could impose a life sentence if the government proved all of the aggravating factors as to which it gave Hall notice and the defendant established no mitigating factors, she responded that, "[w]ithout thinking about that more, I think I would have to say no," thereby saddling Hall with the burden of proving through mitigating factors that a sentence of death was inappropriate. We disagree.

First, while George indicated that, as a general matter, she favored the existence of the death penalty in part because of financial considerations, she also expressly stated that she would be able to base her decision on whether or not to impose the death penalty in this case solely upon the evidence presented during the trial. The district court could thus properly conclude that George was capable of "set[ting] aside [her] own predilections in deference to the rule of law." *Flores,* 63 F.3d at 1356.

 **[36]**    Second, George indicated that she could consider evidence of an abusive childhood as a mitigating factor but that such evidence might not weigh strongly in her

determination of whether the death penalty constituted an appropriate penalty in a particular case. Further, she indicated that the degree of mitigation that such evidence would warrant depends upon the strength of the evidence of abuse. The Constitution does not require that a juror be willing to give a mitigating factor any particular amount of weight; it only requires that the juror manifest an ability to consider such factors in determining whether death is an appropriate punishment. *See Eddings v. Oklahoma,* 455 U.S. 104, 114–15, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ("The sentencer ... may determine the weight to be given relevant mitigating evidence. But [it] may not give it no weight by excluding such evidence from [its] consideration."); *Cordova v. Collins,* 953 F.2d 167, 172 (5th Cir.1992) (holding that the defendant could not "make an arguable constitutional claim" based upon the trial court's failure to strike for cause a venireperson who "stated in voir dire that he would consider evidence of intoxication as a mitigating circumstance, but did not believe that that factor was entitled to receive much weight").

Third, George's statement that, "without thinking about it more," she believed that, in the absence of mitigating factors, she could not consider life imprisonment as an option if the government proved an aggravating factor beyond a reasonable doubt might, considered in a vacuum, indicate bias. However, George previously stated in response to a question by the government that, even in the absence of mitigating factors, she could consider the possibility of life imprisonment. Additionally, she expressly stated that she could follow the district court's instructions. Moreover, the answer was given in response to a rather complex question by defense counsel. Having heard and viewed the entire voir dire firsthand, the district court concluded, "based on the whole record, that [George] will consider all of the things she's supposed to consider, including if there's only aggravating factors presented, whether those aggravating factors should be enough for a vote for death or whether they are insufficient for death." On the basis of a cold appellate record, we cannot say that this determination constituted an abuse of discretion.

b. Susan Norman

 **[37]**    Hall claims that Susan Norman should have been struck for cause because (1) she stated during voir dire that, "[i]f a person takes another life in malice without feeling or remorse for such act, that person I believe should be punished to the full extent of the law"; (2) when asked whether a dysfunctional or physically abusive family would militate

against a death sentence, she responded, "I believe people can overcome things like that"; and (3) she indicated that she would "lean towards the death penalty" if the government proved one or more aggravating factors beyond a reasonable doubt and the defense offered no mitigating factors. We find these arguments unpersuasive.

First, while Norman indicated that she had a favorable attitude toward the death penalty, she also indicated that she would give "honest consideration" to any mitigating factor **\*410** raised by the defendant. *See Flores,* 63 F.3d at 1356 (observing that the Constitution requires the trial court to exclude only those jurors "who cannot set aside their own predilections in deference to the rule of law"). Second, just after her statement that she generally believed that people can overcome abusive childhoods, she stated, "I know in a lot of cases they can't." Norman's statements fall far from indicating that she would not consider such evidence. Third, the fact that Norman indicated that she would lean toward the death penalty if the government proved the existence of aggravating factors beyond a reasonable doubt and the defendant established no mitigating factors does not of itself indicate that she would be substantially impaired in her ability in that circumstance to weigh the evidence and determine whether death was an appropriate sentence. We therefore conclude that the district court did not abuse its discretion in denying Hall's challenge for cause to Norman.

c. Vicki Lane

 **[38]**    Hall claims that Vicki Lane should have been struck for cause because (1) she demonstrated general hostility to the prospect of life imprisonment for convicted murderers when she stated on a jury questionnaire, "I believe life without parole is a waste and a burden, financially and morally, to our state"; and (2) she indicated that she did not consider the existence of equally culpable defendants who did not receive the death penalty to be a mitigating factor. We reject these arguments.

During voir dire, Lane made abundantly clear that she considered herself fully capable of weighing aggravating and mitigating factors in determining an appropriate sentence and that the fact that a defendant had committed premeditated murder would not close her mind to the possibility of a life sentence. She also stated that she understood that financial considerations regarding keeping a defendant in prison for the rest of his life could not enter her consideration of the

appropriate sentence and that she would follow the court's instructions fully in serving as a juror. Moreover, she stated that, upon reaching a verdict of guilty, she would remain equally open to all sentencing options. Additionally, the court engaged in an extensive discussion with Lane regarding whether she could consider the existence of equally culpable defendants who did not receive the death penalty as a mitigating factor, and she ultimately stated that she could consider such evidence. In this regard, the district court concluded as follows:

> It doesn't seem unreasonable, looking at this totally in the abstract, that equally culpable defendants would strike some people as not a very strong mitigating factor. I think she ended up saying she would consider it.

Given that the district court had the opportunity to observe Lane's demeanor face-to-face, we decline to second-guess its determination that she was willing to give consideration to the existence of equally culpable defendants who would not receive the death penalty as a mitigating factor and that she simply did not consider this to be an especially weighty consideration. The Eleventh Circuit addressed a similar circumstance in *United States v. Chandler,* 996 F.2d 1073 (11th Cir.1993). In that case, the government sought the death penalty pursuant to 21 U.S.C. § 848, which is substantially similar to the FDPA in terms of the procedure utilized in obtaining a sentencing recommendation from the jury. *See Chandler,* 996 F.2d at 1079. During voir dire of the jury venire, a venireperson stated that she "did not believe that the defendant's age and past criminal history would affect her recommendation for or against a death sentence." *Id.* at 1103. In holding that the district court did not abuse its discretion in nonetheless choosing not to strike the venireperson for cause, the court observed,

> [The venireperson's] answers do not raise the primary concern of *Morgan;* that is, a juror who would automatically recommend a penalty of death regardless of any mitigating evidence. The statement that she would not consider two of the statutory mitigating factors was made in response to defense counsel's questions and in ignorance of the mandates of § 848. Jurors are not expected to know the law prior to being properly instructed. More important, **\*411** [the venireperson] stated that she would follow the district court's instructions in arriving at her decision. The district court thus did not abuse its discretion in finding that [the venireperson] would be able to follow the court's instructions.

Supp. App. 027

*Id.* We likewise conclude that the district court did not abuse its discretion in failing to strike Lane for cause in spite of her initial statement that she could not consider the existence of equally culpable defendants who did not receive the death penalty as a mitigating factor.

### d. Judith Dallinger

**[39]** Hall claims that Judith Dallinger should have been struck for cause because she had been exposed to pretrial publicity regarding the murder and indicated on her juror questionnaire form that she had developed an opinion that "the defendant and his associates committed the crime." During voir dire, Dallinger exhibited some equivocation regarding her ability to completely set aside the pretrial media coverage of the murder to which she had been exposed. However, when questioned by the court, Dallinger indicated that, while she was not certain that she could completely forget what she had heard in the media about the crime, she could prevent that exposure from playing a role in her decision-making process. She further agreed absolutely that the media could be unreliable and that a verdict must be based solely upon the evidence at the trial. She further indicated that a year had passed since she had seen media coverage of the murder and that she could not remember the specifics of the crime or the names of the alleged perpetrators. Based upon the entire record, the district court drew the following conclusions regarding Dallinger's fitness as a juror in response to Hall's challenge for cause:

> I overrule the objection, and I want to tell you mainly why. I'm convinced that when she told me that she saw that as her job to put [her prior exposure to media coverage and her opinions] out of her mind for the purpose of making a decision, she saw that as her job and she would do it, I think that was the truest expression. And I do think that given enough questioning any one of us would—could be led to doubt that.

> I've got to make up my mind based on conflicting answers and use my own credibility assessments. Some I haven't felt this way about. This one I do. I think she would follow the law, and I think she would be able to disconnect herself from what she may have heard or seen about the case outside the courtroom. She said as much, and I believe her.

**[40]** "A person is not automatically rendered unqualified to serve as a juror merely because he has been exposed to media coverage of the charged crime. The issue becomes whether exposure to media publicity will preclude the individual from returning a verdict based solely on the person's application of the law as stated to the evidence presented." *Bell v. Lynaugh,* 828 F.2d 1085, 1093 (5th Cir.1987); *see also Flores,* 63 F.3d at 1357. We decline to second-guess the district court's determination, made after a face-to-face credibility assessment and thorough questioning, that Dallinger could faithfully follow the court's instructions and reach a verdict based solely upon the evidence presented at trial. *See Bell,* 828 F.2d at 1093 (holding that the trial court properly declined to strike a venireperson for cause where, "[w]hen asked whether [a] newspaper article [discussing the crime at issue in the trial] had influenced her, she stated 'I guess he is more guilty, if I have to choose [between guilty and not guilty,]' and 'I felt like he was guilty by the paper,' " but responded negatively when asked by defense counsel, " 'Do you believe that based on what you have heard, or at least the impression that's left of what you have heard, which is natural, that that would, or could, affect some of your deliberations over issues of fact?' " (alterations in original)).

### e. Joyce McGough

**[41]** Hall claims that Joyce McGough should have been struck for cause because (1) she demonstrated an extremely negative attitude toward life imprisonment without the possibility of parole and stated that she would not impose such a sentence unless the **\*412** defense proved to her that it was appropriate, (2) she demonstrated discomfort with the notion of acquitting a defendant who was probably guilty even if she entertained a reasonable doubt about guilt, and (3) she could not consider evidence of a defendant's abusive childhood as mitigating. We disagree.

During the government's voir dire, McGough stated that, although she did not favor life imprisonment without the possibility of release as a potential sentence, she could nonetheless place her personal feelings regarding the sentence aside and consider it if instructed to do so by the court. She likewise unequivocally stated that, if she were instructed that she could return a guilty verdict only upon proof of guilt beyond a reasonable doubt, she would follow this instruction. McGough also noted that, when she previously served as a juror in a civil case, she was able to return a verdict that did not comport with her own beliefs regarding the fairness of the controlling rule of law but that was nonetheless dictated by the instructions given by the court. The district court also asked McGough whether she could consider the option of life

Supp. App. 028

imprisonment without possibility of release if instructed to do so without the interference of her personal feelings regarding the sentence, and she responded unequivocally that she could.

As to mitigating factors, while McGough initially indicated that she did not consider the factors of equally culpable defendants who did not receive the death penalty or an abusive or dysfunctional family upbringing to be mitigating, upon further examination, she stated that she could in good faith follow the court's instructions and consider such factors as mitigating if instructed to do so. Much like Lane, McGough's testimony indicates nothing more than that she did not consider these mitigating factors to be especially compelling; this fact did not render her an impartial juror. *See Eddings,* 455 U.S. at 114–15, 102 S.Ct. 869; *Chandler,* 996 F.2d at 1103. We therefore conclude that the district court did not abuse its discretion in concluding that McGough lacked any biases that would substantially impair her ability to fulfill her oath as a juror or follow the court's instructions.

f. Linda Faye Palmer

 **[42]**    Hall claims that Linda Faye Palmer should have been struck for cause because she stated in her juror questionnaire, and reiterated during voir dire, that capital punishment was appropriate for "intentional murder and for repeat violent criminals," that she favored more frequent executions, and that she considered the lethal injection "too good/easy for people convicted of capital murder." We find this argument unpersuasive.

During voir dire, Palmer stated that she would be able to set aside her opinions regarding the death penalty and render a verdict based solely upon the evidence and the court's instructions. She also stated that she could give fair and honest consideration to mitigating factors in determining an appropriate sentence. The district court therefore did not abuse its discretion in concluding that Palmer possessed no biases that would substantially impair her ability to fulfill her oath as a juror and follow the court's instructions.

g. Randal Davis

 **[43]**    Hall claims that Randal Davis should have been struck for cause because (1) he stated in his juror questionnaire that he believed that the death penalty was an appropriate punishment for several non-homicide offenses and was appropriate for all kidnappings resulting in death and (2) he indicated during voir dire that he would have difficulty giving mitigating weight to the existence of equally culpable defendants who did not receive the death penalty. However, we conclude that the record evinces no abuse of discretion on the part of the district court in declining to strike Davis for cause.

Davis assured the court during voir dire that he could follow its instructions and "fairly and sincerely in good faith consider the aggravating factors and weigh those against the mitigating factors and decide whether the aggravating factors were sufficient to justify a sentence of death." Further, Davis expressly stated that he could give "good faith, adult consideration" to the mitigating  **\*413**  factor of the existence of equally culpable defendants who did not receive the death penalty and that he would consider the factor important. We therefore conclude that the district court did not abuse its discretion in concluding that Davis was not substantially impaired in his ability to follow the court's instructions and fulfill his oath as a juror.

Because we have concluded that the district court did not abuse its discretion in declining to strike the venirepersons of whom Hall now complains for cause, the district court did not abridge Hall's statutory right to free exercise of his peremptory challenges. We therefore necessarily reject Hall's claim that the district court violated his right to due process by arbitrarily abridging his right to free exercise of his peremptory challenges.

G. Jurors' Failure to Find Abusive Childhood as a Mitigating Factor

Hall next complains of the fact that only one of the twelve jurors found the circumstances surrounding his upbringing to be a mitigating factor. He contends that the conclusion of the remaining eleven jurors that the circumstances surrounding his upbringing did not constitute a factor militating against a death sentence was clearly erroneous. In support of this contention, he notes that his mother, Betty Hall, and his older sister, Cassandra Hall, offered uncontroverted testimony that Hall's father, A.J. Hall, beat Hall's mother throughout their marriage, which ended in divorce when Hall was fifteen.

 **[44]**    As an initial matter, we question whether the jurors' failure to find a particular mitigating factor constitutes a proper subject of review for this court. The district court

Supp. App. 029

in this case submitted to the jury a special verdict form whereby they recorded the number of jurors who found each of the listed mitigating factors. However, this procedure is not required by the FDPA. Section 3593(d) provides that the jury "shall return special findings identifying any aggravating factor or factors set forth in section 3592 found to exist and any other aggravating factor for which notice has been provided under subsection (a) found to exist." 18 U.S.C. § 3593(d). However, the statute does *not* require the jury to return special findings regarding which mitigating factors the jury found to exist or the number of jurors who found that a particular mitigating factor existed. *See id.*

 [45]    [46]    Assuming, *arguendo,* that we possess the authority to review the jurors' special findings regarding mitigating factors, we must accept the jurors' factual determinations unless no reasonable juror could have arrived at the conclusion reached by the juror in question. *Cf. United States v. Robichaux,* 995 F.2d 565, 569 (5th Cir.1993) (noting that, in evaluating a claim that a jury's guilty verdict in a criminal trial is supported by insufficient evidence, the court "inquires whether a reasonable juror could find the evidence establishes guilt beyond a reasonable doubt" (internal quotation marks omitted)). "[D]etermining the weight and credibility of the evidence is within the sole province of the jury." *United States v. Garza,* 990 F.2d 171, 173 (5th Cir.1993) (internal quotation marks omitted); *see also United States v. Kelley,* 140 F.3d 596, 607 (5th Cir.1998).

 [47]    In support of his claim that he experienced an upbringing that militated against the imposition of the death penalty, Hall offered only the testimony of two of his family members, which the jury was free to believe or disbelieve. Additionally, this testimony indicated that Hall was not himself the object of his father's abuse and that, throughout his childhood, Hall attended school and church and was properly housed, fed, and clothed. We cannot conclude that no reasonable juror could conclude that Hall failed to establish by a preponderance of the evidence that he experienced a childhood that rendered him in some degree less deserving of the death penalty than he might otherwise be.

## H. Constitutionality of Aggravating Factors

Hall contends that several of the statutory and nonstatutory aggravating factors that the district court submitted to the jury to evaluate in determining whether to recommend **\*414** a death sentence were unconstitutionally vague, overbroad,

or duplicative. Specifically, Hall challenges the following factors:

(1) the statutory aggravating factor that "the defendant committed the offense in an especially heinous, cruel or depraved manner in that it involved torture or serious physical abuse of the victim," set forth in 18 U.S.C. § 3592(c)(6);

(2) the statutory aggravating factor that the death occurred during the commission of another offense, set forth in § 3592(c)(1); and

(3) the nonstatutory aggravating factor of "the effect of the instant offense on the family of Lisa Rene."

We consider each of these arguments in turn.

1. Offense Committed in an Especially Heinous, Cruel, or Depraved Manner

During the penalty phase, one of the aggravating factors about which the district court instructed the jury was that Hall "committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse of the victim, Lisa Rene." This statutory factor was accompanied by the following instruction:

To establish that the defendant killed the victim in an especially heinous, cruel, or depraved manner, the government must prove that the killing involved either torture or serious physical abuse to the victim. The terms "heinous, cruel, or depraved" are stated in the disjunctive: any one of them individually may constitute an aggravating circumstance warranting imposition of the death penalty. "Heinous" means extremely wicked or shockingly evil, where the killing was accompanied by such additional acts of torture or serious physical abuse of the victim as set apart from other killings. "Cruel" means that the defendant intended to inflict pain upon the victim in addition to killing the victim. "Depraved" means that the defendant relished the killing or showed indifference to the suffering of the victim, as evidenced by torture or serious physical abuse of the victim.

"Torture" includes mental as well as physical abuse of the victim. In either case, the victim must have been conscious of the abuse at the time it was inflicted. Furthermore, the defendant must have specifically intended to inflict severe mental or physical pain or suffering upon the victim, apart

from killing the victim. "Serious physical abuse" means a significant or considerable amount of injury or damage to the victim's body which involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty. Serious physical abuse—unlike torture—may be inflicted either before or after death and does not require that the victim be conscious of the abuse at the time it was inflicted. However, the defendant must have specifically intended the abuse apart from the killing.

Pertinent factors in determining whether a killing was especially heinous, cruel, or depraved include, but are not necessarily limited to, the following: infliction of gratuitous violence upon the victim above and beyond that necessary to commit the killing; needless mutilation of the victim's body; senselessness of the killing; and helplessness of the victim. The word "especially" should be given its ordinary, everyday meaning of being highly or unusually great, distinctive, peculiar, particular, or significant.

Hall contends that the "especially heinous, cruel, or depraved" aggravating factor is unconstitutionally vague, overbroad, and improperly allowed the jury to consider the conduct of his coconspirators in determining whether to impose the death penalty. We disagree.

 **[48]**     First, Hall's vagueness challenge is foreclosed by *United States v. Jones,* 132 F.3d 232 (5th Cir.1998). In that case, this court held that a § 3592(c)(6) aggravating factor and accompanying instruction virtually identical to that at issue here was not unconstitutionally vague. *See id.* at 249–50. We are therefore compelled by principles of intra-circuit *stare decisis* to conclude that the  **\*415**  instruction in this case is not unconstitutionally vague. *See United States v. Garcia Abrego,* 141 F.3d 142, 151 n. 1 (5th Cir.1998) ("It has long been a rule of this court that no panel of this circuit can overrule a decision previously made by another." (internal quotation marks omitted)).

 **[49]**     Hall next claims that the instructions accompanying this aggravating factor rendered it unconstitutionally overbroad. Specifically, Hall complains that the district court's definition of "serious physical abuse" would allow the jury to conclude that the killing was committed in an "especially heinous, cruel, or depraved" manner based solely upon the fact that Hall killed Lisa Rene. Hall bases this argument upon the fact that the district court defined "serious physical abuse" to include "a significant or considerable amount of injury or

damage to the victim's body, which involves a substantial risk of death," a definition that includes any killing.

Hall's argument ignores the remainder of the instruction, which makes clear that "serious physical injury" contemplates something more than an amount of injury necessary to cause death. Specifically, the instruction provides that, in order for a killing to be especially heinous, cruel, or depraved on the basis of an infliction of physical abuse, "the defendant must have specifically intended the abuse *apart from* the killing." Further, the instruction lists a number of factors for the jury to consider in determining whether the offense was especially heinous, cruel, or depraved, including "infliction of gratuitous violence upon the victim *above and beyond that necessary to commit the killing* " and "*needless* mutilation of the victim's body."

Hall also argues that the definition of "serious physical abuse" was suspect because it allowed the jury to consider conduct that occurred after Lisa Rene lost consciousness. However, we see no reason why the jury should have been precluded from considering such conduct because it constituted evidence that the killing was committed in a depraved manner in that it provides an indication that Hall "relished the killing." *Cf. Jones v. Murray,* 947 F.2d 1106, 1118 (4th Cir.1991) (holding that the Virginia Supreme Court had adopted a constitutionally limited construction of "vileness" as an aggravating factor where the state court had held that vileness was evinced by "an aggravated battery such as mutilation, gross disfigurement, or sexual assault committed upon a corpse or an unconscious body"). We therefore conclude that Hall has failed to establish that the district court's instructions regarding the "especially heinous, cruel, or depraved" aggravating factor rendered that factor unconstitutionally overbroad.

 **[50]**     Finally, Hall claims that the district court's instructions invited the jury to consider the conduct of Hall's coconspirators throughout the course of the kidnapping in concluding that the killing was "especially heinous, cruel, or depraved." However, the wording of the aggravating factor itself focuses upon the actions of Hall; it provides that the jury must conclude that "*the defendant* committed the offense in an especially heinous, cruel, or depraved manner." The instructions accompanying the aggravating factor removed any doubt that the jury was required to focus on *Hall's* actions in determining whether this aggravating factor existed. Specifically, the instructions provide that, in order for the killing to have involved torture, "*the defendant*

Supp. App. 031

must have specifically intended to inflict severe mental or physical pain or suffering upon the victim, apart from killing the victim." Similarly, the instructions provide that, in order for the killing to have involved serious physical abuse, "*the defendant* must have specifically intended the abuse apart from the killing."

 **[51]**     Hall finally argues that the "especially heinous, cruel, or depraved" aggravating factor was unconstitutionally duplicative of the factor that the death occurred during the course of a kidnapping. As the government points out, however, the fact that the murder occurred during the course of a kidnapping does not of itself indicate that the murder was "especially heinous, cruel, or depraved." Likewise, a murder not committed in the course of a kidnapping may be "especially heinous, cruel, or depraved." Moreover, the fact that Hall raped Lisa Rene prior to killing her was unnecessary to the **\*416**  jury's conclusion that the death occurred during the course of the kidnapping, but was clearly germane to the determination that Hall committed the offense in an especially heinous, cruel, or depraved manner. Hall has therefore failed to demonstrate any constitutional infirmity in the "especially heinous, cruel, or depraved" statutory aggravating factor.

2. Death During the Course of Another Offense

 **[52]**     Hall claims that the statutory aggravating factor that the death occurred during the commission of another offense, set forth in § 3592(c)(1), did not narrow the jury's discretion. We disagree.

In *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the petitioner was found guilty of capital murder on the basis of a Louisiana statute that defined capital murder to include scenarios in which " 'the offender has a specific intent to kill or inflict great bodily harm upon more than one person.' " *Id.* at 242–43, 108 S.Ct. 546 (quoting La.Rev.Stat. Ann. § 14:30A(3) (West 1986)). The Louisiana Code of Criminal Procedure provided that " '[a] sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, recommends that the sentence of death be imposed.' " *Id.* at 242, 108 S.Ct. 546 (quoting La.Code Crim. Proc. Ann. art. 905.3 (West 1984)). The sole statutory aggravating factor found by the jury and upheld by the Louisiana Supreme Court on direct review was that " 'the offender knowingly created a risk of death or great bodily

harm to more than one person.' " *Id.* at 243 (quoting La.Code Crim. Proc. Ann. art. 905.4(d) (West 1984)). The petitioner claimed that his death sentence was unconstitutional because the aggravating factor justifying its imposition did not narrow the class of persons eligible for the death penalty in that the statutory aggravating factor required proof of nothing more than that the defendant had committed capital murder. The supreme court rejected this argument:

> The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.
>
> ...
>
> Here, the "narrowing function" was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that "the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more.

*Id.* at 244–46.

Hall attempts to distinguish *Lowenfield* on the ground that Louisiana defined capital murder narrowly enough that the defendant was rendered death-eligible based solely upon his conviction. He notes that, in finding the petitioner guilty of capital murder, the jury in that case found that the petitioner killed more than one person with the specific intent to do so, and this circumstance alone was sufficient to render him eligible for the death penalty. Hall notes that conviction of the capital offense established by 18 U.S.C. § 1201 requires nothing more than proof beyond a reasonable doubt that the defendant committed a kidnapping in which "the death of any person result[ed]," regardless of the mental state of the defendant with respect to the death. He thus notes that conviction under § 1201 does not of itself render a defendant eligible for the death penalty. *See* **\*417** *Enmund v.*

Supp. App. 032

*Florida,* 458 U.S. 782, 797, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (holding that the Eighth Amendment does not permit imposition of the death penalty on a defendant "who aids and abets a felony in the course of which murder is committed by others but who does not himself kill, attempt to kill, or intend that killing take place or that lethal force will be employed").

While we agree with Hall that his conviction for violation of § 1201 did not, of itself, render him death-eligible, this fact does not render the aggravating factor that the death occurred during the course of a kidnapping constitutionally infirm. During the penalty phase, before it could consider this aggravating factor or any other, the jury was required to find beyond a reasonable doubt that Hall

   (A) intentionally killed [Lisa Rene];

   (B) intentionally inflicted serious bodily injury that resulted in the death of [Lisa Rene];

   (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and [Lisa Rene] died as a direct result of the act; or

   (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and [Lisa Rene] died as a direct result of the act.

18 U.S.C. § 3591(a)(2). Hall does not contend (nor can he) that he was not constitutionally eligible for the death penalty upon proof beyond a reasonable doubt that he committed a kidnapping during which death resulted and that, as to the death, Hall acted with one of the mental states listed above. *See Tison v. Arizona,* 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (holding "that major participation in [a] felony committed, combined with reckless indifference to human life, is sufficient to satisfy the [Eighth Amendment's] culpability requirement" regarding offenses that may be punishable by death). The fact that the jury was not required to find that Hall acted with a sufficiently culpable mental state to render him eligible for the death penalty until the penalty phase provides no material basis for distinguishing the aggravating factor at issue here from the one at issue in *Lowenfield.* "There is no question but that the [FDPA] narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating

circumstances and the exercise of discretion. The Constitution requires no more." *Lowenfield,* 484 U.S. at 246, 108 S.Ct. 546; *see also Jones,* 132 F.3d at 249 (holding that an aggravating factor based upon 18 U.S.C. § 3592(c)(1) was not unconstitutional).[16]

**\*418** 3. Effect on Lisa Rene's Family

[53]    Hall next argues that the nonstatutory aggravating factor of "the effect of the instant offense on Lisa Rene's family" was unconstitutionally overbroad and vague and that it was unauthorized by the FDPA. We need not reach this issue because we conclude that any error in submitting this aggravating factor to the jury was harmless.

[54]    The FDPA provides that, in reviewing a death sentence imposed pursuant to the act, "[t]he court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless." 18 U.S.C. § 3595(c)(2). Under a death penalty framework pursuant to which the sentencer weighs aggravating factors against mitigating factors in determining whether death constitutes the appropriate sentence, the consideration of a constitutionally infirm aggravating factor constitutes harmless error if, beyond a reasonable doubt, the sentence would have been the same had the sentencer never considered the invalid aggravating factor. *See Clemons v. Mississippi,* 494 U.S. 738, 753, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (noting that whether "beyond a reasonable doubt ... the jury's verdict would have been the same with or without the [constitutionally infirm] aggravating circumstance" constituted an appropriate harmless error inquiry when evaluating the submission of an improper aggravating factor under a weighing framework); *Wiley v. Puckett,* 969 F.2d 86, 91 (5th Cir.1992) (indicating that, in conducting a harmless-error analysis of the submission of an improper aggravating factor under a weighing framework, a "court [may] ask whether beyond a reasonable doubt the sentence would have been the same had the vague aggravating circumstance not been injected into the mix, or the court [may] ask whether beyond a reasonable doubt the sentence would have been the same had the circumstance been properly defined in the jury instructions").

Assuming that the nonstatutory aggravating factor of the effect of the instant offense on Lisa Rene's family was

Supp. App. 033

unconstitutionally overbroad or vague or that it was unauthorized by the FDPA, we conclude that the district court's error in submitting it to the jury was harmless. In addition to its determination that the effect of the offense on Lisa Rene's family constituted an aggravating factor, the jury also unanimously found the following aggravating factors: (1) that Hall intentionally killed Lisa Rene during the course of a kidnapping; (2) that he killed Lisa Rene in an especially heinous, cruel, or depraved manner; and (3) that Hall constitutes a future danger to the lives and safety of other persons. During the trial, the jury heard extensive evidence indicating that, during the course of the kidnapping, Hall and his coconspirators raped Lisa Rene, kept her tied up in a motel room for two days, forced her on two occasions to walk barefooted and masked through the woods to the site of her murder, brutally beat her into unconsciousness with a shovel, and buried her in a grave where she suffocated. Weighing against these facts and the aggravating factors that they prompted the jury to find unanimously were four mitigating factors: (1) "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death"; (2) "[t]he age of the defendant at the time of the offense"; (3) "[t]he circumstances surrounding the defendant's upbringing"; and (4) "[a]ny other aspect of the defendant's character or background which calls for a sentence less than death." Of these mitigating factors, only the first was found by more than one juror. Given the atrociousness of this crime and the relative paucity of mitigating factors, we have little difficulty concluding beyond a reasonable doubt that the jury would have returned a recommendation that Hall receive a death sentence regardless of whether it had considered the aggravating factor of the effect of the offense on Lisa Rene's family.

 **\*419** This conclusion is bolstered by this court's recent decision in *Jones,* 132 F.3d at 232. In that case, the court concluded that two of the four aggravating factors found by the jury—"[the victim's] personal characteristics and the effect of the instant offense on [her] family" and "[the victim's] young age, her slight stature, her background, and her unfamiliarity with [the area where the murder took place]"—were unconstitutionally vague, overbroad, and duplicative. *Id.* at 250–51. This left two valid aggravating factors substantially similar to two of the factors that the jury found unanimously in this case and that we have previously held pass constitutional muster: "[t]he defendant ... caused the death of [the victim], or injury resulting in the death of [the victim], which occurred during the commission of the offense of Kidnapping" and "[t]he defendant ... committed the offense

in an especially heinous, cruel, and depraved manner in that it involved torture or serious physical abuse to [the victim]." *Id.* at 248–50. Weighing against these aggravating factors were ten mitigating factors, many of which were found by more than one juror.[17] The court concluded beyond a reasonable doubt that the jury would have returned a recommendation of death even if it had not considered the two invalid aggravating factors. *See id.* at 252. Our harmless-error analysis in this case leads us to the same conclusion.

## I. Denial of Continuance

 **[55]** Hall claims that the district court denied him his rights to due process and the effective assistance of counsel under the Fifth and Sixth Amendments by denying his motion for a continuance to allow his counsel an additional thirty days to prepare for trial. Proper evaluation of this claim requires the construction of a brief chronology of events that transpired from the time of the issuance of the complaint in this case to the time of trial.

A federal complaint in this matter issued against Hall on October 26, 1994, and Hall was appointed counsel two days later. The district court initially set the trial of Hall and his codefendants for January 3, 1995. A superseding indictment containing capital charges was returned on November 22, 1994, and Hall entered a not guilty plea to the superseding indictment on November 28, 1994. On December 8, 1994, Hall filed a motion for a continuance, which the district court granted without setting a new trial date.

On January 6, 1995, the district court held a status conference at which the government indicated that it would likely seek the death penalty against Hall. The court also indicated a preliminary trial date of July 17, 1995. On February 23, 1995, the government filed its notice of intent to seek the death penalty against Hall.

On March 9, 1995, the district court granted a sealed motion by Hall's appointed counsel to withdraw from the case. On March 15, 1995, the district court entered an amended scheduling order setting Hall's trial for July 17, 1995. On March 21, 1995, the district court appointed new counsel, Jeffrey Kearney **\*420** and Michael Logan Ware, to represent Hall. On April 6, 1995, the district court granted Hall's motion for severance from the trial of his codefendants and entered a second amended scheduling order resetting Hall's trial for October 2, 1995.

Supp. App. 034

On August 2, 1995, Hall filed a motion for a continuance requesting an additional thirty days for trial preparation on the ground that one of his attorneys, Jeffrey Kearney, was scheduled for several trials prior to Hall's October trial date. The district court denied the motion on August 10, 1995. Hall unsuccessfully reurged his motion for a continuance immediately prior to jury selection and twice during the penalty phase. The district court allowed Hall to proceed with jury selection with one attorney present while the other continued to prepare for trial.

 [56]    [57]    We review a district court's denial of a motion for a continuance for an abuse of discretion. *See United States v. Davis,* 61 F.3d 291, 298 (5th Cir.1995). A district court's denial of a continuance will warrant reversal only upon a showing that the denial caused the defendant to "suffer [ ] serious prejudice." *United States v. Dupre,* 117 F.3d 810, 823 (5th Cir.1997), *cert. denied,* 522 U.S. 1078, 118 S.Ct. 857, 139 L.Ed.2d 756 (1998); *see also United States v. Scott,* 48 F.3d 1389, 1393 (5th Cir.1995); *United States v. Castro,* 15 F.3d 417, 423 (5th Cir.1994).

 [58]    In determining whether to grant a continuance, the district court should examine

> (1) the amount of preparation time available, (2) whether the defendant took advantage of the time available, (3) the likelihood of prejudice from a denial, (4) the availability of discovery from the prosecution, and (5) the complexity of the case.

*Scott,* 48 F.3d at 1393.

In this case, the district court did not abuse its discretion in concluding that a thirty-day continuance for trial preparation was not warranted. First, Hall's second team of attorneys had over six months in which to prepare for trial. Second, while we acknowledge that the FDPA creates a somewhat complex procedural framework and is of fairly recent vintage, our review of the record provides no indication that this was a case of exceptional complexity, particularly given that Hall put on no evidence at the guilt phase of his trial and focused solely on the penalty phase. Third, while Hall claims that the government's discovery in the case was voluminous, he makes no contention that open and complete discovery was not forthcoming. Fourth, the district court could properly conclude that prejudice was unlikely to result from denial of the continuance, given that Hall's motion for a continuance indicated no scheduling conflicts on the part of Michael Logan Ware, Hall's other appointed counsel. Further, while

Hall's motion for a continuance stated that his counsel lacked adequate time to investigate the case given that many potential witnesses were in Arkansas, on appeal, he merely makes a general claim that the refusal to grant the continuance denied him due process and the effective assistance of counsel. Hall's only specific allegation of prejudice resulting from the denial of the continuance is the fact that only one of his appointed counsel was present during the majority of jury selection. However, our review of the record reveals no deficiency in the representation that Hall received during this stage of the trial. We therefore conclude that the district court's denial of Hall's motion for a continuance provides no basis for reversing the district court's judgment of conviction and sentence.

## J. Failure to Poll the Jury Regarding Mid–Trial News Broadcast

 [59]    Hall claims that the district court abused its discretion in declining to poll the jury regarding their possible exposure to a television news broadcast during their deliberations in the penalty phase of Hall's trial. The jury began deliberations in the penalty phase on Friday, November 3, 1995. That evening, the district court released the jury for the weekend, and deliberations resumed the following Monday. After the jury returned to its deliberations on Monday, November 6, 1995, Hall moved the district court to either poll the jury or declare a mistrial on the basis of a news broadcast aired on a local station the night before. The broadcast, in its entirety approximately three minutes in **\*421** length, consisted of a thirty-second segment stating merely that the jury had found Hall guilty but had not yet completed deliberations regarding punishment followed by a brief debate between commentators regarding the appropriateness of the death penalty in cases of rape. After viewing a videotape of the broadcast, the district court denied both of Hall's motions.

 [60]    We review a district court's decision not to conduct a voir dire of the jury regarding their possible exposure to mid-trial publicity for an abuse of discretion. *See United States v. Rasco,* 123 F.3d 222, 230 (5th Cir.1997) (" 'It is for the trial judge to decide at the threshold whether news accounts are actually prejudicial; whether the jurors were probably exposed to the publicity; and whether the jurors would be sufficiently influenced by bench instructions alone to disregard the publicity.' " (quoting *Gordon v. United States,* 438 F.2d 858, 873 (5th Cir.1971))), *cert. denied,* 522 U.S. 1083, 118 S.Ct. 868, 139 L.Ed.2d 765 (1998). In *United States v. Herring,* 568 F.2d 1099 (5th Cir.1978), this court held that

the district court should grant a voir dire of the jury on the basis of mid-trial publicity if "serious questions of possible prejudice" exist. *Id.* at 1104. The court went on to hold that the determination of whether such questions exist requires a two-part inquiry:

A court must first look at the nature of the news material in question to determine whether it is innately prejudicial; factors such as the timing of the media coverage and its possible effects on legal defenses are to be considered.... Second, the court must ascertain the likelihood that the publicity has in fact reached the jury. The prominence of the media coverage and the nature and number of warnings against viewing the coverage become relevant at this stage of the inquiry.

*United States v. Manzella,* 782 F.2d 533, 542 (5th Cir.1986) (citing *Herring,* 568 F.2d at 1104–05).

In this case, we conclude that the district court did not abuse its discretion in declining to voir dire the jury regarding their possible exposure to the news broadcast. The portion of the broadcast directly related to Hall's trial did little more than recount the procedural posture of the case, and thus was not in any sense innately prejudicial. *See United States v. Martinez–Moncivais,* 14 F.3d 1030, 1037 (5th Cir.1994) (finding that publicity carried no potential for prejudice because "the news media had merely publicized an issue that the jurors had already been informed of by the judge himself"). The second segment of the broadcast was potentially more prejudicial. However, the district court could properly conclude that the likelihood that the jury was exposed to this portion of the broadcast was so remote that voir dire was not warranted.

Throughout the guilt phase of Hall's trial, the district court repeatedly admonished the jury to avoid media coverage of the trial, and it reemphasized these instructions during the penalty phase. It also provided the jurors with redacted newspapers. Moreover, prior to releasing the jury for the weekend during its penalty-phase deliberations, the court again gave the jurors a stern warning regarding the avoidance of media coverage: "[T]here will be media coverage, and you'll have to be very vigilant to avoid newspapers and television and radio, news coverage...." Given the court's admonition, it is unlikely that any of the jurors saw any portion of the broadcast in question. Moreover, any juror who happened to see the beginning of the broadcast likely would have, pursuant to the court's instructions, turned off the television before the prejudicial portion of the broadcast commenced. In sum, we conclude that the district court did not abuse its discretion in concluding that the likelihood

that the jury was exposed to the prejudicial portion of the broadcast was sufficiently low that voir dire of the jury was not warranted. *See United States v. Bermea,* 30 F.3d 1539, 1559 (5th Cir.1994) (noting that "[an] approach [that this court has] favored [in reducing the likelihood of the jury's exposure to prejudicial extrinsic information] is the giving of a blanket instruction to the jury not to view or listen to *any* radio or television news broadcasts or to read any newspapers except as provided by the court, and then to provide newspapers with any relevant portions redacted from them").

**\*422** K. Admissibility of Hall's Custodial Statement

Hall contends that the district court erred in denying his motion to suppress a custodial statement that he made to state and local law enforcement officials subsequent to his arrest. He argues that admission of the statement violated his Fifth and Sixth Amendment rights as well as 18 U.S.C. § 3501. Full review of these claims requires an overview of the facts surrounding Hall's arrest and subsequent detention as they were developed during the suppression hearing held by the district court.

1. Factual Background

On September 29, 1994, a Texas court issued a warrant for the arrest of Hall and two of his coconspirators for the aggravated kidnapping of Lisa Rene. That same date, a federal criminal complaint and arrest warrant were issued charging Hall with flight to avoid prosecution on the Texas charges in violation of 18 U.S.C. § 1073.

On September 30, 1994, Hall, accompanied by retained counsel, surrendered to law enforcement authorities in El Dorado, Arkansas. Hall was taken before an Arkansas magistrate, who made a determination that probable cause existed to hold Hall on the Texas charges. Hall waived extradition and agreed to return to Texas to face the state aggravated kidnapping charges.

That same day, Hall spoke with Special Agent Garrett Floyd of the Federal Bureau of Investigation and Detective Jim Ford of the Arlington Police Department in the presence of his retained counsel. Before speaking with Hall, Ford read Hall his *Miranda*[18] rights. Floyd testified at the suppression hearing that Hall told Ford and Floyd that he wished to talk to

Supp. App. 036

them in Texas. Floyd also testified that as he, Ford, and Hall's retained counsel left the room, Hall told Floyd, "It wasn't supposed to be that way. I'll talk to you about it when I get to Texas." Floyd also testified that after he escorted Hall back to the holding facility at the jail, Hall stated, "I'll tell you all about it when I get to Texas. Come and see me."

Hall was transported to Texas on October 4, 1994. On October 5, 1994, he was arraigned on the state kidnapping charge before a Texas municipal court judge. That afternoon, Ford and Floyd came to the Arlington jail, where Hall was being detained, to interview him. Floyd testified that, when they arrived, Hall asked what had taken them so long to come see him. Floyd and Ford read Hall his *Miranda* rights, secured a written waiver, and interviewed him for approximately six hours, during which time Hall made incriminating statements both orally and in writing. On October 28, 1994, after the federal complaint in this matter was returned, Hall was formally arraigned before a federal magistrate judge.

2. Constitutional Claims

 **[61]**    Hall first claims that his custodial statement to Floyd and Ford was inadmissible as substantive evidence against him at his trial because Floyd and Ford took the statement in violation of his Fifth and Sixth Amendment rights to counsel. We disagree.

 **[62]**    In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court held that, once the accused asserts his Fifth Amendment right to counsel and thereby "expresse[s] his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. 1880. In *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), the Court made clear that the *Edwards* rule is not offense specific. *See id.* at 682–84, 108 S.Ct. 2093; *see also McNeil v. Wisconsin,* 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *United States v. Carpenter,* 963 F.2d 736, 739 (5th Cir.1992). Once a suspect invokes his Fifth Amendment right to counsel with respect to one offense, law enforcement officials may not reapproach him regarding any offense unless counsel is present. *See McNeil,* 501 U.S. at 177, 111 S.Ct. 2204; **\*423** *Roberson,* 486 U.S. at 682–84, 687, 108 S.Ct. 2093; *Carpenter,* 963

F.2d at 739; *United States v. Cooper,* 949 F.2d 737, 741 (5th Cir.1991).

In *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), the Supreme Court held that the *Edwards* prophylactic rule applies when a defendant invokes his Sixth Amendment right to counsel at an arraignment and law enforcement officials subsequently initiate custodial interrogation of the defendant prior to providing him an opportunity to consult with counsel. *See id.* at 636, 106 S.Ct. 1404 ("*Edwards* is grounded in the understanding that the assertion of the right to counsel is a significant event and that additional safeguards are necessary when the accused asks for counsel. We conclude that the assertion is no less significant, and the need for additional safeguards no less clear, when the request for counsel is made at an arraignment and when the basis for the claim is the Sixth Amendment. We thus hold that, if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." (internal quotation marks and alterations omitted)).

 **[63]**    **[64]**    Unlike the Fifth Amendment right to counsel, the Sixth Amendment right is offense specific; an invocation of the Sixth Amendment right to counsel applies only with respect to the charged offense as to which it is invoked. *See McNeil,* 501 U.S. at 177, 111 S.Ct. 2204. Thus, *Roberson* 's extension of *Edwards* 's preclusion of police-initiated interrogation after the defendant's invocation of his Fifth Amendment right to counsel does not apply to an invocation of the defendant's Sixth Amendment right to counsel. A limited exception to this rule exists, however. If an uncharged offense is "extremely closely related" to or "inextricably intertwined" with a charged offense, a defendant's invocation of his Sixth Amendment right to counsel with respect to the charged offense will also preclude further custodial interrogation regarding that uncharged offense. *Carpenter,* 963 F.2d at 740; *see also Cooper,* 949 F.2d at 743. We have held that this is true even when the uncharged offense in question is a federal offense and the charged offense is a state offense. *See United States v. Laury,* 49 F.3d 145, 150 & n.11 (5th Cir.1995) ("In this case, the federal charges and state charges were identical, and therefore the invocation of the Sixth Amendment right on the state charges was sufficient to invoke the right on the federal charges.").

We accept, merely for the sake of argument, the highly dubious assumption that, by surrendering to law enforcement

Supp. App. 037

officials in the presence of counsel, Hall unequivocally invoked his Fifth Amendment right to counsel. We likewise assume that, at the point of his surrender, Hall had also invoked his Sixth Amendment right to counsel with respect to the Texas aggravated kidnapping charge and that this charge was so inextricably intertwined with the federal charges of which the jury convicted Hall in this case that the invocation of his Sixth Amendment right to counsel as to the Texas charge precluded law enforcement officials from later initiating interrogation regarding the federal charges. Accepting all of these assumptions, we believe that the district court correctly concluded that Hall reinitiated the interrogation that led to his custodial statement. As noted earlier, Agent Floyd testified that, in Arkansas, Hall told him that he wished to speak with law enforcement officials once he got to Texas and that, once Floyd and Ford arrived at the Arlington jail to interview Hall, Hall asked him what had taken them so long to get there. From this testimony, the district court could properly conclude that Hall, rather than Ford or Floyd, initiated the interrogation at the Arlington jail. As such, Hall's custodial statements did not violate the prophylactic rules designed to safeguard Fifth and Sixth Amendment rights. *See Edwards,* 451 U.S. at 484–85, 101 S.Ct. 1880 (holding that, once the accused asserts his Fifth Amendment right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police* " (emphasis added)); *Mann v. Scott,* 41 F.3d 968, 975–76 (5th Cir.1994) (holding that the defendant's custodial statement was not rendered inadmissible **\*424** based upon the fact that he had invoked his Sixth Amendment right to counsel prior to making the statement because the defendant had initiated the conversation with law enforcement officials that resulted in the statement).

3. Section 3501 Claim

Hall next argues that his custodial statement was inadmissible under 18 U.S.C. § 3501(b) and (c). First, he argues that his confession was involuntary under the criteria set forth in § 3501(b). Second, he argues that § 3501(c) renders his confession inadmissible because he was not brought before a federal magistrate judge until twenty-eight days after he was initially taken into custody by Arkansas law enforcement authorities. We consider each of these arguments in turn.

[65] [66] [67] A confession is voluntary if, "under the 'totality of the circumstances,' the statement is the product of the accused's 'free and rational choice.' " *United States v. Doucette,* 979 F.2d 1042, 1045 (5th Cir.1992) (quoting *United States v. Rogers,* 906 F.2d 189, 190 (5th Cir.1990)). Section 3501(b) provides that the trial judge should consider the following factors, among others, in determining whether a defendant voluntarily gave a confession:

> (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. § 3501(b). However, the presence or absence of any of these factors is not dispositive of the voluntariness inquiry. *See id.; United States v. Restrepo,* 994 F.2d 173, 184 (5th Cir.1993). The ultimate determination of whether a confession was voluntary constitutes a question of law, but we accept the factual conclusions upon which the district court predicates its voluntariness determination unless they are clearly erroneous. *See id.* at 183.

[68] As the district court concluded, Hall was arraigned on the charge of aggravated kidnapping by a Texas judge before he made his incriminating custodial statements to Floyd and Ford.[19] Further, Hall was advised of his right not to make a statement and his right to have the assistance of counsel on numerous occasions before he gave his statement. While Hall was not in the presence of an attorney when he actually made his statement, he had at least had an opportunity to consult with an attorney prior to making it. We acknowledge that Hall may not have been aware of the gravity of the offense of which he was suspected at the time of his statement, given that it is unclear whether he was aware that Lisa Rene's body had been discovered by the time he made his statement. However, considering that Hall actually requested the interview at which he made his statement and further chided Floyd and Ford for taking so long to come and talk to him, we have little trouble concluding, as the district court did, that Hall's confession was "the product of [his] free

Supp. App. 038

and rational choice." *Doucette, 979 F.2d at 1045* (internal quotation marks omitted).

 **[69]**    Hall next claims that his confession was involuntary under § 3501(c) because he was not taken before a federal magistrate judge until twenty-eight days after he was taken into custody in Arkansas. Section 3501(c) provides as follows:

  **\*425**  In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

18 U.S.C. § 3501(c). Hall contends that, because he confessed prior to his presentment before a federal magistrate judge and more than six hours after his arrest, § 3501(c) renders his confession presumptively involuntary.

We note as an initial matter that this court has rejected Hall's interpretation of § 3501(c) as rendering involuntary any confession made prior to presentment and more than six hours after arrest. In *United States v. Hathorn, 451 F.2d 1337 (5th Cir.1971)*, we stated,

While Section 3501(c) can be construed to mean that the only confessions obtained more than six hours after arrest that can be admitted are those that were elicited during the time necessary for travel to the magistrate, we [conclude] ... that Congress did not intend to legislate any such arbitrary edict. We believe the correct interpretation to be that Congress established six hours as a minimum period which would pass muster. If, therefore, a longer delay occurs, it merely constitutes another factor to be considered by the trial judge in determining voluntariness.

*Id.* at 1341; *see also United States v. Perez–Bustamante, 963 F.2d 48 (5th Cir.1992).* More to the point, however, is the fact that § 3501(c) is entirely irrelevant to this case.

In *United States v. Alvarez–Sanchez, 511 U.S. 350, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994)*, the Supreme Court held that, "[a]s long as a person is arrested and held only on state charges by state or local authorities, the provisions of § 3501(c) are not triggered." *Id.* at 358, 114 S.Ct. 1599. In reaching this conclusion, the court reasoned as follows:

Clearly, the terms of [§ 3501(c) ] can apply only when there is some "delay" in presentment. Because "delay" is not defined in the statute, we must construe the term "in accordance with its ordinary or natural meaning." *FDIC v. Meyer, 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994).* To delay is "[t]o postpone until a later time" or to "put off an action"; a delay is a "postponement." American Heritage Dictionary 493 (3d ed.1992). The term presumes an obligation to act. Thus, there can be no "delay" in bringing a person before a federal magistrate until, at a minimum, there is some obligation to bring the person before such a judicial officer in the first place. Plainly, a duty to present a person to a *federal* magistrate does not arise until the person has been arrested for a federal offense. See Fed. Rule Crim. Proc. 5(a) (requiring initial appearance before a federal magistrate). Until a person is arrested or detained for a federal crime, there is no duty, obligation, or reason to bring him before a judicial officer "empowered to commit persons charged with offenses against the laws of the United States," and therefore, no "delay" under § 3501(c) can occur.

*Id.* at 357–58, 114 S.Ct. 1599; *see also United States v. Romano, 482 F.2d 1183 (5th Cir.1973)* (providing that Federal Rule of Criminal Procedure 5(a)'s requirement that an officer making an arrest "take the arrested person without unnecessary delay before the nearest available federal magistrate ... applies **\*426**  only to arrests made by or for federal officials and does not apply to arrests made under state law for state offenses" (citations omitted)).

At the time of his confession, Hall was in custody on state charges. He surrendered to Arkansas law-enforcement authorities in response to the Texas warrant, and Arkansas authorities detained him on the basis that probable cause existed to believe that he committed the crime described in that warrant. The Texas municipal court judge arraigned him solely on the state charge. The fact that a federal complaint and warrant had been issued charging Hall with flight from prosecution at the time that he was taken into custody does

Supp. App. 039

not change the fact that Hall was in custody solely on state charges. *See United States v. Watson,* 591 F.2d 1058, 1062 (5th Cir.1979) (holding that § 3501(c) did not apply until a defendant who was being held in custody by state officials on a state charge of bank robbery was taken into federal custody even though a federal warrant had issued based on the same offense prior to the defendant's arrest by state officials).

Hall argues, however, that federal and state authorities were working in tandem in investigating Hall and that the circumstances surrounding his arrest and detention thus constitute an exception to the general rule that § 3501(c) and Rule 5 of the Federal Rules of Criminal Procedure do not apply to an individual in custody solely on state charges. In *Alvarez–Sanchez,* the Supreme Court observed that,

> [a]lthough we think proper application of § 3501(c) will be as straightforward in most cases as it is here, the parties identify one presumably rare scenario that might present some potential for confusion; namely, the situation that would arise if state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment. Long before the enactment of § 3501, we held that a confession obtained during such a period of detention must be suppressed if the defendant could demonstrate the existence of improper collaboration between federal and state or local officers.

*Alvarez–Sanchez,* 511 U.S. at 359, 114 S.Ct. 1599. The record reveals no such improper collaboration in this case. As the district court concluded, "[t]here is little, if any, evidence to suggest that [Hall] was being held by the state solely to permit in-custody interrogation by federal officials without compliance with Rule 5 or § 3501(c)." Indeed, Agent Floyd testified, and the district court found, that, at the time Hall made his custodial statement, Floyd was not even aware of the issuance of a federal warrant or complaint against Hall for flight from prosecution. We see no reason to disturb the district court's factual conclusion that the record in this case reflects the existence of nothing more than "routine

cooperation between local and federal authorities," which is "wholly unobjectionable." *Alvarez–Sanchez,* 511 U.S. at 360, 114 S.Ct. 1599. We therefore reject Hall's contention that § 3501(c) rendered his confession inadmissible as substantive evidence against him.

**L. Additional Review Under § 3595(a)**

In addition to imposing a duty upon the court of appeals to "address all substantive and procedural issues raised on the appeal of a sentence of death," the FDPA also imposes a duty upon this court to "consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of a[ ] [statutory] aggravating factor." 18 U.S.C. § 3595(c)(1). We have found nothing in the record indicating that the jury's recommendation of a death sentence was motivated in any degree by passion, prejudice, or any other arbitrary factor. Further, as noted in Part II.H.3, *supra,* in connection with our harmless error analysis of the district court's submission of the nonstatutory aggravating factor of the effect of the offense on Lisa Rene's family, the record contains ample evidence from which the jury could conclude beyond a reasonable doubt that the death occurred during the commission of a kidnapping, the aggravating factor set forth in § 3952(c)(1), and that Hall killed Lisa Rene in an especially heinous, **\*427** cruel, or depraved manner, the aggravating factor set forth in § 3592(c)(6).[20]

**III. CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's judgment of conviction and sentence.

**All Citations**

152 F.3d 381, 49 Fed. R. Evid. Serv. 1503

## Footnotes

1    Hall's proffered statement in allocution was as follows:

I want to apologize to my family and ask them to forgive me, and I hope somehow they can forgive me. I want to apologize to Lisa Rene's family and ask them to forgive me, even though I know that there is no possible way they can forgive me and I understand that. I want to ask God to forgive me, however, I question in my own mind whether even God can forgive me.

Supp. App. 040

2     In order to avoid confusion, it should be noted that the FDPA was enacted in an omnibus crime control act that also included another act which amended Rule 32. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, tits. VI, XXIII, secs. 60002(a), 230101(b), 108 Stat. 1796, 1959–68, 2078. The Rule 32 amendment moved allocution from subsection (a) to subsection (c) of Rule 32 and moved the requirement of preparing a presentence report from subsection (c) to subsection (b). It therefore appears that the phrase "[n]otwithstanding rule 32(c) of the Federal Rules of Criminal Procedure" in § 3593(c) refers to subsection (c) of the prior version of Rule 32 and subsection (b) of the current version of the rule.

3     While the record does not contain a transcript of the hearing at which the district court imposed sentence, the government represented at oral argument that, at this hearing, the district court asked Hall if he wished to make a statement before the imposition of sentence. In any event, even if this did not occur, Hall does not complain about it on appeal.

4     This is true unless the government files a motion authorizing the court "to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." 18 U.S.C. § 3553(e).

5     Hall concedes that his "proffered allocution constituted information relevant to the mitigating factors of remorse and acceptance of responsibility."

6     As indicated in Part II.A.5, *infra,* in connection with Hall's argument that the district court abused its discretion in declining to allow him to make an unsworn statement to the jury, we express no opinion as to whether the district court could properly exercise its discretion to allow a defendant to make such a statement.

7     Hall directs our attention to *United States v. Moree,* 928 F.2d 654, 656 (5th Cir.1991), in which we in passing described a criminal defendant's right to allocute under the subsection of Rule 32 that now occupies subsection (c)(3)(C) as "constitutional [in] dimension." *Id.* at 656. However, as noted earlier, we have not construed Rule 32(c)(3)(C) as affording a defendant a right to make a statement before the jury; rather, the rule merely requires the court to allow the defendant to make a statement at some point before it actually imposes sentence. As such, no conflict exists between *Moree* 's statement that the right to allocute afforded by Rule 32(c)(3)(C) is of constitutional dimension and our conclusion here that a criminal defendant possesses no constitutional right to make an unsworn statement of remorse before the jury that is not subject to cross-examination.

8     It is at least arguable that the district court may have discretion to admit an unsworn statement of remorse by the defendant because the general requirement that witnesses in criminal cases be sworn stems from Rule 603 of the Federal Rules of Evidence. *See* Fed.R.Evid. 603 ("Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so.").

9     By incorporating some of the pleadings that he filed at the district court level in his brief, Hall also attempts to reurge his argument asserted in the district court that the district court lacked statutory authority to order him to submit to a psychiatric examination. Because Hall has not adequately briefed this issue, we decline to address it. *See Yohey v. Collins,* 985 F.2d 222 (5th Cir.1993) (declining to consider arguments in other pleadings that the appellant attempted to incorporate by reference in a brief already in excess of the 50–page limit).

10     It is also worth noting that, had the district court granted Hall's request to seal the results of the examination until after the guilt phase, it would not have eliminated the risk that the government would have, either inadvertently or intentionally, introduced the results of the examination or their fruits prior to Hall's waiver of his privilege against self-incrimination by placing his mental state at issue. Section 3593(c) provides that, during the sentencing hearing, "[t]he government shall open the argument." 18 U.S.C. § 3593(c). To the extent that, pursuant to Hall's request, the government would have had access to the results of the psychiatric examination after the guilt phase but prior to the sentencing hearing, a risk would exist that the government would improperly utilize the results or their fruits during its initial presentation of information to the jury on sentencing.

11     We express no opinion on whether reversal would have been warranted if Hall had requested lesser safeguards, such as an order that the government utilize neither the results of the psychiatric examination nor their fruits prior to his presentation of psychiatric evidence during the sentencing hearing and the district court had ordered the examination without imposing such safeguards.

12     Hall has not specified what quantum of evidence, e.g., substantial evidence, preponderance of the evidence, clear and convincing evidence, beyond a reasonable doubt, he considers appropriate.

13     Moreover, it is significant that in *Williams* the Court addressed a due process challenge under the Fourteenth Amendment. The Court did not hold that the Sixth Amendment right to confrontation applied to the states via the Fourteenth Amendment's Due Process Clause until over fifteen years after *Williams* was decided. *See Pointer v. Texas,* 380 U.S.

400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). It is thus quite questionable whether *Williams* is controlling with respect to the determination of whether the Sixth Amendment right to confrontation extends to capital sentencing hearings.

In reaching this conclusion, we necessarily reject Hall's contention that his sentence must be vacated on the ground that the district court violated the evidentiary standard of § 3593 by admitting the victim impact statements. Even if the "probative value [of the statements was] outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury," 18 U.S.C. § 3593(c), to the extent that admission of the statements was harmless under the *Chapman* standard, it was necessarily harmless under the less stringent harmless-error standard applicable to nonconstitutional errors. *See United States v. Lowery,* 135 F.3d 957, 959 (5th Cir.1998).

In a footnote in his initial brief, Hall asserts that the district court should have struck a number of other venirepersons for cause. However, he provides no legal analysis as to why these venirepersons were impermissibly impaired. We therefore do not consider Hall's conclusory allegation that the district court should have stricken them for cause. *See* Fed. R.App. P. 28(a)(6) ("The argument must contain the contentions of the appellant on the issues presented, and the reasons therefor...."); *Bank One, Texas, N.A. v. Taylor,* 970 F.2d 16, 27 (5th Cir.1992) ("It is established law that matters which have not been adequately briefed are precluded from consideration on appeal.").

Hall also argues that this case is distinguishable from *Lowenfield* on the ground that, under Louisiana's death penalty framework, the jury is not required to weigh mitigating factors against aggravating factors. He argues that, under a weighing framework such as the FDPA, allowing the jury to consider the mere circumstance that established the basis of his conviction as an aggravating factor "would unfairly skew the weighing process in favor of death." *United States v. McVeigh,* 944 F.Supp. 1478, 1489–90 (D.Colo.1996). In support of this proposition, Hall relies upon the following language from *Stringer v. Black,* 503 U.S. 222, 231–32, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992):

> With respect to the function of a state reviewing court in determining whether the sentence can be upheld despite the use of an improper aggravating factor, the difference between a weighing State and a nonweighing State is not one of "semantics," ... but of critical importance. In a nonweighing State, so long as the sentencing body finds at least one valid aggravating factor, the fact that it also finds an invalid aggravating factor does not infect the formal process of deciding whether death is an appropriate penalty. Assuming a determination by the state appellate court that the invalid factor would not have made a difference to the jury's determination, there is no constitutional violation resulting from the introduction of the invalid factor in an earlier stage of the proceedings. But when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale.

*Id.* at 231–32. Hall's reliance upon this language, of course, begs the question of whether the fact that the death occurred during the course of a kidnapping is an "invalid factor." As indicated *supra,* we have concluded that the fact that the death was intentionally committed during the course of a kidnapping is a factor that may justify imposition of the death penalty. We likewise conclude that it is a factor that the jury may properly weigh against mitigating factors in determining whether the death penalty constitutes an appropriate punishment in a particular case.

The mitigating factors found by at least one juror in *Jones* included the following:

> (1) the defendant ... did not have a significant prior criminal record [found by six jurors];
>
> (2) the defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge [found by two jurors];
>
> (3) the defendant committed the offense under severe mental or emotional disturbance [found by one juror];
>
> (4) the defendant was subjected to physical, sexual, and emotional abuse as a child (and was deprived of sufficient parental protection that he needed) [found by four jurors];
>
> (5) the defendant served his country well in Desert Storm, Grenada, and for 22 years in the United States Army [found by eight jurors];
>
> (6) the defendant is likely to be a well-behaved inmate [found by three jurors];
>
> (7) the defendant is remorseful for the crime he committed [found by four jurors];
>
> (8) the defendant's daughter will be harmed by the emotional trauma of her father's execution [found by nine jurors];
>
> (9) the defendant was under unusual and substantial internally generated duress and stress at the time of the offense [found by three jurors];
>
> (10) the defendant suffered from numerous neurological or psychological disorders at the time of the offense [found by one juror].

*Jones,* 132 F.3d at 238 n. 3

*See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Supp. App. 042

Hall contends that the arraignment before the Texas municipal court judge did not constitute an "arraignment" within the meaning of § 3501(b) because it did not comport with the requirements of Rule 10 of the Federal Rules of Criminal Procedure. However, Hall has cited no authority for the proposition that a *state* arraignment must comport with the *Federal* Rules of Criminal Procedure in order to constitute an arraignment for purposes of the voluntariness calculus contemplated by § 3501(b).

Hall objects to the order of this court permitting him to file only a 100–page brief. We have allowed Hall to file a brief containing twice the normally applicable maximum number of pages and conclude that he was not denied due process or the effective assistance of counsel by not allowing him to file an even longer brief. *See* Fed. R.App. P. 28(g). We therefore decline to consider the arguments that Hall asserts in an appendix to his initial brief. *Cf. Conkling v. Turner,* 18 F.3d 1285, 1299 n.14 (5th Cir.1994) ("Attorneys cannot circumvent the fifty-page limit of Federal Rule of Appellate Procedure 28(g) by incorporating by reference a trial memorandum."); *Yohey v. Collins,* 985 F.2d 222 (5th Cir.1993) (declining to consider arguments in other pleadings that the appellant attempted to incorporate by reference in a brief already in excess of the 50-page limit).

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Supp. App. 043



ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ORLANDO CORDIA HALL, | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:00-CV-422-Y |
| | § | (Criminal No. 4:94-CR-121-Y) |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

MEMORANDUM OPINION AND ORDER
DENYING AMENDED MOTION TO VACATE CONVICTION AND SENTENCE

Petitioner Orlando Cordia Hall (Hall) is a federal prisoner under a death sentence who, having been being convicted of capital murder in this Court, has filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255. The government filed a brief opposing the motion and Hall replied. The Court denies Hall's motion.

I

**History of the Case**

On October 31, 1995, because of Hall's involvement in the kidnapping and death of Lisa Rene, a sixteen-year-old high-school student, a jury convicted Hall of kidnapping in which a death occurred, conspiracy to commit kidnapping, traveling in interstate commerce to promote possession of marijuana with intent to distribute, and carrying a firearm during a crime of violence. After a subsequent punishment hearing, the jury, after finding certain aggravating and mitigating factors to be present, recommended, by a unanimous vote, that Hall receive the death penalty. This Court formally imposed

1

Certified a true copy of an instrument
on file in my office on 8/24/04
Clerk, U.S. District Court,
Northern District of Texas
By _____ Deputy

Supp. App. 044

the death penalty on February 12, 1996.  The case was appealed to the Fifth Circuit Court of Appeals, which affirmed Hall's conviction and sentence. *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), *cert. denied*, 526 U.S. 1117 (1999).

Hall filed an initial motion to vacate in May 2000.  In June, this Court granted Hall's request to file a discovery motion, and Hall filed a motion for discovery in August and a supplemental motion for discovery in May 2001.  In April 2002, this Court denied his motions for discovery. Hall then filed an amended motion to vacate in June and a second amended motion to vacate in September 2002. The government filed its response in January 2003, and Hall filed a reply in March.  This Court conducted an evidentiary hearing on June 7, 2004, regarding Hall's third through fifth claims for relief.

The Fifth Circuit Court of Appeals recited the following factual background in its opinion on direct appeal:

> Orlando Cordia Hall, along with Bruce Webster and Marvin Holloway, ran a marijuana trafficking enterprise in Pine Bluff, Arkansas. They purchased marijuana in varying amounts in the Dallas/Fort Worth area with the assistance of Steven Beckley, who lived in Irving, Texas. The marijuana was transported, typically by Beckley, to Arkansas and stored in Holloway's house.
> On September 21, 1994, Holloway drove Hall from Pine Bluff to the airport in Little Rock, Arkansas, and Hall took a flight to Dallas, Texas to engage in a drug transaction.  Beckley and Hall's brother, Demetrius Hall (D. Hall), picked up Hall at the airport.  Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis and Neil Rene (N. Rene), at a car wash and gave them $4700 for the purchase of marijuana.  Later that day, Beckley and D. Hall returned to the car wash to pick up the marijuana, but Vitalis and N. Rene never appeared. Later, when Hall got in touch with Vitalis and N. Rene by

2

Supp. App. 045

telephone, they claimed they had been robbed of the $4700. Using the telephone number that Beckley had used to contact Vitalis and N. Rene, Hall procured an address at the Polo Run Apartments in Arlington, Texas from a friend who worked for the telephone company.  Hall, D. Hall, and Beckley began conducting surveillance at the address and saw Vitalis and N. Rene exit an apartment and approach the same car that they had driven to the car wash, which they claimed was stolen from them along with Hall's $4700.  Hall therefore deduced that Vitalis and N. Rene had lied to him about having been robbed.

On September 24, 1994, Hall contacted Holloway and had him drive Webster to the Little Rock Airport.  From there, Webster flew to Dallas.  That evening, Hall, D. Hall, Beckley, and Webster returned to the Polo Run Apartments in a Cadillac Eldorado owned by Cassandra Ross, Hall's sister.  Hall and Webster were each armed with handguns, D. Hall carried a small souvenir baseball bat, and Beckley had duct tape and a jug of gasoline.  The four men approached the apartment that they had previously seen Vitalis and N. Rene leave.

Webster and D. Hall went to the front door of the apartment and knocked.  The occupant of the apartment, Lisa Rene, N. Rene's sixteen-year-old sister, refused to let them in and called her sister and 911.  After Webster unsuccessfully attempted to kick in the door, he and D. Hall went around to a sliding glass door on the patio and saw that Lisa Rene was on the telephone. D. Hall shattered the glass door with his baseball bat, Webster entered the apartment, tackled Lisa Rene, and dragged her to the car.

Hall and Beckley had returned to the car when they heard the sound of breaking glass.  Webster forced Lisa Rene onto the floorboard of the car, and the group drove to Ross's apartment in Irving, Texas.  Once there, they exited the Cadillac and forced Lisa Rene into the backseat of Beckley's car.  Hall got into the backseat as well. Beckley got in the driver's seat, and Webster got in the front passenger seat.  The group then drove off again. During the drive, Hall raped Lisa Rene and forced her to perform oral sex on him.  The group later returned to Ross's apartment.

From there, Beckley, D. Hall, and Webster drove Lisa Rene to Pine Bluff.  Hall remained in Irving and flew back to Arkansas the next day.  Once Beckley, D. Hall, and Webster reached Pine Bluff, they obtained money from Holloway to get a motel room.  In the motel room, they tied Lisa Rene to a chair and raped her repeatedly.

3

Supp. App. 046

Hall and Holloway arrived at the motel room on Sunday morning, September 25, 1994.  They went into the bathroom with Lisa Rene for approximately fifteen to twenty minutes. When Hall and Holloway came out of the bathroom, Hall told Beckley, "She know too much." Hall, Holloway, and Webster then left the motel.

Later that afternoon, Hall and Webster went to Byrd Lake Park and dug a grave.  That same evening, Hall, Webster, and Beckley took Lisa Rene to Byrd Lake Park, but could not find the grave site in the dark.  They then returned to the motel room.  In the early morning of Monday, September 26, 1994, Beckley and D. Hall moved Lisa Rene to another motel because they believed that the security guard at the first motel was growing suspicious.

Later the same morning, Webster, Hall, and Beckley again drove Lisa Rene to Byrd Lake Park.  Lisa Rene's eyes were covered by a mask.  Hall and Webster led the way to the grave site, with Beckley guiding Lisa Rene by the shoulders. At the grave site, Hall turned Lisa Rene's back toward the grave and placed a sheet over her head.  He then hit her in the head with a shovel.  Lisa Rene screamed and started running.  Beckley grabbed her, and they both fell down.  Beckley then hit Lisa Rene in the head twice with the shovel and handed it to Hall.  Webster and Hall then began taking turns hitting her with the shovel.  Webster then gagged Lisa Rene and dragged her into the grave.  He covered her with gasoline and shoveled dirt back into the grave.  Hall, Beckley, and Webster then returned to the motel and picked up D. Hall.

On September 29, 1994, an arrest warrant issued out of the City of Arlington for Hall, D. Hall, and Beckley for Lisa Rene's kidnapping. D. Hall, Beckley, and Webster were subsequently arrested. On September 30, 1994, Hall surrendered to Pine Bluff authorities in the presence of his attorney.  On the advice of counsel, he did not give a statement at the time of his arrest, but indicated that he would talk with law enforcement agents after he was transported to Texas.  On October 5, 1994, following his transfer to the Arlington County jail, Hall gave a written statement to FBI and Arlington County officials in which he substantially implicated himself in the kidnapping and murder.

*Hall*, 152 F.3d at 389-90.

4

## II.

### *Standard of Review*

Title 28, U.S.C. § 2255 provides that a federal prisoner may move the convicting court to vacate, set aside, or correct a conviction or sentence based on its being imposed in violation of the Constitution or the laws of the United States. *See* 28 U.S.C. § 2255. A petition under § 2255 "may not do service for an appeal," and it is presumed that a defendant stands fairly and finally convicted. *United States v. Shaid*, 937 F.2d 228, 231-32 (5th Cir. 1991) (en banc), *citing United States v. Frady*, 456 U.S. 152, 164 (1982). Therefore a defendant may not raise even constitutional or jurisdictional issues for the first time on collateral appeal without establishing both cause for failing to raise the issue on direct appeal and actual prejudice resulting from the error. *Id*. A defendant must meet this cause-and-prejudice standard even where he alleges a fundamental constitutional error. *Id., citing Murray v. Carrier*, 477 U.S. 478, 493 (1986). Other types of error may be raised for the first time under § 2255 only if the defendant establishes that the error could not have been raised on direct appeal *and*, if the error were condoned, it would result in a complete miscarriage of justice. *United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992).

Moreover, claims that were also raised, and rejected, on direct appeal are also barred from federal habeas review. *United States v. Rocha*, 109 F.3d 225, 229 (5th Cir. 1997). A federal habeas petitioner

5

cannot, however, be expected to have raised a claim based on a Supreme Court case before that case was handed down. *Id.* Furthermore, ineffective assistance of counsel on appeal does satisfy the cause-and-prejudice standard. *Id.* And, finally, the Supreme Court has recently held that claims that counsel was ineffective at trial can be raised on habeas review under § 2255 regardless of whether or not the claims were previously raised on direct appeal. *United States v. Massaro*, 538 U.S. 500, 123 S.Ct. 1690, 1693-94, 155 L.Ed.2d 714 (2003).

## III

### *Issues Presented*

In his second amended motion to vacate his conviction and sentence, Hall raises the following nine issues in twelve claims for relief:

A.  Hall's rights under the Fifth Amendment were violated because the indictment against him did not allege any aggravating factors that rendered Hall eligible for the death penalty (claim one).

B.  Hall was denied his Sixth Amendment right to the effective assistance of counsel (claim two).

C.  A juror's contact with the victim's family and other extraneous information that entered into the jury's deliberations violated Hall's rights under the Fifth, Sixth, and Eighth Amendments. (claims three through five).

D.  The government violated Hall's rights under the Fifth and Sixth Amendments by failing to disclose exculpatory and mitigating information concerning government witness Larry Nichols (claim six).

6

Supp. App. 049

E.   Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated because of false testimony given by government witnesses Larry Nichols and Steven Beckley (claims seven and twelve).

F.   The government violated Hall's Sixth Amendment rights by using jail inmate Larry Nichols to elicit information from Hall(claim eight).

G.   Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated when the government provided a statement to the defense made by Alonso Airy that contained false information for the purpose of dissuading the defense from calling Airy to the stand(claim nine).

H.   The government interfered with Hall's Sixth Amendment right to counsel when it advised his initial defense attorneys about information that Hall intended to kidnap the attorneys in an escape attempt (claim ten).

I.   Hall's rights under the Fifth And Eighth Amendments were violated by the racially discriminatory effects of the federal capital sentence scheme (claim eleven).

Hall also requests an evidentiary hearing before this Court on all of his claims.

**IV**

***Procedural Bars***

In its response to Hall's petition, the government asserts procedural bars to this Court's consideration of many of the claims that Hall raises in his petition. The government asserts that Hall is procedurally barred from raising all but his second and part of his third through fifth claims for relief because the claims were

Supp. App. 050

not raised on direct appeal and he has failed to allege any cause and prejudice for the procedural default.

In his reply, Hall asserts that these claims are not procedurally barred from this Court's review because the claims are based on new factual or legal bases. Hall further asserts that he can establish cause and prejudice to overcome any procedural bar because his counsel were ineffective on direct appeal. With respect to Hall's third through fifth, and ninth through eleventh claims for relief, this Court agrees that these claims are based on new facts not previously available to Hall, including affidavits obtained from various individuals during the habeas process. Specifically, Hall's eleventh claim, a selective-prosecution claim, is based on statistics that were not available at the time of his trial or appeal. Moreover, Hall's first claim for relief is based on cases decided by the Supreme Court after Hall's direct appeal was final. Accordingly, none of these claims are procedurally barred from habeas review. Furthermore, as noted earlier, Hall's second claim for relief, alleging numerous ineffective-assistance-of-counsel claims, is cognizable on habeas relief. Finally, in the interests of justice, this Court will address Hall's sixth, seventh, eighth, and twelfth claims, although they were not raised on direct appeal and are not based on new law or facts, as Hall has alleged that his appellate counsel was ineffective for not raising these claims.

8

Supp. App. 051

**V**

*Discussion of Claims*

**A.   <u>Ring v. Arizona Claim</u>**

In his first claim for relief, Hall contends that his conviction and death sentence violate the Fifth Amendment.  Specifically, Hall asserts that, under the Supreme Court's recent cases *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the indictment against him violated his Fifth Amendment rights because it did not allege the aggravating circumstances and the culpable mental state that made Hall eligible for the death penalty under the Federal Death Penalty Act (FDPA).  The government responds that Supreme Court precedents do not require that these things be alleged in the indictment and that, in any event, this claim is unavailable to Hall at the habeas level because it is barred by *Teague v. Lane*, 489 U.S. 288, 310 (1989).

*Applicable Statutory Law*

Under 18 U.S.C. § 1201(a)(1), a person who unlawfully kidnaps a person and transports her to another state *shall* be punished by either life imprisonment or death where the death of any person results from the kidnapping.  In order for a person found guilty of such a kidnapping to be sentenced to death, the government must prove beyond a reasonable doubt at a sentencing hearing that the defendant either intentionally killed the victim, intentionally inflicted serious bodily injury that resulted in the death of the victim,

9

Supp. App. 052

intentionally participated in an act that resulted in the victim's death where the defendant contemplated that a life would be taken, or intentionally engaged in an act of violence with reckless disregard for human life where the act caused the death of the victim. 18 U.S.C. § 3591(a)(2).

Furthermore, under 18 U.S.C. § 3593(a)(1), the government must provide timely notice of its intent to seek the death penalty in a case where the death penalty is a possible sentence. This notice must set forth the aggravating factor or factors that the government intends to prove at the sentencing hearing. *See* 18 U.S.C. § 3593(a)(2), (b). Several aggravating factors are set forth in 18 U.S.C. § 3592(c), but the jury may consider other non-statutory aggravating factors if notice has been given.[1] At the conclusion of the sentencing hearing, the jury must make special findings setting forth which aggravating and mitigating circumstances, if any, it finds. Any findings with respect to an aggravating circumstance must be unanimous. 18 U.S.C. § 3593(d). If the jury unanimously finds the existence of at least one aggravating factor under § 3592(c), the jury must weigh all aggravating factors with any mitigating factors and must by unanimous vote determine that the aggravating factors outweigh any mitigating factors in order for a defendant to be sentenced to death. 18 U.S.C. § 3593(e).

---

[1] The statute also sets forth a number of mitigating circumstances to be considered by the jury in determining whether a sentence of death should be imposed. 18 U.S.C. § 3592(a).

Supp. App. 053

*Applicable Case Law*

In *Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999), a federal case involving a defendant who was convicted of carjacking, the Supreme Court held that, under the Fifth And Sixth Amendments, any fact, other than a prior conviction, that increases the maximum penalty for a crime must be charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt. In *Apprendi v. New Jersey*, a case involving a defendant sentenced for shootings under a hate-crimes statute, the Supreme Court extended this rule to state convictions under the Due Process clause of the Fourteenth Amendment. *Apprendi*, 530 U.S. at 491. The Supreme Court noted in *Apprendi*, however, that Apprendi had not raised a constitutional claim that the Fifth Amendment required that any factor that might enhance his sentence had to be presented in an indictment. Rather, Apprendi had raised only a claim that he had a right to trial by jury under the Due Process clause of the Fourteenth Amendment. *Id.* at 477, n. 3. The Supreme Court has subsequently reiterated that, under *Jones* and *Apprendi*, any fact, other than a prior conviction, that increases the penalty of a federal crime beyond its statutory maximum must be charged in the indictment. *United States v. Cotton*, 535 U.S. 625, 627 (2002).

Subsequently, in *Ring v. Arizona*, the Supreme Court in effect extended the rule announced in *Apprendi*, holding that under the Sixth and Fourteenth Amendments capital murder defendants are entitled to

11

a jury determination on any fact that increases their maximum punishment, such as aggravating circumstances that make a capital defendant eligible for the death penalty. *Ring*, 536 U.S. at 589. Again, however, Ring had not argued before the Supreme Court that his indictment was constitutionally defective under the Fifth Amendment because it did not charge the aggravating circumstances which made him eligible for the death penalty, and the case was not decided on that basis. *Id.* at 597, n. 4; *see also United States v. Bernard*, 299 F.3d 467, 489 (5th Cir. 2002) ("*Ring* did not hold that indictments in capital cases must allege aggravating and mental state factors.")

Recently, in *United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004), a direct appeal by another criminal defendant who received the death penalty in this court, the Fifth Circuit held that, following *Ring v. Arizona*, the Fifth Amendment requires the federal government to charge, by indictment, the statutory aggravating factors it intends to prove in order to render a defendant eligible for the death penalty. *Id.*, slip op. at 4. The Fifth Circuit further held, however, that such *Apprendi* error is susceptible to a harmless error review because it is not a structural error. *Id.*, slip op. at 5-6. The Court then held that the error was harmless beyond a reasonable doubt under the harmless-error test set forth in *Chapman v. California*, 386 U.S. 18 (1967), because the government provided notice of the statutory aggravating factors it intended to prove at trial

12

Supp. App. 055

four months prior to trial and because any rational grand jury would have found probable cause to charge Robinson with at least one of the aggravating factors that were omitted from his indictment. *Robinson*, slip op. at 8-9.

*Analysis*

At the punishment phase of Hall's trial, the jury found beyond a reasonable doubt that Hall intentionally engaged in conduct intending that Lisa Rene be killed or that lethal force be employed against her and her death was a result of this conduct, a mental state that made him eligible for the death penalty. (R. Nov. 6, 1995:5). Furthermore, the jury unanimously found the existence of two statutory aggravating factors and two non-statutory factors. Some jurors found the existence of four mitigating factors and, after weighing the aggravating and mitigating factors, the jury unanimously recommended the death penalty. (R. Nov. 6, 1995:5-7.)

Hall does not contend that his Sixth or Fourteenth Amendment rights were violated by the sentencing structure of the Federal Death Penalty Act. As required by *Apprendi* and *Ring*, the jury made the determination beyond a reasonable doubt that Hall had the requisite mental state that made him eligible for the death penalty, and the jury made the determinations regarding the aggravating factors, the existence of at least one being required in order for the death penalty to be imposed. Instead, Hall maintains that the indictment against him was "fatally flawed" under the Fifth Amendment because

13

it did not allege the mental state the government intended to prove under 18 U.S.C. § 3591(a)(2) and because the indictment did not allege what aggravating factors that the government intended to prove at sentencing pursuant to 18 U.S.C. § 3592(c). (Second Amended Petition at 25.)

As noted earlier, the Fifth Circuit has recently expanded the rulings in *Apprendi* and *Ring* to require not only that the jury make the findings regarding sentencing but also to require that the grand jury indictment set forth the mental state and aggravating factors intended to be proven by the government at sentencing. *See Robinson*, slip op. at 4. *Robinson*, however, was a direct-appeal case. The Fifth Circuit has specifically held that the rule announced in *Apprendi* is a new criminal procedural rule that is not retroactively applicable under the exceptions set forth in *Teague v. Lane*, 489 U.S. 288 (1989). *See United States v. Brown*, 305 F.3d 304, 309-10 (2002). Accordingly, *Apprendi* is not applicable to initial petitions under § 2255. *Id.* And the Supreme Court recently ruled that the rule in *Ring* is a new procedural rule that does not be apply retroactively to cases on habeas review. *Schirro v. Summerlin*, __ U.S. __, 124 S.Ct. 2519, 2526 (2004). If a federal habeas petitioner cannot apply retroactively the rulings in *Apprendi* nor *Ring* to a conviction that was final before these cases were handed down, under *Teague* the Fifth Circuit's ruling in *Robinson* is not applicable to Hall, whose conviction was final well before these cases were handed down by the

14

Supreme Court and the Fifth Circuit. Accordingly, this claim is *Teague*-barred.

With regard to Hall's substantive claim, the Fifth Circuit has held that *Apprendi* error, even on direct appeal, is subject to a harmless-error analysis. *See United States v. Matthews*, 312 F.3d 652, 665 (5th Cir. 2002); *United States v. Baptiste*, 309 F.3d 274, 278-79(5th Cir. 2002). In *Matthews*, the Fifth Circuit applied the *Chapman v. California*, 386 U.S. 18 (1967), harmless-error standard that is applicable on direct appeal and held *Apprendi* error to be harmless where, looking at the evidence presented at trial, it is clear that any rational jury would have charged the defendant with all of the elements of the crime. *Matthews*, 312 F.3d at 665-66. And, most recently, the Fifth Circuit applied the *Chapman v. California* harmless-error standard in *United States v. Robinson*.

Applying the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1992), which the Supreme Court established for use in federal habeas cases involving an allegation of constitutional error at trial, it was harmless not to include in the indictment against Hall the intent element or the statutory aggravating factors. Under this standard, in order to be entitled to habeas relief, a petitioner must prove that an error had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637-8. Hall has not shown a substantial and injurious effect or influence. He has not shown that, given the evidence presented to

15

Supp. App. 058

the petit jury, the grand jury would have declined to include in the indictment the specific intent element or at least one statutory aggravating factor. After all, the jury that decided Hall's sentence unanimously found the existence of requisite intent beyond a reasonable doubt and unanimously found the existence of several aggravating factors. Moreover, Hall has not shown that he was harmed by a lack of notice on these issues. The government provided the required statutory notice to defense counsel, setting forth both the specific intent and the aggravating factors it intended to prove at trial. Hall is therefore not entitled to relief on this claim, and his first claim for relief is denied.

**B.     Ineffective-assistance Claims**

In claim two, Hall asserts that his trial counsel were ineffective in numerous respects. Specifically, Hall contends that they were ineffective for: 1) failing to conduct a timely investigation into potential mitigating evidence, thereby emphasizing some evidence while not presenting more persuasive mitigating evidence through additional witnesses and presenting ill-prepared witnesses; 2) failing to present documentary evidence at the punishment phase of the trial to corroborate testimony; 3) failing to call available and known witnesses to testify at punishment; 4) failing to question government witnesses in order to present additional mitigating evidence; 5) failing to appropriately cross-examine government witness Larry Nichols at the punishment phase; 6) failing to re-interview

16

a potential defense witness after he appeared to have altered his testimony; 7) failing to make a closing argument at the guilt phase of the trial; 8) failing to argue effectively that Hall should have been allowed to make a statement in allocution; 9) making uninformed and unreasonable decisions regarding their choice and use of witnesses; 10) failing to adequately argue their motions for continuance; 11) making an ineffective closing argument at the punishment phase; and 12) failing to conduct an adequate *voir dire*.

*Standard of Review*

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344-45 (1980). In order to obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the *Strickland* test, in order to prove that his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. 466 U.S. at 687. Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689. *See also Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (habeas petitioner must show that trial result was unreliable or

17

proceeding fundamentally unfair due to deficient performance of counsel).

Recently, in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the Supreme Court applied the *Strickland* standard to a claim that counsel was ineffective by failing to investigate potentially mitigating evidence. In *Wiggins*, the Court stated that the appropriate inquiry is whether the investigation supporting counsel's decision not to present certain mitigating evidence was itself reasonable. *Wiggins*, 123 S.Ct. at 2536. This analysis is done by conducting an objective review of counsel's performance under the prevailing professional norms, in the context of counsel's perspective at the time of trial. *Id.*

*Analysis of Ineffectiveness Claims*

1. <u>Failure to Investigate</u>

Hall first contends that his trial counsel were ineffective for failing to conduct a timely investigation regarding potential mitigating evidence. Specifically, Hall faults counsel for not conducting adequate investigation on their own between the time they were appointed on March 21, 1995, and the beginning of Hall's trial, and for failing to seek the assistance of a mitigation expert until September 7, 1995, and not meeting with the appointed mitigation expert until September 15, 1995, when the voir-dire portion of Hall's trial began on October 1, 1995. Hall maintains that: because his trial counsel failed to timely investigate potential mitigating

18

Supp. App. 061

evidence, they unreasonably made the decision to rely on the "equally-culpable-co-defendants" statutory mitigating factor, rather that investigating mitigating evidence about Hall's deprived background; the defense witnesses who did testify about Hall's background at the punishment phase of the trial were ill-prepared; and trial counsel failed to present testimony from numerous other witnesses.

With regard to a capital sentencing proceeding, defense counsel has the obligation to conduct a "reasonably substantial, independent investigation" into potential mitigating circumstances. *Lewis v. Dretke*, 355 F.3d 364, 367 (5th Cir. 2003), *citing Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002). If counsel has made an adequate investigation, any conscious and informed decision made based on trial tactics and strategy cannot be the basis for a claim of having received ineffective assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial with obvious unfairness." *United States v. Cotton*, 343 F.3d 746, 753 (5th Cir. 2003), *cert. denied*, __ U.S. __, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004), *quoting United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002).

*Facts Applicable to First Ineffectiveness Claim:*
*Failure to Investigate*

As support for his assertions, Hall points to vouchers submitted by defense counsel, Michael Ware and Jeffrey Kearney; and the defense investigator, Danny LaRue; as well as affidavits from the mitigation specialist, Tena Francis; a defense attorney who assisted trial

19

counsel in this case, Kevin McNally; a well-known defense attorney, Michael Tigar; and a social worker, Jill Miller; this Court's orders appointing a mitigation specialist and authorizing a total of $7500.00 for that specialist's services; declarations from Betty Hall and Cassandra Ross, both defense witnesses at trial; and declarations from numerous persons outlining their potential testimony, had they been called as witnesses by the defense. (Hall's Exhibits #3, 5, 6-9, 12-19, 23, 25-30, 34-38; Hall's Reply Exhibits 2-5, 7-8, 10-11.) In response, the government has submitted affidavits from both Ware and Kearney.  (Government Exhibits E & F.)

A review of these documents submitted by the parties, as well as the record of the trial reveals that, prior to Ware and Kearney's being appointed to represent Hall, Hall had been represented by prior counsel.  He had interviewed Hall and had required him to complete a nineteen-page questionnaire entitled "Client Background Information," in which Hall answered numerous questions about his social, vocational, scholastic, and medical history.  He also traveled to Hall's hometown of El Dorado, Arkansas, where he interviewed Hall's mother and other family members, a Reverend Hegler, Hall's adult probation officer from a prior criminal conviction, Hall's parole officer, and Hall's previous attorney. (Government Exhibit E at p. 2-3 and attached exhibit A.)  Prior counsel turned over to Hall's trial counsel both his notes of these interviews and the questionnaire. Defense counsel filed a motion requesting the appointment of

20

various experts, including a psychiatrist, a psychologist, a jury consultant, a forensic pathologist, and a mitigation expert. In a hearing held on July 14, 1995, believing that a jury consultant was of greater importance than a mitigation specialist, defense counsel dropped their request for a mitigation specialist.[2] This Court authorized funds for defense counsel to hire a psychiatrist, a psychologist, and a pathologist, but denied counsel's request for a jury consultant. (Government Exhibit E at 5-7.)

In August of 1995, an attorney who specialized in death penalty cases, Kevin McNally, provided defense counsel with the name of a mitigation specialist, Tena Francis. She was officially appointed by this Court on September 14, 1995, and she first met with defense counsel on September 15, 2005. She and defense counsel also met with Hall that day. Prior to the meeting with Francis, defense counsel Ware had met and spoken with Hall's mother, Betty Hall, and his sister, Cassandra Ross, in his office; and he had also spoken with Hall's previous Arkansas attorney, James Bennett. (Government Exhibit E at pp. 12-13, 19; Hall's Exhibits 11, 13.) Later, Ware traveled to Arkansas and again conferred with Betty Hall. (Government Exhibit E at p. 20.)

---

[2] In his affidavit, defense counsel Ware explains that he had, prior to Hall's case, never used a mitigation specialist in any of the several capital cases he had tried before, choosing instead to use the services of private investigators, mental health experts, and paralegals, as well as his own labor in order to discover and develop mitigating evidence. (Government Exhibit E at p. 10.)

21

After being hired, and prior to the punishment phase of the trial, which began on November 1, 1995, Tena Francis submitted two investigative memoranda to Michael Ware, dated October 23 and October 25, 1995.  In the October 23rd memo, Francis outlines the substance of her interview with Tracy Hall, Hall's brother, who was at that time confined in a prison in Arkansas for aggravated assault. (Government Exhibit E, attached exhibit C.)  In her October 25th memo, Francis outlines information that, as she states in the body of the memo, was gleaned through "extensive interviews with members of [Hall's] family, his minister, officials at school, neighbors, and other significant persons from [Hall's] life (for example, girlfriends)."  This included information about Hall's: mother and father, A.J. Hall, including the violence in the home, their substance abuse, and their subsequent divorce; siblings Pamela, Scotty, Cassandra, Tracy, and Demetrius, as well as some half-siblings; birth and medical history; personality; relationship with his family; having four children by four different women; school history; limited work history; and criminal history, including parole from Arkansas state prison in 1993.  At the end of the October 25, 1995 memo, which was entitled "Client Social History," Francis expressed her belief that the report was incomplete because there was not enough time to locate other witnesses; several members of the family were hesitant in answering the questions; and several members of the family were

22

Supp. App. 065

hesitant to speak because of their knowledge and participation in Hall's drug activities. (Hall's Reply Exhibit #13 at pp. 1-13.)

At the punishment phase of the trial, defense counsel presented testimony from: an FBI agent and a police detective who testified about Beckley's and Demetrius Hall's involvement in the crime (R. 18:52-60); a police lieutenant and a highway patrolman from Arkansas who testified about Bruce Webster's involvement in the crime and his extremely violent history (R. 18:80-97); an operations manager from the federal detention center where Hall was housed, who testified, among other things, that he had no record of any disciplinary problems with Hall (R. 18:98-102); an employee of Kroger's who testified about Beckley's prior discharge for dishonesty (R. 18:106-08); and Hall's mother and sister, who testified about A.J. Hall's severe physical abuse of Betty Hall, Hall's good relationship with and love for his children, his good behavior while in prison in Arkansas, and his remorse for the crime. (R. 18:111-147.)

During the punishment phase, defense counsel questioned several government witnesses at the punishment phase of the trial about the fact that they had previously spoken with either defense counsel or the defense investigator, including: LaTonya Anders, the mother of one of Hall's children (R. 17:97-8); Sylvia Henry, Bruce Webster's girlfriend (R. 17:130); David Butler, a prosecutor from Arkansas who testified to Hall's bad reputation (R. 17:166); and Carolyn Dikes,

23

a lieutenant in the El Dorado police department who also testified about Hall's bad reputation (R. 17:177.)

*Analysis of First Ineffectiveness Claim:*
*Failure to Investigate*

While Hall criticizes his attorneys for failing to conduct enough investigation on their own and for failing to hire a mitigation specialist earlier, the record before this Court reveals that defense counsel had done a substantial amount of investigation into mitigating evidence prior to trial, including interviewing government witnesses and members of Hall's family, and that the mitigation specialist had over six weeks between the time of her appointment and the punishment phase began to investigate and develop potential mitigating evidence. Indeed, her investigation included traveling to Arkansas and, according to her own memo to defense counsel, interviewing numerous people there. And, while Francis and the other experts who submitted affidavits in support of this claim contend that a far greater amount of investigation was needed in this case, this Court would have been unwilling at the time of trial to authorize an unlimited amount of funds with which to conduct further investigation, especially where that investigation would have involved contacting witnesses who had minimal contact with Hall. This Court instead concludes that Hall's counsel performed a reasonably substantial and independent investigation into potential mitigating circumstances and therefore did not provide ineffective assistance. *See Lewis v. Dretke*, 355 F.3d at 367.

24

Hall next contends that his trial counsel made an unreasonable decision to emphasize, in the punishment phase of the trial, the statutory mitigating circumstance of "equally culpable co-defendants" and that they failed to adequately prepare Betty Hall and Cassandra Ross prior to their giving testimony at trial.  Under federal law, the fact that equally culpable co-defendants will not be punished by death is a mitigating factor that, if proven, *shall* be considered by the jury in determining whether a death sentence shall be imposed. *See* 18 U.S.C. § 3591(a)(4).  Defense counsel believed that it was a good trial strategy to emphasize this mitigating factor because Hall's co-defendants, Demetrius Hall;  Marvin Holloway; and most especially, Steven Beckley; were arguably equally culpable and had reached plea agreements with the government and would not be eligible for the death penalty.  Defense counsel Michael Ware believed, based on his experience, that jurors disliked the government "striking deals" with co-defendants and that North Texas jurors in particular tend to be conservative jurors who might therefore be more open to the equally-culpable-co-defendants mitigating factor as opposed to "excuse defenses" in a case such as Hall's where the facts were particularly gruesome. (Government Exhibit E at pp. 14-5.)

The Supreme Court noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 2065.  In

25

viewing counsel's decisions from their perspective at the time of trial, the strategy of heavy reliance on the statutory mitigating factor, "equally culpable co-defendants," was a reasonable one. From the bench it was clear that defense counsel were making the argument most likely to be persuasive to the jury--an appeal to its sense of fundamental fairness--and that the jury was attentive and responsive to it. Besides, other statutory mitigating factors, such as duress, minor participation, absence of a prior criminal record, victim's consent, and impaired capacity, were not available to Hall. (Government Exhibit E at pp. 16-18.) Also, it was a reasonable trial strategy for counsel to rely on their experience as criminal defense attorneys in reaching this decision. And, finally, counsel also submitted non-statutory mitigation factors to the jury, such as Hall's age, his remorse, and the circumstances of his upbringing, so that the defense did not rely on one mitigation factor to the exclusion of all others. (R. 20A:25.)   Defense counsel were not ineffective in this regard.

Hall also contends that Betty Hall and Cassandra Ross were inadequately prepared as witnesses. As support, he points to the length of their testimony and their being effectively cross-examined on certain issues, and to affidavits from both women. (Hall's Exhibits #15, 16.)  In their affidavits, Betty Hall and Cassandra Ross state that they had limited contact with the defense team, but also acknowledge that they met with defense attorney Michael Ware on more

26

Supp. App. 069

than one occasion, met with mitigation specialist Tena Francis, and met with a psychiatrist who had been hired by defense counsel.  They also state in their affidavits that they felt unprepared for giving their testimony, as they were not informed by Michael Ware until the same day as their testimony that they were going to testify about Hall's upbringing and the violence in the household.  And, finally, they state in their affidavits that they would have given further information detailing the violence in the Hall household. (Hall's Exhibit #15 at pp. 1-3, 5-8; Hall's Exhibit #16 at p. 1-2, 4-6.)

The Fifth Circuit has cautioned that a reviewing court should be wary of claims that an attorney failed to present **enough** evidence of a certain type.  *Smith v. Cockrell*, 311 F.3d 661, 669 (5th Cir. 2002), *citing Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000). While Betty Hall and Cassandra Ross criticize the time that they spent with defense counsel and maintain that they were ill-prepared, the record of the trial reveals that they testified to much of what is contained in their exhibits.  Specifically, at trial, Betty Hall testified that: A.J. was abusive towards her during most of their marriage including when she was pregnant; that she had been beaten with the butt of a gun, by a two-by-four, and with fists; that her teeth were knocked out; that she was dragged out of bed and beaten and beaten after getting home from work or from a store; that this was all done in front of the children; that the children tried to intervene, but would get knocked around themselves; that the police

27

Supp. App. 070

were called several times, but arrested A.J. on only one occasion; that Hall would physically protect her from her husband; and that she stayed with her husband because she had small children and had no place to go, but she left when Demetrius was old enough to look after himself. (R. 18:113-116.) Cassandra Ross testified that: there was a lot of physical and verbal abuse during her childhood; that A.J. would beat her mother with boards and anything else he could get his hands on; that all of the children tried to stop the abuse and would call the police, but their father would snatch the telephone away; that she left the home at age eighteen, married and moved to Texas; and that she had Hall come and live with her for a while and go to school in Texas at one point. (R. 18:137-40.)   While the government did cross-examine both women about Hall's criminal history, his lack of an employment history, the fact that all of the children were fed, clothed, and sent to church, and the fact that Cassandra Ross had never been in trouble even though she was raised in the same household, this type of cross-examination was to be expected and would have occurred no matter how many times the women met with defense counsel.  Hall's mother and sister gave substantial testimony about Hall's upbringing, and Hall has not shown that his trial counsel were ineffective for failing to elicit further, similar testimony from them or for failing to question them in a more effective manner.

Hall further argues that his trial counsel failed to develop and present mitigating evidence from Hall's father, A.J. Hall, his

Supp. App. 071

two brothers, Scotty and Tracy, and his sister Pamela Palmer. (Second Amended Petition at 74-85.)[3] Defense counsel Michael Ware, however, explains in his affidavit that he made the strategic decision not to call these family members as witnesses. In particular, he decided not to call A.J. Hall as a witness because, although Ware had met with Hall's father, he was "absolutely opposed" to testifying and would not have likely made an effective witness, given Betty Hall's testimony about his violence towards her. (Government Exhibit E at p. 25.)  Ware made the decision not to call Tracy or Scotty Hall, two of Hall's brothers, based on interviews that Tena Francis conducted with them.  In particular, Tracy Hall, who at the time of the interview was in prison for firing a gun into a crowd and injuring nine people, was an admitted crack-cocaine dealer in El Dorado, Arkansas.  He told Francis that Hall had "taken him under his wing" in the drug-dealing business, that they had shared the drug-dealing business in El Dorado, and that Hall had taught him how to be smart about drug dealing. (Government Exhibit E at pp. 23-4, attached exhibit C at pp.1-2.)  Scotty Hall was also in prison for drug possession when he was interviewed by Francis, and Francis had learned that Scotty was a spouse batterer. (Hall's Exhibit 18 at p. 3, Hall's.

---

[3] Hall has submitted declarations from these individuals and contends that A.J. could have testified about the problems in his marriage and his own bad behavior, and Tracy, Scotty, and Pamela could have testified about their upbringing and about how they were disciplined harshly by their father, witnessed the abuse of their mother, and were exposed to drug dealing and other criminal behavior while growing up. (Hall's Exhibits #17-9, 25).

29

eply Exhibit 13 at p. 5.)  Ware made the decision not to call Pamela Palmer as a witness because she was very unwilling to speak at length to Francis, as she was very angry at the time at Hall for lying to her about his involvement in the crime and for involving Demetrius Hall in the crime. (Government Exhibit E at pp. 22-23, Hall's Reply Exhibit 13 at p. 5.)  It was reasonable for trial counsel to opt not to call as witnesses a father who was opposed to testifying, two brothers who were imprisoned criminals themselves, and a sister who at the time remained hostile to her brother, notwithstanding what they now state they would have testified to at trial.

Hall also asserts that his trial counsel failed to develop and present mitigating testimony from: Cassandra Ross's in-laws, Reverend Jerry and Gracie Ross, who were neighbors of the Hall family and could have testified about the violence in the Hall household (Hall's Exhibit #26, 27); Betty Hall's co-workers, who saw her at work after being beaten (Second Amended Petition at 87); A.J.'s sister, who could have testified about the slave history of their family and the abuse she endured as a child, as well as Betty Hall's illnesses (Second Amended Petition at 87); one of Betty Hall's sisters, who could have testified about A.J.'s violence towards Betty and about Betty's abandonment of her children after she left A.J. (Second Amended Petition at 88); two additional women with whom Hall fathered children, who could have testified about Hall's love for his children and his financial support of his children (Hall's Exhibit #29, 30);

30

and a teacher from the middle school Hall attended, who could have testified about his shock at hearing about the crime (Second Amended Petition at 92.) Much of this evidence would have been cumulative of the testimony given by Betty Hall and Cassandra Ross and merely would have been further evidence of A.J. Hall's abuse of Betty Hall, something that the government did not dispute. Some of this evidence, such as evidence about A.J. Hall's upbringing, would have been of little, if any, assistance to the jury in reaching its decision. And, with regard to some of this potential testimony, such as testimony from mothers of Hall's children and a middle school teacher about Hall's general good character, it is so attenuated that there is no reasonable probability that the outcome would have been affected by such testimony. *See Carter v. Johnson*, 131 F.3d 452, 465 (5th Cir. 1997) (holding that Carter was not prejudiced by counsel's failure to investigate, discover and present the testimony of character witnesses, as there was no reasonable probability that testimony that he was a "good and peaceful person" would have resulted in a life sentence, given that Carter had confessed to two murders). Hall has not established any prejudice as a result of his trial counsel's failure to discover and present this testimony.

Finally, Hall asserts that his trial counsel were ineffective for failing to investigate and present records from Hall's imprisonments in Arkansas and in federal prison and supporting testimony from prison guards and prison experts illustrating his good

31

behavior in prison in both the Arkansas state prison and federal prison. (Hall's Exhibit #34-38.)  As noted earlier, defense counsel did present testimony from an officer at the federal detention center that there was no record of any disciplinary problems with Hall while he was housed there.  Hall contends, however, that his trial counsel should have offered further evidence to support this, as well as testimony and evidence from Arkansas prison guards about his good conduct while incarcerated there.  In his affidavit, Michael Ware explains that he was hesitant to present such testimony because such witnesses would have had to concede on cross-examination that, in his earlier incarceration in Arkansas, Hall had been eligible for early release for "good time."  Moreover, Ware had been informed that Hall had actually continued his drug dealing business while in prison in Arkansas, and he was also aware that the government had rebuttal expert witnesses ready to testify about prison conditions and did not want to open the door to that testimony.  Instead, defense counsel opted to argue at closing that Hall would not be a future danger to society because his records from both stints in prison revealed no disciplinary problems and because there is no parole in the federal prison system. (Government Exhibit E at pp. 25-6; R. 20A:53, 78.) Counsel exercised reasonable trial strategy in this regard, and Hall has not shown how further testimony on this subject would have resulted in a life sentence.  Hall has failed to establish ineffective assistance of counsel under the *Strickland* standard based on his

32

contention that his counsel failed to conduct an adequate investigation into potential mitigating evidence.

## 2.   Failure to Present Documentary Evidence

Hall also contends that his trial counsel were ineffective for failing to place certain documentary evidence into evidence at the punishment phase of the trial. Specifically, Hall asserts that trial counsel should have placed into evidence a hospital emergency-room record that documented injuries Hall's mother Betty Hall received in 1968 at the hands of his father, A.J. Hall, the record of his father's arrest in 1974 for assault and battery on Betty Hall, and a handwritten letter and a poem Hall sent to his daughter.

As noted earlier, trial counsel presented uncontested evidence, through the testimony of Betty Hall and Cassandra Ross, that Betty Hall was severely physically abused by her husband, that the police came to the house three times and A.J. Hall he was arrested once because of this abuse, and that Hall was a concerned and involved father. (R. 18:113-16, 119, 138-41.)  Accordingly, the documentary evidence Hall contends should have been offered into evidence was cumulative of testimony that was given at trial. *See Brown v. Cain*, 104 F.3d 744, 751 (5th Cir. 1997) (holding that counsel was not ineffective for failing to locate and present additional evidence that would have been cumulative to the testimony of the defendant's mother and sister regarding his difficult past).  Moreover, the government never contested the fact that Betty Hall was severely

33

physically abused by her husband, but instead argued that the abuse did not extend to Hall and that, even if it did, it did not excuse his actions. (R. 20A:92.)   Accordingly, defense counsel were not ineffective for failing to present documentary evidence that was cumulative of testimony already presented at trial and on a topic that was never in dispute.

### 3.   Failure to Call Available Witnesses

Hall complains further that his trial counsel were ineffective for failing to call as witnesses certain people who were known to counsel and were available to testify.   Specifically, Hall argues that counsel should have called Reverend D.L. Hegler, who was the Hall family's pastor during Hall's childhood, and Reverend Willie Ray Norful and his wife, the couple into whose custody Hall was released when he was paroled from prison in Arkansas. All of these people were in attendance at Hall's trial. As support for this claim, Hall has submitted an affidavit from Reverend Hegler.

Hall contends that Norful and his wife could have testified that Norful gave Hall a job at his church so that he could be paroled from prison, the people in the church and the Norful family liked him, Hall kept Norful's son out of his drug trade when he began it again after being paroled, and that they believed that the crime was very out of character for Hall.[4]  Hall further contends that Hegler could

---

[4]  This Court does not find in the record any declarations that Norful and his wife provided to habeas counsel indicating their willingness to testify on Hall's

34

have testified about the physical violence between Hall's parents as well as the alcohol abuse and infidelity; the poverty, drug trade, and racism in El Dorado, Arkansas; Hegler's surprise that Hall was involved in such a violent crime; and Hall's expressions of remorse to Hegler. (Hall's Exhibit #22.)

In his affidavit submitted as an exhibit with the government's response, defense counsel Michael Ware explains that he chose not to call Reverend Hegler as a witness for the defense because mitigation specialist Tena Francis interviewed Hegler on October 9, 1995, and in that interview Hegler stated, among other things, that: Hall was bright, but did not apply himself; Hall dropped out of school in order to pursue his drug dealing; Hall believed that he could beat the system and would therefore not get caught dealing drugs; Hall had a "lot of boys" selling cocaine for him in El Dorado; Hall was still dealing drugs while in an Arkansas state prison; the elderly people who lived near Hall's father were afraid of Hall; Hall's parents "went wrong" by always being there to bail him out of trouble; and Hegler felt that Hall used him to get released on parole when he had no intention of leading a legal life when he was released. (Government Exhibit E at pp. 21-2.)  Notwithstanding what Reverend Hegler now says about Hall a number of years after Hall's trial, defense counsel exercised reasonable trial strategy not to call as

---

behalf and outlining their proposed testimony, and Hall does not refer to any such exhibits in his petition.

Supp. App. 078

a witness someone who had this many negative things to say about their client.  They were not ineffective in refusing to call Hegler as a witness and, had they done so and had the government performed competent cross-examination of Hegler, doubtless Hall would now be asserting counsel's incompetence for placing Hegler on the stand.

With regard to defense counsel's failure to call Reverend Norful or his wife as a witness, Hall has failed to establish either deficient representation or prejudice.  While Ware does not specify his reasons for not calling Norful or his wife as witnesses, the information that Hall alleges that these potential witnesses could have provided is not necessarily mitigating evidence.  For example, while Norful gave Hall a job at his church so that Hall could be paroled from Arkansas state prison, the record reveals that Hall in actuality returned to drug dealing.  And, while the Norful family and the people in the church might have liked Hall personally, Hall obviously took advantage of their kindness and continued to violate the law on several occasions. Additionally, regardless of what Norful and his wife believed about Hall's character, Hall was clearly quite capable of raping, physically attacking, and burying alive an innocent sixteen-year-old girl.  Their belief that he was not is immaterial. Thus, Hall has failed to show either prong of the *Strickland* standard with respect to his counsel's failure to call Reverend Norful or his wife as witnesses at trial.  This claim is without merit.

36

4. <u>Failure to Adequately Question Government Witnesses</u>

Hall also argues that his trial counsel were ineffective in their cross-examination of certain government witnesses. Specifically, Hall contends that his trial counsel could have elicited from Hall's brother, Demetrius Hall, testimony about their deprived childhood; could have elicited from LaTonya Anders, Hall's girlfriend, testimony about his concern for her, their daughter, and his other children; and could have elicited from Wendell Olden, an official from the school district where Hall attended school, testimony about the drug problem that pervaded El Dorado, Arkansas.

Demetrius Hall testified for the government at the guilt phase of the trial, while LaTonya Anders and Wendell Olden testified for the government at the punishment phase of the trial. Demetrius Hall testified about his involvement in the crime. On cross-examination, defense counsel elicited from Demetrius Hall testimony that Hall had turned himself in to the police, that Hall told Demetrius to tell the truth to the police, that the original plan was to get the money from the "Jamaicans" and no one knew that Webster was going to take the victim from her apartment, that Hall was not present when Webster, Beckley, and Demetrius sexually assaulted Lisa Rene, and that Demetrius believed that his brother was sorry for what he had done. (R. 13:230, 239-46.)

LaTonya Anders testified at punishment about a $13,500 cocaine purchase she attempted to make on Hall's behalf in Houston, after

37

she had given birth to Hall's daughter, when Hall was not allowed to leave Arkansas because he was on parole. She also testified that she and another friend of Hall were robbed at gunpoint before they completed the transaction. She further testified that she transported crack cocaine from Houston three different times for Hall and later helped transport marijuana for him, as well. (R. 17:57-71.) Anders testified regarding her knowledge about the kidnapping. (R. 17:77-91.) On cross-examination, defense counsel elicited from Anders, among other things, that Hall was a good father to her child, that Hall had always been good to her other child that was not his, that Hall treated his other three children well, and that Hall treated her and the other mothers of his children well. (R. 17:100-101, 111.)

Finally, Wendell Holden testified that he was the assistant principal at Rogers Middle School in El Dorado, Arkansas, as well as a city-council member, that he had known Hall since he was in junior high school, and that he had heard people speak about Hall and that Hall had a bad reputation in the community. (R. 17:169-71.) Carolyn Dykes, a lieutenant with the El Dorado police department also testified at punishment that Hall had a bad reputation in the community. On cross-examination, Dykes acknowledged that she had known Hall's family for a long time and knew that Hall's father had been a crack dealer for a long time. (R. 17:175-78.)

Hall has established neither deficient representation nor prejudice from the failure to further question Demetrius Hall, LaTonya

38

Anders, and Wendell Holden in an effort to elicit more mitigating evidence.  As noted above, Demetrius Hall and LaTonya Anders gave very damaging testimony about Hall.  While Hall faults his trial counsel for failing to question them about Hall's upbringing and specific instances of care he showed his daughter, their testimony illustrated that Hall was willing to involve his younger brother and the mother of his child in his drug dealing, even where their lives were in danger.  Thus, defense counsel's representation was not deficient, as both of these witnesses gave mitigating testimony on cross-examination about Hall's remorse, about his lack of original intent to kidnap the victim, and about his love for his children. *Prejean v.  State*, 889 F.2d 1391, 1898-9 (5th Cir.), *cert. denied*, 494 U.S. 1090 (1990) (holding that, where defense counsel did place certain evidence before the jury, counsel was not ineffective for failing to present more of the same).  And, Hall has not shown a reasonable probability that any further testimony would have resulted in a life, rather than a death sentence.

Moreover, while Hall criticizes defense counsel for failing to question Holden about the drug culture in El Dorado, defense counsel did elicit from another government witness the fact that Hall's father was also a drug dealer.  In any event, Hall has not shown how further testimony on this issue would have been mitigating evidence.  After all, Hall committed murder partly in retribution for one of his drug deals having gone bad.  Hall has not shown a reasonable probability

39

that any testimony about the fact that other young men were drug dealers in Hall's hometown would have lessened Hall's culpability in the minds of the jurors. Hall has not established either prong of the *Strickland* standard with regard to this claim.

5.    Failure to Adequately Cross-Examine Larry Nichols

Hall contends that his trial counsel, Jeff Kearney, was ineffective in his cross-examination of government witness Larry Nichols at the punishment phase of the trial. Specifically, Hall asserts that Kearney failed to impeach Nichols with his prior testimony from a trial of his co-defendants in a bank robbery in which he testified for the government. Hall asserts that counsel failed to impeach Nichols with his previous testimony that he learned tips in improving his situation from other inmates in federal prison, that he was a drug dealer, that he committed numerous robberies other than the bank robbery for which he was arrested, that he owned at least five guns, and that he passed fraudulent checks. Hall further asserts that his trial counsel was ineffective in failing to cross-examine Nichols about differences between the original statements he gave the FBI about Hall and his trial testimony.

At the punishment phase of Hall's trial, Nichols testified that he and Hall were fellow inmates in the Mansfield Correctional Center in the months leading up to Hall's trial. Nichols further testified that Hall bragged about raping Lisa Rene, spoke about being a drug dealer in Arkansas, talked about a man he attempted to rob in

40

Arkansas, and spoke about beating women. Nichols also testified that Hall told him that he would kill Steven Beckley if he ever got the chance and told him that he had a plan to escape from custody that involved taking either one of his lawyers or a female guard hostage and using one of the shanks that was hidden in the jail. (R. 17:220-27.)

On direct examination, Nichols acknowledged that he had been charged with the armed robbery of three banks and, in exchange for his testimony at the trial of his co-defendants, had pled guilty to two counts of using a weapon during a crime of violence. (R. 17:210-12.) Nichols also testified that, while the minimum sentence for the crimes for which he pled guilty was twenty-five years, there was a provision whereby his sentence could be lowered because of his cooperation in the case against his co-defendants. (R. 17:213-14.)

On cross-examination, Nichols further admitted that: his prior plea agreement also "settled up" five or six robberies he had committed in Louisiana; he had purchased the car used in the bank robberies from the proceeds of other robberies; he also had federal charges against him for transporting a stolen vehicle across state lines; in the robberies he carried either a .380 automatic or a Tech 9 assault rifle; he had also robbed fast-food places and convenience stores; and he had previously tried to convince one of his co-defendants in the robbery cases to sign a false affidavit stating that Nichols had nothing to do with the robberies. (R. 17:242-45,

41

Supp. App. 084

248.)   Nichols also admitted on cross-examination that, while the sentence for the two crimes he had pled guilty to was twenty-five years, he had not yet been sentenced.  He further acknowledged that the government had already filed a motion with the judge presiding over his case for downward departure on his sentence due to his cooperation in that case and that he would like for the judge in his case to know about his cooperation with the government in Hall's case before he was officially sentenced. (R. 17:252, 256, 260-62, 268-69.)

In an affidavit submitted with the government's response, defense attorney Jeff Kearney explains that he had a copy of Nichols's testimony from the bank robbery trial, that he reviewed this testimony, Nichols's plea agreement, and the prosecution's file in that case, and that he questioned Nichols regarding several aspects of his testimony from that trial.  He also states in his affidavit that, in furtherance of his cross-examination of Nichols, he toured the Mansfield prison facility where Nichols and Hall were housed together and interviewed the jailers who found the hidden shanks that Nichols told the government about.  Finally, Kearney explains that, although Nichols denied some of his previous testimony, he admitted much of it, and Kearney made the decision not to "pin down" Nichols on all of his prior testimony because Kearney believed that the jury knew that Nichols was self-motivated and knew he was lying, and Kearney had determined that doing so would destroy the mood and tempo

42

of the cross-examination and would risk alienating the jury by "beating a dead horse." (Government Exhibit F.)

This Court finds that defense attorney Kearney made a reasonable strategic decision not to impeach Nichols on every difference between his prior testimony and his testimony at Hall's trial. This decision was made after fully reviewing Nichols's prior testimony and was therefore made with knowledge of inconsistencies in Nichols's testimony. The decision was also made in order to streamline cross-examination and therefore make it more effective. But counsel did elicit from Nichols his substantial criminal history, his previous attempt to have a co-defendant perjure himself in an affidavit, and his admitted desire to improve his own situation in life by testifying against Hall. Such a strategic choice, when it is made after a thorough investigation of the relevant facts, is virtually unchallengeable. *See Strickland v. Washington*, 466 U.S. at 690-91. Hall's trial counsel was not ineffective in his cross-examination of Larry Nichols.

6.   Failure to Interview Alonzo Airy

Hall next asserts that his trial counsel were ineffective for failing to seek a continuance in order to re-interview inmate Alonzo Airy, a potential punishment witness for the defense, after defense counsel were informed that Airy had been interviewed by the government and had apparently changed his story about Hall's behavior while incarcerated in federal prison. Hall further asserts this his trial

43

counsel were ineffective for failing to conduct further investigation and thereby discover other federal inmates who could have presented testimony favorable to Hall.

Before the government had concluded its case-in-chief at the punishment phase of the trial, but after federal inmate Larry Nichols had concluded his testimony for the government, during which he testified about Hall's lack of remorse while in federal prison and Hall's plan to escape from prison, the government requested that it be permitted to amend its witness list to add Alonzo Airy. Assistant U.S. Attorney (AUSA) Richard Roper explained to this Court that Alonzo Airy had only recently been interviewed by the government because he was on the defense's witness list that had been filed with the Court on the first day of trial. (R. 18:4.) Roper further stated that he wished to call Airy as a witness for the government because he had corroborated Nichols' testimony when he spoke to FBI Agent Paul Shannon and AUSA Paul Macaluso a couple of days earlier. (R. 18:5-6; Hall's Exhibit #39.) Defense counsel objected to the government's attempt to amend its witness list because the testimony would be cumulative of Nichols's testimony, because Nichols had not been impeached regarding Alonzo Airy as of yet, and because the government could cross-examine Airy if and when he was called by the defense. (R. 18:8.) This Court denied the government's request to add Airy as a government witness (R. 18:14), and the defendant did not call him.

44

Airy had been listed as a defense witness because he had been interviewed by mitigation specialist Francis on October 22, 1995, when he told her that Hall had never discussed any escape plan and was extremely remorseful. Airy had also informed Francis that Nichols was constantly discussing his desire to have his sentence reduced and had stated that it was easy for an inmate to lie for the government in order to obtain a recommendation from the government that a sentence be lowered. (Hall's Exhibit 7.)  Hall has included as an exhibit with his petition an affidavit signed by Airy on April 10, 2000, stating, in essence, that he never told Agent Shannon and Macaluso much of the information Agent Shannon included in an FBI-302 statement dated October 30, 1995.[5]  Specifically, in his new affidavit, Airy asserts that, contrary to what is stated in the FBI statement, he never told the government representatives that Hall was cold or remorseless, never told them that Hall said that the others followed him, never said that Hall told him that he wanted to kill Beckley because he was a "snitch," never said that Hall spoke of the victim in disparaging language, and never told the agents that Hall spoke to him about an escape plan in which he would kidnap and/or kill his attorney. (Hall's Exhibit #40.)

In response, the government has submitted affidavits from Macaluso and Shannon.  In Macaluso's affidavit, he states that he

---

[5] Airy does not appear to dispute that he had a conversation with federal agents that day, but instead disputes what was said.

45

and Shannon interviewed Airy on October 30, 1994, because the defense had listed him as a possible witness.  Macaluso further states that he recalls that Airy made very disparaging comments about Larry Nichols and viewed Nichols as someone who had taken advantage of his own co-defendants.  However, Airy confirmed the accuracy of Nichols's comments regarding Hall and what Hall had told Nichols about the kidnapping and murder of Lisa Rene.  Finally, Macaluso states in his affidavit that Shannon's statement that was prepared after the interview was accurate. (Government's Exhibit C.)  Likewise, in his own affidavit, Shannon states that his previous statement outlining the interview with Airy on October 30, 1995, is correct. (Government's Exhibit D.)

Hall contends that defense counsel were ineffective for not requesting a continuance so Airy could be re-interviewed and a determination made on whether he would give testimony that would be helpful.  Also, with a continuance, Hall thinks other inmates could have been interviewed who would have been able to give testimony corroborating Airy's testimony about Nichols.[6]  Putting aside the question of whether this Court would have granted a mid-trial continuance for this reason when two other similar requests for continuance had been denied, Hall has failed to establish any

---

[6]
Hall has also submitted affidavits from two other inmates of the prison where Hall was housed prior to trial.  These inmates state generally that Hall never spoke to them about any escape plans and never bragged to them about the crime, and that Nichols was known as a "snitch." (Hall's Exhibits #32, 33.)

Supp. App. 089

prejudice as a result of defense counsel's failure to re-interview Airy and/or discover other federal inmates to testify for Hall.  In this regard, even had the defense re-interviewed Airy and determined that Airy was willing to testify in a matter contrary to what was contained in the FBI statement, had he been called as a defense witness, the government would have, presumably, been able both to question Airy about the interview with Shannon and Macaluso and to call Shannon as a witness in order to impeach Airy.  Hall has not shown that a credibility determination between Airy, a convicted federal felon, and Shannon, an FBI agent, would have been settled in Hall's favor.

Moreover, with regard to any other inmates who might have testified on Hall's behalf, Hall has failed to establish that, even had these inmates been located, their testimony would have so effectively impeached Nichols testimony that Hall would not have received the death penalty.  First, as noted earlier, defense counsel already effectively impeached Nichols during cross-examination about his self-interested motivation.  Second, these inmates could only testify about what Hall told them, not what Hall might or might not have said to Larry Nichols.  Because Hall has not established the prejudice prong of the *Strickland* standard, this claim is without merit.

### 7.   Failure to Make a Closing Argument at the Guilt Phase

Supp. App. 090

Hall argues that his trial counsel were ineffective in their decision not to make a closing argument at the guilt phase of the trial. Hall contends that, had trial counsel made a closing at the guilt phase of the trial, they could have "built a bridge" between the guilt and the punishment phases of the trial. Thus, even though counsel were in effect conceding that Hall was guilty of the offenses for which he was charged, counsel could have raised questions in the closing argument about the veracity of the testimony given by Hall's co-defendants and could have begun to argue at closing that these co-defendants were equally culpable.

As support for this claim, Hall points to two affidavits submitted by defense attorney Michael Tigar, one with the amended petition and one with Hall's reply to the government's response. In these affidavits, Tigar opines that defense counsel were ineffective for failing to give a closing statement at the guilt phase of the trial. Specifically, Tigar states that trial counsel should have given a closing statement at the guilt phase of the trial, highlighting co-defendant Steven Beckley's plea agreement, as well as his previous lies to the police and the inconsistencies between his previous statements to the police and his trial testimony. Tigar further states that trial counsel's decision not to make a closing statement at the guilt phase of the trial left the jury with only the government's theory of the case and did not adequately emphasize the defense's argument that Beckley was an equally culpable defendant

Supp. App. 091

who was not going to receive the death penalty. (Hall's Exhibit 12 at pp. 9-12.)  And, Tigar states that, while the government would be expected to "land a few blows" in rebuttal, defense counsel were ineffective for not making a closing statement at the guilt phase in order to address those jurors not yet set on a death sentence for Hall. (Hall's Reply Exhibit 5 at pp. 19-20.)

In his affidavit, defense attorney Michael Ware states that he was aware of the concept of "building a bridge" between the guilt and punishment stages of the trial. He believed, however, that prosecutors are fully capable of doing the same and therefore he made a strategic decision not to make a closing statement at the guilt phase of the trial so that the government could not give another closing statement in rebuttal, which would have been the last argument the jury would have heard at the guilt phase. (Government Exhibit E at p. 28.)  Instead, defense counsel made an opening statement at the punishment phase of the trial, before the government opened its case-in-chief, in which counsel emphasized that Hall accepted responsibility in his confession, that there were others who were equally culpable against whom the death penalty was not sought, that Hall had four young children and had been a good father, that Hall had witnessed the physical abuse of his mother by his father, that Hall grew up hard and dealt drugs, but that this was a case of a situation getting out of hand and the appropriate sentence was life

49

in prison without the possibility of release rather than death. (R. 17:8-11.)

This Court finds that Hall's trial counsel did not render ineffective assistance of counsel in deciding not to make a closing statement at the guilt phase of the trial.  This decision was made by experienced criminal defense attorneys, was made because the defense was not contesting Hall's guilt but was instead concentrating on the punishment phase of the trial, and was made for the strategic purpose of not providing the government an opportunity to give a rebuttal argument which would be the final argument the jury heard at the guilt phase.  Moreover, Hall's concern that, because of this decision, the defense did not establish the framework for the punishment phase of the trial is answered by the fact that defense counsel made an effective *opening* statement at the punishment phase of the trial.  Defense counsel were not ineffective in this regard. Besides, Hall has also not established that he was prejudiced by this decision, as he has not shown a reasonable probability that, by relying primarily on an opening statement at the punishment phase to make the case for life over death rather than upon a closing statement at the guilt phase, Hall received a death rather than a life sentence.

## 8.   Failure to Effectively Argue Right to Allocution

Hall contends that his trial counsel were ineffective for failing to effectively argue his alleged right to allocute before the jury.

50

Before the defense presented its witnesses at the punishment phase of Hall's trial, defense counsel argued to this Court that Hall had an absolute right to make a statement to the jury before the jury reached its decision on punishment under Rule 32(c) of the Federal Rules of Criminal Procedure.  They also cited a Fifth Circuit case, albeit a non-death penalty case, as support for this argument.  This Court denied defense counsel's request to allocute before the jury without being subjected to cross-examination on the basis that the federal death penalty statute did not provide for such a right and that Hall had no constitutional right to allocute. (R. 18:45-50.) On direct appeal, Hall argued that he had a right to make a statement of remorse to the jury under Rule 32(c) or, in the alternative, under common law.  Furthermore, Hall contended on appeal that he had a constitutional right to allocute and that, even if such a constitutional right did not exist, this Court had violated Hall's due-process rights by allowing the government to present victim impact statements that were not subject to cross examination, but did not give Hall the same opportunity. *Hall*, 152 F.3d at 391.  The Fifth Circuit denied each of these claims, holding that Hall did not have a federal statutory, common-law, or constitutional right of allocution and that this Court did not abuse its discretion in declining to permit the allocution. *Id.*, 152 F.3d at 391-98.

Hall now contends that his defense counsel were ineffective because, had counsel cited state death-penalty cases where the trial

51

court permitted such an allocution, there is a reasonable probability that this Court would have exercised its discretion and allowed Hall to make a statement of remorse to the jury without being subject to cross-examination. Hall further contends that, had defense counsel presented the proposed statement to this Court at the time the point was argued, rather than waiting until after trial to place the statement into evidence, this Court would have been persuaded to allow Hall to make the brief statement of remorse.

Contrary to Hall's argument, regardless of what state case law defense counsel might have presented to the Court supporting his position that a court has the *discretion* to allow a defendant in a death penalty case to allocute before the jury, this Court would not have granted Hall's request to allocute before the jury, no matter the content of the statement, without subjecting himself to cross-examination by the government. And, more importantly, on direct appeal the Fifth Circuit held that it was not error for this Court to deny Hall's request. Counsel were not ineffective for failing to argue more strenuously a point that was without merit. *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (noting that the Fifth Circuit has consistently held that counsel is not ineffective for failing to make futile motions or objections).

9.   Unreasonable decisions regarding expert witnesses

Hall next argues that his trial counsel were ineffective in their request and use of experts with respect to the punishment phase of

52

Supp. App. 095

the trial.  Specifically, Hall contends that his trial counsel were ineffective in first requesting a psychiatrist and psychologist rather than a mitigation specialist, in requesting a mitigation specialist too late in the process, by not having him examined by a neuropsychologist, and by failing to have someone testify about the impact that Hall's upbringing had on his behavior.

On July 14, 1995, defense counsel sought, and obtained, funds from this Court with which to hire both a psychiatrist and a psychologist to examine Hall.  Defense counsel also sought, but were denied, funds with which to hire a jury consultant, but were given funds to hire a forensic pathologist. (July 12, 1995, hearing at 10-13; Government Exhibit E at 5-6.)  Defense counsel hired forensic psychiatrist Dr. Lisa Clayton and neuropsychologist Dr. Randy Price. Subsequent to this, in September of 1995, defense counsel sought, and obtained, funds with which to hire a mitigation specialist.  Dr. Clayton examined Hall and was prepared to testify for the defense, but the defense opted not to have her testify because this Court had ordered that, were she to do so, the government had the right to have Hall examined by its own expert. (Government Exhibit E at 7-8.)  Dr. Price examined numerous documents relating to Hall, but evidently did not examine Hall and was either unwilling to testify on Hall's behalf or felt that he was unable to give any testimony that would assist Hall. (Hall's Exhibits 7 & 13, Government Exhibit E at 8-9.)

53

Hall contends that there was evidence before defense counsel that indicated that he should be examined by a neuropsychologist, based on the fact that the mitigation specialist had discovered that Hall's mother was beaten when she was pregnant with Hall and may have also been abusing alcohol; and that Hall performed poorly in school, had been diagnosed with hearing problems as a child, and had a poor memory. (Hall's Exhibit #7 at 18-20.)  Defense counsel, however, did in fact hire a neuropsychologist so, in essence, Hall faults his counsel for not hiring another psychologist to examine him.

Hall also contends that an expert should have testified at trial regarding the effects that Hall's upbringing had on his personality and offers an affidavit from a social worker as support for this claim. (Hall's Exhibit 14.)  An offer of proof made by defense counsel after the trial, however, illustrates that this was the type of evidence that Dr. Clayton was prepared to give, but that she was not called to the stand because defense counsel made the strategic decision not to allow Hall to be examined by an expert hired by the government. (November 21, 1995 hearing; Government Exhibit E at 7-8.) Thus, Hall faults his trial counsel for not hiring *another* expert to testify generally, without having examined Hall, about how a history of family abuse and poverty caused Hall to enter the illegal drug trade.

First, Hall has failed to establish that his trial counsel were ineffective in their use of experts.  Defense counsel sought the

54

assistance of more experts than this Court authorized.  While Hall contends that the mitigation specialist was not hired in a timely matter, this Court concluded earlier in this opinion that counsel were able to utilize the mitigation specialist.  And, while neither the psychologist nor the psychiatrist testified on behalf of Hall, this was not due to any ineffective assistance on the part of defense counsel. *See Lewis v. Dretke*, 355 F.3d 364, 366 (5th Cir. 2003) (holding that counsel was not ineffective in making a strategic, informed decision to forego a psychiatric evaluation of the defendant to forestall the testimony of the state's expert psychiatric witness).

Second, Hall has failed to establish that he was prejudiced by the decisions that defense counsel made with respect to the use of experts.  As Michael Ware notes in his affidavit, defense counsel were not allowed an inexhaustible amount of money with which to hire experts to assist them in their defense of Hall. (Government Exhibit E at pp. 5.)  In fact, this Court denied defense counsel's request for a jury consultant when the government pledged not to use one; and defense counsel were not permitted to hire expensive experts at will and without a benefits analysis.  While defense counsel might have reasonably argued to this Court that they should be permitted to hire another psychologist because their psychologist was either unwilling or unable to testify on Hall's behalf, it is highly doubtful that this Court would have entertained a request to hire a social worker to testify about Hall's upbringing after having already given

Supp. App. 098

defense counsel funds with which to hire both a psychologist and a psychiatrist.

Even had this Court permitted defense counsel to hire another neuropsychologist to examine him *and* a social worker to testify generally about the effect his upbringing had on his behavior, Hall has failed to establish a reasonable probability that these experts would have discovered and testified about information that would have mitigated against the imposition of the death penalty such that Hall would have received a life, rather than a death, sentence.  Hall has submitted declarations from a neuropsychologist who examined him on April 13, 2001; and from a social worker who reviewed Hall's and his siblings' education records, records of Hall's parents' divorce, his mother's medical records, unemployment data from El Dorado, a summary of the testimony in the case, Hall's previous arrest and prison records, and the numerous declarations that Hall has submitted from Hall's friends and relatives.

In his declaration, the psychologist does not state that Hall suffers from any mental disorder or is mentally retarded.  Instead, Dr. Michael Gelbort states that, due to "markers" that Hall exhibited, he believes that Hall suffers from "neuropsychological impairment." Gelbort bases his opinion on the fact that, in the testing performed on him, Hall scored in the fortieth percentile in verbal intellect and the twelfth percentile in non-verbal abilities. Because of this, Gelbort believes that Hall has a lesser ability to exercise judgment

Supp. App. 099

and to anticipate the consequences of his actions and would be someone who would benefit from supervision. (Hall's Exhibit #41 at pp. 3-4.)[7]

In her declaration, Jill Miller states that Hall was a victim of severe physical abuse at home and his mother suffered from health problems and depression; that Hall has learning disabilities; and that Hall was abandoned by his mother when she left his father and thus had responsibilities towards his younger siblings. She concludes, consequently, that these are some of the reasons why Hall began selling drugs. Miller also states in her affidavit that Hall was a good prisoner in Arkansas and that, at the time of Lisa Rene's murder, Hall had indicated that he wanted to leave the drug trade and obtain "gainful employment." (Hall's Exhibit #14 at pp. 15-16.) Miller also states that, because of his history of trauma, the lack of good role models during his upbringing, and the pervasiveness of the drug trade in his hometown of El Dorado, the lure of the drug trade was something that Hall could not resist. (Hall's Exhibit at pp. 24-25.)

Even had both of these experts testified at Hall's trial about the information contained in their declarations, there is no reasonable probability that the result would have been different. Quite simply, although this Court does not deny the claims that Hall

---

[7] There is a second declaration from Dr. Gelbort that was submitted as an exhibit with Hall's reply to the government's response. In this declaration, Gelbort explains why Hall's neurological impairment would not have been evident to defense counsel when speaking to Hall. (Hall's Reply Exhibit #15.)

is of below-average intelligence and that his upbringing was deprived, the facts of the crime and the witnesses who testified for the government at punishment belie the contentions that Hall was incapable of exercising judgment or that he only entered the drug trade to provide for his family and wanted to exit it as soon as possible. In fact, after Lisa Rene was abducted from her apartment, Hall was the one who directed that she be transported to Arkansas, oversaw her confinement in the motel rooms, helped to dig her grave, helped to kill her, gave Beckley and Demetrius Hall advice on how to avoid the police, and refused to tell the police about the location of Lisa Rene's grave. And he did all of this because money had been stolen from him during a *drug transaction*. And, with regard to Hall's criminal history, after previously being imprisoned in Arkansas on drug charges and being released into the care of a family friend, Hall returned to the drug trade, directing both the mother of his child and members of his family in the business. In short, explanations for why Hall entered into the drug trade nowhere near sufficiently mitigate against his abhorrent behavior while practicing his livelihood such that there is a reasonable probability that, had this testimony been placed before the jury, Hall would have received a life sentence. *See Kunkle v. Dretke*, 352 F.3d 980, 992-93 (5th Cir. 2003) (holding that trial counsel were not ineffective for failing to present sufficient evidence of the defendant's mental problems and his troubled home life given the limited weight the jury would

58

place on this evidence when compared to the defendant's history of criminal behavior and aggressiveness towards others). The Court concludes that this claim is without merit.

### 10. Failing to Adequately Argue Motions for Continuance

Hall asserts that his trial counsel were ineffective for failing to adequately argue the motions for continuance that they made to this Court. Specifically, Hall contends that counsel were ineffective with respect to a motion for continuance defense counsel made on August 2, 1995, approximately two months prior to trial, and two motions for continuance made during the punishment phase of the trial. This Court denied all three motions.

As the government notes in its response, Hall must show not only that his motions for continuance would have been granted had they been supported with greater evidence and argument, but he must also establish a reasonable probability that, had the motions been granted, counsel would have obtained a sufficient amount of additional mitigating evidence to have altered the death-penalty verdict. *McFadden v. Cabana*, 851 F.2d 784, 787-88 (5th Cir. 1988). This he has not done. First, this Court almost surely would not have granted these motions for continuance had they been argued and supported as Hall suggests.[8] Second, earlier in this opinion, this Court concluded

---

[8] Hall suggests that the first motion for continuance should have included defense attorney Michael Ware's professional schedule as support for the motion. However, Hall fails to present any evidence that Michael Ware's schedule prevented him from being ready for trial.

59

that Hall had failed to show a reasonable probability of a different outcome at sentencing had the additional mitigating evidence he now points to been admitted into evidence.  Accordingly, Hall has failed to establish prejudice because his motions for continuance were denied, and Hall has therefore failed to establish ineffective assistance of counsel under the *Strickland* standard with regard to this claim.

### 11.   Making an Ineffective Closing Argument at Punishment

Hall further argues that his trial counsel were ineffective in their closing statements at the punishment phase of the trial.  Hall contends that the two closing statements given by Michael Ware and Jeff Kearney were ineffective because an inadequate amount of time was spent arguing positive reasons why Hall's life should have been spared, such as his upbringing, his prior good behavior in prison in Arkansas, and his children.  Hall further argues that the fact that the jury deliberated for over ten hours at the punishment phase is evidence that, had Hall presented more mitigating evidence at trial and argued it more forcefully in their closing statements, there is a reasonable probability that he would have received a life, rather than a death, sentence.

In considering whether a closing statement constituted ineffective assistance of counsel, an appellate court should look at the closing statements in their entirety. *Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir. 1997).  And counsel is not ineffective for

Supp. App. 103

making the strategic decision to acknowledge a defendant's culpability and even concede that the death penalty would be justified in order to establish credibility with the jury. *Id.* In the case at hand, defense counsel made closing statements that lasted for one hour. In these closing statements, they expressed sympathy for the victim's family, reiterated that Hall was guilty of the offense he was convicted of, and suggested that Hall's abusive home life and the harm that a death sentence would give to his children and his mother were circumstances that mitigated against a death sentence. (R. 20A:52, 55-6.) Defense counsel also emphasized that, if given a life sentence, Hall would not be eligible for parole and would die in federal prison (R. 20A:53, 78.) And, defense counsel suggested that the only people who would benefit from Hall's receiving a death sentence were his co-defendants and government witness Larry Nichols, who all testified in order to lower their own prison sentences. (R. 20A:56-7.) Finally, defense counsel made an impassioned plea that the jury not accept the partnership that the government entered into with people who were criminals and liars in order to seek the death penalty against Hall. (R. 20A:60-82.)

While Hall disagrees with the overall trial strategy of defense counsel to emphasize the equal culpability of Hall's co-defendants, this Court has determined that this was a reasonable trial strategy. Defense counsel's closing statements helped support this trial strategy, as well as emphasizing other factors that the jury should

61

consider in reaching its decision.  Accordingly, defense counsel's closing statements were not, taken in their entirety, ineffective closing statements.  Moreover, Hall has failed to establish prejudice.  Hall points to the fact that the jury deliberated for over ten hours as evidence that, had defense counsel made more effective closing statements in which Hall's upbringing was emphasized in greater detail, there is a reasonable probability that he would not have been sentenced to death.  However, the fact that the jury deliberated for a substantial period of time militates just as forcefully toward the conclusion that defense counsel's closing statements were very effective, thereby creating  issues that necessitated extensive deliberation.  Hall's defense counsel were not ineffective in this regard.

12.   Failing to Conduct an Adequate Voir Dire

Finally, Hall asserts that his trial counsel rendered ineffective assistance of counsel by failing to conduct an adequate voir dire of prospective jurors.  Hall, however, only argues generally that his trial counsel were ineffective during the voir-dire process because they failed to investigate in a timely manner certain mitigating evidence.  Individual voir dire began on October 2, 1995.  (R. 1.)  As noted earlier, by that date defense counsel had met with Hall and members of his family several times and had the benefit of some investigation performed by Hall's previous attorneys.  Thus, investigation into potential mitigating evidence had been conducted

Supp. App. 105

prior to voir dire.  But more importantly, Hall has failed to point to any particular act or omission committed by defense counsel during the voir-dire process that rendered their representation of him ineffective. (*See* Amended Petition at 143-45.)  Without any support from the record for this claim, it is without merit.

### *Summary as to Ineffective Assistance*

In summary, Hall was represented by two experienced criminal defense attorneys who had, prior to representing Hall, a total of thirty-five years of experience between them in criminal law.  Each had tried numerous criminal jury trials in both state and federal court.  Prior to Hall's trial, each had tried two other death-penalty cases to conclusion and had been involved in other capital cases where there was a mistrial or where the government did not seek the death penalty. (Government Exhibit E at 1, Exhibit F at 1-2.)  Hall's attorneys conducted reasonable investigations in all areas of the case; requested and were appointed experts to assist them; vigorously cross-examined government witnesses at both stages of the trial, thereby questioning and examining the government's case against Hall; ably argued all objections and points of law; and eloquently defended their client in their closing statements.  Hall received constitution- ally effective assistance of counsel at his trial, and his second claim for relief is therefore denied.

63

C.    **Juror-Misconduct Claims**

In his third through fifth claims for relief, Hall alleges various instances of juror misconduct.  In his third claim, Hall asserts that there was extraneous evidence or information introduced into the jury's punishment-phase deliberations.  In his fourth claim for relief, Hall contends that one of the jurors had *ex parte* contact with a member of the victim's family.  And in his fifth claim for relief, Hall asserts that there is an unacceptable risk that "at least one juror" voted for the death penalty based on sympathy for the victim and her family.  Hall contends that his rights under the Fifth, Sixth, and Eighth Amendments were violated by these acts.

*Law Applicable to Juror Misconduct*

The Supreme Court has stated that, with respect to claims that there was an impermissible outside influence on the jury, due process "means a jury capable and willing to decide a case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The Supreme Court has further stated that, with such claims, the issue that must be decided is whether the intrusion affected the jury's deliberations and thereby its verdict. *United States v. Olano*, 507 U.S. 725, 739 (1993).  A defendant is entitled to a new trial when extrinsic evidence is introduced into the jury room unless these is no reasonable probability that the jury's verdict was influenced by the information. *United States v. Ruggiero*, 56 F.3d 647, 652 (5th

64

Cir. 1995); *United States v. Luffred*, 911 F.2d 1011, 1014 (5th Cir. 1990).

*Analysis*

Hall bases these claims on two incidents that allegedly occurred during the trial. First, Hall's sister, Cassandra Ross, has submitted an affidavit to this Court stating that she saw a television newscast during which one of the female jurors was interviewed. Ross claims that the juror told the reporter that, during the weekend break in punishment deliberations, she had a birthday party for her daughter and that she placed a candle on the cake in Lisa Rene's memory and she and the guests said a prayer for Lisa Rene. (Hall's Exhibit #42.) Second, Hall has submitted evidence, including copies of e-mails and letters, that one of the jurors at Hall's trial, Jacqueline Holmes, communicated with Hall by letter after his trial and told him that she had met the victim's mother in the hallway during the trial. (Hall's Exhibits #44-49.) Hall contends that this evidence establishes that there was extrinsic information placed before the jury and there is a reasonable probability that the jury's verdict was influenced by the information. Hall further contends that Jacqueline Holmes's statements in letters and e-mails written by her indicate that she based her decision at the penalty phase of the trial on sympathy for the victim.

This Court conducted a hearing on these issues on June 7, 2004. At this hearing, Jacqueline Holmes testified under oath. She

acknowledged that she had communicated with Hall in prison by mail after the trial ended.  She also acknowledged that, in one of her letters to Hall, she stated that she met the victim's mother during the trial.  She further testified, however, that this statement was not true, that she never met the victim's mother, and that she included this statement in her letter in an attempt to encourage Hall to confide in her and respond to her inquiries.  Holmes further testified at the hearing that she did not host or attend a birthday party during the weekend break in deliberations at the penalty phase of Hall's trial, she was not aware of any other juror attending such a party, and she did not recall any discussions between the jurors about a birthday party. (*See* Record of June 7, 2004 hearing.)

With regard to Hall's allegation that a juror had *ex parte* communications with the victim's mother, the live, sworn testimony before this Court is that this communication did not occur, and this Court finds Holmes's testimony to be credible.  Accordingly, Hall has not established that any inappropriate *ex parte* contact occurred. With regard to Hall's allegation that extrinsic evidence was introduced into the jury room, Hall has made a specific allegation that a juror lit a birthday candle in honor of a murder victim and said a prayer in her memory.  Assuming that this allegation is indeed true, and a female juror other than Jacqueline Holmes attended the birthday party, it is not evidence that there was *any* outside influence on the jury.  Instead Hall offers merely *speculation* that

66

there may have possibly been some unknown person at the party who said something to the juror that influenced her vote.  Mere speculation that some discussion between a juror and an unknown person occurred does not establish that extrinsic evidence entered the jury deliberations, especially where Jacqueline Holmes's sworn testimony is that she does not recall any juror discussing a birthday party, much less any prayer offered on behalf of the victim.  Hall has also failed to establish this claim.[9]

Finally, Hall contends that an "unacceptable risk" exists that Jacqueline Holmes's decision to recommend the death penalty for Hall was based on her sympathy for the victim and her family, rather than on the evidence.  Hall bases this claim on statements that Holmes made in messages posted on a web site regarding the death penalty, and Hall has submitted these messages to this Court as exhibits.  In particular, Holmes stated that she was the last person on the jury in Hall's case to vote in favor of sentencing Hall to death. She admits that she ultimately voted as she did because of the horror

---

[9]  Hall makes two further contentions.  First, he asserts that he has been unable to locate evidence to support this claim because this Court has previously denied him discovery on this issue.  As noted in its earlier order denying Hall's request for discovery, further discovery was denied on this issue because Hall had failed to assert a *prima-facie* claim of juror misconduct, because Hall's contention that someone might have communicated something to the unknown juror at the birthday party was, and remains, mere speculation.   Second, Hall appears to assert a further claim that religion played an impermissible part in the jury's verdict at punishment, given the juror's prayer for the victim at the party and testimony given at trial at the punishment phase of the trial regarding attending and being active in church. (R. 32:18.)  As the government notes in its response, it never advocated the death penalty for religious reasons.  And, the constitution is not violated merely because testimony regarding the victim's church attendance was offered into evidence. *See United States v. Bernard*, 299 F.3d 467, 479-80 (5th Cir. 2002).  These contentions are without merit.

the victim suffered, Hall's attempts to hide the crime, and his lack of remorse. She discloses that she has struggled with her decision in the years since, that she will always remember the sadness of both the victim's and Hall's families, and that she stopped writing letters to Hall because she was "overwhelmed" by the emotions that the correspondence evoked. (Hall's Exhibits #44, 48.)

As support for this claim, Hall cites cases in which the trial court removed jurors from service due to their inability to serve because of mental illness, depression, or a nervous or emotional condition. These cases are not applicable in the instant case. In her web postings, Holmes spoke of struggling with her decision after the fact. This is not evidence that she voted in favor of the death penalty at the time of trial based on overwhelming sympathy for the victim and her family. Instead, she specifically stated that she ultimately voted to recommend the death penalty because of the horror Lisa Rene experienced in death and because Hall attempted to hide his crime rather than promptly expressing remorse. Her decision was therefore based on the circumstances of the crime and Hall's response to them. Hall has shown no constitutional violation based on Holmes's verdict. Hall's third through fifth claims for relief are without merit, and they are denied.

## D.   **Brady Claim**

In his sixth claim for relief, Hall contends that the government violated its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), because

68

the government was in possession of mitigating and impeachment evidence but did not provide it to Hall.  Specifically, Hall asserts that the government knew that one of its witnesses, Larry Nichols, had additional criminal conduct and more experience as a government witness than what it revealed at trial, but that it did not inform defense counsel.  Hall further asserts that, contrary to Nichols's testimony, he had been placed in protective custody prior to the times he spoke with Hall at the Mansfield jail.  Hall contends that all of this additional information could have been used by the defense to impeachment Nichols, thereby discrediting his testimony.

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the suppression of evidence favorable to the accused and material to either guilt or punishment by the state violates a defendant's due-process rights under the federal constitutional.  And under *Brady*, the prosecution has the duty to turn over to the defense both exculpatory and impeachment evidence, whether or not it was requested by the defense. *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985).  Such evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.  A reasonable probability of a different result is shown when the suppression of evidence undermines confidence in the verdict. *Bagley*, 473 U.S. at 678.

As noted earlier in this opinion, at the punishment phase of Hall's trial, Nichols testified that he and Hall were fellow inmates

69

in the Mansfield Correctional Center in the months leading up to Hall's trial.  Nichols further testified about Hall's demeanor in prison and his statements that he would kill Steven Beckley if he ever got the chance and that he had a plan to escape from custody. (R. 17:220-27.)

On direct examination, Nichols acknowledged that he had approached an FBI agent with this information when he was in court regarding his own federal cases and that, after speaking about Hall to FBI agents and an AUSA on March 6, 1995, he was placed in protective custody when he returned to Mansfield because he was a "snitch." (R. 17:236-37.)  He further acknowledged that he had been charged with the armed robbery of three banks and, in exchange for his testimony at the trial of his co-defendants, had pled guilty to two counts of using a weapon during a crime of violence. (R. 17:210-12.)  Nichols also testified that there was a provision in his plea agreement with the government whereby the government could recommend that his sentence be reduced because of his cooperation in the case against his co-defendants. (R. 17:213-14.)

On cross-examination, Nichols acknowledged his numerous prior robberies, his ownership of guns, his purchase of a car with stolen money, and his attempt to convince a co-defendant to lie in an affidavit. (R. 17:242-45, 248.)  Nichols also admitted on cross-examination that he had not yet been sentenced in his case.  He further acknowledged that the government had already filed a motion

70

Supp. App. 113

with the judge presiding over his case for a downward departure from his guideline sentence due to his cooperation in that case and that he would like for the judge in his case to know about his cooperation with the government in Hall's case before he is officially sentenced. (R. 17:252, 256, 260-62, 268-69.)

Hall contends that the government withheld the full extent of Nichols's prior criminal conduct from Hall's attorneys. Hall further contends that Nichols was in protective custody before, not after, he spoke to federal agents about Hall and that this information was withheld from Hall's attorneys. And Hall asserts that the government withheld information that Nichols was a "career informant" who had cooperated with the government in cases other than those of his two co-defendant bank robbers and Hall.

Hall asserts that the government knew about Nichols's other prior criminal conduct because Nichols disclosed it during his testimony at the trial of his co-defendants. In that regard, the record from Hall's trial reflects that Hall's attorney Jeff Kearney questioned and confronted Nichols with his testimony at his co-defendants' trial on more than one occasion. (R. 17:246-47, 257.) Furthermore, in an affidavit submitted with the government's response, Kearney states that he reviewed the transcript of Nichols' previous testimony and utilized this information in cross-examining Nichols. (Government Exhibit F.) Nichols's prior criminal conduct, as related by Nichols at the prior trial, was not withheld from the defense.

71

Hall contends that Nichols was in protective custody before he spoke to an FBI agent on February 28, 1995, about Hall.  Hall bases this on the word "protect" which is in parentheses in the report FBI Agent Arthur Grovner filed regarding his conversation with Nichols that occurred in a federal courtroom. (Hall's Exhibit #1.)  Hall has no other evidence of this allegedly withheld evidence, and Hall's supposition that this parenthetical notation indicates that Nichols was already in protective custody is belied by the text of the report, which states that Nichols informed Grovner that he was a cellmate with one of the Hall brothers.  This allegation is without merit.

Finally, Hall contends that the government withheld information that Nichols was a career informant.  Hall does not state where he learned this information and does not specify against whom Nichols cooperated as a government witness other than his co-defendants and Hall.  Regardless, even were this allegation correct and even if the government knew that Nichols had acted as an informant in the past additionally to what he admitted on the stand, Hall has not shown that this information is material impeachment evidence.  On cross- examination, Nichols was impeached by defense counsel Kearney not only with his extensive criminal history, but also his willingness to testify against others, including his previous associates, in order to improve his own situation.  Hall has not shown a reasonable probability that, had the jury been provided even more evidence along

72

this vein, Hall would not have received the death penalty.  Hall's sixth claim for relief is without merit and is therefore denied.

**E.    <u>False-Testimony Claims</u>**

In his seventh and twelfth claims for relief, Hall argues that his constitutional rights were violated when the government presented false testimony from government witnesses Larry Nichols and Steven Beckley.  Specifically, in his seventh claim, Hall contends that government witness Larry Nichols lied upon being cross-examined at the punishment phase of the trial when he testified that he never used any of the proceeds from his previous robberies to use drugs and was never told by other inmates about ways to help himself within the legal system.  In his twelfth claim for relief, citing *Johnson v. Mississippi*, 486 U.S. 578 (1988), Hall contends that his death sentence violates the Eighth Amendment because it was based on false testimony given by government witnesses Larry Nichols and Steven Beckley.

The Supreme Court has held that the presentation of false evidence violates a criminal defendant's due-process rights. *See Mooney v. Holohan*, 294 U.S. 103, 112 (1935).  The same result obtains when the prosecutor, although not soliciting false evidence, allows it to go uncorrected when it appears. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  And this is true whether the presentation was intentional or through negligence. *United States v. Antone*, 603 F.2d

Supp. App. 116

566, 569 (5th Cir. 1979), *citing Giglio v. United States*, 405 U.S. 150, 154 (1972).

In order to prevail on this claim that his constitutional rights were violated by the presentation of false testimony, Hall must establish not only that the testimony was actually false, but also that it was material and that the prosecution knew it was false. *Napue v. Illinois*, 360 U.S. at 271.  As evidence that Nichols lied at trial, Hall points to Nichols's testimony at the trial of his own co-defendants. (Hall's Exhibit #31.)  As noted earlier, Nichols's prior testimony was available to defense counsel and was used in cross-examining him.  But even if this Court were to consider the government's failure to correct Nichols's testimony on these points at Hall's trial an error under *Napue*, it was not material.  Nichols's testimony at Hall's trial and the previous trial differed with respect to collateral matters that are not material to Hall's sentence. Regardless of whether Nichols used his illegal proceeds to purchase drugs, there was ample evidence of Nichols's prior criminal behavior placed into evidence, including numerous armed robberies, as well as the illegal possession of guns. And, regardless of whether someone counseled Nichols on how to avail himself of the system to improve his chances of lowering his sentence, there was ample evidence admitted of his willingness to initiate contact with the government in order to provide information against other defendants, as well as his willingness to testify against others with the express hope

74

of having his sentence reduced.   Indeed, in an affidavit submitted with this Court, defense counsel Kearney explains that, while he did have access to all of Nichols's testimony from his co-defendants' trial, he decided not to confront Nichols with all of the inconsistencies in his testimony at Hall's trial and the previous trial, no matter how minor, because Nichols had substantially admitted most of the impeaching information in his testimony at Hall's trial. (Government Exhibit F.)   Hall's seventh claim for relief is denied.

With respect to Hall's twelfth claim, the Supreme Court in *Johnson v. Mississippi*, 486 U.S 578 (1988), reversed a death penalty in a case where a prior felony conviction from another state was used to prove an aggravating circumstance at the sentencing phase of the trial and that prior conviction was later reversed.   Hall asserts that under this Supreme Court precedent, his death sentence is invalid because it is based on false testimony given by Larry Nichols at the punishment phase of the trial and by false testimony given by Steven Beckley at the guilt phase of the trial.   In addition to his assertions that Nichols lied, which are set forth in his seventh claim for relief, Hall asserts that Steven Beckley lied about the nature of Hall's involvement in the kidnapping and murder of Lisa Rene and that, while this testimony was given at the guilt phase of the trial, Hall's sentence was based in part on his allegedly false testimony.

75

As this Court noted earlier, all of the allegedly false testimony that Nichols gave at Hall's trial was not material to the sentencing phase of the trial.  With respect to Beckley's testimony, Hall asserts, without any supporting proof, that Beckley testified falsely that Hall was the leader of the group who committed the kidnapping and murder.  However, while Beckley did testify that Hall was one of the primary actors in the kidnapping who also, along with Beckley and Bruce Webster, participated in her murder, his testimony was corroborated to a large extent by the testimony of Hall's brother, Demetrius Hall, by the testimony of Marvin Holloway, and by Hall's confession to the police. (*See* R. 13:107-227; R. 14:45-57; R. 16:14-64.)  Hall has not shown that his death sentence was based on false testimony.  Accordingly, this Court denies relief with respect to these claims.

## F.   <u>Government-Agent Claim</u>

In his eighth claim for relief, Hall asserts that his right to counsel under the Sixth Amendment was violated because the government used Larry Nichols as a government agent to elicit information from Hall to be used against him at trial.  Specifically, Hall asserts that, either with the direction or the encouragement of FBI Agent Grovner, Nichols elicited information from Hall between February 28, 1995, the day that Nichols initially approached an FBI agent about Hall, and March 5, 1995, the date Nichols met with FBI agents and prosecutors and related his information about Hall.

76

Supp. App. 119

The Supreme Court has held that, after a criminal defendant's right to counsel has attached, the government cannot initiate any questioning of the defendant without the presence of his attorney, unless he has waived his right to have counsel present. *Brewer v. Williams*, 430 U.S. 387 (1977). This includes situations where the government uses a co-defendant who is cooperating with the government to elicit information after both have been indicted. *Maine v. Moulton*, 474 U.S. 159 (1985); *Massiah v. United States*, 377 U.S. 201 (1964).

Hall bases his contention that Larry Nichols was used as a government agent on "information and belief," but has consistently maintained that additional discovery is required to develop this claim. However, the government has submitted an affidavit from FBI Agent Grovner in which he states that he never encouraged or directed Nichols to elicit further information from Hall. Rather, Grovner states in his affidavit that Nichols related to him information that Nichols had already been given by Hall regarding the escape plan, and Nichols stated that he had more information that he wanted to tell the government. (Government Exhibit B.) And the statement made by Agent Grovner regarding his conversation with Nichols on February 28, 1995, reflects that Nichols told Grovner some, but not all, of the information he had gleaned from Hall. (Hall's Exhibit 1.) As Agent Grovner has specifically denied Hall's contention that he ever encouraged or directed Nichols to elicit information from Hall, and Hall has presented no evidence to the contrary, Hall's claim that

77

the government violated his Sixth Amendment right to counsel by using Larry Nichols as a government agent is without merit. Hall's eighth claim for relief is denied.

**G.    False-Statement Claim**

In his ninth claim for relief, Hall contends that his rights under the Fifth, Sixth, and Eighth Amendments were violated when, during his trial, the government gave defense counsel a false statement from FBI Agent Shannon regarding Hall's fellow inmate Alonzo Airy.  Hall further asserts that the information contained in the false statement caused defense counsel to decide not to call Airy as an impeachment witness against Larry Nichols at the trial's punishment phase.  Hall argues that his sentence should be reversed because, had Airy been called as a witness for the defense, he would have effectively impeached Nichols's testimony about Hall's behavior while he was at the Mansfield jail.

As noted earlier in this opinion, before the government had concluded its case-in-chief at the punishment phase of the trial, but after Larry Nichols had concluded his testimony for the government, the government requested from this Court that it be permitted to amend its witness list to add Airy to the list, who had recently been interviewed by the government. (R. 18:4.)  The government wished to call Airy as a witness because he had corroborated Nichols's testimony when he spoke to government agents a couple of days earlier. (R. 18:5-6; Hall's Exhibit #39.)  Defense

78

Supp. App. 121

counsel objected to the government's attempt to amend its witness list (R. 18:8), and this Court denied the government's request to add Airy as a government witness. (R. 18:14.)  Defense counsel did not call Airy as a witness.

Hall offers no case law as support for his assertion that his sentence should be reversed on the basis of this claim, but has included as an exhibit an affidavit, signed by Airy on April 10, 2000, stating, in essence, that he never told Agent Shannon and AUSA Macaluso much of the information Shannon included in an FBI-302 statement dated October 30, 1995. Specifically, in his new affidavit Airy asserts that, contrary to what is stated in the FBI statement, he never told the government representatives that Hall was cold or remorseless, never told them that Hall said that the others followed him, never said that Hall told him that he wanted to kill Beckley because he was a "snitch," never said that Hall spoke of the victim in disparaging language, and never told the agents that Hall spoke to him about an escape plan in which he would kidnap and/or kill his attorney. (Hall's Exhibit #40.)

In response, the government has submitted affidavits from Macaluso and Shannon.  In his affidavit, Macaluso states that he and Shannon interviewed Airy on October 30, 1994, because the defense had listed him as a possible witness.  Macaluso further states that he recalls that Airy made very disparaging comments about Larry Nichols and viewed Nichols as someone who had taken advantage of his

79

own co-defendants.  However, Airy confirmed the accuracy of Nichols's comments regarding Hall and what Hall had told Nichols about the kidnapping and murder of Lisa Rene.  Finally, Macaluso states in his affidavit that Shannon's statement that was prepared after the interview was accurate. (Government's Exhibit C.)  Likewise, in his own affidavit, Shannon states that his previous statement outlining the interview with Airy on October 30, 1994, is correct. (Government's Exhibit D.)

Hall does not allege that the government knowingly presented false testimony, as Airy did not testify for the government.  Instead, Hall appears to be making a general prosecutorial misconduct claim, alleging that the prosecution committed misconduct when the prosecutors presented an FBI statement in order to convince the defense attorneys not to call Airy as a defense witness.  The Fifth Circuit has stated that prosecutorial misconduct is not a ground for relief unless it casts serious doubt on the jury's verdict. *Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001).  And any alleged prosecutorial misconduct must be examined in the context of the trial in which it occurred. *United States v. Bermea*, 30 F.3d 1539, 1563 (5th Cir. 1994).

Hall alleges that the government's stated desire to call Airy as a witness improperly influenced defense counsel not to call Airy themselves.  But to make a showing that the government infringed on his right to present a defense at the punishment phase of his trial,

80

Hall must show that the government's conduct substantially interfered with Airy's free choice to testify. *See United States v. Thompson*, 130 F.3d 676, 686 (5th Cir. 1997). And while the government cannot conceal exculpatory evidence from a defendant, the government is under no obligation to conduct the defendant's investigation for him. *United States v. Garza*, 165 F.3d 312, 315 (5th Cir. 1999); *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990).

Hall has not shown that any government action interfered with Airy's decision or choice to testify. First, it is difficult to conceive why the government attorneys would have argued forcefully for the right to call Airy as a government witness knowing that he would give testimony substantially different than what the FBI agent recounted in his statement. Second, and more importantly, even if the FBI statement was a complete fabrication, when this Court denied the government's request to call Airy as a witness, defense counsel were free to do so and were certainly free to speak to Airy again and determine what testimony he was actually willing to give. Defense counsel, not the government, decided not to call Airy as a witness.[10] Accordingly, no prosecutorial misconduct alleged by Hall casts serious doubt upon the jury's verdict at punishment. Accordingly, this claim is without merit and it is denied.

---

[10] As noted earlier in this opinion, the decision not to call Airy as a witness was an imminently reasonable one because, even if he contradicted everything in the FBI statement, the government was free to question him about the statement and call FBI Agent Shannon to impeach Airy's testimony. Surely, this would have undercut Hall's defense, not aided it.

Supp. App. 124

H.      **<u>Interference-with-Counsel Claim</u>**

In his tenth claim for relief, Hall asserts that the government "arbitrarily interfered" with his Sixth Amendment right to counsel when the government informed his original trial counsel, Mark Daniel and Michael Heiskell, that Larry Nichols had told the government that Hall had a plan to escape by taking one of his attorneys hostage. Hall maintains that Nichols was an unreliable witness and that, had Hall's original attorneys been aware of his unreliability, they would not have withdrawn from the case.  The government responds that there is no evidence that Nichols was an unreliable witness, that the government had an obligation to inform counsel about the information it had received about the escape plan, and that Hall had no constitutional right to be represented by any particular attorneys.

On October 28, 1994, Mark Daniel was appointed to represent Hall and on January 6, 1995, Michael Heiskell was appointed as co-counsel in the case.  On March 8, 1995, these attorneys filed a motion to withdraw from their representation of Hall.  On March 9, 1995, after conducting an *in camera* review of the issue, this Court issued an order granting the motion.   Jeff Kearney and Michael Ware were subsequently appointed as new counsel for Hall.   Hall's former attorneys requested to withdraw from the case when they were informed about an alleged plan by Hall to escape from custody by taking one of his attorneys hostage. (Government Exhibit E.)  This information was obtained from fellow inmate Larry Nichols, who first spoke briefly

82

with FBI Agent Arthur Grover about the alleged plot on February 28, 1995, and then spoke in greater detail with both FBI Agents and prosecutors on March 7, 1995. (Hall's Exhibits 1, 2.)

Hall contends that the statement made by Nichols to the government, as outlined in an FBI-302 statement dated March 7, 1995, in which Nichols is quoted to have stated that Hall had a plan to escape from prison by taking one of his attorneys hostage, was an unreliable statement by an unreliable witness. The only evidence that Hall has submitted to this Court in an attempt to establish that Nichols' statements to authorities about the escape was unreliable are sworn declarations from other fellow inmates Charles May, Javier Solis, and Alonzo Airy. May, Solis, and Airy all assert in their statements that they were inmates with Hall at the Mansfield Detention Center for unspecified time periods and that they never heard him speak about an escape plan and did not believe that he would have said this to anyone else. (Hall's Exhibits 32, 33, 40.) In his affidavit, Airy also states that Nichols had urged him to claim that Hall had spoken to him about an escape plan. (Hall's Exhibit 40.) All three of these affidavits were signed in 2000.

None of this evidence presented by Hall conclusively establishes that Nichols's statement to the authorities about the alleged escape plan was false, as all of the statements state only that Hall never spoke to them about any escape plan. More importantly, however, none of this evidence shows that the government had any specific reason

83

to disbelieve Nichols when he spoke to FBI agents and prosecutors on March 7, 1995. As noted by the government in its response, Hall's previous attorneys were informed immediately about the alleged plan because it had a direct bearing on their safety. As their motion to withdraw was filed with this Court on March 8, 1995, it is clear that Hall's prior attorneys acted immediately on the information provided to them. Any statement or declaration made in 2000 questioning the accuracy of Nichols's statements about Hall have no bearing on whether such an escape plan was a possibility in March of 1995.

Moreover, and most importantly, Hall has shown neither any constitutional violation in the government's reasonable action of informing defense counsel about possible dangers in their representation of Hall nor in defense counsel's request to withdraw from representing Hall. The Fifth Circuit has consistently held that a criminal defendant has no constitutional right to be represented by a particular attorney. *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *see also United States v. Breeland*, 53 F.3d 100, 106, n. 11 (5th Cir. 1995). Without any proof of a constitutional violation, this claim for relief must fail. Hall's tenth claim for relief is denied.

I.   **Selective-Prosecution Claim**

Finally, in his eleventh claim, Hall, in essence, makes a selective-prosecution claim. Specifically, Hall contends that the

84

government violated his constitutional rights under the Fifth and Eighth Amendments because it has used ethnicity as a basis for seeking the death penalty against African-Americans like himself. Hall bases his claim on statistics that purport to show that the government has sought the death penalty against African-American defendants with disproportionate frequency as compared to defendants of other races.

### *Applicable Law*

In *United States v. Armstrong*, 517 U.S. 456 (1996), the Supreme Court addressed the appropriate standard for establishing a selective-prosecution claim. In *Armstrong*, the Court first noted that, absent clear evidence to the contrary, there is a presumption that prosecutors have properly discharged their duties. The Court then went on to state that, in order to dispel this presumption and establish that he has been selectively prosecuted on the basis of his race, a criminal defendant must show that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. And, in order to establish a discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted. *Id.* at 464-65.

### *Analysis*

At trial, Hall made a pre-trial motion to dismiss the government's notice to seek the death penalty because of racial discrimination, along with a request for discovery of information

85

regarding the government's decision-making in death-penalty cases. In response, the government argued that there were an insufficient number of federal death-penalty cases to support either Hall's allegation of racial discrimination or the request for discovery. This Court denied the motion and Hall's discovery request.

In support of his contention that the federal government has used ethnicity as a factor in seeking the death penalty, Hall now on habeas review points to statistics maintained by the Federal Death Penalty Resource Center that purportedly indicate that the Department of Justice has authorized the death penalty in 199 cases, 76% of which had non-white defendants and 52% of which involved an African-American defendant. And, of these defendants, 47.5% of white defendants obtained a plea deal for a lesser sentence, while 27.2% of African-Americans obtained such plea deals. (Second Amended Petition at 192-93.)

This statistical evidence is insufficient to establish a *prima-facie* selective-prosecution case. In *United States v. Jones*, 287 F.3d 325, 333-35 (5th Cir.), *cert. denied*, 537 U.S. 1018 (2002), the Fifth Circuit was presented a Department of Justice Report, titled "Department of Justice, The Federal Death Penalty System: A Statistical Survey (1988-2000)," as support for a selective-prosecution claim and ruled that this evidence was not sufficient to establish a *prima-facie* case. This report reflected that, between 1995 and 2000, the Attorney General of the United States authorized

86

159 death-penalty prosecutions from 682 potential death-penalty cases. With respect to the race of the defendants, of those 159 cases, there were forty-four white defendants, seventy-one black defendants, thirty-two Hispanic defendants, and twelve "other" defendants. *Jones*, 287 F.3d at 333-34.

Moreover, on direct appeal in the case of Hall's co-defendant, Bruce Webster, the Fifth Circuit denied a similar claim, holding that Webster had failed to make a sufficient showing that he was selectively prosecuted, because he had not shown that other similarly situated individuals were not prosecuted for the death penalty, and he had failed to establish a discriminatory purpose on the part of the Department of Justice.   The Fifth Circuit further held that Webster's statistical evidence, consisting of statistics showing that 66% of federal death penalty cases involved African-American defendants, did not rebut the presumption of good faith on the part of the prosecution. *United States v. Webster*, 162 F.3d 308, 333-35 (5th Cir. 1999).

Hall presents to this Court similar statistics to those that the Fifth Circuit has previously held to be insufficient to support a claim of selective prosecution.   This Court is not at liberty to rule otherwise, so Hall's eleventh claim for relief is denied.[11]

_____

[11]    Hall, conceding that his statistics are insufficient to demonstrate purposeful discrimination, further asserts that this Court should grant him the right to conduct discovery on this issue.   But in both his previous motion for discovery and here, while Hall has arguably presented some statistical evidence to support his claim that there has been a disparate effect on African-Americans,

Supp. App. 130

## VI

### *Request for Evidentiary Hearing*

This Court held an evidentiary hearing on Hall's third, fourth, and fifth claims for relief on June 7, 2004.  Hall also requests that this Court conduct an evidentiary hearing on the remaining claims he raises in his motion. Section 2255 does not automatically require a hearing to dispose of every motion made under its authority. *Coco v. United States*, 569 F.2d 367, 369 (5th Cir. 1976).  But § 2255 does require a hearing unless the motion, files, and record of the case conclusively show that no relief is appropriate. *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992).  Conclusive, rather than direct evidence, however, is required in order to deny relief without a hearing.  *United States v. Drummond*, 910 F.2d 284, 285 (5th Cir. 1990).  Bona-fide or contested fact issues must be resolved on the basis of an evidentiary hearing.  *Booth v. United States*, 507 U.S. 243 (5th Cir. 1975); *Reagor v. United States*, 488 F.2d 515 (5th Cir. 1973).

The record before this Court, including the exhibits submitted by Hall with his motion, do not create any contested fact issues with

---

he has presented no evidence that there were *similarly situated* white defendants against whom the death penalty was not sought.  Furthermore, Hall has failed to present any evidence, inferred or otherwise, that there has been any discriminatory intent when prosecutors have decided to ask for permission to seek the death penalty against African-American individuals or when the Department of Justice has authorized the death penalty in cases against African-American defendants.  Accordingly, following the reasoning in *Armstrong*, Hall's statistical evidence is not sufficient to establish either the elements of his claim of selective prosecution or the "some evidence" standard necessary to establish good cause for discovery. *Armstrong*, 517 U.S. at 465, 468.

regard to Hall's remaining claims that must be resolved in order to decide his case.  To the contrary, many of Hall's claims are based on the record from the trial.  And, with regard to the claims for which Hall has submitted additional evidence, the Court has decided these claims based on information that remains uncontested, by assuming that what Hall alleges is true, or based on legal, not factual, bases.  Accordingly, because the record before this Court shows conclusively that Hall is not entitled to relief, his request for an evidentiary hearing on his remaining claims for relief is denied.

It is therefore ORDERED that Petitioner's motion to vacate his conviction and sentence under 28 U.S.C. § 2255 be, and is hereby, DENIED.

It is further ORDERED that the clerk of the Court shall transmit a copy of this order to Petitioner by certified mail, return receipt requested.

SIGNED August **24**, 2004.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/eb:be

89

Supp. App. 132

455 F.3d 508
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of
America, Plaintiff–Appellee,

v.

Orlando Cordia HALL,
Defendant–Appellant.

No. 04–70050.
|
July 5, 2006.

**Synopsis**
**Background:** Following affirmance of his convictions for kidnapping resulting in death, conspiring to kidnap, traveling in interstate commerce to promote possession of marijuana with intent to distribute, and sentence of death, 152 F.3d 381, defendant moved to vacate his conviction and sentence. The United States District Court for the Northern District of Texas, Terry R. Means, J., 2004 WL 1908242, denied the motion and defendant applied for a certificate of appealability.

**Holdings:** The Court of Appeals, King, Circuit Judge, held that:

[1] defense counsel's investigation into defendant's family background for mitigation evidence was not deficient;

[2] defendant was not entitled to certificate of appealability (COA) on issue of whether defense counsel was ineffective during trial;

[3] defendant was not entitled to COA on issue of whether there was extraneous influence on the jury;

[4] defendant was not entitled to COA on issue of whether there was prosecutorial misconduct; and

[5] defendant failed to show a federal prosecutorial policy of discriminatory intent.

Application for certificate of appealability denied.

West Headnotes (12)

**[1]** **Criminal Law** ⚬ Certificate of probable cause or reasonable doubt

To obtain a certificate of appealability, an applicant must make a substantial showing of the denial of a constitutional right. 28 U.S.C.A. § 2255.

22 Cases that cite this headnote

**[2]** **Criminal Law** ⚬ Certificate of probable cause or reasonable doubt

An applicant for a certificate of appealability need not establish that he will win on the merits; rather, he need only demonstrate that the questions he raises are debatable among reasonable jurists.

**[3]** **Criminal Law** ⚬ Certificate of probable cause or reasonable doubt

In determining whether to grant a certificate of appealability, the inquiry by the Court of Appeals is limited to a threshold examination that requires an overview of the claims and a general assessment of their merits.

1 Cases that cite this headnote

**[4]** **Criminal Law** ⚬ Certificate of probable cause or reasonable doubt

In a matter involving a sentence of death, any doubts as to whether a certificate of appealability should be issued must be resolved in the applicant's favor.

**[5]** **Criminal Law** ⚬ Adequacy of Representation

**Criminal Law** ⚬ Deficient representation in general

A fair assessment of defense counsel's challenged conduct requires reviewing courts to make every effort to eliminate the distorting

effects of hindsight and to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. U.S.C.A. Const.Amend. 6.

**[6]    Criminal Law** 👈 Adequacy of investigation of mitigating circumstances

Defense counsel's investigation into defendant's family background for mitigation evidence against imposition of death penalty was not deficient, as element of claim of ineffective assistance; counsel spoke with defendant and presented him with lengthy questionnaire and learned that defendant felt he had reasonably happy and peaceful childhood, counsel used private investigator to help evaluate and investigate defendant's background, counsel interviewed defendant's sister and mother and learned father was extremely violent, both women were called to testify, and counsel employed services of mitigation specialist. U.S.C.A. Const.Amend. 6.

**[7]    Criminal Law** 👈 Certificate of probable cause or reasonable doubt

Following unsuccessful motion to vacate kidnapping conviction and death sentence, defendant was not entitled to certificate of appealability (COA) on issue of whether defense counsel was ineffective during trial, since no reasonable jurist could debate the district court's decision to deny relief on those grounds; defendant's arguments that counsel failed to adequately prepare witness, obtain opportunity for allocution, effectively argue motion for continuance, effectively conduct voir dire, present effective closing argument, or present evidence of defendant's good conduct during past incarceration were not supported by anything more than defendant's displeasure with outcome of trial and sentencing hearing. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2255.

**[8]    Criminal Law** 👈 Multiple particular grounds

Ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions. U.S.C.A. Const.Amend. 6.

75 Cases that cite this headnote

**[9]    Criminal Law** 👈 Certificate of probable cause or reasonable doubt

Following unsuccessful motion to vacate kidnapping conviction and death sentence, defendant was not entitled to certificate of appealability (COA) on issue of whether there was extraneous influence on the jury based on juror's alleged contact with victim's mother and attendance at prayer ceremony for victim, since no reasonable jurist could debate the district court's decision to deny relief on those grounds; district court conducted evidentiary hearing to resolve claim during which juror testified that she had never met victim's mother and that she lied to defendant in order to encourage him to correspond with her, juror also denied attending any sort of prayer ceremony. 28 U.S.C.A. § 2255.

4 Cases that cite this headnote

**[10]    Criminal Law** 👈 Certificate of probable cause or reasonable doubt

Following unsuccessful motion to vacate kidnapping conviction and death sentence, defendant was not entitled to certificate of appealability (COA) on issue of whether there was prosecutorial misconduct related to government's alleged concealment of witness's criminal history, since no reasonable jurist could debate the district court's decision to deny relief on those grounds; district court reviewed trial record and affidavit from defendant's trial counsel and concluded that government did not withhold any information about witness's prior criminal conduct from defendant's trial counsel. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2255.

4 Cases that cite this headnote

**[11]    Criminal Law** 👈 Particular cases

Defendant convicted of kidnapping and sentenced to death failed to show a federal

Supp. App. 134

prosecutorial policy of discriminatory intent, as required to support his selective prosecution claim raised on motion to vacate conviction and sentence. 28 U.S.C.A. § 2255.

4 Cases that cite this headnote

**[12]**    **Criminal Law**  ⚷  Costs

Defendant convicted of kidnapping and sentenced to death failed to point to any specific needs or limitations caused by the alleged lack of funds, as required to support his claim of denial of reasonably necessary funds raised on motion to vacate conviction and sentence. 28 U.S.C.A. § 2255.

**Attorneys and Law Firms**

 **\*510** Delonia Anita Watson, Fort Worth, TX, for U.S.

Robert Charles Owen, Owen & Rountree, Austin, TX, Marcia Adele Widder, The Capital Appeals Project, New Orleans, LA, for Hall.

Appeal from the United States District Court for the Northern District of Texas.

Before KING, SMITH and STEWART, Circuit Judges.

**Opinion**

KING, Circuit Judge:

Defendant-appellant Orlando Hall, a federal prisoner under a sentence of death, has applied for a certificate of appealability to challenge the district court's denial of his motion to vacate his conviction and sentence under 28 U.S.C. § 2255. Hall previously sought, and was denied, a certificate of appealability from the district court. For the reasons discussed below, we DENY Hall's application for a certificate of appealability.

I. BACKGROUND

Orlando Cordia Hall ("Hall") ran a marijuana trafficking enterprise in Pine Bluff, Arkansas, along with Bruce Webster ("Webster") and Marvin Holloway ("Holloway"). Hall,

Webster, and Holloway bought marijuana in the Dallas/Fort Worth area, assisted by Steven Beckley ("Beckley"), who lived in Irving, Texas. Typically, Beckley drove the marijuana back to Arkansas, and Holloway stored the marijuana in his house.

On September 21, 1994, Holloway drove Hall from Pine Bluff to Little Rock, Arkansas, and Hall then flew from Little Rock to Dallas in order to buy marijuana. Beckley and Hall's brother, Demetrius Hall ("D. Hall") picked Hall up at the Dallas airport. Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis ("Vitalis") and Neil Rene ("N. Rene"), at a car wash and gave them $4700 to procure marijuana. Hall and Beckley returned to the car wash to pick up the marijuana, but Vitalis and N. Rene did not return. Hall then spoke with Vitalis and N. Rene by telephone, and Vitalis and N. Rene told Hall that they had been robbed of both their car and the $4700 entrusted to them.

Hall and Beckley then gave Vitalis's and N. Rene's phone number to a friend who worked for the telephone company, and this friend told them that the number was associated with an address at the Polo Run Apartments in Arlington, Texas. Hall, D. Hall, and Beckley began surveilling this address, and they saw Vitalis and N. Rene exit an apartment and approach the same car which they claimed had been stolen along with the $4700. Based on this surveillance, Hall and Beckley concluded that Vitalis and N. Rene had lied about the robbery and had kept the $4700 for themselves.

Hall called Holloway on September 24, 1994, and instructed him to drive Webster to the airport in Little Rock. Webster then flew from Little Rock to Dallas. **\*511** That evening, Hall, D. Hall, Beckley, and Webster drove to the Polo Run Apartments in a car owned by Hall's sister Cassandra. Hall and Webster each carried handguns, D. Hall carried a souvenir baseball bat, and Beckley carried duct tape and a jug of gasoline.

When they arrived, Webster and D. Hall knocked on the front door of the apartment that Vitalis and N. Rene had left. Lisa Rene ("Rene"), N. Rene's sixteen-year-old sister, was alone in the apartment and refused them entry. When Webster and D. Hall began issuing threats, Rene called her sister and 911. Webster attempted to kick in the front door, but when that failed he and D. Hall circled around to the patio and broke into the apartment through a glass door. Webster then entered the apartment, tackled Rene, and dragged her back to Hall's sister's car. The group then drove away from the

Supp. App. 135

Polo Run Apartments and returned to Hall's sister's apartment, where Beckley's car was parked. There, they forced Rene into Beckley's car and then drove off in a group. During this second drive Hall raped Rene. Later, the group returned to Hall's sister's apartment, and from there Beckley, D. Hall, and Webster drove back to Pine Bluff along with Rene. Hall remained behind and flew back to Arkansas the next day.

Once Beckley, D. Hall, and Webster reached Pine Bluff, Holloway provided them with money, which they used to move into a motel room. There, they tied Rene to a chair and raped her repeatedly. On September 25, 1994, Hall and Holloway arrived at the motel room and took Rene into the bathroom for approximately twenty minutes. When they emerged, Hall told Beckley, "She know too much," and then he left the motel with Holloway and Webster.

After leaving the motel, Hall and Webster went to Byrd Lake Park and dug a grave. That evening, Hall, Webster, and Beckley took Rene to Byrd Lake Park, but they could not find the grave site in the dark, so they returned to the motel room. Early the next morning, on September 26, 1994, Beckley and D. Hall moved Rene to another motel because they were concerned that a security guard at the first motel was becoming suspicious.

Later on the morning of the 26th, Webster, Hall, and Beckley again drove Rene to Byrd Lake Park, after covering her eyes with a mask, and they took her to the grave site, which they were able to locate in the daylight. At the grave site, Hall placed a sheet over Rene's head and then hit her once in the head with a shovel. Rene screamed and attempted to run away, but Beckley grabbed her and hit her twice in the head with the shovel. Beckley then handed the shovel to Hall, and Hall and Beckley took turns beating her. When they had finished, Webster gagged Rene, dragged her into the grave, covered her with gasoline, and covered her with dirt. In its current brief before this court, the government reminds us that the medical report supported findings that Rene was alive but unconscious when she was buried by Webster, that she died from the effects of the multiple blunt force injuries she suffered during her beating, combined with asphyxia, and that she may have regained consciousness in the grave before her death. After Rene was buried, the three men returned to the motel and picked up D. Hall.

On September 29, 1994, an arrest warrant was issued in Arlington for Hall, D. Hall, and Beckley for Rene's kidnapping, and D. Hall, Beckley, and Webster were arrested.

On September 30, 1994, Hall surrendered to Pine Bluff authorities in the presence of his attorney. Based on his **\*512** attorney's advice, Hall did not give a statement at arrest, but he indicated that he would talk once he was transported to Texas. On October 5, 1994, Hall gave a written statement to FBI and Arlington County officials in which he substantially implicated himself in Rene's kidnapping and death.

The United States District Court for the Northern District of Texas issued a criminal complaint on October 26, 1994, charging Hall, D. Hall, Webster, and Beckley with kidnapping in violation of 18 U.S.C. § 1201(a)(1). On November 4, 1994, a six-count superseding indictment was returned, charging Hall, D. Hall, Webster, Beckley, and Holloway with kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1), conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c), traveling in interstate commerce with intent to promote the possession of marijuana with intent to distribute in violation of 18 U.S.C. § 1952, using a telephone to promote the unlawful activity of extortion in violation of 18 U.S.C. § 1952, traveling in interstate commerce with intent to promote extortion in violation of 18 U.S.C. § 1952, and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c).

The government filed notice of its intent to seek the death penalty against Hall on February 23, 1995. The district court severed Hall's trial from the trial of his codefendants on April 6, 1995, and his trial began on October 2, 1995. On October 31, 1995, the jury convicted Hall of kidnapping in which a death occurred, conspiracy to commit kidnapping, traveling in interstate commerce to promote possession of marijuana with intent to distribute, and using and carrying a firearm during a crime of violence. After a separate hearing, the jury recommended, by unanimous vote, that Hall receive the death penalty.[1]

Hall appealed, and his conviction and sentence were affirmed by this court on August 21, 1998. *United States v. Hall,* 152 F.3d 381, 389–90 (5th Cir.1998) [hereinafter *Hall*]. Hall filed a petition for rehearing with this court, which was denied on October 1, 1998. Hall then petitioned the Supreme Court for a writ of certiorari, which was denied on May 17, 1999. *Hall v. United States,* 526 U.S. 1117, 119 S.Ct. 1767, 143 L.Ed.2d 797 (1999).

Hall filed his initial motion to vacate his conviction and sentence, pursuant to 28 U.S.C. § 2255, in May 2000. In June 2000, the district court granted Hall's request to file a

Supp. App. 136

discovery motion. Hall filed an initial discovery motion in August 2000 and a supplemental discovery motion in May 2001. The district court denied both motions in April 2002. Hall then filed a second § 2255 motion to vacate in June 2002, and he filed an amended version of this motion to vacate in September 2002. In this second amended motion, Hall raised twelve claims for relief from his conviction and sentence.[2] *See Hall v.* **\*513** *United States,* No. 4:00–CV–422–Y, slip op. at 6, 2004 WL 1908242 (N.D.Tex. Aug. 24, 2004) [hereinafter Dist. Ct. Op.].

The government filed a response to this second amended motion to vacate in January 2003, and Hall replied in March 2003. On June 7, 2004, the district court conducted an evidentiary hearing limited to the extraneous influence on the jury issues raised by Hall's third, fourth, and fifth claims for relief, which were grouped together by the district court as issue C in the list reproduced in note 2 *supra.* On August 24, 2004, the district court issued a comprehensive, careful memorandum opinion and order, denying all of the claims presented in Hall's § 2255 motion for relief.

Hall filed a notice of appeal from the district court's order denying his § 2255 motion on November 9, 2004, and he applied to the district court for a certificate of appealability ("COA") on that same date as well. The district court denied Hall's COA application on December 6**,** 2004, citing *Hernandez v. Johnson,* 213 F.3d 243, 248 (5th Cir.2000), and finding that Hall had failed to make a substantial showing of the denial of a federal constitutional right. On July 18, 2005, Hall filed the present application for a COA with this court.

## II. DISCUSSION

 **[1]** **[2]** **[3]** **[4]** This court may not consider an appeal from the denial of a 28 U.S.C. § 2255 motion for relief unless either the district court or this court issues a COA. 28 U.S.C. § 2253(c)(1)(B). To obtain a COA, an applicant such as Hall "must make a substantial showing of the denial of a constitutional right." *United States v. Garza,* 165 F.3d 312, 314 (1999) (citing 28 U.S.C. § 2253(c)(2), and *United States v. Kimler,* 150 F.3d 429, 431 n. 1 (5th Cir.1998)). An applicant such as Hall "need not establish that he will win on the merits"; rather, "he need only demonstrate that the questions he raises are debatable among reasonable jurists." *Garza,* 165 F.3d at 314 (citing *United States v. Rocha,* 109 F.3d 225, 227 n. 2 (5th Cir.1997)). "In determining whether to grant a COA, our inquiry is limited to a threshold examination

that 'requires an overview [of Hall's current claims] ... and a general assessment **\*514** of their merits.' " *Smith v. Dretke,* 422 F.3d 269, 273 (5th Cir.2005) (quoting *Miller–El v. Cockrell,* 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)). Because this matter involves a sentence of death, "any doubts as to whether a COA should be issued must be resolved" in Hall's favor. *Smith,* 422 F.3d at 273 (quoting *Hernandez,* 213 F.3d at 248) (internal alterations omitted).

Hall raises several distinct claims in his current application for a COA. First, Hall believes that a COA should issue to determine whether the district court erred in denying five of the specific substantive claims in his § 2255 motion. Second, Hall claims a COA should issue to address whether the district court erred by limiting the June 7, 2004, evidentiary hearing solely to his extraneous influence upon the jury claims. Third, Hall claims that a COA should issue to address whether the district court erred in denying all discovery. Fourth, Hall claims that a COA should issue to determine whether the district court erred in denying him reasonable additional funds to develop further evidence. Finally, Hall claims that this court should assign a new judge if it decides that a remand is necessary. The government has provided substantive and direct responses to all of the claims discussed above.[3]

The remainder of this opinion will discuss the claims in Hall's application for a COA, and the government's substantive response to these claims, in greater detail. Because both Hall and the government devote most of their attention to Hall's five general merits claims—particularly his ineffective assistance of counsel claim—these will be addressed first, together with related procedural claims.

### A. Hall's Substantive Claims

In his current application for a COA, Hall reiterates five of the substantive claims from his § 2255 motion: his ineffective assistance of counsel claim, his extraneous influence on the jury claim, his incomplete indictment claim, his prosecutorial misconduct claim, and his selective prosecution claim. Related to these five claims is his procedural claim that the district court erred in limiting the evidentiary hearing to the extraneous influence on the jury claim. Of the five substantive claims, the ineffective assistance of counsel claim is the most important to his current application; in his brief before this court, Hall acknowledges that the "centerpiece of this case is ... [the] penalty-phase IAC [ineffective assistance of counsel] claim." Therefore, the ineffective assistance of counsel claim will be considered first, and **\*515** the

Supp. App. 137

sentencing component of this claim will be considered most extensively.

*1. Hall's Ineffective Assistance of Counsel Claim*

In the proceedings before the district court, Hall claimed that his trial counsel was constitutionally ineffective on twelve separate grounds, all of which are substantially reiterated in his current application for a COA.[4] After separately and extensively considering each of Hall's arguments, the district court concluded that Hall received "constitutionally effective assistance of counsel at his trial" because his attorneys "conducted reasonable investigations in all areas of the case ... vigorously cross-examined government witnesses ... ably argued all objections and points of law; and eloquently defended their client in their closing statements." The government now argues that the "record demonstrates that the [district] court conducted an exhaustive review of each of Hall's claims, and properly denied relief. No COA should issue because no court would resolve Hall's issues in a different manner." Hall believes that each of his twelve grounds was sufficient to support his ineffective assistance of counsel claim, and in his current application for a COA, he argues that reasonable jurists could debate the district court's decision on each of these twelve grounds.

**[5]** To establish ineffective assistance of counsel, Hall must satisfy a two-part test and show both that his counsel's performance was deficient and that he was actually prejudiced by the deficient performance. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (stating that an ineffective assistance of counsel claim has "two components" and requiring convicted defendants to show both that "counsel's performance was deficient" and "that the deficient performance prejudiced the defense"). We determine whether counsel's performance was deficient "by examining whether the challenged representation fell below an objective standard of reasonableness." *Cotton v. Cockrell,* 343 F.3d 746, 752 (5th Cir.2003) (citing *Kitchens v. Johnson,* 190 F.3d 698, 701 (5th Cir.1999)). Crucially, "a fair assessment" of counsel's challenged **\*516** conduct requires reviewing courts to make "every effort ... to eliminate the distorting effects of hindsight ... and to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. When it has been shown that " 'counsel made an adequate investigation,' " we have held that " 'any strategic decisions made as a result of that investigation fall within the wide range of

objectively reasonable professional assistance.' " *Cotton,* 343 F.3d at 752 (quoting *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir.2002)). Of course, even if Hall could establish that his counsel's performance was deficient, satisfying the first step of the *Strickland* test, he would also have to establish that the " 'prejudice caused by the deficiency is such that there is a reasonable probability that the result of the proceedings would have been different[,]' " thereby rendering the trial " 'fundamentally unfair or unreliable.' " *Cotton,* 343 F.3d at 753 (quoting *Ransom v. Johnson,* 126 F.3d 716, 721 (5th Cir.1997)). But because, as will be discussed immediately below, no reasonable jurist could debate the district court's conclusion that Hall's counsel provided reasonable, vigorous, and thorough assistance at Hall's trial and sentencing, we need not address this second step of the *Strickland* test, and so we will not consider whether the errors Hall alleges could have prejudiced his defense.

*a. Hall's Mitigation Arguments*

**[6]** The acknowledged "centerpiece" of Hall's current application for a COA is his argument that his trial counsel failed to present various mitigation evidence and arguments at Hall's sentencing because they failed to conduct an objectively reasonable investigation into Hall's family background. We observed, when considering Hall's direct appeal, that

> [i]n support of his claim that he experienced an upbringing that militated against the imposition of the death penalty, Hall offered only the testimony of two of his family members[5] .... Additionally, this testimony indicated that Hall was not himself the object of his father's abuse and that, throughout his childhood, Hall attended school and church and was properly housed, fed, and clothed.

*Hall,* 152 F.3d at 413. Hall now argues that his upbringing was somewhat more difficult than we recognized on direct appeal. More specifically, Hall now argues that he was beaten with belts and switches by both of his parents, but particularly his father, as a form of discipline, and he argues that this discipline constituted abuse. He also argues that his trial counsel failed to present evidence of this alleged abuse because they failed to adequately investigate his background before sentencing, and he concludes that his trial counsel's failure to present evidence of this abuse substantially prejudiced his defense at sentencing, constituting ineffective assistance of counsel. In support of this argument, Hall

Supp. App. 138

submitted several highly detailed declarations from family members and assorted experts along with his second amended § 2255 motion.

Although we did not consider some of the allegations presented in these declarations during Hall's direct appeal, we did consider the significant evidence, presented by Hall's trial counsel to the jury, which **\*517** demonstrated that Hall's upbringing was marked by violence. As we stated in Hall's direct appeal, his trial counsel presented uncontroverted evidence that his mother was repeatedly beaten by his father throughout his childhood.[6] *See Hall,* 152 F.3d at 413 (noting the "uncontroverted testimony that Hall's father ... beat Hall's mother throughout their marriage"). Moreover, we observe that in reviewing Hall's argument, "our principal concern ... is not whether counsel should have presented a mitigation case" of the sort Hall envisions. *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052). "Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Hall's] background *was itself reasonable.*" *Id.*

To support his current argument that his trial counsel's investigation was objectively unreasonable and therefore deficient, Hall has presented declarations from various experts purporting to show that his trial counsel fell short of then-prevailing professional norms requiring a wide-ranging and thorough inquiry into his family, medical, and social history. Hall believes that these expert declarations demonstrate that his trial counsel failed to conduct sufficiently extensive interviews with his family members about his alleged childhood abuse. At the very least, he argues that these declarations have created a fact question on this issue because they conflict with affidavits given by his trial counsel and submitted by the government defending the sufficiency of the mitigation investigation.

Even if these expert declarations are assumed to be true, no reasonable jurist could debate the district court's conclusion that the mitigation investigation of Hall's counsel was objectively reasonable. To begin, Hall's trial counsel spoke with Hall and presented him with a lengthy questionnaire. From the questionnaire and their initial conversations, Hall's trial counsel learned that Hall felt that he had a reasonably happy and peaceful childhood, although Hall also indicated that he had been whipped when he was bad. Hall's trial counsel also made use of a private investigator to help evaluate and investigate Hall's background. Hall's

trial counsel also interviewed Hall's mother and sister Cassandra, who told him that Hall's father had extremely violent tendencies. Based on these interviews, Hall's trial counsel decided to call both women to testify. Hall's trial counsel also employed the services of a mitigation specialist named Tena Francis ("Francis"), who has since submitted multiple declarations castigating Hall's trial counsel for, inter alia, failing to employ her earlier and failing to adopt all of her tactical litigation suggestions. Notwithstanding her subsequent critical declarations, Francis interviewed additional family members and a minister familiar with Hall's childhood and background while she was employed by Hall's trial counsel, and she sent summaries of these **\*518** interviews to Hall's trial counsel before sentencing.[7]

Although Hall's experts have attacked some of the strategic and tactical litigation decisions made by Hall's trial counsel, they have not raised serious fact questions about the reasonableness of the investigation upon which those litigation decisions were made. The crux of Hall's current argument is that Hall's trial counsel conducted an insufficient investigation either because counsel was unaware that Hall had been physically abused as a child or because counsel was unaware that the violent discipline inflicted upon Hall constituted abuse.[8] The government has provided affidavits from Hall's trial counsel which contradict these points,[9] but more importantly, this core of Hall's argument is also **\*519** clearly and directly contradicted by the declarations that he has presented and upon which he now relies. In both her declaration given on June 11, 2002, and her declaration given on March 11, 2003, after she reviewed one of Hall's counsel's affidavits, Francis repeatedly stated that Hall's trial counsel "was informed, by me [Francis] ... that the Hall children had been subjected to serious domestic violence in the family throughout their childhoods," and she also repeatedly acknowledged that Hall's trial counsel subsequently and repeatedly tried to discuss this issue with Hall's mother, but that "her [Hall's mother's] answers lacked the kind of details I [Francis] had noted in my reports." Therefore, even if the declarations presented by Hall are assumed to be true, Hall's central argument lacks support. Contrary to the conclusory allegations found in Hall's application for a COA and Miller's declaration, it is clear that: Hall's trial counsel was aware that Hall had been subjected to physical discipline as a child; Hall's trial counsel was aware of expert opinions that this discipline constituted abuse; Hall's trial counsel personally conducted further investigation and also directed Francis to conduct further investigation into this issue; and finally, Hall's trial counsel attempted, albeit unsuccessfully, to elicit

Supp. App. 139

testimony about this issue from the family witnesses who were reasonably chosen to testify at Hall's sentencing.

In light of Hall's counsel's considerable prior experience and thorough efforts to investigate the potential mitigation case that Hall now describes, no reasonable jurist could debate the district court's conclusion that "Hall's counsel performed a reasonably substantial and independent investigation into potential mitigating circumstances and therefore did not provide ineffective assistance of counsel." Therefore, Hall is not entitled to a COA on this issue. Moreover, because this conclusion is supported not only by the subsequent affidavits submitted by the government *but also by the very declarations upon which Hall now relies,* no reasonable jurist could debate the district court's conclusion that the declarations submitted by Hall have failed to "create any contested fact issues." Accordingly, because Hall's expert declarations have failed to create a contested fact issue about the objective reasonableness of his trial counsel's mitigation investigation, no reasonable jurist could debate the district court's decision not to provide an evidentiary hearing to address this issue. As a result, Hall is not entitled to a COA based on the district court's limitation on the evidentiary hearing.

Contrary to the arguments advanced in Hall's reply brief, our recent decision in *Smith v. Dretke,* 422 F.3d at 269, does not directly control this application for a COA. In *Smith,* we granted an application for a COA based in part on our holding that "reasonable jurists could debate whether the [mitigation] investigation that supported trial counsel's strategy at sentencing was reasonable and adequate." 422 F.3d at 284. In his reply brief, Hall argues that our opinion in *Smith* illustrates why Hall's application also merits a COA. But whatever superficial similarities Hall's application may bear to the application we considered in *Smith,* several critical distinctions prevent the direct application of *Smith*'s holding to this matter. Unlike Hall's trial counsel, the trial counsel in *Smith* could not remember specific details about their background investigation, such as "exactly who they contacted or what was learned from the individuals they contacted," and the record in *Smith* tended to "support[ ] the conclusion that trial counsel only contacted those individuals who actually testified at trial," whereas the record **\*520** in this matter indicates that Hall's trial counsel conducted a much broader investigation. *Id.* at 277. Moreover, unlike Hall's trial counsel, the trial co-counsel in *Smith* provided substantive statements about the defendant's background which were directly "contrary to the actual testimony presented at sentencing ...." *Id.* at 281. Based on these and

other shortcomings without parallel in the matter at hand, we held in *Smith* that "reasonable jurists could debate whether trial counsel conducted a reasonable investigation." *Id.* But because these concerns are not raised by Hall's application for a COA, *Smith* does not control this application for a COA.

### b. *Hall's Additional Ineffective Assistance of Counsel Arguments*

**[7]**    In addition to the mitigation arguments discussed above, Hall has provided six additional specific ineffective assistance of counsel arguments which he believes merit a COA. First, Hall argues that his trial counsel failed to adequately prepare for and cross-examine Larry Nichols, a former cellmate of Hall's. Second, Hall argues that his trial counsel failed to obtain an opportunity for allocution for Hall. Third, Hall argues that his trial counsel failed to effectively argue several motions for a continuance. Fourth, Hall argues that his trial counsel failed to effectively conduct voir dire. Fifth, Hall argues that his trial counsel failed to present an effective closing argument. Sixth, Hall argues that his trial counsel failed to present adequate evidence of Hall's good conduct during his past incarceration. The district court reviewed all of these claims individually and in detail before denying Hall's ineffective assistance of counsel claim, and no reasonable jurist could debate the district court's conclusions. These arguments each "essentially come[ ] down to a matter of degrees[,]" and we have held in the past that these sorts of questions "are even less susceptible to judicial second-guessing" than most ineffective assistance of counsel arguments. *Kitchens,* 190 F.3d at 703; *see also Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir.2000) (citing *Kitchens* and *Strickland,* and stating the need to be "particularly wary" of arguments that second-guess the performance of trial counsel by a matter of degrees). Because Hall has offered little more than his displeasure with the outcome of his trial and sentencing hearing to support these arguments, no reasonable jurist could debate the district court's decision to deny him relief on these grounds, and no reasonable jurist could debate the district court's refusal to consider these grounds during its evidentiary hearing. Therefore, Hall is not entitled to a COA on these substantive issues, and he is not entitled to a COA based on the district court's decision to limit the evidentiary hearing.

**[8]**    Hall also claims that he is entitled to a COA on his ineffective assistance of counsel claim because of the cumulative effect of the various errors he alleges. Our clear

Supp. App. 140

precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions. *See Miller v. Johnson,* 200 F.3d 274, 286 n. 6 (5th Cir.2000) (stating that in the absence of specific demonstrated error, a defendant cannot, by definition, show that cumulative error of counsel deprived him of a fair trial); *Yohey v. Collins,* 985 F.2d 222, 229 (5th Cir.1993) (stating that because certain alleged errors did not rise to constitutionally ineffective assistance of counsel, and because certain other claims were meritless, a petitioner had "presented nothing to cumulate"). Accordingly, no reasonable jurist could debate the district court's conclusion that the cumulative effect of the **\*521** alleged errors did not constitute ineffective assistance of counsel, and Hall is not entitled to a COA on this issue.

### 2. Hall's Extraneous Influence on the Jury Claim

 **[9]**  Hall's extraneous influence on the jury claim is based on two incidents that allegedly occurred during the trial. First, Hall alleges that juror Jacqueline Holmes ("Holmes") had contact during Hall's trial with Hall's victim's mother. This first allegation is based on letters allegedly written by Holmes to Hall in prison after the conclusion of Hall's trial. Second, Hall alleges that at least one juror—who may or may not have been Holmes—attended an event at which prayers were offered for Hall's victim.

As discussed above, the district court conducted an evidentiary hearing to resolve this claim on June 7, 2004, and at this hearing, Holmes testified under oath. With respect to Hall's first allegation, Holmes admitted that she had written letters to Hall after the trial. She also admitted that in these letters she stated that she had met Hall's victim's mother during the course of the trial. At the evidentiary hearing, however, Holmes maintained that these post-trial letters to Hall were not true: she testified that she had never met the victim's mother, and she claimed that she had lied in her letters in order to encourage Hall's correspondence with her. With respect to Hall's second allegation, Holmes testified that she had not attended any prayer ceremony of the sort described by Hall, nor was she aware of any other juror who had done so. *Id.*

With respect to Hall's first allegation, the district court found Holmes's testimony during the evidentiary hearing "to be credible," and therefore ruled that "Hall has not established that any inappropriate ex parte contact occurred." With respect to Hall's second allegation, the district court stated that even

[a]ssuming that this allegation is indeed true, and [a juror] attended [a prayer ceremony], it is not evidence that there was *any* outside influence on the jury. Instead Hall offers merely *speculation* that there may have possibly been some unknown person at the [prayer ceremony] who said something to the juror that influenced her vote. Mere speculation that some discussion between a juror and an unknown person occurred does not establish that extrinsic evidence entered the jury deliberations, especially where Jacqueline Holmes's sworn testimony is that she does not recall any juror discussing a [prayer ceremony], much less any prayer offered on behalf of the victim [during the jury's deliberations].

*Id.* at 66–67.

In his current application, Hall argues that he is entitled to a COA on this extraneous influence on the jury claim because reasonable jurists could debate the district court's conclusion and with the limitations the district court imposed on the evidentiary hearing it held on this issue.[10] But by holding the evidentiary hearing, the court **\*522** provided Hall with sufficient opportunity to investigate his first allegation about Holmes's conduct, and it found Holmes's direct testimony credible. No reasonable jurist could find fault with either the district court's method or conclusion, particularly in light of the limitations on a juror's testimony on any individual juror's deliberations or the jury's collective deliberations. *See, e.g., United States v. Ruggiero,* 56 F.3d 647, 652 (5th Cir.1995) (reviewing the limitations on subsequent testimony about juror deliberations set forth by this court's precedent and Federal Rule of Evidence 606(b)). With respect to Hall's second allegation, no reasonable jurist could debate the district court's conclusion that Hall has merely offered speculative and conclusory allegations that "are insufficient to raise a constitutional issue." *United States v. Pineda,* 988 F.2d 22, 23 (5th Cir.1993) (quoting *United States v. Woods,* 870 F.2d 285, 288 n. 3 (5th Cir.1989)).

### 3. Hall's Incomplete Indictment Claim

In his second amended § 2255 motion, Hall claimed that the original indictment against him violated his Fifth Amendment rights because it did not allege the aggravating circumstances and the culpable mental state that made him eligible for the death penalty. The district court denied this claim for relief, after applying our recent precedent and the recent precedent of the Supreme Court. *See* Dist. Ct. Op. at 13–16 (citing, inter alia, *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), *United States v. Robinson,* 367 F.3d

278 (5th Cir.2004), *United States v. Matthews,* 312 F.3d 652 (5th Cir.2002), and *United States v. Brown,* 305 F.3d 304 (5th Cir.2002)). In his current application for a COA, Hall acknowledges the contrary precedent of this court and the Supreme Court cited by the district court—precedent that we must follow. Because Hall concedes in a footnote that he has included this claim in his current application in order "to preserve this issue for further review[,]" we will not consider this claim any further.

### 4. Hall's Prosecutorial Misconduct Claim

 **[10]**  Hall's prosecutorial misconduct claim revolves around Larry Nichols ("Nichols"), one of Hall's fellow inmates who provided testimony against Hall during the sentencing phase of Hall's trial. More specifically, Hall now claims that the government concealed Nichols's full criminal history from Hall, violated Hall's Sixth Amendment rights by deliberately using Nichols to elicit information from Hall outside the presence of Hall's counsel, and encouraged or tolerated perjury by Nichols.

In denying Hall's § 2255 motion, the district court held that these claims of prosecutorial misconduct lacked factual support. The district court found, based on a review of the trial record and an affidavit from Hall's trial counsel, that the government did not withhold any information about Nichols's prior criminal conduct from Hall's trial counsel. The district court also recognized that Hall's Sixth Amendment rights were not violated for two reasons: first, because Nichols's testimony directly contradicts Hall's claims; and second, because the very text of the report Hall selectively cites undercuts his claims. Finally, the district court found that Hall failed to show that Nichols's allegedly false statements about his prior criminal behavior or his prior contact with the government were material. *See, e.g., United States v. O'Keefe,* 128 F.3d 885, 893–94 (5th Cir.1997) (stating that a conviction obtained through the use of false testimony cannot be overturned unless the allegedly false statements were material). Because no reasonable jurist could debate **\*523** the district court's conclusions, no COA should issue on Hall's claim of prosecutorial misconduct. Additionally, because Hall has failed to raise any contested fact issues about the alleged prosecutorial misconduct, no reasonable jurist could debate the district court's decision not to provide an evidentiary hearing to address this issue, and Hall is not entitled to a COA based on the district court's limitation on the evidentiary hearing.

### 5. Hall's Selective Prosecution Claim

 **[11]**  Hall also argues that a COA should issue because reasonable jurists could conclude the district court erred in denying Hall's selective prosecution claim. In denying Hall's § 2255 motion, the district court found that Hall's statistics fell short of establishing a prima facie selective prosecution case under the standard set forth in *United States v. Armstrong,* 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). *Armstrong* requires a defendant such as Hall to show that federal prosecutorial policy had both a discriminatory effect *and* a discriminatory intent; in this matter, as the district court and the government both point out, Hall has not provided any direct evidence of discriminatory intent. Furthermore, the district court noted that Hall's statistical evidence is similar to evidence rejected by this court in the past. Dist. Ct. Op. at 86–87 (citing, inter alia, *United States v. Jones,* 287 F.3d 325, 333–35 (5th Cir.2002); *United States v. Webster,* 162 F.3d 308, 333–35 (5th Cir.1998)). Because no reasonable jurist could debate the district court's conclusions, no COA should issue on this claim. Additionally, because Hall has failed to raise any contested fact issues about the alleged selective prosecution, no reasonable jurist could debate the district court's decision not to provide an evidentiary hearing to address this issue, and Hall is not entitled to a COA based on the district court's limitation on the evidentiary hearing.

### B. Hall's Procedural Claims

In addition to the substantive and procedural claims considered above, Hall has raised two other procedural claims in this application for a COA.[11] First, Hall argues that a COA is appropriate because reasonable jurists could debate the district court's blanket denial of discovery. Second, Hall argues that the district court's denial of Hall's request for funds to develop evidence merits a COA. In explaining why none of Hall's substantive claims merits a COA, we have also explained why the district court's decision to limit the evidentiary hearing does not merit a COA. Similarly, because Hall has not raised any contested fact issues that might entitle him to relief, no reasonable jurist could debate the district court's decisions to deny his motions for discovery.

 **[12]**  We now turn to Hall's final remaining claim, that a COA should issue because the district court denied him "reasonably necessary funds" to develop supporting evidence. In responding to Hall's denial of funds claim, the government observes that Hall has wholly failed to identify any specific needs for additional post-conviction funded investigation. Moreover, as the government also observes,

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

despite this alleged lack of sufficient funding, Hall has provided several expert declarations and evaluations related to his ineffective assistance of counsel claim. In the past, "this court has held that a COA is **\*524** not necessary to appeal the denial of funds for expert assistance," reviewing such claims directly for abuse of discretion. *Smith,* 422 F.3d at 288 (citing *Hill v. Johnson,* 210 F.3d 481, 487 n. 3 (5th Cir.2000)).

Most of our past holdings, however, relied on the text of 21 U.S.C. § 848(q)(4)(B), which was recently repealed by the USA Patriot Improvement and Authorization Act of 2005, Pub. L. No. 109–177, Title II, §§ 221(4), 222(c), 120 Stat. 192, 231–32 (2006). *See Smith,* 422 F.3d at 287–88 (relying upon the text of 21 U.S.C. § 848(q)(4)(B)); *Hill,* 210 F.3d at 487 n. 3 (stating that "[a] COA is not required for appeals under § 848(q)(4)(B)"); *cf. Jackson v. Dretke,* No. 05–70014, 2006 WL 1308063, at \*10 (5th Cir. May 11, 2006) (citing *Hill* and *Smith,* without citing any statutory provision, and stating that a "COA is not required to appeal the denial of funds for expert assistance"). Moreover, the government's brief, which predates the enactment of the USA Patriot Improvement and

Authorization Act of 2005, does not request direct review and the abuse of discretion standard, but instead simply claims that Hall's claim for a COA based on insufficient funding lacks all merit. In any event, because Hall has not pointed to any specific needs or limitations caused by the alleged lack of funds, his funding claim fails whether it is considered as a claim for a COA or a claim on direct review. No reasonable jurist could debate the district court's funding decisions, and therefore the district court's decision to deny Hall's overbroad funding requests could not have been an abuse of discretion.

III. CONCLUSION

For the reasons discussed above, Hall's application for a COA is DENIED.

**All Citations**

455 F.3d 508

Footnotes

1   Hall was sentenced to death for the kidnapping conviction, life imprisonment for the conspiracy conviction, and sixty months imprisonment for each of the remaining two convictions.

2   The district court found that the twelve claims listed in Hall's motion raised nine issues, specifically whether:

   A. Hall's rights under the Fifth Amendment were violated because the indictment against him did not allege any aggravating factors that rendered Hall eligible for the death penalty (claim one).

   B. Hall was denied his Sixth Amendment right to the effective assistance of counsel (claim two).

   C. A juror's contact with the victim's family and other extraneous information that entered into the jury's deliberations violated Hall's rights under the Fifth, Sixth, and Eighth Amendments (claims three through five).

   D. The government violated Hall's rights under the Fifth and Sixth Amendments by failing to disclose exculpatory and mitigating information concerning government witness Larry Nichols (claim six).

   E. Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated because of false testimony given by government witnesses Larry Nichols and Steven Beckley (claims seven and twelve).

   F. The government violated Hall's Sixth Amendment rights by using jail inmate Larry Nichols to elicit information from Hall (claim eight).

   G. Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated when the government provided a statement to the defense made by Alonso Airy that contained false information for the purpose of dissuading the defense from calling Airy to the stand (claim nine).

   H. The government interfered with Hall's Sixth Amendment right to counsel when it advised his initial defense attorneys about information that Hall intended to kidnap the attorneys in an escape attempt (claim ten).

   I. Hall's rights under the Fifth And [sic] Eighth Amendments were violated by the racially discriminatory effects of the federal capital sentence scheme (claim eleven).

   *Hall v. United States,* No. 4:00–CV–422–Y, slip op. at 6–7, 2004 WL 1908242 (N.D.Tex. Aug. 24, 2004) [hereinafter Dist. Ct. Op.]. The district court also noted that Hall moved for "an evidentiary hearing before this Court on all of his claims." *Id.* at 7.

3   In responding to Hall's second amended § 2255 motion, the government also argued that Hall was "procedurally barred from raising all but his second and part of his third through fifth claims for relief because [the barred claims] were not raised on direct appeal and he has failed to allege any cause and prejudice for the procedural default." Dist. Ct. Op. at 7–8.

The district court was not persuaded by the government's procedural objections. Although it recognized that many of the claims "were not raised on direct appeal and are not based on new law or facts," the district court chose to address the claims "in the interests of justice" because "Hall ... alleged that his appellate counsel was ineffective for not raising these claims." Dist. Ct. Op. at 8.

In responding to Hall's current application for a COA, the government briefly observes (in a single footnote) that it "is not abandoning any of those procedural bars," and it argues that "[i]n the event this Court elects to grant COA on any issue, the government will rely on those procedural bars in its [subsequent] response." Gov't Br. at 8 n.1. Because these arguments have not been sufficiently briefed at this stage, we will not consider them at any greater length.

More specifically, Hall contended that his trial counsel was constitutionally ineffective for:

1) failing to conduct a timely investigation into potential mitigating evidence, thereby emphasizing some evidence while not presenting more persuasive mitigating evidence through additional witnesses and presenting ill-prepared witnesses;

2) failing to present documentary evidence at the punishment phase of the trial to corroborate testimony;

3) failing to call available and known witnesses to testify at punishment;

4) failing to question government witnesses in order to present additional mitigating evidence;

5) failing to appropriately cross-examine government witness Larry Nichols at the punishment phase;

6) failing to re-interview a potential defense witness after he appeared to have altered his testimony;

7) failing to make a closing argument at the guilt phase of the trial;

8) failing to argue effectively that Hall should have been allowed to make a statement in allocution;

9) making uninformed and unreasonable decisions regarding their choice and use of witnesses;

10) failing to adequately argue their motions for continuance;

11) making an ineffective closing argument at the punishment phase; and

12) failing to conduct an adequate voir dire.

Dist. Ct. Op. at 16–17. Although Hall has reordered, combined, and separated these twelve grounds in his current application for a COA, they are substantially the same as the grounds considered by the district court.

The two family members who testified at Hall's trial were Hall's mother and his sister Cassandra, whose car and apartment were used in Rene's abduction. Both offered uncontroverted testimony that Hall's father beat Hall's mother throughout their marriage, until the marriage ended in divorce when Hall was fifteen. *See Hall,* 152 F.3d at 413.

More specifically, Hall's mother testified at trial that Hall's father:

was abusive towards her [Hall's mother] during most of their marriage including when she was pregnant; that she had been beaten with the butt of a gun, by a two-by-four, and with fists; that her teeth were knocked out; that she was dragged out of bed and beaten ... after getting home from work or from a store; that this was all done in front of the children; that the children tried to intervene, but would get knocked around themselves; that the police were called several times, but arrested [Hall's father] on only one occasion; that Hall would physically protect her from [Hall's father]; and that she stayed with [Hall's father] because she had small children and had no place to go ....

Dist. Ct. Op. at 27–28 (citing R. 18:113–116).

Hall's trial counsel ultimately decided against calling these additional family members as witnesses for tactical reasons. In denying Hall's § 2255 motion, the district court examined this decision and concluded that "[i]t was reasonable ... not to call as witnesses a father who was opposed to testifying, two brothers who were imprisoned criminals themselves, and a sister who at the time remained hostile to her brother, notwithstanding what they now state they would have testified to at trial." Dist. Ct. Op. at 30.

More specifically, Hall's father was opposed to testifying in large part because of his reluctance to admit to his extensive physical abuse of Hall's mother. One of the two brothers in question had been incarcerated for firing a gun into a crowd and injuring nine people; the other brother was in prison for drug possession. Finally, the sister in question was opposed to testifying because "she was very angry ... at Hall for lying to her about his involvement [in Rene's kidnapping and death] and for involving [their brother] Demetrius Hall [in Rene's kidnapping and death]." Dist. Ct. Op. at 30. No reasonable jurist could debate the district court's conclusion that Hall's counsel acted reasonably in choosing not to call these additional witnesses.

This core of Hall's argument can be found in the declaration of Jill Miller ("Miller"), a forensic social worker, whose declaration was submitted along with Hall's second amended § 2255 motion. In her declaration, Miller stated:

First, this characterization—that the Hall children were not "abused"—was incorrect. The physical discipline imposed on the children in this family, by both parents, was unduly harsh and rose to the level of abuse .... [Furthermore,] the dynamics and effects of family violence cannot be uncovered simply by asking someone if she was "abused." ...

Supp. App. 144

Counsel's examination of these witnesses reflects a failure to grasp this basic principle .... At the same time, the true extent and severity of the physical beatings [visited on Hall's mother and her children] were not communicated by the testimony actually presented at [Hall's] penalty phase.

Miller Decl. (June 12, 2002) at 17.

According to one of his trial counsel's affidavits, Hall himself indicated that he had been whipped by his parents during counsel's first interview with Hall, and his subsequent, thorough investigation into Hall's background was based on his knowledge, resulting from extensive experience, "that defendants in that situation cannot necessarily be relied upon to be one-hundred percent truthful and forthcoming." Ware Aff. (Jan. 15, 2003) at 3, 5.

Hall's counsel also stated that after he directed Francis to interview Hall's additional family members and conduct further background investigation, she "later reported ... that she was sure that there must have been severe child abuse in the home, including abuse of the defendant ...." However, despite subsequent interviews, counsel was unable to elicit any further information about this alleged abuse from Hall's mother and sister, the witnesses who were reasonably chosen to testify at Hall's sentencing. Ware Aff. (Jan. 15, 2003) at 20 ("Although I spoke with them on additional occasions neither Cassandra [Hall's sister] nor [Hall's mother] nor the defendant ever said anything that supported Tena Francis's feeling that the defendant must have been physically abused as a child .... When I traveled to Arkansas and again interviewed [Hall's mother], she did not indicate anything of much additional significance on those particular topics, although, once again I asked her about them specifically after ... explaining the significance of such information.")

In particular, Hall argues that the evidentiary hearing was insufficient because Hall lacked access to videotaped interviews with the jurors. In response, the government observes that "[s]ecuring a copy of the broadcast [interviews] ... would bring Hall no closer to showing an illegal or prejudicial intrusion into the jury process" because Hall's allegations still fail to demonstrate "that any extraneous evidence was introduced into the jury's deliberations, or that any juror violated the court's instructions to forego discussion about the case outside of the deliberation process, especially given the testimony from Holmes." Gov't Br. at 31 (citing, inter alia, *United States v. Riley,* 544 F.2d 237, 242 (5th Cir.1976); *United States v. Ianniello,* 866 F.2d 540, 543 (2d Cir.1989)).

In his application for a COA, Hall also argued that this case should be reassigned if a remand was necessary in order to foreclose any claim of waiver. Because we have denied his application for a COA without remanding any issue to the district court, this claim is mooted.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———

No. 16-10670

———

In re:  ORLANDO CORDIA HALL,

　　　　Movant.

———

Motion for an Order Authorizing
the United States District Court
for the Northern District of Texas
to Consider a Successive 28 U.S.C. § 2255 Motion

———

Before STEWART, Chief Judge, JOLLY and SMITH, Circuit Judges.

PER CURIAM:

Orlando Hall, a federal death-row prisoner, moves for authorization to file a successive 28 U.S.C § 2255 motion.  He may do so if he makes a *prima facie* showing that, as he asserts, his claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."  28 U.S.C. § 2255(h); *Reyes-Requena v. United States*, 243 F.3d 893, 897–98 (5th Cir. 2001).

Hall was convicted of one count of kidnapping in which a death occurred, conspiracy to commit kidnapping, traveling in interstate commerce to promote

No. 16-10670

possession of marihuana with intent to distribute, and using and carrying a firearm during and in relation to a crime of violence, namely kidnapping and conspiracy to commit kidnapping, in violation of 18 U.S.C. § 924(c). The relevant subpart of § 924(c)—the "residual clause"—states,

> (3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and
>
> . . . .
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3)(B). In *Johnson v. United States*, 135 S. Ct. 2551, 2555–57, 2563 (2015), the Court held that the residual clause of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(ii), is unconstitutionally vague. Hall seeks application of *Johnson* to the differently worded "crime of violence" definition quoted above.

*Johnson* announced a new rule of constitutional law that has been made retroactive by the Supreme Court to cases on collateral review. *Welch v. United States*, 136 S. Ct. 1257, 1264–65 (2016). But *Johnson* did not address § 924(c)(3)(B) or any similarly worded provision. Noting that undeniable fact, this court has now denied a motion for authorization to file a successive § 2255 motion, holding, in a binding, published opinion involving a similarly situated federal death-row prisoner, that "the Supreme Court has not taken a position on whether *Johnson* applies to section 924(c)(3)(B)," thus denying a motion for authorization to file a successive § 2255 motion. *In re Fields*, No. 16-50521, ___ F. 3d ___, 2016 U.S. App. LEXIS 11029, at *3 (5th Cir. June 17, 2016) (per curiam). "Further, even if *Johnson* does apply to that provision, the Supreme Court has not addressed whether this arguably new rule of criminal procedure applies retroactively to cases on collateral review." *Id.* *See also In re Arnick*, No. 16-10328, ___ F.3d ___, 2016 U.S. App. LEXIS 11030, at *2–3 (5th Cir.

2

No. 16-10670

June 17, 2016) (per curiam) (denying a motion for leave to file a successive § 2255 motion, under *Johnson*, regarding a provision of the U.S. Sentencing Guidelines).

Based on this court's new precedent in *Fields*, Hall's motion for authorization is DENIED.

3

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔦𝔣𝔱𝔥 𝔠𝔦𝔯𝔠𝔲𝔦𝔱

United States Court of Appeals
Fifth Circuit

**FILED**

October 30, 2020

Lyle W. Cayce
Clerk

No. 19-10345

In re: Orlando Cordia Hall,

*Movant.*

Motion for an order authorizing
the United States District Court for the
Northern District of Texas to consider
a successive 28 U.S.C. § 2255 application

Before Dennis, Ho, and Oldham, *Circuit Judges*.

James C. Ho, *Circuit Judge*:

Over two decades ago, Orlando Cordia Hall and his conspirators kidnapped and then repeatedly raped a 16-year-old high school student. They then took turns beating her with a shovel, before covering her with gasoline and burying her alive. A jury convicted Hall of four federal crimes and sentenced him to death. His convictions have been repeatedly and unanimously upheld on appeal, both on direct review and in two federal habeas petitions. He now seeks authorization to file a third federal habeas petition.

Among his four convictions, Hall was sentenced to death for the crime of kidnapping resulting in death. He does not challenge that conviction here, however. Instead, he challenges his conviction under 18 U.S.C. § 924(c) for carrying a firearm during a crime of violence. He argues, counterintuitively,

No. 19-10345

that kidnapping resulting in death is somehow not a proper predicate "crime of violence" to support a § 924(c) conviction. We disagree.

There are two ways for the Government to establish a "crime of violence" under 18 U.S.C. § 924(c)(3). A "crime of violence" includes any felony that either (A) "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" (commonly known as the "elements" clause), or (B) "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (commonly known as the "residual" clause).

The Supreme Court recently held the residual clause to be unconstitutionally vague in *Davis v. United States*, 139 S. Ct. 2319 (2019). So Hall hopes to challenge his § 924(c)(3) conviction by asking this court to apply *Davis* retroactively to his case. Because this is a successive federal habeas petition, however, he must show (among other things) that *Davis* has been "*made retroactive* to cases on collateral review *by the Supreme Court*." 28 U.S.C. § 2255(h)(2) (emphasis added).

There is no need to reach the residual clause issue, because as we shall explain, kidnapping resulting in death plainly satisfies the elements clause of § 924(c)(3). In doing so, however, we observe that he may not be entitled to relief under the residual clause either. We acknowledge that, according to five of our sister circuits, *Davis* was "made retroactive . . . by the Supreme Court" through its previous ruling in *Welch v. United States*, 136 S. Ct. 1257 (2016). But we are not so sure. The Government did not contest the issue

No. 19-10345

in any of those circuits, thus depriving those circuits of adversarial process.[1] Moreover, at least seven members of the federal judiciary—three of our colleagues and four Justices of the Supreme Court—have made clear that rulings such as *Davis* are not automatically retroactive, and thus must be made retroactive by the Supreme Court in a future case to comply with provisions such as 28 U.S.C. § 2255(h)(2).

We do not ultimately reach the residual clause issue, however, because we conclude that kidnapping resulting in death satisfies the elements clause of § 924(c)(3).  Accordingly, we deny Hall authorization to proceed on this successive habeas petition.

## I.

Hall's conspirators violently kidnapped a 16-year-old high school student, Lisa Rene, inside her apartment. *United States v. Hall*, 152 F.3d 381, 389 (5th Cir. 1998).  They tackled and dragged Rene to a car, where Hall was waiting and where he raped her.  Hall and his conspirators then took Rene from Arlington, Texas to Pine Bluff, Arkansas. *Id.*

The next day, Hall and his conspirators rented a motel room, where they tied their victim to a chair and raped her repeatedly. *Id.*  Hall and at least one conspirator were armed with handguns. *Id.*  One of the conspirators decided that Rene "kn[e]w too much," and so they went to Byrd Lake Park to dig a grave. *Id.*  One day later, Hall and his conspirators blindfolded Rene and took her to the grave site. *Id.* at 390.  There, they beat her over the head

---

[1] Nor did the Government contest the issue before our court.  So we appointed *amicus curiae* here to present the opposing view—just as the Supreme Court did in *Welch*.  Notably, the Government made clear during oral argument that it had no institutional objection to the contention by *amicus* that *Davis* is not retroactive for purposes of 28 U.S.C. § 2255(h)(2).

We thank *amicus curiae* for his excellent brief and oral argument.

Supp. App. 151

with a shovel. *Id.* She screamed and tried to escape, but they caught her and took turns beating her with a shovel. *Id.* One of the conspirators covered Rene in gasoline and they then buried her alive. *Id.*

Within a week, Hall and his conspirators were arrested and charged with Lisa Rene's kidnapping resulting in death. *Id.* Hall was convicted of four crimes: kidnapping resulting in death (death sentence), conspiracy to commit kidnapping (life imprisonment), traveling interstate to distribute drugs (sixty months served concurrently with the life sentence), and carrying a firearm during a crime of violence (sixty months to be served consecutively to the other sentences). *Id.*

Hall's trial and convictions occurred in 1995, and he brought his first § 2255 motion in 2002. *Hall v. United States*, 2004 WL 1908242, at *1 (N.D. Tex. Aug. 24, 2004). The district court denied Hall's motion, and our court denied his request for a certificate of appealability. *United States v. Hall*, 455 F.3d 508 (5th Cir. 2006). We also denied Hall's 2016 motion to file a second habeas petition. *In re Hall*, No. 16-10670, slip op. at *3 (5th Cir. June 20, 2016).

Hall now seeks authorization to file a third habeas petition under 28 U.S.C. § 2255 to challenge his yet-unserved sixty-month sentence for carrying and using a firearm during a crime of violence. He argues that *Davis v. United States*, 139 S. Ct. 2319 (2019), which set aside the residual clause of § 924(c)(3), requires that his conviction for carrying a firearm during a crime of violence also be set aside—and that vacatur of his § 924(c) conviction would somehow require vacatur of his death sentence as well. As we shall demonstrate, however, *Davis* left intact the elements clause of § 924(c), and the crime of kidnapping resulting in death falls within the elements clause.

4

Supp. App. 152

No. 19-10345

## II.

To satisfy the elements clause, a crime of violence must have as a required element "the use . . . of physical force." 18 U.S.C. § 924(c)(3)(A). The Supreme Court has defined "physical force" in this context to mean "*violent* force—that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010). And "force" includes "direct" and "indirect force," as well as "knowing or reckless conduct." *United States v. Reyes-Contreras*, 910 F.3d 169, 182–83 (5th Cir. 2018) (en banc).

Courts use the categorical approach to determine whether an offense fits within § 924's elements clause. *See, e.g., id.* at 174. That "requires us first to identify the crime of conviction." *Id.* Courts must "'look only to the statutory definitions'—*i.e.*, the elements—of [an offense], and not 'to the particular facts underlying those convictions.'" *Descamps v. United States*, 570 U.S. 254, 261 (2013) (quoting *Taylor v. United States*, 495 U.S. 575, 600 (1990)). Elements are the parts of a crime that the "prosecution must prove to sustain a conviction." *Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016) (quoting BLACK'S LAW DICTIONARY 634 (10th ed. 2014)).

When a statute lists multiple elements of conviction in the alternative, it is "divisible" into different offenses. *Id.* at 2249. To determine which offense formed the basis for the conviction, courts look to the trial record, "including *charging documents*, plea agreements, transcripts of plea colloquies, findings of fact and conclusions of law from a bench trial, and *jury instructions and verdict forms*"—a process known as the "modified categorical approach." *Johnson*, 559 U.S. at 144 (emphases added). *See also Shepard v. United States*, 544 U.S. 13 (2005).

The federal kidnapping resulting in death provision involves different elements of conviction from the general federal crime of kidnapping—

5

namely, the additional requirement that "the death of [a] person results"—and triggers an enhanced penalty. 18 U.S.C. § 1201(a). Accordingly, we conclude that kidnapping resulting in death is a different offense than generic kidnapping. *See, e.g.*, *Burrage v. United States*, 571 U.S. 204, 210 (2014) ("Because the 'death results' enhancement increased the minimum and maximum sentences to which Burrage was exposed, it is an element."); *United States v. Ruiz-Hernandez*, 890 F.3d 202, 210 (5th Cir. 2018) (similar).

Kidnapping resulting in death has as an element "the use . . . of physical force" as required under 18 U.S.C. § 924(c)(3)(A). We note that the Eighth Circuit recently reached the same conclusion. *See United States v. Ross*, 969 F.3d 829, 839 (8th Cir. 2020) ("Because the offense of kidnapping resulting in death has as an element the use of force, it is a crime of violence under § 924(c)."). And for good reason.

The "use of force" is not limited to the intentional or knowing use of force—it also includes conduct that recklessly disregards the risk of injury to another person. *See, e.g.*, *Voisine v. United States*, 136 S. Ct. 2272, 2279 (2016) ("[T]he word 'use' does not demand that the person applying force have the purpose or practical certainty that it will cause harm, as compared with the understanding that it is substantially likely to do so. . . . [T]hat word is indifferent as to whether the actor has the mental state of intention, knowledge, or recklessness with respect to the harmful consequences of his volitional conduct."); *Reyes-Contreras*, 910 F.3d at 183 ("[T]he 'use of force' does not require intent because it can include knowing or reckless conduct.").

This principle should decide this case, for it seems obvious that the act of kidnapping, and especially kidnapping *resulting in death*, necessarily contemplates the reckless disregard of the risk of serious injury to the victim. Judge Colloton put the point well, when he stated: "Reckless disregard for

Supp. App. 154

human life is *inherent* in the commission of felonies such as robbery and kidnapping that carry a grave risk of death." *Ross*, 969 F.3d at 839 (emphasis added). After all, "intentional kidnapping necessarily involves 'a deliberate decision to endanger another' that amounts to recklessness." *Id.* (quoting *Voisine*, 136 S. Ct. at 2279)). So "[w]here a perpetrator intentionally kidnaps a victim, and the kidnapping results in the victim's death, the perpetrator's mental state is sufficient to show that he necessarily 'used' force against the victim." *Id.*

We acknowledge that the Eighth Circuit decision was not unanimous. As the dissent there acknowledged, "[s]hooting someone multiple times in the course of a kidnapping sure sounds like a 'crime of violence.'" *Id.* at 845 (Stras, J., dissenting). But "[s]uppose that an individual gets in a car with a person impersonating an Uber driver and dies, either in a tragic car accident caused by the driver's recklessness or by jumping out after discovering the driver's true identity. Both scenarios qualify as kidnapping by 'inveigle[ment]' or 'decoy[ ],' and each 'results' in death. And critically, neither involves the use of force." *Id.* (citations omitted).

But we disagree that these hypothetical scenarios do not involve the use of force. We agree instead with Judge Colloton, who responds: "If a kidnapper inveigles a victim into his car and then causes her death by recklessly crashing the vehicle or prompting the victim to flee from the speeding car, the kidnapper's offense involves the use of force against the victim." *Id.* at 839. As he puts it, "[f]orce is necessary to kill the victim when she slams into the windshield or the pavement." *Id.* And "[t]he application of force is not an accident: when the perpetrator intentionally deceives and kidnaps the victim, he makes a deliberate decision to endanger her and acts with reckless disregard for her safety." *Id.* Put simply, the defendant uses force in keeping the victim against her will—and that act undoubtedly creates a serious risk that she will die trying to break free.

So we have no difficulty concluding that kidnapping resulting in death entails the kind of reckless conduct contemplated by the "use of force" required under 18 U.S.C. § 924(c)(3)(A). Nor do we see any real risk that the federal kidnapping statute could be read to cover conduct short of recklessness. Indeed, every case within our circuit involving the crime of kidnapping resulting in death has involved at least reckless conduct. *See, e.g.*, *United States v. Webster*, 162 F.3d 308, 322 (5th Cir. 1998); *United States v. Whitmore*, 386 F. App'x 464, 467–68 (5th Cir. 2010). So even if there were such a thing as "negligent" kidnapping—even if there were "a theoretical possibility" that a defendant could commit the crime of kidnapping resulting in death without knowingly, intentionally, or even recklessly employing physical force—there is no "realistic probability . . . that the [Government] would apply [the] statute to [such] conduct." *United States v. Castillo-Rivera*, 853 F.3d 218, 222 (5th Cir. 2017) (en banc) (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)).

This conclusion is further reinforced by the fact that Hall was charged with *the capital crime* of kidnapping resulting in death. As in any federal capital case, Hall's charging documents expressly incorporated the federal capital statute. *See* 18 U.S.C. § 3591(a)(2); *see also Hall*, 152 F.3d at 419 (noting that a "superseding indictment containing capital charges was returned on November 22, 1994"). So did the jury instructions. The trial judge instructed jurors that they "must as a preliminary matter unanimously agree that the government has proven beyond a reasonable doubt that the defendant, Orlando Cordia Hall . . . intentionally killed the victim" under 18 U.S.C. § 3591(a)(2). *United States v. Hall*, 4:94-CR-121-Y-2, Dkt. 458 at 4–5 (N.D. Tex., Nov. 3, 1995).

Any offense that incorporates the elements of 18 U.S.C. § 3591(a)(2) is a crime of violence. After all, that statute makes clear that no federal capital sentence shall be issued unless it is "determined beyond a reasonable doubt"

that the defendant "(A) intentionally killed the victim; (B) intentionally inflicted serious bodily injury that resulted in the death of the victim; (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act." 18 U.S.C. § 3591(a)(2). Any one of these provisions satisfies the elements clause of 18 U.S.C. § 924(c).

In sum, all federal capital charges must incorporate the required elements of § 3591(a)(2), and therefore necessarily satisfy the elements clause of § 924(c). So we have no difficulty concluding that capital kidnapping resulting in death is a crime of violence under the elements clause.

Hall's challenge to his § 924(c) conviction therefore fails. *Davis* set aside § 924(c)(3)'s residual clause as unconstitutionally vague. *Davis*, 139 S. Ct. at 2324. But it had no effect on convictions under the elements clause.

### III.

We uphold Hall's § 924(c) conviction under the elements clause. Moreover, it is far from clear that Hall would be entitled to relief under the residual clause in any event.

We acknowledge that five of our sister circuits have held *Davis* retroactively applicable to successive habeas petitions, notwithstanding the express statutory requirement that the new rule of constitutional law has been "*made retroactive* to cases on collateral review *by the Supreme Court.*" 28 U.S.C. § 2255(h)(2) (emphasis added). *See King v. United States*, 965 F.3d

Supp. App. 157

60, 64 (1st Cir. 2020); *In re Mullins*, 942 F.3d 975, 979 (10th Cir. 2019); *In re Matthews*, 934 F.3d 296, 301 (3rd Cir. 2019); *In re Hammoud*, 931 F.3d 1032, 1039 (11th Cir. 2019); *see also In re Franklin*, 950 F.3d 909, 910 (6th Cir. 2020) ("*Lower courts* may determine *on their own* the retroactivity of new rules when '[m]ultiple cases . . . necessarily dictate the retroactivity of the new rule.'") (emphasis added) (quoting *Tyler v. Cain*, 533 U.S. 656, 664 (2001)).

But none of those courts received adversarial briefing on the issue. *Cf. Lankford v. Ohio*, 500 U.S. 110, 127 (1991) (recognizing "the critical role that the adversary process plays in our system of justice"). What's more, in *In re Hammoud*, 931 F.3d at 1039, the first case to assume *Davis*'s retroactivity, the Government never even mentioned *Davis*. And in subsequent cases, the Government has simply followed *Hammoud*.

Adversarial briefing might very well have altered the outcome in those other circuits. In fact, at least seven respected jurists have concluded that decisions like *Davis* are *not* automatically retroactive—and thus must be made retroactive by the Supreme Court in a future case to satisfy provisions such as 28 U.S.C. § 2255(h)(2). In *Pisciotta v. Harmon*, 748 F. App'x 634 (5th Cir. 2019) (per curiam), three of our colleagues rejected the argument that *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), is by itself retroactively available on collateral review. *See Pisciotta*, 748 F. App'x at 635 ("*Dimaya* did not address whether its holding might apply retroactively on collateral review"). There is no principled distinction between *Dimaya* and *Davis*, and Hall does not claim otherwise. Similarly, four Justices indicated (and none of their colleagues disagreed) that it would take a future ruling to determine whether *Davis* is retroactive, stating: "[W]ho knows whether the ruling [in

*Davis*] will be retroactive?" *Davis*, 139 S. Ct. at 2354 (Kavanaugh, J., dissenting).[2]

If these seven jurists are right, then their conclusion presents yet another fatal flaw to Hall's successive petition. After all, his successive petition cannot proceed unless *Davis* has been "made retroactive . . . by the Supreme Court." 28 U.S.C. § 2255(h)(2). To be sure, the Supreme Court has made clear in dicta that the "right combination of holdings" can make a holding retroactive. *Tyler*, 533 U.S. at 666. But those prior holdings must "necessarily dictate" retroactivity of the new rule. *Id.*

A reasonable jurist could easily read *Welch* and conclude that *Davis*'s retroactivity *logically follows*. But that is different from saying that *Welch necessarily dictates* that outcome. A reasonable jurist might well predict that the Supreme Court would make *Davis* retroactive if asked. But a successive habeas petition may proceed only if *Davis* has been "made retroactive . . . by the Supreme Court," 28 U.S.C. § 2255(h)(2)—not if everyone merely agrees the Supreme Court *will* make it retroactive. If it takes further legal analysis to decide the retroactivity question—as at least seven respected members of the federal judiciary have concluded—then the requirements of 28 U.S.C. § 2255(h)(2) have not been met.

But this issue will remain for another day. Hall's § 924(c) conviction falls within the elements clause. We deny Hall authorization to proceed on his successive habeas petition for that reason.

---

[2] We recently relied on the separate writings of various justices to help demonstrate that a ruling has not been made retroactive by the Supreme Court. *See In re Sharp*, 969 F.3d 527, 528 (5th Cir. 2020) (per curiam) (citing *Ramos v. Louisiana*, 140 S. Ct. 1390, 1407 (2020) (plurality opinion); *id.* at 1420 (Kavanaugh, J., concurring in part); *id.* at 1348 (Alito, J., dissenting)).

No. 19-10345

## IV.

The dissent accuses us of committing a "host of grievous errors" in this "federal death penalty case."

But this proceeding has *nothing* to do with Hall's death sentence. Hall was convicted and sentenced to death for the crime of federal kidnapping resulting in death under 18 U.S.C. § 1201(a). And notably, Hall does not question the validity of that conviction, or the resulting sentence of death, anywhere in this proceeding. Instead, Hall brings this third petition to challenge only his separate conviction under 18 U.S.C. § 924(c) for carrying a firearm during a crime of violence, for which he was separately sentenced to 60 months imprisonment.

Nor do we see any error in that 60-month sentence. To begin with, as we explain, that 60-month sentence is fully supported under the elements clause of § 924(c). In fact, we adopt precisely the same approach as the Eighth Circuit in concluding that kidnapping resulting in death inherently involves conduct in reckless disregard to human life, and thereby satisfies the elements clause of § 924(c). *See Ross*, 969 F.3d at 839. And we follow our own en banc precedent in concluding that there is no "realistic probability" that a defendant could be prosecuted for kidnapping resulting in death based on anything less than reckless conduct. *See Castillo-Rivera*, 853 F.3d at 222. The dissent would simply prefer that we ignore circuit decisions on both of these points.

The dissent also criticizes our reliance on 18 U.S.C. § 3591(a)(2), the federal death penalty statute. Specifically, the dissent accuses us of misreading § 3591(a)(2)(C)—claiming that that provision requires only participation in "an act," and not participation in "an act of violence." But that ignores nearly the entire text of § 3591(a)(2)(C). That provision authorizes the death penalty only if the defendant "intentionally participated

12

No. 19-10345

in an act, *contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act*." 18 U.S.C. § 3591(a)(2)(C) (emphasis added).  Read in full, § 3591(a)(2)(C) plainly involves the use of force.  The dissent claims that its atextual reading of § 3591(a)(2)(C) is somehow supported by our decision in *United States v. Williams*, 610 F.3d 271 (5th Cir. 2010).  It is not—indeed, *Williams* does not even involve § 3591(a)(2)(C).  *See id.* at 284 ("In Williams's case, the sole threshold intent submitted to the jury during the eligibility phase was that contained in 18 U.S.C. § 3591(a)(2)(D).").[3]

And as for the dissent's criticism of our discussion of the residual clause, it ignores the fact that we are simply agreeing with seven respected members of the judiciary that decisions like *Davis* are not automatically retroactive and therefore must be made retroactive by the Supreme Court in

---

[3] The dissent also implies that it is somehow improper for us to decide this case based on the elements clause.  It observes in passing that "Hall was charged, tried, and convicted by a jury that was instructed on the definition of that residual clause"— implying (without explanation) that the issue is somehow waived, and that we therefore may not deny authorization for Hall's third habeas petition based on the elements clause.  There are at least two problems with this theory.  First, the dissent neglects to mention that the trial court instructed the jury on the elements clause as well as the residual clause.  To quote the court's instructions to the jury:  "The term 'crime of violence' means an offense that is a felony and—(A) has an element the use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  *United States v. Hall*, 4:94-CR-121-Y-2, Dkt. 444 at 10 (N.D. Tex. Oct. 31, 1995).  Second, even if Hall was originally convicted based on the residual clause, we have held that any such error is "harmless" so long as the conviction can be upheld under the elements clause.  *See, e.g., United States v. Griffin*, 946 F.3d 759, 761 (5th Cir. 2020) (although "the district court recognized that it relied on the residual clause at Griffin's 2008 sentencing . . . reliance on the residual clause was harmless if Griffin's three convictions also satisfied the other, still-valid definitions of 'violent felony.'").

13

a future case to satisfy 28 U.S.C. § 2255(h)(2). *See Pisciotta*, 748 F. App'x at 635; *Davis*, 139 S. Ct. at 2354 (Kavanaugh, J., dissenting). Instead, the dissent criticizes us for neglecting our decision in *In re Sparks*, 657 F.3d 258, 261–62 (5th Cir. 2011). But *Sparks* confirms our point here—that to satisfy 28 U.S.C. § 2255(h)(2), "multiple holdings" taken together must "necessarily dictate" that a new rule announced by the Supreme Court applies retroactively. *Id.* at 261. Moreover, nothing in *Sparks* allows us to ignore the conclusion of seven respected jurists that decisions like *Davis* and *Dimaya* have *not* been previously made retroactive by the Supreme Court.

\* \* \*

It has been over two decades since Hall was sentenced to death for the brutal killing of an innocent 16-year-old. His conviction has been repeatedly affirmed on appeal, under both direct review and following multiple habeas petitions. It is time—indeed, long past time—for these proceedings to end. Hall's request for authorization to proceed on his successive habeas petition is denied.

No. 19-10345

James L. Dennis, *Circuit Judge*, dissenting:

In this federal death penalty case, the majority commits a host of grievous errors to arrive at its conclusion that movant Orlando Hall fails to satisfy the standards for authorization to file a successive habeas petition. First, the majority decides that the 18 U.S.C. § 924(c) conviction that Hall challenges as unconstitutional can be sustained because, in its view, Hall's predicate crime of violence (COV) for kidnapping "plainly satisfies" the elements clause of § 924(c). Thus, the majority decides that, despite § 924(c)'s residual clause having been declared unconstitutional in *United States v. Davis*, 139 S. Ct. 2319 (2019), and despite the fact that Hall was charged, tried, and convicted by a jury that was instructed on the definition of that residual clause, that Hall's trial and conviction could not possibly have been affected by the invalidity of § 924(c)'s residual clause. Lacking any on-point precedent for denying Hall's claim, the majority reaches its erroneous conclusion only by concocting a far more onerous requirement for authorization than the statutorily-mandated prima facie standard and thus erects an unprecedented barrier to authorization. Second, after arriving at its unjustified decision, the majority reels out several pages of dicta that wrongfully and needlessly cast doubt on the unanimous holdings of all four of our sister circuits that have decided that the rule announced in *Davis* applies retroactively so as to authorize successive habeas petitions. In doing so, the majority advances an eccentric reading of 28 U.S.C. § 2255(h)(2), the provision governing the requirements for authorization, that is contrary not only to our well-established circuit precedent but also to the holdings of every other circuit court.

Because I would follow binding circuit precedent in this capital case and join four other federal courts of appeal in holding that *Davis* applies retroactively to successive habeas petitions, and because Hall has made "a sufficient showing of possible merit" that he can benefit from that decision,

15

No. 19-10345

*Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001) (internal quotation marks omitted), I would grant his motion for authorization. The majority errs in holding otherwise, so I must respectfully dissent.

## I.

To receive authorization to file a successive habeas petition, Hall must make a "prima facie" showing that his claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. §§ 2244(b)(3)(C), 2255(h)(2). A prima facie showing is "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." *Reyes-Requena*, 243 F.3d at 899. Hall claims that his conviction for carrying a firearm during a COV is invalid under the Supreme Court's recent decision in *Davis*, which declared void for vagueness § 924(c)'s "residual clause." Having identified *Davis* as the case on which he relies, the first question is whether that decision has been "made retroactive to cases on collateral review by the Supreme Court." § 2255(h)(2).

In *Teague v. Lane*, 489 U.S. 288, 311 (1989), the Supreme Court announced two types of rules that should be applied retroactively to cases on collateral review: substantive rules of constitutional law (the first *Teague* exception) and watershed rules of criminal procedure (the second *Teague* exception). This case implicates only the first *Teague* exception.

"Substantive rules . . . set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose." *Montgomery v. Louisiana*, 136 S. Ct.718, 729 (2016); *see also Teague*, 489 U.S. at 311 (explaining that substantive rules are those that "place[] certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." (internal quotation marks omitted)). And "[c]ourts must give retroactive

16

Supp. App. 164

effect to new substantive rules of criminal law." *Montgomery*, 136 S. Ct. at 728, 736 (holding that *Miller v. Alabama*, 567 U.S. 460 (2012), which held as unconstitutional mandatory life imprisonment without parole for juvenile offenders, announced a new substantive rule of constitutional law that must be given retroactive effect).

In *United States v. Reece*, 938 F.3d 630, 635 (5th Cir. 2019), we held that the Supreme Court's decision in *Davis* was substantive and thus applied retroactively to a first habeas petition. "[T]he rule announced in *Davis* meets the standard for a new substantive rule," we reasoned, because its invalidation of § 924(c)'s residual clause "narrow[ed] the scope of conduct for which punishment is now available."

Our conclusion was reinforced by the Supreme Court's twin decisions in *Johnson v. United States*, 135 S. Ct. 2551 (2015), and *Welch v. United States*, 136 S. Ct. 1257 (2016). In *Johnson*, the Court declared that the residual clause of the Armed Career Criminal Act (ACCA)—which is worded similarly to the residual clause in § 924(c)—was void for vagueness. 135 S. Ct. at 2563. Then, in *Welch*, the Court held that *Johnson* established a substantive rule, because it limited the "substantive reach of the A[CCA], altering the range of conduct or the class of persons that the Act punishes." *Welch*, 136 S. Ct. at 1265 (cleaned up). Because *Johnson* announced a substantive rule, the *Welch* Court held that it "has retroactive effect . . . in cases on collateral review." *Id.*

*Davis*, we have recognized, "operates in much the same way" as *Johnson*. *Reece*, 938 F.3d at 635. "[T]he residual clause [of §924(c)] allows for punishment of certain offenses that the elements clause cannot otherwise reach. Consequently, the residual clause's invalidation narrows the scope of conduct for which punishment is now available." *Id.* And because *Davis*,

17

No. 19-10345

like *Johnson*, narrows the scope of punishable conduct, it too is "a substantive decision and so has retroactive effect." *Welch*, 136 S. Ct. at 1265.

As noted, *Reece* was decided within the initial habeas petition context, and therefore considered under 28 U.S.C. § 2255(f)(3) whether the right "recognized by the Supreme Court" in *Davis* had been "made retroactively applicable to cases on collateral review." § 2255(f)(3). Motions, like Hall's, for authorization to file a *successive* habeas petition are governed by 28 U.S.C. § 2255(h)(2); this provision contains slightly different statutory language from § 2255(f)(3), requiring that a movant rely on a "new rule of constitutional law, made retroactive to cases on collateral review *by the Supreme Court*." *Id.* § 2255(h)(2) (emphasis added). The question, then, becomes whether the Supreme Court has "made [*Davis*] retroactive." *Id.*

There are two ways the Court can make "a new rule . . . retroactive within the meaning of § 2255(h)(2) [:] (1) the Supreme Court itself must . . . expressly h[o]ld that the new rule is retroactive on collateral review, or (2) the Supreme Court's holdings in multiple cases . . . must necessarily dictate retroactivity of the new rule." *In re Hammoud*, 931 F.3d 1032, 1038–39 (11th Cir. 2019) (cleaned up) (quoting *Tyler v. Cain*, 533 U.S. 656, 666 (2001)).[4] Though the first possibility has not yet occurred with respect to *Davis*, I would conclude—like every other court that has considered this question— that *Davis*'s retroactivity is "necessarily dictate[d]" by the Court's holdings." *Tyler*, 533 U.S. at 666.

In her concurrence in *Tyler v. Cain*, Justice O'Connor employed a syllogism to demonstrate how, despite the absence of an express holding by the

---

[4] "Although *Tyler* was decided in the context of a successive petition filed by a state prisoner and interprets 28 U.S.C. § 2244(b)(2)(A), the decision applies with equal force to the identically worded § 2255(h)(2) standard." *In re Sparks,* 657 F.3d 258, 260 n.2 (5th Cir. 2011) (per curiam).

18

Supp. App. 166

Court that a rule applies retroactively, "multiple holdings" taken together can "logically dictate the retroactivity of [a] new rule":

> if we hold in Case One that a particular type of rule applies retroactively to cases on collateral review and hold in Case Two that a given rule is of that particular type, then it necessarily follows that the given rule applies retroactively to cases on collateral review. In such circumstances, we can be said to have "made" the given rule retroactive to cases on collateral review.

*Id.* at 668-669 (O'Connor, J., concurring). Applying this syllogism, Justice O'Connor noted that the Court in *Teague* had determined that "a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Id.* at 669 (quoting *Teague*, 489 U.S. at 307). *Teague*, then, was "Case One" in Justice O'Connor's syllogism. "When the Court holds as a new rule in a subsequent case"—a case following *Teague*—"that a particular species of primary, private individual conduct is beyond the power of the criminal lawmaking authority to proscribe, it *necessarily follows* that this Court has 'made' that new rule retroactive to cases on collateral review." *Id.* (emphasis added). In other words, after *Teague*, whenever the Supreme Court announces a substantive rule—that is, one that "places certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe," *Teague*, 489 U.S. at 307—that rule *necessarily* has been made retroactive by the Court.

In *In re Sparks*, 657 F.3d 258, 262 (5th Cir. 2011), we applied Justice O'Connor's logic in holding that a substantive rule set forth by the Supreme Court necessarily had been made retroactive by the Court. There, a juvenile non-homicide offender who had been sentenced to life imprisonment without the possibility of parole moved for authorization to file a successive § 2255 petition. *Sparks*, 657 F.3d at 259. He argued that his sentence was

unconstitutional under the Supreme Court's decision in *Graham v. Florida*, 560 U.S. 48 (2010), which barred life without parole for the movant's class. *Id.* at 260. We granted authorization, holding that *Graham* established a substantive rule and, consequently, applied retroactively. *Id.* at 261-62. The rule in *Graham*, we explained, fell under the first *Teague* exception, i.e., presented a substantive rule, because it "prohibit[ed] a certain category of punishment for a class of defendants because of their status or offense." *Id.* at 261 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 330, *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002)). Under the retroactivity principles articulated by Justice O'Connor in *Tyler*, "the combined effect of the holding of *Graham* itself and the first *Teague* exception," was that the Supreme Court, "as a matter of logical necessity," had "made [*Graham*] retroactive on collateral review." *Id.* at 262. Put simply, *Teague*'s rule that substantive decisions apply retroactively plus *Graham*'s announcement of a substantive rule meant that the Court had "made" *Graham* retroactive within the meaning of § 2255(h)(2), even though it had not explicitly said so. *See id.*

As is evident, necessary to the decision in *Sparks* was application of Justice O'Connor's syllogism. *See id.* Because the use of that syllogism formed part of *Sparks*'s holding, we are bound to follow it as this case is indistinguishable from *Sparks* for retroactivity purposes. Applying Justice O'Connor's syllogism here, it is clear that *Davis* applies retroactively. Again, the first *Teague* exception (Case One) establishes that substantive rules necessarily apply retroactively. And *Davis* (Case Two) announces a substantive rule for the reasons set forth above. Therefore, *Davis* must apply retroactively to successive habeas petitions. *See Teague*, 489 U.S. at 307.

Conspicuously failing even to cite *Sparks*—despite the fact that both parties and appointed amicus discuss it repeatedly—the majority implies that the requirements for authorization under § 2255(h)(2) are met only if the Supreme Court has expressly held that a rule applies retroactively. As the

20

majority puts it, if any "further legal analysis" is required beyond mere application of a Supreme Court pronouncement that a rule applies retroactively, then § 2255(h)(2) is not satisfied. Maj. Op. at 11. That erroneous assertion cannot be squared with *Sparks*. Under the rule of orderliness, we are obliged to follow *Sparks* and, in turn, Justice O'Connor's concurrence in *Tyler*. Those teachings lead to the inescapable conclusion that *Davis* applies retroactively to successive habeas petitions.

This determination, moreover, accords with that reached by every federal court of appeals to have decided *Davis*'s retroactive application to successive habeas petitions. *See In re Mullins*, 942 F.3d 975 (10th Cir. 2019); *In re Matthews*, 934 F.3d 296 (3d Cir. 2019); *In re Hammoud*, 931 F.3d at 1038-39; *In re Franklin*, 950 F.3d 909 (6th Cir. 2020) (mem.). The Sixth, Tenth, and Eleventh Circuits all relied on *Tyler*'s instruction that the combination of multiple Supreme Court decisions can dictate retroactivity. *See In re Franklin*, 950 F.3d at 910-911; *In re Mullins*, 942 F.3d at 977-79; *In re Hammoud*, 931 F.3d at 1038-39. As the Sixth Circuit explained:

> The Supreme Court's decision in *Welch* . . . establishes the retroactivity of *Davis*. *Welch* explained that decisions announce a substantive rule and are thus retroactive when they alter the range of conduct . . . that the law punishes. That occurred in *Johnson v. United States* because it changed the substantive reach of the Armed Career Criminal Act. So too in *Davis*, where the Court narrowed § 924(c)(3) by concluding that its second clause was unconstitutional."

*In re Franklin*, 950 F.3d at 910–11 (cleaned up); *see also In re Mullins*, 942 F.3d at 979 ("Because *Davis* has the same limiting effect on the range of conduct or class of people punishable under § 924(c) that *Johnson* has with respect to the ACCA, *Welch* dictates that *Davis*—like *Johnson*—'announced a substantive rule that has retroactive effect in cases on collateral review.'" (quoting *Welch*, 136 S. Ct. at 1268)). The reasoning of these courts clearly refutes the

majority's contention that *Davis*'s retroactivity is not necessarily dictated by *Welch*.

In light of the foregoing, it is unsurprising that the Government agrees with the analysis that *Davis* applies retroactively; any other position would be contrary to logic and binding circuit precedent. Of course, the Government's concession does not bind courts, but it is notable that other circuits have found such a concession sufficient reason alone to give a rule retroactive application. *See In re Matthews*, 934 F.3d at 301 (accepting the Government's concession of *Davis*'s retroactivity as sufficient to conclude for authorization purposes that the Supreme Court had made the case retroactive); *Woods v. United States*, 805 F.3d 1152, 1154 (8th Cir. 2015) (per curiam) ("Based on the government's concession [of the retroactivity of *Johnson*], we conclude that Woods has made a prima facie showing that his motion contains 'a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.'" (quoting § 2255(h)(2)).

Based on the reasons above, I conclude that *Davis* has been "made retroactive . . . by the Supreme Court." § 2255(h)(2). I proceed, then, to determine whether Hall can make "a sufficient showing of possible merit" that he can benefit from *Davis*. *Reyes-Requena*, 243 F.3d at 899.

## II.

Hall can receive authorization to file a successive habeas application if he "'makes a prima facie showing that [his] application satisfies the requirements of' [28 U.S.C.] § 2244(b)." *In re Salazar*, 443 F.3d 430, 431 (5th Cir. 2006) (per curiam) (quoting 28 U.S.C. § 2244(b)(3)(c)). Under 28 U.S.C. § 2244(b)(2), Hall must show that his "claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." In other words, Hall needs to make a prima facie showing that his claim relies on *Davis*. *See In re Morris*, 328 F.3d

22

No. 19-10345

739, 740 (5th Cir. 2003). Though *Davis* invalidated the residual clause of §
924(c), it left intact its elements clause, *see* 18 U.S.C. § 924(c)(3)(A). To
benefit from *Davis*'s rule, then, Hall must make a prima facie showing that
he was convicted under § 924(c)'s residual clause. As explained below, he
meets this minimal standard. *See Reyes-Requena*, 243 F.3d at 899 (explaining
that a "prima facie showing" is "simply a sufficient showing of possible merit
to warrant a fuller exploration by the district court").

Under the modified categorical approach, I agree with the majority
that Hall was convicted of kidnapping resulting in death, an offense distinct
from generic kidnapping. *See* 18 U.S.C. § 1201(a); Maj. Op. at 6. But I depart
from its conclusion that this conviction means that Hall is precluded from
benefiting from *Davis*. First, § 1201(a), which defines the federal kidnapping
offense, criminalizes conduct that does not have "as an element the use, at-
tempted use, or threatened use of physical force" and thus does not satisfy §
924(c)'s elements clause. § 924(c)(3)(A). *See United States v. Walker*, 934
F.3d 375, 379 (4th Cir. 2019) ("Accordingly, because . . . 18 U.S.C. § 1201(a)
may be committed without violence, kidnapping clearly does not categori-
cally qualify as a crime of violence under the force [or elements] clause, §
924(c)(3)(A)."); *cf. United States v. Taylor*, 848 F.3d 476, 491 (1st Cir. 2017)
(noting that "[t]he government admit[ted] that kidnapping" under § 1201(a)
"cannot" qualify as a crime of violence under the force clause); *Knight v.
United States*, 936 F.3d 495, 497 (6th Cir. 2019) ("The government concedes
that under *Davis* kidnapping in violation of 18 U.S.C. § 1201(a) is not a 'crime
of violence' and thus Knight's conviction under § 924(c) for using a firearm
during and in relation to kidnapping must be vacated."); BLACK'S LAW DIC-
TIONARY (10th ed. 2014) (defining "inveigle" as "[t]o lure or entice through
deceit or insincerity"). Section 1201(a) kidnapping, then, is not categorically
a COV under § 924(c)'s elements clause.

No. 19-10345

Second, the majority incorrectly contends that kidnapping resulting in death, as distinguished from kidnapping simpliciter, necessarily satisfies the elements clause. The "death results" portion of § 1201(a) does not contain a *mens rea* requirement. § 1201(a); *see Burrage v. United States*, 571 U.S. 204, 210-14 (2014); *United States v. Hayes*, 589 F.2d 811, 821 (5th Cir. 1979) (discussing the "death results" language of 18 U.S.C. § 242, which criminalizes deprivations of federal rights under color of law, and stating that "no matter how you slice it, if death results does not mean if death was intended" (internal quotation marks omitted)). But "[t]he key phrase in" the elements clause of 18 U.S.C. § 16(a)—a criminal provision identical in wording to § 924(c)'s elements clause and which defines a COV to include "the use . . . of physical force against the person or property of another—most naturally suggests a higher degree of intent than negligent or merely accidental conduct." *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (alterations in original) (internal quotation marks omitted). Put another way, the kidnapping resulting in death offense simply requires but-for causation between the kidnapping and a death, and a death may result from a kidnapping without force or the threat thereof ever being applied. It makes sense, then, that this court has never held that kidnapping resulting in death necessarily involves the use, attempted use, or threatened use of physical force. In short, it is conceivable that a particular kidnapping by inveiglement resulting in unintended death might not satisfy the elements clause of § 924(c) but instead could be found to constitute a COV under § 924(c)'s residual clause, which the Supreme Court declared unconstitutionally vague in *Davis*.

In holding otherwise, the majority leans heavily on the decision of a divided panel of the Eighth Circuit in *United States v. Ross*, 969 F.3d 829, 838-39 (8th Cir. 2020). There, the Eighth Circuit held that kidnapping resulting in death under § 1201(a) necessarily involves the use of force because the act of kidnapping involves, at a minimum, reckless disregard for human life and

24

when the kidnapping results in a victim's death, "the perpetrator's mental state is sufficient to show that he necessarily 'used' force against the victim." *Ross*, 969 F.3d at 839. This faulty reasoning does not withstand close scrutiny. As established, § 1201(a) kidnapping, though it may require at least the mental state of recklessness, does not necessitate the use of force. For the Eighth Circuit's and the majority's conclusion to stand, then, the "death results" element of a kidnapping resulting in death must require a forceful act. But the application of force requires "volitional conduct." *Voisine v. United States*, 136 S. Ct. 2272, 2279 (2016) (actor must have the "mental state of intention, knowledge, or recklessness" to "use force"); *see also Leocal*, 543 U.S. at 9. By contrast, the death results element under § 1201(a), as the Eighth Circuit majority acknowledged, has no *mens rea* requirement. *See Ross*, 969 F.3d at 839. In short, the death results element simply requires that kidnapping constitute a but-for cause of a death, *see Burrage*, 571 U.S. at 210-14, and therefore could be satisfied without the use of force.

The dissent in *Ross* aptly illustrated this point: "Suppose that an individual gets in a car with a person impersonating an Uber driver and dies . . . in a tragic car accident caused by . . . by jumping out after discovering the driver's true identity." See 969 F.3d at 845 (Stras, J., concurring in the judgment and dissenting in part) (internal citations omitted). This scenario "qualif[ies] as kidnapping by 'inveiglement'" and "'results' in death. And critically," it does not "involve[] the use of force." Id. (internal citation omitted). Failing to appreciate this logic, the majority here accepts fully the Eighth Circuit majority's reply that "[f]orce is necessary to kill the victim when she slams into the . . . pavement" and that this "application of force is not an accident" because the perpetrator acts with reckless disregard for the victim's safety when he intentionally kidnaps her. Id. That the act of kidnapping—which, again, does not require force—may involve reckless disregard for another's safety is no answer to the question of whether force was

used when a victim dies during or after a kidnapping. Inveiglement clearly is not per se a "forceful act[], and nowhere does the court identify any other possible use of force, direct or indirect, by the perpetrator in" the scenario described. 969 F.3d at 845 n.3 (Stras, J., concurring in the judgment and dissenting in part). Thus, the majority's suggestion that kidnapping resulting in death under § 1201(a) requires force is error.

Even though it is entirely possible that a kidnapping resulting in death could be committed without the use of physical force—and thus is not restricted to the elements clause—this is not enough to constitute a prima facie showing, according to the majority. Instead, it holds—rather extraordinarily—that Hall must show a "realistic probability . . . that the [Government] would apply [the] statute to [such] conduct." Maj. Op. at 8. (quoting *United States v. Castillo-Rivera*, 853 F.3d 218, 222 (5th Cir. 2017) (en banc)). The "realistic probability" test is familiar, but not in the context in which the majority deploys it. The realistic probability test is a judge-made rule designed by a badly fractured court of appeals to legalistically but illogically fit more state offenses into federal generic offense definitions to enhance punishments. *See Castillo-Rivera*, 853 F.3d at 222. It ill-fits the end for which it was conceived and has absolutely no place in judging a prima facie showing or a showing of possible merit to warrant a fuller exploration by the district court under §2244(b)(3)(C) as incorporated by § 2255's requirements for second or successive motions for authorization to apply for a writ of habeas corpus. In equating the judicially-created realistic probability test with the far less demanding, statutorily-mandated prima facie standard—a standard we have consistently described as requiring merely a "showing of possible merit," *see, e.g., Reyes-Requena*, 243 F.3d at 899—the majority improperly ratchets up the burden on the movant.

The error in the majority's importation of the realistic probability standard into the habeas context is underscored by our limited

No. 19-10345

"gatekeeping" role in ruling on motions for authorization. *See United States v. Wiese*, 896 F.3d 720, 723 (5th Cir. 2018). If we find that the prima facie standard for authorization is met, then the petitioner passes through only the first of two jurisdictional gates. The petitioner must still clear a second gate by "*actually prov*[*ing*] at the district court level that the relief he seeks relies" on a new rule. *Id.* (emphasis added). If he cannot, the district court lacks jurisdiction and "must dismiss the motion without reaching the merits." *Id.* We recently held that to prove reliance on a new rule that invalidates a residual clause—that is, that a petitioner's conviction rests on a now-invalid provision—the prisoner must show by a *preponderance of the evidence* in the *district court* that he was indeed convicted under the residual clause. *See United States v. Clay*, 921 F.3d 550, 558–59 (5th Cir. 2019). Nowhere did we mention that a petitioner must have already shown a realistic probability that his conviction fell under the residual clause or imply that any showing beyond the statutorily-required prima facie standard was needed for authorization.

Last, the majority baldly asserts that because Hall was charged with the capital crime of kidnapping resulting in death, his offense necessarily involved force and therefore is a predicate COV under § 924(c)'s elements clause. In other words, the majority contends that all death-penalty eligible offenses under the Federal Death Penalty Act, 18 U.S.C. § 3591, require the use of force. Notably, the majority cites no precedent whatsoever for this proposition. And the federal capital punishment statute distinguishes between "participat[ing] in an act," § 3591(a)(2)(C), and "engag[ing] in an act *of violence*," § 3591(a)(2)(D) (emphasis added). We previously examined this language in *United States v. Williams*, 610 F.3d 271, 284-88 (5th Cir. 2010), and ruled that an "act of violence"—as expressly distinguished from "an act"—necessarily requires "physical force." The reasoning of *Williams*, then, indicates that § 3591(a)(2)(C) could well be satisfied without the use of physical force, strongly undermining the majority's *ipse dixit* that all federal

27

No. 19-10345

capital offenses necessarily satisfy § 924(c)'s elements clause. Hall has made the minimal prima facie showing that his predicate COV satisfies solely the residual clause, and it should be left for the district court to determine by a preponderance of the evidence whether in fact his § 924(c) conviction can be sustained.

\* \* \*

For these reasons, I would hold that Hall has made a "sufficient showing of possible merit to warrant a fuller exploration by the district court" and would therefore grant him authorization to file a successive habeas petition. *Reyes-Requena*, 243 F.3d at 899. Because the majority errs in denying authorization, I respectfully dissent.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| ORLANDO CORDIA HALL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-00176-JPH-DLP |
| | ) | |
| CHARLES DANIELS, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER GRANTING MOTION TO DISMISS
PETITION FOR WRIT OF HABEAS CORPUS**

Orlando Cordia Hall is a federal prisoner scheduled to be executed on November 19, 2020. Following his 1995 convictions for multiple crimes related to the kidnapping and murder of 16-year-old Lisa Rene, a jury recommended imposition of the death penalty for his conviction on the charge of kidnapping resulting in death. The district judge imposed a sentence of death for that conviction and imposed multiple terms of imprisonment for the other counts of conviction. The convictions and sentences imposed were upheld on appeal, and Mr. Hall was denied relief on a motion for postconviction relief under 28 U.S.C. § 2255. After that ruling was affirmed, the Fifth Circuit twice denied Mr. Hall's requests to file a successive § 2255 motion. In this petition for a writ of habeas corpus under 28 U.S.C. § 2241, Mr. Hall contends that his conviction for using and carrying a firearm during a crime of violence was unlawful and, consequently, that he must be resentenced on all counts of conviction. The Court cannot evaluate the merits of these arguments unless section 2255 is

1

structurally inadequate to test the legality of his conviction and sentence. Because Mr. Hall has not shown that is the case, his petition must be dismissed.

## I.    Background

Mr. Hall and his confederates kidnapped, raped, and murdered Ms. Rene in September 1994. *United States v. Hall*, 152 F.3d 381, 389−90 (5th Cir. 1998) (describing the details of Mr. Hall's crimes). A jury in the Northern District of Texas convicted him of kidnapping resulting in death, *see* 18 U.S.C. § 1201(a)(1), and using and carrying a firearm during a crime of violence, *see* 18 U.S.C. § 924(c), plus two other offenses. *Hall*, 152 F.3d at 390. The district court sentenced him to death for the offense of kidnapping resulting in death and 60 years in prison for the firearm offense. *Id.* The Fifth Circuit affirmed Mr. Hall's convictions and sentences. *Id.* at 427. His first § 2255 motion yielded no relief, and the Fifth Circuit denied him leave to file a successive § 2255 motion in 2016. *See In re Hall*, --- F.3d ----, ----, 2020 WL 6375718, at *2 (5th Cir. Oct. 30, 2020).

In 2017, Mr. Hall filed this § 2241 petition, arguing that his conviction under 18 U.S.C. § 924(c) for using and carrying a firearm during a crime of violence is void because § 924(c)(3)(B) is unconstitutionally vague. Section 924(c)(3)(B) provides one of the two alternate paths for a felony charged under § 924(c) to qualify as a crime of violence.[1] Mr. Hall's argument relied on *Johnson v. United States*, 576 U.S. 591 (2015), which held that the residual clause of

---

[1] A "crime of violence" for § 924(c) purposes is a felony that "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3).

2

the Armed Career Criminal Act, a provision analogous to § 924(c)(3)(B), was unconstitutionally vague. In 2019, the Supreme Court held that 18 U.S.C. § 924(c)(3)(B) is likewise unconstitutionally vague. *Davis v. United States*, 139 S. Ct. 2319, 2336 (2019). After *Davis*, Mr. Hall again sought leave from the Fifth Circuit to file a successive § 2255 motion. *In re Hall*, 2020 WL 2020 WL 6375718, at *2. The Fifth Circuit denied that request, holding that *Davis* did not undermine Mr. Hall's conviction because kidnapping resulting in death is a crime of violence under § 924(c)(3)(A). *Id.* at *5.

Following that denial of leave to file a successive § 2255 motion, the respondent moved to dismiss this case, arguing that (1) Mr. Hall's petition is barred by § 2255(e); (2) Mr. Hall's kidnapping offense is a crime of violence under § 924(c)(3)(A); and (3) even if Mr. Hall's § 924(c) conviction is void, his death sentence should stand. The motion to dismiss is fully briefed.

## II.    28 U.S.C. § 2255(e)

Congress chose to "steer[] almost all [federal] prisoner challenges to their convictions and sentences toward § 2255." *Shepherd v. Krueger*, 911 F.3d 861, 862 (7th Cir. 2018). It did so by requiring federal prisoners to file § 2255 motions in the district of conviction, except for limited access to § 2241 by way of the savings clause. *See In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998) ("The purpose behind the enactment of section 2255 was to change the venue of postconviction proceedings brought by federal prisoners from the district of incarceration to the district in which the prisoner had been sentenced." (citing *United States v. Hayman*, 342 U.S. 205, 212–19 (1952)).

3

To challenge a federal conviction or sentence under § 2241, a prisoner must show that § 2255 "is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). Without that showing, a district court cannot reach the merits of the arguments raised in the petition. *Id.* (petition otherwise "shall not be entertained"); *Webster v. Daniels*, 784 F.3d 1123, 1124 (7th Cir. 2015) (en banc) (petition "must be dismissed at the threshold" if § 2255(e) is not satisfied). Section 2255(e), aptly described by the Seventh Circuit as the "savings clause" and the "safety valve," thus "recognizes a narrow pathway to the general habeas corpus statute, section 2241." *Purkey v. United States*, 964 F.3d 603, 611 (7th Cir. 2020); *see Webster*, 784 F.3d at 1135.

While the Seventh Circuit has not described the "outer limits of what might prove that section 2255 is 'inadequate or ineffective to test the legality' of a person's detention," *Purkey*, 964 F.3d at 611–12, it has described three cases as "central" to those limits. *See Davenport*, 147 F.3d at 611–12 (claim relying on Supreme Court decision of statutory interpretation made retroactive to cases on collateral review); *Garza v. Lappin*, 253 F.3d 918, 921–23 (7th Cir. 2001) (claim relying on decision issued by international tribunal after § 2255 proceedings were completed); *Webster*, 784 F.3d at 1135–44 (claim relying on evidence that existed but was unavailable at the time of trial and showed that defendant was categorically ineligible for the death penalty). Outside the fact patterns presented in these cases, a petitioner must (at least) make "a compelling showing that, as a practical matter, it would be impossible to use section 2255 to cure a fundamental problem" with the challenged conviction or sentence. *Purkey*, 964

4

Supp. App. 180

F.3d at 615; *see Webster*, 784 F.3d at 1136 ("[T]here must be some kind of structural problem with section 2255 before section 2241 becomes available.").

### III.   Discussion

The threshold question for this Court is whether Mr. Hall has shown that there was a fundamental problem with his conviction or sentence that he could not have addressed under § 2255. Put another way, has Mr. Hall shown there is a "structural problem" with § 2255 that prevented him from raising the issue he seeks to raise now in this case? The Court cannot reach the merits of Mr. Hall's arguments unless it finds that Mr. Hall has shown that there is a fundamental or structural problem. *See Davenport*, 147 F.3d at 609 ("Nothing in 2255 made the remedy provided by that section inadequate to enable Davenport to test the legality of his imprisonment. He had an unobstructed procedural shot at getting his sentence vacated.").

### A.   The Fifth Circuit decided the issue raised by Mr. Hall in this case

Mr. Hall argues that "he was completely foreclosed from obtaining a ruling in a § 2255 proceeding on the merits of his challenge to his § 924(c) conviction." Dkt. 44 at 22; *see id.* at 14 ("[T]he Fifth Circuit's repeated denials of permission [to file a successive § 2255 motion] have rendered § 2255 inadequate and ineffective."). Mr. Hall's argument thus rests on the premise that no court has adjudicated the merits of his § 924(c) claim. *Id.* at 22 ("Mr. Hall has never been denied relief on the merits of his § 924(c) challenge. Instead, he was twice altogether denied access to the § 2255 procedure by the Fifth Circuit."). The respondent argues that "[b]ecause the Fifth Circuit squarely rejected Hall's claim

Supp. App. 181

on its merits . . . Hall cannot show that Section 2255 was inadequate or ineffective to test his *Davis* claim." Dkt. 46 at 12. Indeed, the Fifth Circuit squarely addressed and rejected the merits of Mr. Hall's § 924(c) claim in its order denying Mr. Hall leave to file a successive § 2255 motion. In that order, the court held that Mr. Hall was properly convicted of using and carrying a firearm during a crime of violence because "capital kidnapping resulting in death is a crime of violence under [§ 924(c)(3)(A)]." *In re Hall*, 2020 WL 6375718, at *5.

Any contention that the Fifth Circuit should not have reached the merits of the § 924(c) claim at the leave-to-file stage is not for this Court to resolve. Similarly, whether the Fifth Circuit correctly decided that kidnapping resulting in death is a crime of violence is not the issue presently before the Court. The fact that the Fifth Circuit decided that issue demonstrates that Mr. Hall had "'a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence.'" *Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019) (quoting *Davenport*, 147 F.3d at 609). A reasonable opportunity does not include the opportunity to have claims that were asserted, considered and rejected in the Fifth Circuit relitigated in the Seventh Circuit. *See Bourgeois v. Watson*, 977 F.3d 620, 638 (7th Cir. 2020). Applied to the facts of Mr. Hall's case, § 2255 is not inadequate or ineffective.

### B.   Mr. Hall's other arguments

The parties' arguments have changed since Mr. Hall filed his petition in 2017 due to intervening Supreme Court and Fifth Circuit decisions.  Moreover,

Supp. App. 182

the Court's conclusion that Mr. Hall cannot proceed through § 2255(e) makes it unnecessary for the Court to resolve other issues presented.

Mr. Hall originally argued that § 2255 is inadequate or ineffective based on *Davenport* because his claim relies on issues of statutory interpretation. Dkt. 1 at 17−19; *see Davenport*, 147 F.3d at 611−12; *Montana v. Cross*, 829 F.3d 775, 783 (7th Cir. 2016). He appears to have abandoned this argument in response to the respondent's motion to dismiss, and rightly so. His claim ultimately rests on *Davis* and *Johnson*, which both announce new constitutional rules. *See Montana*, 829 F.3d at 783 (to satisfy the *Davenport* test, a petitioner must rely "not [on] a constitutional case, but [on] a statutory-interpretation case" (internal quotation omitted)).

The Court need not—indeed, cannot—address many of the parties' other arguments because Mr. Hall has not shown a "structural problem" with  § 2255 that prevented him from raising the issue he seeks to raise now in his § 2241 habeas corpus petition. *See Webster*, 784 F.3d at 1125 (habeas corpus petition "must be dismissed at the threshold" if § 2255(e) is not satisfied). Specifically, the Court does not address either the merits of Mr. Hall's § 924(c) claim or whether success on that claim would warrant resentencing for Mr. Hall's other convictions. Moreover, the Court need not decide whether, as the respondent argues, the "law of the case" doctrine requires this Court to accept the Fifth Circuit's conclusion that Mr. Hall's kidnapping offense is a crime of violence under § 924(c)(3)(A).

Because the structure of § 2255 allowed Mr. Hall an opportunity to litigate his § 924(c) claim, and because the Fifth Circuit denied leave to file a successive § 2255 motion based on its conclusion that the claim has no merit, Mr. Hall cannot now present the claim in a § 2241 habeas corpus petition.

## IV.   Conclusion

The respondent's motion to dismiss, dkt. [39], is **GRANTED**. Mr. Hall's motion for stay of execution, dkt. [44], is **DENIED**. The petition for a writ of habeas corpus is **DISMISSED**. Final judgment shall now enter.

**SO ORDERED.**

Date: 11/14/2020

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Jonathan Glen Bradshaw
DEPARTMENT OF JUSTICE
jonathan.bradshaw@usdoj.gov

Timothy Wayne Funnell
UNITED STATES ATTORNEY'S OFFICE
tim.funnell@usdoj.gov

Benjamin Gillig
SIDLEYAUSTIN LLP
1 South Dearborn
Chicago, IL 60603

Robert N. Hochman
SIDLEY AUSTIN LLP
rhochman@sidley.com

James Robert Wood
UNITED STATES ATTORNEY'S OFFICE
bob.wood@usdoj.gov

8

Supp. App. 184

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.


*s/ Kathryn Marshall Ali*
KATHRYN MARSHALL ALI