No. 20-3229

IN THE

# United States Court of Appeals

FOR THE SEVENTH CIRCUIT

ORLANDO CORDIA HALL,

*Petitioner-Appellant,*

v.

T.J. WATSON, WARDEN

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Southern District of Indiana, No. 2:20-CV-00599-JPH-DLP
Hon. James Patrick Hanlon, District Judge

UNITED STATES'S COMBINED RESPONSE TO APPELLANT'S BRIEF AND
EMERGENCY MOTION FOR STAY OF EXECUTION PENDING APPEAL

ERIN NEALY COX
  *United States Attorney*
  *Northern District of Texas*

JOSH J. MINKLER
  *United States Attorney*
  *Southern District of Indiana*

JONATHAN BRADSHAW
  *Assistant U.S. Attorney*
  *Northern District of Texas*

  *Special Assistant U.S. Attorney*
  *Southern District of Indiana*
  *10 West Market St., Ste. 2100*
  *Indianapolis, Indiana 46204*
  *(817) 252-5273*

**TABLE OF CONTENTS**

Page

TABLE OF CASES, STATUTES, AND OTHER AUTHORITIES.............................iii

INTRODUCTION ...................................................................................................1

JURISDICTIONAL STATEMENT ........................................................................4

ISSUES PRESENTED FOR REVIEW ....................................................................5

STATEMENT OF THE CASE..................................................................................5

    A.      Hall made a *Batson* challenge at trial but did not seek review of the district court's ruling in his appeal. .......................................................5

    B.      Hall's Section 2255 motion did not assert *Batson* error but advanced a claim that statistical studies showed racial discrimination in the administration of capital punishment. .....................................................6

    C.      Hall filed additional collateral challenges to his conviction and sentence and sought stays of his execution. ...........................................7

    D.      Hall filed a second Section 2241 petition and accompanying motion to stay, which the district court denied. ...................................................8

SUMMARY OF THE ARGUMENT ....................................................................11

APPLICABLE LEGAL STANDARDS..................................................................12

DISCUSSION.........................................................................................................14

    1.      Hall's inexcusable delay in bringing a last-minute stay motion warrants its denial. ...............................................................................14

    2.      Hall has no chance of succeeding on the merits. ................................20

        A.     Hall's successive Section 2241 petition is an abuse of the writ. ...............................................................................................20

B.    Hall's claims are not cognizable under Section 2241. .............. 21

        i.      Hall could have raised his *Batson* claim under Section 2255. ................................................................................ 22

        ii.     Hall already litigated – and lost – his remaining claim under Section 2255. ........................................................... 27

C.    Even if Hall could proceed via the savings clause, his claims have no merit. .............................................................. 31

        i.      Hall has no chance of success on his newly manufactured, last-minute *Batson* claim........................ 31

             a.     Hall bases his claim on inflammatory allegations that have no basis in the trial record. ................... 31

             b.     Hall's claim relies on a completely inaccurate retelling of the trial record, including the views of the Black venire members who were struck and the non-Black venire members to whom he compares them. ....................................................... 33

        ii.     Hall's claim that his death sentence violates the Fifth and Eighth Amendments and the FDPA is meritless... 53

3.    The remaining stay considerations do not weigh in Hall's favor, especially given his delay and that he cannot succeed on the merits. ................................................................................................. 55

CONCLUSION................................................................................................. 57

CERTIFICATE OF SERVICE ....................................................................... 58

# TABLE OF CASES, STATUTES, AND OTHER AUTHORITIES

**Page(s)**

**Federal Cases**

*Anraout v. Marberry*, 351 F. App'x 143 (7th Cir. 2009) .............................................. 21

*Barr v. Lee*, 140 S. Ct. 2590 (2020) ................................................................. 14, 15, 56

*Batson v. Kentucky*, 476 U.S. 79 (1986) ................................................................... 8

*Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2020) .............................................. 20, 30, 34

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) ........................................................ passim

*Calderon v. Thompson*, 523 U.S. 538 (1998) ............................................................. 55

*Chazen v. Marske*, 938 F.3d. 851 (7th Cir. 2019) ....................................................... 40

*Davis v. Ayala*, 576 U.S. 257 (2015) .......................................................... 36, 42, 43, 45

*Davis v. Greer*, 13 F.3d 1134 (7th Cir. 1994) ............................................................ 54

*Felker v. Turpin*, 518 U.S. 651 (1996) ..................................................................... 20

*Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) .......................................................... 21

*Gordon v. Holder*, 632 F.3d 722 (D.C. Cir. 2011) ...................................................... 15

*Hall v. United States*, 526 U.S. 1117 (1999) ............................................................... 6

*Hall v. United States*, No. 4:00-CV-422-Y, 2004 WL 1908242
    (N.D. Tex. Aug. 24, 2004) ........................................................................... 6, 7, 17

*Herrera v. Collins*, 506 U.S. 390 (1993) ................................................................... 55

*Hill v. McDonough*, 547 U.S. 573 (2006) .................................................................. 15

*In re Davenport*, 147 F.3d 605 (7th Cir. 1998) .......................................................... 21

*In re Hall*, ___ F.3d ___, 2020 WL 6375718 (5th Cir. Oct. 30, 2020) ..................... 3, 7, 8

*Johnson v. United States*, 135 S. Ct. 2551 (2015) ......................................................... 7

**Federal Cases, continued** **Page(s)**

*Lambert v. Buss*, 498 F.3d 446 (7th Cir. 2007) ........................................................ 13, 14

*Lee v. Watson*, (*Lee II*), 964 F.3d 663 (7th Cir. 2020) ........................................ 22, 24, 25

*Lee v. Watson (Lee I), No. 19-3399*, 2019 WL 6718924 (7th Cir. Dec. 6, 2019) 13, 14, 19

*McCleskey v. Kemp*, 481 U.S. 279 (1987) .................................................................. 53, 54

*McCleskey v. Zant*, 499 U.S. 467 (1991) ........................................................................ 20

*McDermott ex rel. NLRB v. Ampersand Pub., LLC*, 593 F.3d 950 (9th Cir. 2010) ....... 15

*Nelson v. Campbell*, 541 U.S. 637 (2004) ....................................................................... 14

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................... 12, 13

*Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017) ....................................................... 30

*Purkey v. United States*, 964 F.3d 603 (7th Cir. 2020) ............................................. passim

*Roundtree v. Krueger*, 910 F.3d 312 (7th Cir. 2018) ................................................. 21, 29

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) .................................................................... 7

*United States v. Davis*, 139 S. Ct. 2319 (2019) ................................................................ 7

*United States v. Hall*, 152 F.3d 381 (5th Cir. 1998) ................................................. passim

*United States v. Hall*, 455 F.3d 508 (5th Cir. 2006) ......................................................... 7

*United States v. Hendrix*, 509 F.3d 362 (7th Cir. 2007) .................................................. 50

*United States v. Holland*, 1 F.3d 454 (7th Cir. 1993) ...................................................... 13

*United States v. Thompson*, 735 F.3d 291 (5th Cir. 2013) ........................................ passim

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1998) .................................................. 23

*Venckiene v. United States*, 929 F.3d 843 (7th Cir. 2019) ................................................. 4

*Webster v. Daniels*, 784 F.3d 112  (7th Cir. 2015) ............................................................ 9

*Williams v. Chrans*, 50 F.3d 1358 (7th Cir. 1995) ............................................... 12, 13, 56

iv

## Federal Statutes and Rules

18 U.S.C. § 3593(f) ........................................................................55

28 U.S.C. § 2255(h) ........................................................................20

28 U.S.C. § 2255(h)(1) ....................................................................26

28 U.S.C. § 2255(f)(1) .....................................................................11

## Other Authorities

*United States v. Wheeler*, No. 18-420 (Sup. Ct.), 2018 WL 5017116
(denied Mar. 18, 2019) ............................................................22

**INTRODUCTION**

Orlando Hall was convicted and sentenced to death more than 25 years ago for the brutal kidnapping, repeated rape, and murder of a 16-year-old girl—a "heinous, cruel, and depraved" crime. *United States v. Hall*, 152 F.3d 381, 406 (5th Cir. 1998). Since then, he has challenged his conviction and sentence through a direct appeal, a motion under 28 U.S.C. § 2255, applications for successive Section 2255 motions, and a (different) petition under 28 U.S.C. § 2241. He has been a party to extensive litigation challenging the federal government's execution protocol. Hall also filed suit in the District of Columbia on November 3, seeking to enjoin his execution, which on September 30 was scheduled for November 19, 2020. As of yet, no federal court has granted Hall criminal or civil relief.

Seven days before his scheduled execution—and 43 days after receiving notice of that date—Hall filed this (his second) Section 2241 petition and sought to stay his execution. In his petition, Hall claimed that: (1) the government's use of its peremptory challenges at his trial 25 years ago violated *Batson*, and (2) a 2011 statistical analysis showed that the federal death penalty was applied in a racially disproportionate manner.

On November 17, 2020, the district court denied Hall's last-minute stay motion in this case. The court explained that, to obtain a stay, Hall must make a "strong showing" that (1) a structural problem with Section 2255 prevented him from

1

raising his belated claims, and that (2) he would be entitled to relief on the merits. R.18 at 2.[1] Hall could make neither showing. *Id.* He also failed to show that he was diligent in pursuing his claims. R.18 at 2.

Hall appeals and seeks another stay—his second such request to this Court this week. This Court should deny his request because Hall has not shown this Court that he is entitled to stay his execution. First, Hall delayed in raising these claims, sitting on them for years before bringing them seven days before his scheduled execution. His delay is particularly inexcusable because all the facts underlying his claims existed many years ago and were readily available to him. His contention that he lacked both the incentive and resources to pursue them rings hollow given the fact that he was aggressively litigating other claims in different courts across three federal circuits—including a separate Section 2241 petition in the district court.[2] His delay alone warrants denying his eleventh-hour request for a stay.

Second, Hall fails to make a strong showing of likely success on the merits of his claims for three, independent reasons. *First*, his successive petition is an abuse of the writ. *Second*, the district court correctly held that Hall cannot resort to the savings clause, 28 U.S.C. § 2255(e), because he cannot show that Section 2255 was

---

[1] "R." citations are to the Section 2241 proceedings below.

[2] The district court correctly dismissed that petition, and a few hours ago, this Court affirmed the dismissal and declined to issue a stay of execution. *See Hall v. Watson*, No. 20-3216 (7th Cir.)

"inadequate or ineffective" for these claims. *Third*, his claims are fundamentally meritless.

All of these reasons support denying a stay, and the balance of equities leads to the same conclusion. More than 25 years after Hall's "brutal killing of an innocent 16-year-old[,] . . . [i]t is time—indeed, long past time—for these proceedings to end." *In re Hall*, 2020 WL 6375718, at *6.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 2241. Hall contends that this Court has jurisdiction under 28 U.S.C. §§ 1291 and 2241(a) because he says that the district court entered a "final judgment denying his petition for a writ of habeas corpus under 28 U.S.C. § 2241." Br. at 4. That is incorrect; the district court merely denied Hall's motion to stay his execution pending resolution of his Section 2241 petition. R.18 at 2, 21. The Government does not, however, contest this Court's jurisdiction. *See, e.g.*, *Venckiene v. United States*, 929 F.3d 843, 853 (7th Cir. 2019).

**ISSUES PRESENTED FOR REVIEW**

I. Is Hall entitled to a last-minute stay based on claims he raised only seven days before his scheduled execution despite knowing about them for years?

II. Can Hall obtain a stay of execution where his petition is barred as an abuse of the writ, not cognizable, and contains only meritless claims?

**STATEMENT OF THE CASE**

A. Hall made a *Batson* challenge at trial but did not seek review of the district court's ruling in his appeal.

In September 1994, Hall and his coconspirators, in retaliation for a drug debt, kidnapped, gang-raped, beat with a shovel, gagged, soaked in gasoline, and buried alive an innocent 16-year-old girl—the little sister of one of the men who owed Hall money for marijuana. *See Hall*, 152 F.3d at 389-90. The details of his crimes are recounted in detail in prior opinions and in the government's brief in Hall's other appeal before this Court. *See id.* (*See Hall v. Watson*, No. 20-3216.)

Charged with interstate kidnapping resulting in death, among other offenses, Hall proceeded to trial. *Hall*, 152 F.3d at 389. During jury selection, he challenged the government's use of peremptory strikes, alleging that it exercised its strikes in a racially discriminatory manner. R.1-11 at 6. Judge Means considered Hall's arguments and the government's race-neutral reasons for striking particular venire members, and he determined that Hall's *Batson* challenge should be

overruled. R.1-11 at 7-14. The jury found Hall guilty and, following separate penalty proceedings, recommended a sentence of death. *Hall*, 152 F.3d at 390. The district court imposed that sentence. *Id.*

On appeal, Hall challenged his conviction and sentence on 11 grounds. *Id.* at 390-91. Although he had preserved the *Batson* challenge in the district court, he did not ask the Fifth Circuit to review the district court's ruling. *See id.* His decision to forego review of that claim, however, did not result from inattention to jury selection as a means of challenging his conviction, as he argued that "[t]he district court committed reversible error by denying several of his challenges for cause to certain venirepersons, thereby forcing him to utilize his peremptory challenges to keep these individuals off the jury." *Id.* at 406. The Fifth Circuit considered, and rejected, that and all other claims of error Hall made. *See id.* at 391-427. The Supreme Court denied certiorari. *Hall v. United States*, 526 U.S. 1117 (1999).

B. Hall's Section 2255 motion did not assert *Batson* error but advanced a claim that statistical studies showed racial discrimination in the administration of capital punishment.

Once his conviction and sentence became final, Hall filed a Section 2255 motion. By 2002, he had amended his motion twice to assert a total of 12 claims for relief. *Hall v. United States*, No. 4:00-CV-422-Y, 2004 WL 1908242, at *4 (N.D. Tex. Aug. 24, 2004). Hall did not raise any claim related to *Batson* error, either directly or related to a claim that trial counsel was ineffective in investigating or litigating

6

such a claim. *See id.* He did allege, however, that his "rights under the Fifth and Eighth Amendments were violated by the racially discriminatory effects of the federal capital punishment scheme[.]" *Id.*

The district court considered Hall's claim that the government "used ethnicity as a basis for seeking the death penalty against African-Americans like himself." *Id.* at 36. The court determined that Hall's use of statistics was "insufficient to establish a *prima-facie* selective-prosecution case." *Id.* Both it and the Fifth Circuit denied a certificate of appealability. *United States v. Hall*, 455 F.3d 508, 510, 523 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 2029 (2007).

C.  Hall filed additional collateral challenges to his conviction and sentence and sought stays of his execution.

Since 2016, Hall has been collaterally attacking his criminal judgment under Sections 2255 and 2241. He first challenged his death sentence by seeking authorization to file a successive Section 2255 motion attacking his firearm conviction under *Johnson v. United States*, 135 S. Ct. 2551 (2015). *See In re Hall*, No. 16-10670 (5th Cir. June 20, 2016). When that failed, he filed the same claim in a Section 2241 petition. *Hall v. Daniels*, No. 2:17-CV-00176-JPH-DLP, Doc. 1 (S.D. Ind. Apr. 19, 2017). That court stayed its proceedings while Hall (again) sought authorization to file a successive Section 2255 motion, this time based on *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), and then *United States v. Davis*, 139 S. Ct. 2319 (2019). *See In re Hall*, 2020 WL 6375718, at *2.

7

On September 30, 2020, following the completion of a lengthy process of revising the federal execution protocol and the lifting of a stay related to the previous protocol, the Bureau of Prisons notified Hall of his scheduled execution for November 19, 2020. Hall sought a stay of execution from the Fifth Circuit, which denied Hall's application for a successive Section 2255 motion and, accordingly, denied his stay motion. *See id.* at *7. Hall then returned to his pending Section 2241 petition, but that court, too, denied a stay. *Hall v. Daniels*, No. 2:17-CV-00176-JPH-DLP, Doc. 48 (SD Ind. Nov. 14, 2020). This evening, this Court affirmed the district court's dismissal of Hall's first Section 2241 petition and similarly denied a stay. *See Hall v. Watson*, No. 20-3216 (7th Cir.).

On November 3, 2020, more than a month after receiving notice of his scheduled execution, Hall filed suit in the District of Columbia and sought a stay. The district court denied a stay on November 16, determining that Hall was unlikely to succeed on his claims. *Hall v. Barr, et al.*, No. 1:20-CV-3184, slip op. at 5 (D.D.C. Nov. 16, 2020). Hall has appealed that decision.

D. Hall filed a second Section 2241 petition and accompanying motion to stay, which the district court denied.

Finally, just seven days before his scheduled execution and while his first Section 2241 was still pending, Hall filed this second Section 2241 petition. R.1. In it, he raised two claims. First, he alleged that the government made race-based peremptory strikes to certain venirepersons, in violation of *Batson v. Kentucky*, 476

8

U.S. 79 (1986). R.1 at 19-36. Second, he claimed that statistics suggested that his capital sentence was imposed in a racially discriminatory manner. *Id.* at 37-48.

The district court denied Hall's stay motion because he did not make a strong showing that he is likely to succeed on the merits of his claims. *See* R.18. Because Hall predicated his claims on *Webster v. Daniels*, 784 F.3d 112 (7th Cir. 2015) (en banc), the court considered whether his two claims met *Webster*'s criteria for presenting a claim based on "new evidence" under Section 2241. *Id.* at 11. Specifically, the court considered whether (1) the evidence sought to be presented existed at the time of the original proceedings, (2) the evidence was unavailable to Hall at the time of trial despite diligent efforts to obtain it, and (3) the evidence showed that Hall was categorically ineligible for a particular punishment. *Id.* at 11 (quoting *Webster*, 784 F.3d at 1140 n.9.).)

With these criteria in view, the district court pointed to publicly available information—*e.g.*, news articles, court opinions, underlying briefs—to conclude that "Hall's *Batson* claims were available through diligent search during Mr. Hall's § 2255 proceedings." *Id.* at 12-14. His claim, therefore, did not involve "new evidence" that allowed him to access Section 2241 through *Webster*. And, thus, the court concluded that Hall did "not demonstrate a strong likelihood that he can show § 2255 was "structurally unavailable." *Id.* at 15 (citing *Purkey v. United States*, 964 F.3d 603, 615 (7th Cir. 2020)).

As for Hall's claim concerning racial discrimination in the application of the death penalty, the district court pointed out that he was relying on a 2011 study that examined death penalty cases brought in federal districts in Texas from 1988 to 2010. *Id.* at 15-16. It concluded that his use of the statistics failed to satisfy the first *Webster* criterion—that the "evidence sought to be presented must have existed at the time of the original proceedings." *Id.* (quoting *Webster*, 784 F.3d at 1140 n.9).) And to the extent any of the underlying data predated Hall's trial, he could not satisfy the second criterion because the evidence was available to him. *Id.* at 17. In fact, the court noted that Hall relied on some of that data in support of his earlier claim in his Section 2255 motion. *Id.* Because Hall failed to make a strong showing that his discriminatory application claim relied on any evidence that existed but was unavailable to him at the time of his trial or Section 2255 proceedings, the court concluded that he failed to show likelihood of success on the merits. *Id.* Finally, the district court concluded that Hall could not show that he was categorically ineligible for the death penalty, the final *Webster* criterion. *Id.* at 17-18.

The district court explained that allowing Hall's last-minute, successive petition to proceed under Section 2241 would frustrate Congress's statutory framework. *See id.* at 19 (describing the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 105, 110 Stat. 1214, 1220). AEDPA

imposes strict time limits and restricts the filing of successive collateral attacks. *See* 28 U.S.C. §§ 2255(f)(1), (h). "To allow Mr. Hall to now raise these claims in a § 2241 petition would undermine the structure of § 2255." R.18 at 20.

Finally, balancing the remaining stay factors, the district court concluded that "Hall's delay in bringing his claims . . . weighs heavily against granting a stay." *Id.* at 21.

## SUMMARY OF THE ARGUMENT

This Court should deny Hall's motion to stay his execution because his last-minute successive Section 2241 petition is procedurally barred and meritless. The facts underlying Hall's two claims have existed for many years, and he exercised no diligence in presenting them to a court prior to his last-minute petition. Despite having preserved a *Batson* challenge during trial, Hall never raised it in his direct appeal, Section 2255 motion, or any of his other collateral attacks. With respect to his claim of racial disparity in the administration of the death penalty, Hall litigated that in his Section 2255 motion and lost. The 2011 statistical analysis on which Hall now relies was based on historical data that existed long before that and could have been obtained by Hall, and is not new evidence that can excuse his delay and warrant the extraordinary relief of a last-minute stay of execution. Although Hall portrays his delay in terms of months, not years, that, too, is far too long to justify a last-minute stay.

Hall's delay is alone sufficient to justify denial of his stay motion, but multiple additional grounds exist for its denial and for affirmance of the district court. Hall can make no strong showing that he would prevail on the merits. His *Batson* claim is premised on accusations that ignore or misstate much of the voir dire record, which (as his army of counsel has implicitly admitted by never raising a *Batson* argument in 25 years of appellate and collateral litigation) establishes definitively that no *Batson* violation occurred. And his statistical claim cannot, he admits, establish anything about his own trial. His Section 2241 claims thus constitute an abuse of the writ, are not cognizable under the savings clause, and lack merit.

Hall is not entitled to a stay. This Court should deny his motion and affirm the judgment of the district court.

## APPLICABLE LEGAL STANDARDS

A stay of execution is a form of equitable relief to which the standards for a preliminary injunction generally apply. *See Williams v. Chrans*, 50 F.3d 1358, 1360 (7th Cir. 1995); *see Nken v. Holder*, 556 U.S. 418, 434 (2009). A capital prisoner seeking a stay of execution pending additional legal proceedings bears the burden of demonstrating: (1) he has a significant likelihood of success on the merits in the pending legal proceedings; (2) he will suffer irreparable harm if a stay is not granted; and (3) the balance of equities (the harms to the prisoner and the government, as well as the interests of the public at large) weigh in favor of a stay.

*Lambert v. Buss*, 498 F.3d 446, 447 (7th Cir. 2007); *cf. United States v. Holland*, 1 F.3d 454, 456 (7th Cir. 1993).

This Court has established several guidelines for applying the relevant equitable rules to an application for a stay of execution. First, the requirement that the movant "make a '*strong* showing' of probable success on the merits" is a demanding one—a court may not grant a stay even if it is based on a "significant possibility" of success or a finding "that evaluating [the defendant]'s arguments will take more time." *Lee v. Watson* (*Lee I*), No. 19-3399, 2019 WL 6718924, at *1 (7th Cir. Dec. 6, 2019) (unpublished) (quoting *Nken*, 556 U.S. at 434) (emphasis added).[3]

Second, "[t]he prospect of irreparable injury" is "not itself enough" to justify a stay of execution, *Lee I*, 2019 WL 6718924, at *1, because irreparable injury is generally taken as a given in capital cases, *Chrans*, 50 F.3d at 1360.

Third, as for the remaining equitable considerations, when a defendant's conviction and sentence have been upheld on direct appeal and collateral review, a court must recognize the government's "strong interest in proceeding with its judgment" and must consider "the extent to which the inmate has delayed unnecessarily in bringing the claim" on which a stay application is based. *Lambert*,

---

[3] Notably, Hall invites this Court to stay his execution based on a more relaxed standard and one that this Court rejected in *Lee I*. *See* Mot. at 9-10, 12-13 (claiming repeatedly he has a "significant possibility" of succeeding in his appeal).

498 F.3d at 452 (quoting *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004)); *see Bucklew v. Precythe*, 139 S. Ct. 1112, 1133-34 (2019). Because the government has a "significant interest in enforcing its criminal judgments, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Lambert*, 498 F.3d at 452 (quoting *Nelson*, 541 U.S. at 650).

Given these standards, this Court has identified "two critical factors in evaluating whether a stay of execution should issue" — "whether the inmate shows a significant probability of success on the merits," and "whether the inmate has delayed unnecessarily in bringing the claim." *Id.* at 451. Absent a strong showing of both, a capital defendant is not entitled to a stay of execution. *Id.*; *see Barr v. Lee*, 140 S. Ct. 2590, 2591-92 (2020) (per curiam); *Lee I*, 2019 WL 6718924, at *1-2.

## DISCUSSION

1. Hall's inexcusable delay in bringing a last-minute stay motion warrants its denial.

Hall filed his second Section 2241 petition just *seven days* before his execution date. Those dilatory tactics alone warrant denial of his stay motion. As the district court recognized, Hall's delay "weigh[ed] *heavily* against granting a stay." R.18 at 2, 21. Hall does not argue that he was diligent in filing his claims in the district court on the eve of his execution. *See* Br. at 41. He merely contends that the district court gave his delay "far too much weight[.]" *Id.* It did not.

14

The Supreme Court has repeatedly cautioned that last-minute stays or injunctions of federal executions "should be the *extreme* exception, not the norm." *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (per curiam) (quotation marks omitted; emphasis added). As a result, the Supreme Court has recognized that delay may be a dispositive factor that dooms the belated motion. *See Bucklew*, 139 S. Ct. at 1134 (noting that the "'last-minute nature of an application' that 'could have been brought' earlier . . . 'may be grounds for denial of a stay'" or other equitable relief) (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)).[4] The district court's consideration of Hall's delay was thus consistent with instructions from the Supreme Court.

Hall's claims certainly "could have been brought" much earlier, as they are based on events that occurred 25 years ago. Hall could have included these claims along with the 11 others he raised on direct appeal, but he did not. *See Hall*, 152 F.3d at 388-427. He raised one of them in his Section 2255 proceeding, and he lost. Even more, he could have asserted these claims in the first Section 2241 petition he filed in 2017, but he did not. And, although he still would have been dilatory, he

---

[4] Hall cites out-of-circuit authority for the proposition that this Court cannot justify denying his stay based solely on his delay. Br. at 41 (citing *Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir. 2011), and *McDermott ex rel. NLRB v. Ampersand Pub., LLC*, 593 F.3d 950, 965 (9th Cir. 2010). Those cases, however, are not analogous to a last-minute application to stay an execution, a context in which the Supreme Court has clearly said otherwise. *See Bucklew*, 139 S. Ct. at 1134.

could have moved to amend that first petition soon after receiving notice of his scheduled execution on September 30, 2020, rather than waiting until *seven days* before the noticed date.

The central facts about jury selection in Hall's case were known to him during his direct appeal more than two decades ago. Indeed, Hall raised a *Batson* challenge to the government's strikes during jury selection, which the district court overruled. R.1-11. Hall's decision to forego appellate review of that ruling was not an oversight, as he conceded below that his *Batson* claim would have been a "non-starter" and a "sure loser." R.15 at 7 n.3, 13. Nor did Hall raise a *Batson* claim in his Section 2255 motion or any of the other collateral proceedings he initiated.

Hall argued below that his delay was excused because his "sure loser" claim did not become viable until later decisions from the Supreme Court and Fifth Circuit finding *Batson* error in other cases. That argument fails for several reasons, including that neither case—both involving pre-*Batson* trials—suggests, much less makes the necessary strong showing, that Hall's jury was selected in a racially discriminatory manner post-*Batson*. But even accepting Hall's contention that he could not have alleged a *Batson* claim until 2009—the date of the latter decision— Hall has no excuse for waiting another 11 years, until the eve of his noticed execution, to file his petition. Indeed, even on Hall's telling, the facts underlying

his *Batson* claim were completely available to him well before 2017, when he initiated his first Section 2241 proceeding.

Similarly, Hall also has not been diligent in realleging his claim of racial discrimination in connection with the decision to seek and secure the death penalty for his offense. Hall raised—and lost—that claim in his first Section 2255 proceeding in 2004. *Hall*, 2004 WL 1908242, at *36-37.

Hall now tries to rely on "new" statistics, but the particular figures he points to were available by 2011. Hall cites the subsequent *report* of those figures in August 2020 as "new evidence" that justifies raising this claim now. Br. at 28-29. But his argument fails, first, because the data underlying that analysis have existed for nearly a decade, and Hall's counsel could have secured this analysis (or an equivalent) long ago through reasonable diligence. Indeed, the 2011 declaration he points to makes it clear that the analysis was performed at the request of another inmate, and Hall easily could have sought it himself. *See* R.1-7 at 2 ¶ 2. Moreover, if the mere *analysis* of historical data that has long been available constitutes new evidence, as Hall contends, an inmate could wait until a scheduled execution looms before performing new analyses (or, at least, obtaining analyses not yet known to him) and then claim to have found "new evidence" warranting postponement of his execution. That would make late stays routine, not the extreme exception the Supreme Court says they are. Moreover, even accepting

17

Hall's belief that he was unable to raise this claim before August 2020, he has not explained why he delayed three months more to bring his claim.

Again, Hall provides no excuse for his delay in this Court. Below, he only cited as reasons for not bringing his claims sooner that (1) he lacked any incentive to make them while a temporary injunction prevented his execution, and (2) he lacked the resources to present these claims. R.16-1 at 4-6. With respect to his first excuse, Hall provides no authority validating his apparent belief that an injunction preventing his execution released him from his obligation to diligently pursue relief. In any event, Hall's counsel were aware of the federal government's work to revise the execution protocol to which his prior injunction related, and were aware that the government had been scheduling executions pursuant to the revised protocol since mid-2019. And as it relates to Hall's *Batson* claim, his argument about an absence of incentive is patently wrong, as a prisoner always has incentive to challenge his *conviction*, even while he is not under an imminent threat of execution.

In any event, Hall's excuses—that he lacked both the incentive and resources to challenge his conviction and sentence over the past several years—are belied by the fact that he was *actually challenging* his conviction and sentence in the Fifth Circuit and the Southern District of Indiana during this time. And, in a particularly egregious example of delay, from September 30, 2020, when he received notice of

his execution[5] until November 11, when he filed this successive Section 2241 petition, Hall litigated claims in both of those courts *and* initiated a new lawsuit in the District of Columbia.

That Hall has chosen not to avail himself of multiple opportunities to seek relief until now—on the eve of his execution date—suggests that his petition is a delay tactic rather than a reflection of meritorious claims. This Court's observations about dilatory tactics in *Lee I*, 2019 WL 6718924, at *1, demand that Hall's stay motion be denied. Like Hall, Lee delayed filing a Section 2241 petition. *Id*. But unlike Hall, Lee's petition was filed at least two months before the scheduled execution date—not *seven days* prior. *Id.* In vacating a stay of execution, this Court pointed out that Lee waited to seek relief under Section 2241 until four years after learning of evidence "he characterize[d] as newly discovered" and two months after receiving notice of his execution date. *Id.* at *2. Recognizing that a district court would want more than the *months* that Lee's belated motion permitted to adjudicate his claims, this Court explained that Lee could not rely on the effects of his delay to justify postponement of his execution. *Id.* Hall's delay, which allowed

---

[5] Notably, on the day Hall received notice of his execution date, his attorneys issued a statement in which they alleged that Hall's jury was selected in a racially discriminatory manner. Marcia C. Widder & Robert C. Owen, *Orlando Hall Attorney Statement Regarding Execution Date Announcement* (Sept. 30, 2020), https://www.fd.org/news/orlando-hall-attorney-statement-regarding-execution-date-announcement). Yet he contends that he could not have alleged that in a court filing until 43 days later.

19

a mere *seven days* for respondents to prepare briefing and for the district court to render a decision, is even more extreme and justifies denying his stay motion. *See Bucklew*, 139 S. Ct. at 1134.

2. Hall has no chance of succeeding on the merits.

A. Hall's successive Section 2241 petition is an abuse of the writ.

In most cases, a federal prisoner may collaterally attack his judgment only by motion under Section 2255. *Bourgeois v. Watson*, 977 F.3d 620, 632 (7th Cir. 2020). AEDPA limits the availability of successive Section 2255 motions to cases involving either (1) persuasive new evidence that the prisoner was factually not guilty of the offense, or (2) a new rule of constitutional law made retroactive by the Supreme Court to cases on collateral review. 28 U.S.C. § 2255(h). And even before Congress codified AEDPA, federal courts imposed restrictions on a prisoner's ability to file multiple Section 2255 motions or Section 2241 petitions. *See Felker v. Turpin*, 518 U.S. 651, 664 (1996) (describing the abuse-of-the-writ doctrine).

A prisoner abuses the federal writ of habeas corpus by "raising a claim in a subsequent petition that he could have raised in his first, regardless of whether the failure to raise it earlier stemmed from a deliberate choice." *McCleskey v. Zant*, 499 U.S. 467, 489 (1991). Post-AEDPA, this Court has applied this doctrine to uphold

the dismissal of successive Section 2241 petitions seeking to raise claims that could have been raised earlier. *E.g.*, *Roundtree v. Krueger*, 910 F.3d 312, 314 (7th Cir. 2018).

Hall abused the writ here. He filed his first petition in 2017. He could have raised therein both of the claims he presented in his successive Section 2241 petition last week. And he had no reason for not doing so. Even by his own accounting, all of the supporting "facts" existed by 2011. Hall's "second petition is an abuse of the writ," subject to summary dismissal. *Anraout v. Marberry*, 351 F. App'x 143, 144-45 (7th Cir. 2009). Hall thus cannot make a strong showing that his petition will carry the day.

B.  Hall's claims are not cognizable under Section 2241.

The district court applied this Court's precedents correctly in finding that Hall could not resort to the savings clause. R.18 at 7-20.

This Court has decided three central cases applying the savings clause. *See In re Davenport*, 147 F.3d 605 (7th Cir. 1998); *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); *Webster*, 784 F.3d at 1123. Hall only relies on *Webster* here. In that case, the defendant (and Hall's coconspirator) obtained new evidence in support of his intellectual-disability claim—evidence that existed at the time of his trial but had been purportedly unavailable to him. *Id.* at 1132-34. Because Webster could not satisfy Section 2255(h)'s gatekeeping requirements for a successive motion, he filed a Section 2241 petition claiming that he was categorically ineligible for the

death penalty based on that new evidence. *Id.* at 1134-35. In that "rare case," the en-banc Court held that there was a "structural problem" in Section 2255, so Webster could invoke the savings clause. *Webster*, 784 F.3d at 1135-44.[6]

While these cases do not create "rigid categories delineating when the [savings clause] is available," *Purkey*, 964 F.3d at 614, binding precedent "holds unambiguously" that a Section 2241 petition may not proceed under the savings clause "absent 'a compelling showing' that it was 'impossible' to use § 2255 to cure the defect identified in the § 2241 petition." *Lee v. Watson* ("*Lee II*"), 964 F.3d 663, 666 (7th Cir. 2020), *cert. denied*, No. 20-5032, 2020 WL 3964235 (July 14, 2020). At a minimum, "there must be something 'structurally inadequate or ineffective about section 2255 as a vehicle' for the arguments raised in the § 2241 petition." *Id.* That is, "the words 'inadequate or ineffective,' taken in context, must mean something more than unsuccessful." *Purkey*, 964 F.3d at 615.

i. Hall could have raised his *Batson* claim under Section 2255.

Hall could have, but chose not to, raise his *Batson* claim on direct appeal or in his first Section 2255 motion. *Batson*, of course, was on the books before Hall ever stood trial for brutalizing Lisa Rene. Hall's lawyers raised a *Batson* challenge at

---

[6] In the government's view, the savings clause does not permit a defendant to challenge his criminal judgment under Section 2241. *See* Pet. for Cert., *United States v. Wheeler*, No. 18-420 (Sup. Ct.), 2018 WL 5017116 (denied Mar. 18, 2019). The government recognizes this Court's binding precedent and notes its position for issue-preservation.

trial, R.1 at 14, and his codefendant Webster (tried separately) raised a *Batson* claim as well, *United States v. Webster*, 162 F.3d 308, 350 (5th Cir. 1998). In his direct appeal, Hall opted to press a different claim of jury-selection error but made no issue of the *Batson* ruling. In a declaration to the district court, one of Hall's long-time attorneys explained that decision as reflecting the reality that "part of appellate counsel's job is 'winnowing out weaker claims on appeal and focusing on those more likely to prevail…'" R.15-2, at 3.

And Hall raised no *Batson* claim under Section 2255, though he could have done so. Hall had access to the facts underlying his *Batson* claim before he filed his second amended Section 2255 motion (in 2002), and the district court's order puts to rest Hall's arguments to the contrary. *See* R.18 at 12-15. The "Sparling manual" was discussed in a story by the *Dallas Morning News* in 1986. R.18 at 12 n.2. The *Miller-El* and *Reed* trials were finished long before Hall was indicted. And a separate article "cited by Mr. Hall" and published in 2002 discussed "AUSA Macaluso's ties to the Sparling Manual." R.18 at 13. All of that evidence was available months before Hall filed his final, amended Section 2255 motion in September 2002. *See also Hall v. United States*, 4:00-CV-422-Y, Doc. 1068 (N.D. Tex. Sept. 25, 2002) (granting Hall's motion to amend and docketing his motion as filed on September 18, 2002). And, as Hall admits, the Supreme Court itself discussed

the Sparling Manual during the pendency of Hall's initial Section 2255 proceeding. *See* R.18 at 12.

As the district court explained, "Mr. Hall's current *Batson* claim does not involve evidence that is 'newly discovered' but new lawyers looking at the same evidence that has been available to Mr. Hall for many years." R.18 at 14. Because Hall could have included his *Batson* claim in his first Section 2255 motion, there "was nothing structurally inadequate about § 2255 as a vehicle," and "[t]he savings clause does not apply." *Lee II*, 964 F.3d at 667.

Hall argues that in 2002 he did not have the *decisions* in *Miller-El* or *Reed*, seeking to cast those as "new evidence." Br. at 24. Accepting as true Hall's doubtful contention that those decisions turned his "sure loser" into a winner, Hall was not diligent in relying on them, which this Court has required in permitting savings-clause claims based on new evidence. *See Webster*, 784 F.3d at 1146 (explaining that the lower court may proceed to the merits of Webster's claim only if it concludes that the relevant records were previously "unavailable and all due diligence was exercised"). *Miller-El* and *Reed* were published more than a decade ago, and Hall cannot explain why he failed to pursue this *Batson* claim in his first Section 2241 petition. Nor can he explain why he further delayed until seven days before his scheduled execution.

Hall argues that the court below misperceived the availability of information about Macaluso and the Sparling Manual because it relied on Internet research, which was not as prevalent during Hall's original proceedings. That argument is a red herring. Although the district court cited to the information's availability on the Internet today, the sources of the information recounted were readily available to Hall from 1995 through 2005—e.g., an Associated Press report and a New York Times article from 2002. The Internet was undoubtedly available to Hall in 2002, but more to the point, these press reports, by design, were intended to be widely disseminated and could easily found by anyone looking for them. *See Lee II*, 964 F.3d at 667 (explaining that evidence cannot be "newly discovered" under *Webster* when it was in a publicly available court record).

Hall intimates that "reasonable diligence" required no more than that he read *Miller-El* and *Reed*—more than a decade after their publication—which provided the information he claims now as "new evidence." Br. at 26. But the bar for reasonable diligence is not nearly so low. Under Hall's theory, any addition of hard copy materials to the internet, or mention of pre-existing facts in a new judicial decision, could support a Section 2241 action based on "new evidence" whenever counsel happens to encounter the newly publicized information. That approach would permit the "never-ending series of reviews and re-reviews

(particularly since there is no numerical limit for section 2241)" that this Court has foreclosed. *Purkey*, 964 F.3d at 615.

Hall's reliance on *Webster* breaks down further at the "most important[]" step in the *Webster* analysis. *Webster*, 784 F.3d at 1140 n.9. Webster's new evidence ultimately proved that he was, as a *categorical* matter, *constitutionally ineligible* for the death penalty. *See id.* at 1125. For Hall, a successful *Batson* claim entitles him only to a new trial and penalty proceeding, after which he could be found guilty and again sentenced to death.

The *Webster* majority also emphasized that Webster relied on constitutional cases that the Supreme Court had decided *after* AEDPA's enactment, and after the conclusion of Webster's direct appeal. As the majority explained, "the fact that the Supreme Court had not yet decided *Atkins* and *Roper* at the time AEDPA was passed" highlighted the "lacuna in [Section 2255]." *Id.* at 1138. By contrast, *Batson* predated AEDPA's enactment, and if Congress had intended to allow defendants to raise *Batson* claims in second or successive Section 2255 motions, it could have said so. Instead, AEDPA limits successive motions to newly discovered evidence that establishes actual innocence by "clear and convincing evidence." 28 U.S.C. § 2255(h)(1). And AEDPA requires petitioners to raise such claims within one year of "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." *Id.* § 2255(f)(4). As

26

the district court explained, R.18 at 18-21, allowing Hall to proceed with a *Batson* claim—raised more than two decades after trial, almost as long after his first Section 2255 motion, and three years after his first Section 2241 petition—would nullify Section 2255's congressionally-mandated limitations. Hall has not (and cannot) point to any Seventh Circuit precedent supporting that result.

      ii.  Hall already litigated—and lost—his remaining claim under Section 2255.

The same analysis applies with full force to Hall's second claim. The district court correctly determined that the statistics Hall presented did not satisfy *Webster*'s three criteria to unlock Section 2241. The Court explained in *Webster* that, first, the purportedly new evidence "must have existed at the time of the original proceedings." 784 F.3d at 1140 n.9. Much of Hall's "new evidence" cannot be seen as "new" because Hall relied on it in his first Section 2255 motion. *See* R.18 at 17; *see also id.* at 6 (describing affidavit from Kevin McNally discussing racial disparities in the application of federal death sentences in cases reaching back to 1988). The balance of Hall's "new" evidence—statistics contained in a declaration prepared in 2011—is, in fact, almost a decade old. Those statistics were compiled at the request of *another* death-row inmate in 2010—demonstrating their

availability to defendants like Hall. R.1 at 40. Unlike Webster, Hall points to no impediment to his having obtained this evidence before now.[7]

In any event, it is not the type of new evidence that warranted relief in *Webster*. *Webster* relied on "records that predate[d] the trial," "found much later, despite diligence on the part of the defense," and that "[bore] directly on the constitutionality of the death sentence." 784 F.3d at 1140. Hall relies on statistical analysis compiled after the government determined to seek the death penalty. The district court was correct to reject his reliance on such "evidence." *See* R.18 at 16. Otherwise, "'there would never be any finality' where a petitioner raises a claim, such as discriminatory application of the death sentence, for which new evidence is regularly created." R.18 at 16 (quoting *Webster*, 784 F.3d at 1140).

As the district court pointed out, nothing about those statistics suggests that Hall would be constitutionally ineligible for the death penalty. R.18 at 18-19. *Webster*'s "most important[]" requirement was that "the evidence . . . show[s] that the petitioner is constitutionally ineligible for the penalty he received." *Webster*, 784 F.3d at 1140 n.9. Hall seemingly concedes that he does meet that requirement —

---

[7] Hall claims that "Counsel for Mr. Hall requested funding for such analysis, but were denied." Br. at 29. The cited source—R.1 at 43—does not support that proposition; instead, there, Hall stated only that his racial-discrimination claim failed before the first Section 2255 court. Hall's counsel's declarations, filed below, also do not support Hall's claim about funding; instead, the Owen declaration describes limited funding for *sentence mitigation* work. R.15-1 at 6-8.

he simply contends that it is not a genuine requirement for passing through Section 2255(e) using *Webster*. Br. at 23. The clear language of *Webster* shows otherwise. Because Hall has not (1) offered evidence that is genuinely new, in the sense that he could not have previously discovered it, and (2) showed that he is categorically ineligible for the death penalty, the district court was correct to reject his reliance on *Webster*. *Id.*

Ultimately, Hall cannot show a structural flaw in Section 2255 that barred him from raising his claims that the federal capital sentencing scheme is biased. To the contrary, Hall's allegation of that very claim during his first round of collateral review disproves his argument. In addition to be non-cognizable, Hall is squarely barred from relitigating it here. *See Roundtree*, 910 F.3d at 314.

Foreclosed under this Court's savings-clause precedents, Hall alternatively asks this Court to craft a new exception to the savings clause for any race-related claims. Br. at 22, 30-31. Hall cites no precedent to support such an atextual result, and none exists. And Hall's argument on this score is based on a hyperbolic descriptions of his own claims. Hall states, for example, that "the evidence that Hall seeks to present would overwhelming[ly] demonstrate that his death sentence was obtained in violation of the Constitution's prohibitions on racial discrimination"; in reality, Hall himself has conceded that the trial record shows no *Batson* violation, and that his additional "evidence" is not based on his own

case.  Br. 30.  Similarly, Hall suggests that he will be "execut[ed] … on the basis of [his] race," but he has pointed to no evidence that his jury considered race, or that any members of his jury bore any racial animus. *Id.* at 31. Hall's claims are thus quite different than those considered by the Supreme Court in *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017), in which a "juror ma[de] a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *Contra* Br. 30.

If Hall could simply return to the district court every few years and file a new Section 2241 petition claiming that further statistics support his already-rejected argument, "what would stop a never-ending series of reviews and re-reviews (particularly since there is no numerical limit for section 2241)?" *Purkey*, 964 F.3d at 615. Hall seeks to return to the days of endless rounds of successive collateral attacks on his criminal judgment. AEDPA prohibits that approach, and the Court has squarely rejected "end-runs" around Section 2255(h). *Bourgeois*, 977 F.3d at 637. Hall's Section 2241 claims are therefore meritless.

C. Even if Hall could proceed via the savings clause, his claims have no merit.

    i. Hall has no chance of success on his newly manufactured, last-minute *Batson* claim.

        a. Hall bases his claim on inflammatory allegations that have no basis in the trial record.

As with his Section 2241 petition, on appeal Hall fails to demonstrate *any* likelihood of success on the merits of his last-minute *Batson* claim. In fact, Hall fails to engage, much less contradict, the government's detailed discussion in its response to his Section 2241 petition and stay motion, which explained that (a) the four-person prosecution team, led by AUSA (later U.S. Attorney) Richard Roper, committed no *Batson* violation, (b) it is unclear what the final racial/ethnic composition of the jury was, so it is speculative at best and inaccurate at worst to repeatedly claim the jury was "all-White," and (c) even if it were "all-White," the reasons for the jury's racial/ethnic makeup were related not to race/ethnicity but rather to legitimate factors largely focusing on various venire members' beliefs (pro and con) about the death penalty. R.12 at 19-35. Lead AUSA Roper explained some of these race-neutral factors to the district court in painstaking detail based on extensive notes he made of each juror's written questionnaire and of each juror's individual voir dire examination. *See id*; R.1-11 at 8-11.

The comprehensive jury-selection record created in this case explains why none of Hall's counsel ever raised—much less prevailed on—a *Batson* claim in any appeal or collateral-review motion in the last 25 years. It also explains why, rather than basing his claim primarily on the actual voir dire record in his case, Hall's argument rests primarily on innuendo he draws from *Miller-El* and *Reed* relating to pre-*Batson* jury-selection practices in the Dallas District Attorney's Office and Macaluso's role in jury selection in those cases before he later joined the U.S. Attorney's Office.

The Department of Justice, including the U.S. Attorney's Office for the Northern District of Texas, unequivocally condemns any racially discriminatory jury-selection process, including the Dallas District Attorney's Office's pre-*Batson* voir dire practices as described in *Miller-El*. The Department emphasizes its commitment to fairness in jury selection, including its commitment to following the requirements of *Batson* and its progeny. But Hall's argument based on *Miller-El* and *Reed* does not come close to establishing any *Batson* violation in his trial and is meant to divert this Court's attention from the actual trial record, which—as Hall's counsel has known ever since declining to raise a *Batson* challenge on direct appeal—demonstrates unequivocally that no *Batson* violation occurred.

b.  Hall's claim relies on a completely inaccurate retelling of the trial record, including the views of the Black venire members who were struck and the non-Black venire members to whom he compares them.

Aside from relying on *Miller-El* and *Reed*, Hall's argument either minimizes, omits, or mischaracterizes the statements and views of the potential jurors at issue as well as the reasons AUSA Roper provided to explain his use of peremptory strikes.

A four-member federal prosecution team tried Hall, and AUSA Roper led that team. The team also included long-time appellate AUSA Delonia Watson, AUSA Chris Curtis, and AUSA Macaluso. As lead counsel, AUSA Roper handled a substantial amount of the voir dire; completed the prosecution's peremptory strike list; presented all of the argument on the *Batson* challenges and did so from his own notes; and provided voluminous, legitimate, and credible reasons for the strikes at issue. *See, e.g.*, R.1-15 (prosecution strike list); R.1-11 (*Batson* hearing). Longtime district judge Means presided over the case, watched the voir dire, heard the *Batson* challenges and AUSA Roper's explanations for the strikes at issue, and found Roper's explanation for his strikes credible and valid under governing caselaw. R.1-11. And, although Hall claims his attorneys did not have an opportunity to respond to Roper's explanation, the fact is that his attorneys did not request any opportunity and did not contradict Roper's statements and

observations—lending further credence to Roper's explanations and the district court's ruling. Br. at 32; R.1-11 at 8-11.

Out of the four Black venire members AUSA Roper struck, Hall does not contend that AUSA Roper violated *Batson* in striking two—Frances Miller and Lawrence Barrett—because of their strong opposition to the death penalty. R.1 at 36 n.12. Rather, he takes issue with AUSA Roper's decision to strike two other Black venire members, Amy Evans and Billie Lee. Br. at 34-36. But reviewing the statements of all four potential jurors and AUSA Roper's explanations for striking them easily demonstrates that all four strikes were justified.

*Frances Miller.* Miller checked the box on the questionnaire indicating, "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it I could assess it under the proper set of circumstances"; she further stated that she was "basically opposed to the death penalty." R.13 at 132, 134. She also said in the questionnaire that "no one has the right to kill another person" and admitted that she did not know if she could ever vote to impose the death penalty. *See id.*

The district court noted these questionnaire answers during voir dire and followed up with her on them, and she responded, "my tendency would be to go to life without parole, and the circumstances would have to be very crucial before I could consider the death penalty, because I just don't believe in the death

penalty." R.13 at 141. Based on her beliefs, the court "presume[d] the government" would challenge her for cause, and the government did, explaining that Miller's voir dire answers indicated she was not sure she could ever vote to impose the death penalty and that, if she were ever to do so, she would need to have found several aggravating factors, which is more than the law requires. R.13 at 142-44. After lengthy discussion in which the court was "thinking out loud" about the question, the court—which was conservative in its decision to strike any potential jurors for cause, likely because the parties had 20 peremptory strikes each—denied the motion. R.13 at 142-45.

In response to the *Batson* challenge as to Miller, AUSA Roper provided detailed reasons based on his own notes and focused on her opposition to the death penalty and the strong possibility she could never vote to impose it:

> In her questionnaire she said she was against the death penalty but could assess it in the proper circumstances, though she felt like she couldn't give the death penalty if life without the possibility of release was an option. Then she said their living and enduring the punishment of never being able to be free would be more harsh punishment. She said, "I feel at the time death is an easy escape and no one has the right to kill another person." She—and in her testimony she said that she was tending to lean for life without release. She also said, "I don't know. I don't think I could do it. I just don't know that I could do it." And I noticed that there were long pauses in those responses when we asked her about that. She said she was basically opposed to the death penalty, and she believed that living in prison was a worse punishment.

So the reason we struck Ms. Miller was because her views on the death penalty we believed substantially impaired her consideration for the death penalty.

R.1-11 at 10-11.

Hall does not argue that these reasons were not race-neutral or were impermissible under existing caselaw. *See Davis v. Ayala*, 576 U.S. 257, 273-74, 279 (2015) (recognizing that a juror's hesitancy to impose the death penalty and demeanor are race-neutral justifications); *see also United States v. Thompson*, 735 F.3d 291, 297 (5th Cir. 2013), *as modified* (Nov. 18, 2013) ("This court has routinely found demeanor to be a race-neutral justification.").

Based on AUSA Roper's explanation, the district court rejected the *Batson* challenge as to Miller.

*Lawrence Barrett.* The record demonstrates that AUSA Roper struck potential juror Lawrence Barrett for the same reasons. In questioning Barrett during voir dire, AUSA Roper noted that Barrett's questionnaire indicated "that [Barrett] said that [he] couldn't give the death penalty if life without parole is an option, and [he] said that a person [serving a life sentence] will no longer be a threat to society." R.13 at 146. Roper later asked, "if the fact that life without the possibility of release is an option, would it really take you out of being able to fairly consider the death penalty?" Barrett responded, "Yes, it would." R.13 at 149. Barrett further explained that he would only vote to impose the death penalty if the government proved its

case beyond all shadow of a doubt." R.13 at 154. The government moved to strike for cause because Barrett was "obviously against the death penalty." R.13 at 158. The court denied the motion but said, "I think he's a real good candidate for a peremptory." R.13 at 159.

AUSA Roper took the court's suggestion and exercised a peremptory strike on Barrett. R.1-15. In responding to Hall's challenge, he again offered a comprehensive explanation for the decision:

> He was challenged for cause because of his views on the death penalty. Also, I noticed when he came in in the general pool, that he was the only juror that made eye contact and smiled and looked at the defendant for several moments smiling, which sometimes doesn't mean anything and sometimes it does, but I do feel like it was significant. He, again, in his questionnaire said he was basically against the death penalty but could assess it in some circumstances. He said in his questionnaire he couldn't give the death penalty if life without parole was an option, and he stated on the questionnaire, that's question 52-A, that the person will no longer be a threat to society. And he testified that he just didn't know if he could do it, meaning giving the death penalty. He thought it was a tough decision, he'd most likely lean toward life without parole, he didn't see it served a purpose, and he didn't think he could sign his name to a verdict form that resulted in someone being put to death, though he did—he was rehabilitated on—when the defense got hold of him, but all in all I felt like he was substantially impaired from giving the death penalty, and that's why we struck him.

*Id.* at 12. Based on this explanation, the court rejected the *Batson* challenge as to Barrett. *Id.*

***Amy Evans.*** AUSA Roper provided similar—and similarly comprehensive—reasons for striking Amy Evans. When asked if she could impose the death penalty

when life without parole was also an option, Evans explained in her questionnaire that it would "depend on the nature of the crime" but added that she "would probably lean more toward the life sentence." R.1-14 at 10. She also said that her husband was a minister and would likely be more opposed to the death penalty than she was. R.1-14 at 10; R.13 at 161-62. She further noted in her questionnaire that her brother-in-law went to prison for murder and another brother-in-law went to prison as a habitual offender. R.1-14 at 13.

During voir dire, the prosecution questioned her about her questionnaire answer indicating that she leaned toward a life sentence instead of the death penalty, indicating the government's concern with that questionnaire answer. R.13 at 161-62. Evans was equivocal on whether she would vote to impose the death penalty. *Id*. The prosecution did not move to strike Evans for cause, likely because the court had consistently denied its request to strike other potential jurors with similar views, including Miller, Barrett, and others.

AUSA Roper exercised a peremptory strike on Evans, yet again offering a voluminous, detailed explanation for the decision:

> I noticed that she had two brothers-in-law in prison, as stated in her questionnaire. I ran out of time and didn't have a chance to ask her about that and it concerned me. She—in her testimony she was very, very hesitant on her views on the death penalty, and she said that she was leaning toward life without the possibility of parole. And she during the questions asking her about whether she could give the

death penalty or not, she had very long pauses in her answers and was very hesitant in what she said.

I really don't think—based on my experience, I just don't think she would be a juror that could give a death penalty in a case because of her hesitant answers and her views toward the death penalty. . . .

. . . . She said . . . she would pass the referendum [to have the death penalty but s]he didn't want to vote for it. Also, if the death penalty was a—I just don't feel like all in all, considering her, that she could actually give the death penalty if it got down to it, and I think she would give a sentence of life without the possibility of release because of her feelings about her statements. She was leaning toward life without parole. One other—one time I asked her a question, and I recall the response as being—she was very hesitant. She said, well, I possibly could render the death penalty on some circumstances. But I thought that was such a weak answer, I thought that she was—I really think she is substantially impaired from giving the death penalty if she made it on the jury.

R.13 at 13-14. As with the other explanations, the district court credited this one and overruled the *Batson* objection. *Id.*

Hall attacks this ruling on several bases, all of which fail. First, he argues that Evans did not take long pauses because the record does not reflect that she did. R.1 at 30-31. This is despite the fact that (a) a court reporter rarely, if ever, notes a witness's hesitation or pause in a transcript, and (b) to the extent it could, the transcript does demonstrate Evans's hesitation—for instance, in response to a question about how she felt about the death penalty, she responded: "I'm really not that sure. I—I believe as a last resort or in a case to where a crime was committed intentionally without, you know, any—any regards for life or, you

know, something like that, I just—I think it would probably be appropriate." R.13 at 160. Additionally, Judge Means and Hall's trial counsel were present during Evans's voir dire examination and did not contradict or disagree with AUSA Roper's recollection that Evans was hesitant.

Additionally, although Hall further suggests that the district court was required to "validate" this part of Roper's explanation, R.1 at 30, the Fifth Circuit has held otherwise. *Thompson*, 735 F.3d at 300; *see Chazen*, 938 F.3d at 865 (Barrett, J., concurring) (collecting cases and explaining why there is "force" behind district court decisions applying the law of the circuit of conviction in Section 2241 proceedings). And, regardless, common sense dictates that if this observation were counter to Judge Means's and Hall's trial counsel's memories, they would have pointed it out on the record. And yet they did not, indicating they agreed with AUSA Roper's assessment of Evans's demeanor.

Second, as he did in his Section 2241 petition, Hall in his brief compares Amy Evans to white juror Mary Ann Herring, whom AUSA Roper did not strike, Br. at 8, 35; R.1 at 32; *see* R.1-14, 1-23, but the government explained exhaustively in its district-court response why they were not similar, R.12 at 26-27, and Hall offers nothing in his brief to contradict the government's explanation. The two were not the same in terms of their beliefs about the death penalty because, for example, in their questionnaires, Evans said her support of the death penalty was dependent

on the nature of the crime, while Herring did not place a qualification on her answer that she was in favor of it. R.1-14 at 9; R.1-23 at 9-10. And, during voir dire, Herring said the death penalty was "something that's needed" and should be available for crimes like premediated or vicious murders. R.13 at 123. The two also gave different answers to the question about whether they could impose the death penalty if life without parole also were an option. Evans said it would "depend on the nature of the crime" but added, she "would probably lean more toward the life sentence." R.13 at 10. But Herring said simply that "it would depend on the crime" without expressing a general preference toward a life sentence. R.1-23 at 11.

Additionally, while Evans explained that her husband was a minister and likely opposed (or at least was not in favor of) the death penalty for religious reasons, R.1-14 at 10; R.13 at 161-62, Herring's husband was not religious clergy and did not hold a different view from Herring on the death penalty. R.1-23 at 4, 11. Likewise, Evans had two brothers-in-law who were in prison—one for murder and the other a habitual offender—while Herring reported one family member, a son-in-law, who had been arrested, charged, or convicted of something but she had no details about it. R.1-14 at 14; R.1-23 at 11, 13.

As his Section 2241 petition did, Hall's brief likewise continues to unfairly compare Evans to juror Linda Harrell despite the government's explanation in its

response that the two were not alike in their views on the death penalty. Br. at 35; R.1 at 40; R.12 at 27-29. During voir dire, Harrell expressed greater comfort—and less hesitant answers—with regard to the death penalty than did Evans:

Voir Dire of Evans

Q. How do you feel about the death penalty yourself, Mrs. Evans?

A. I'm really not that sure. I—I believe as a last resort or in a case to where a crime was committed intentionally without, you know, any—any regards for life or, you know, something like that, I just—I think it would probably be appropriate. R.13 at 160.

Voir Dire of Harrell

Q. In your own words, ma'am, how do you feel about the death penalty?

A. I believe in the death penalty. I believe it's—I don't know if the word is appropriate. I believe it's deserving in some cases under the right circumstances. I just socially and morally just believe that it's okay. R.13 at 124.

As these excepts demonstrate, Evans's and Harrell's views "were by no means 'indistinguishable.'" *Davis*, 576 U.S. at 273.

Additionally, like Herring and unlike Evans, Harrell's spouse did not oppose the death penalty. R.1-24 at 12. Also like Herring and unlike Evans, Harrell did not have a family member in prison for murder—contrary to Hall's suggestion, Harrell's husband's arrest for indecent exposure is not comparable to a murder prosecution. R.1 at 41; *see* R.1-24 at 14. And Harrell's questionnaire answer of "I don't know" to the question about whether she would impose the death penalty if life without parole were available was not equivalent to Evans's answer that it

would depend on the nature of the crime but that she would lean toward a life sentence. R.1-24 at 12; R.1-14 at 10. Harrell's answer indicated that she had not formed an opinion; Evans's answer indicates she had formed at least some opinion and was leaning toward life without parole over the death penalty.

Taken together, it is clear why the differences between Evans's answers and those of Herring and Harrell led AUSA Roper to strike Evans but not Herring or Harrell. And Supreme Court precedent supports such distinctions; as the Court has explained when addressing the need to distinguish between varying degrees of opposition to or support for the death penalty in capital jury selection:

> In a capital case, it is not surprising for prospective jurors to express varying degrees of hesitancy about voting for a death verdict. . . . [B]oth the prosecution and the defense may be required to make fine judgment calls about which jurors are more or less willing to vote for the ultimate punishment. These judgment calls may involve a comparison of responses that differ in only nuanced respects, as well as a sensitive assessment of jurors' demeanor. . . . A trial court is best situated to evaluate both the words and the demeanor of jurors . . . as well as the credibility of the prosecutor who exercised those strikes.

*Ayala*, 576 U.S. at 273-74 (internal quotation marks and citations omitted).

Finally, Hall reiterates his claim that, given AUSA Roper's mention of Evans's family members who were in prison, the prosecution also should have struck others who had family involved with the criminal justice system, Br. at 34; *see* R.1 at 41—but he again fails to acknowledge obvious distinctions between Evans and those potential jurors. For example, juror Stacy Donaldson's husband received

probation for a DWI charge, and juror Randall Davis was acquitted on a DWI charge. R.1-26 at 13; R.1-27 at 12. Particularly in the context of a prosecution for intentionally killing someone, neither are equivalent to having a family member in prison for murder, as Evans did.

Hall also ignores that those jurors were otherwise stronger for the government than Evans. For instance, during Donaldson's voir dire, she said she never opposed the death penalty and believed "in some cases it is justified and that it should be used," such as in murder cases. She also said that her husband was in favor of the death penalty. R.13 at 172-73. Hall's attorneys found her to be favorable to the government and moved to strike for cause, which the court denied. R.13 at 175. Thus, it is understandable why AUSA Roper did not view, for example, Donaldson's husband's interaction with the criminal justice system as disqualifying and wanted to seat her on the jury. In sum, Hall's challenges to Evans fail.

*Billie Lee.* Hall's claim with regard to the last potential juror, Billie Lee, fares no better. Lee, a teacher, said in her questionnaire in response to the question about whether she was in favor of the death penalty: "If the crime is 'extremely' brutal and heinous, the death penalty may be an option. Life without parole would also be another option." R.1-29 at 8-9. In the next question, Lee said that she believed the death penalty served a legitimate purpose when it was used against criminals

"who repeatedly commit heinous crimes (without a conscience)." R.1-11 at 9. Later on, she reinforced this view that the death penalty should be reserved for people who repeatedly kill others. She was asked, "For what crimes do you think the death penalty should be available?" R.1-29 at 9. She responded that it should be available for "serial killers; people who kill for the sake of killing; habitual child molesters who kill their victims." *Id.*

On the same page of her questionnaire, which listed several views of the death penalty ranging from (a) "I believe the death penalty is appropriate for all crimes involving murder" to "(e) I could never, regardless of the facts and circumstances, return a verdict which assessed the death penalty," Lee chose (d), the next to most extreme anti-death-penalty option. That option stated, "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it, under the proper set of circumstances." R.1-29 at 9. This was the same option that Miller chose that also served as one basis for Miller's strike, which Hall does not contest. R.13 at 126; R.1-11 at 9.

Relatedly, on another questionnaire page that asked Lee to rate her response to a list of statements relating to the death penalty, some of her answers reinforced her hesitance to impose capital punishment. In response to the statement, "The death penalty is wrong," she checked "slightly agree." R.1-29 at 27. She checked

the same answer in response to the statement, "The State cannot teach the sacredness of human life by destroying it." R.1-29 at 28.

Due to the nature of her questionnaire answers, during voir dire the district court specifically questioned Lee about them before allowing the parties to ask their own questions. The court noted her response to the first multipart question in which she chose the option indicating that she did not believe "the death penalty ever ought to be invoked" but that she could "assess it under the proper set of circumstances," and it asked: "Does that still represent your belief about the death penalty?" She responded, "Yes, it does." R.13 at 163-64. She later explained, "I'm ambivalent about the death penalty. . . . On one hand I think that it should not be used at all, and then there are certain cases or circumstances when I think maybe yes"; "basically I feel [the death penalty] should not be applied." R.13 at 168. She continued by explaining that she would be willing to consider the death penalty for crimes against children but specified that she meant "smaller children," and re-expressed her general preference for life in prison: "[I]t would depend on evidence, but, of course, I think life without ever being released would be a better option." R.13 at 171.

Roper explained that he had exercised a peremptory strike on Lee because of these views:

In her questionnaire she said that she didn't believe in the death penalty but could assess it. . . .

She said, "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper circumstances."

She said in her questionnaire that it would have to be repeatedly commit [sic] heinous crimes without conscience, and we don't have repeated murders in this case. She also said she would—thought it was appropriate for serial killers. Of course, we don't have serial killers. She said also habitual child molesters, that would be a possible crime she could give the death penalty. We don't have habitual child molesters. [Hall] hasn't been convicted of child molestation in the past. She said she would lean toward life without the possibility of release.

I thought she was impaired just because of her questionnaire. She said on her questionnaire she thought that the death penalty was wrong. She slightly agreed that the death penalty was wrong. . . .

Oh, she also was on a prior jury trial for robbery and found the defendant not guilty . . . .

. . . . I'm sorry, I was mistaken about her. She didn't—I got that mixed up. She wasn't on the jury on a robbery. I'm sorry, my notes were jumbled up. I apologize. She had a brother-in-law who was a criminal defense attorney, which caused me some concern. And she's—I got the impression from her that she was really just ambivalent toward even considering the death penalty . . . .

R.1-11 at 14-16.

Hall's brief finds much fault in this explanation, but his claims are baseless.

Hall argues that AUSA Roper's accidental misstatement that Lee had acquitted

someone of a crime, and then his apology for misreading his notes and follow-up

statement that he struck Lee because she had a brother-in-law who was a criminal

47

defense attorney, shows that AUSA Roper was searching for a reason to strike her. But, in fact, AUSA Roper clearly explained the reason for the mistake — he was speaking from his notes and he had simply misread them. To put this misstatement into context, jury selection occurred over 11 days and involved roughly 100 potential jurors. It was thus inevitable that both parties would, at times, confuse certain facts about each juror.[8]

But AUSA Roper immediately corrected himself, apologized, and continued providing reasons specific to Lee that both explained and supported his decision to exercise a peremptory strike on her. Put simply, AUSA Roper was correct in terms of the facts he cited in support of this peremptory strike. And the trial court, which observed the jury selection proceedings and assessed AUSA Roper's credibility, found no *Batson* violation.

Relatedly, Hall contends that the government did not strike a non-Black juror, Dana Crittenden, who had voted to acquit on a previous murder case and whose brother-in-law was an assistant public defender and that this shows AUSA Roper was inconsistent in the reasons for his strikes. Br. at 9; *see* R.1-33 at 30-31; R.1-32 at 13-14. Again, Hall omits critical facts: Crittenden's other answers were so

---

[8] Similarly, Hall's emphasis on AUSA Roper's statement at the beginning of the *Batson* hearing that he tried to strike all four of the potential jurors at issue here for cause is misplaced as his statement was a simple mistake on his part due to the fact that the parties individually questioned the 100 potential jurors and Roper remembered moving to strike at least some of the four potential jurors the defense identified. R.1-11 at 10.

favorable to the government that *Hall* unsuccessfully moved to strike her for cause. Tr. Vol. 1:130[9]; *see* R.1-32 at 10-11 (explaining that she supported the death penalty and believed it should be assessed for crimes like murder). In fact, the defense argued in moving to strike her that "her ability to give fair consideration to [one of the mitigating factors upon which it planned to rely] was . . . substantially impaired to where she couldn't give fair consideration to that issue." Tr. Vol. 1:30. Thus, it is not a surprise that the government did not use a peremptory strike on her.

Hall further claims, misleadingly, that "the prosecutor never questioned Ms. Lee about her brother-in-law's employment [as a criminal defense attorney] during voir dire, which, once again, undercuts any suggestion that the government had concerns about this fact." Br. at 35. This statement ignores that the district court itself questioned Lee on this because her questionnaire did not indicate what type of law her brother-in-law practiced. R.1-29 at 15. Thus, before allowing the parties to question her, the court asked her clarifying questions about her brother-in-law's practice, and she explained that he practiced criminal law.

---

[9] Hall includes the bulk of Crittenden's voir dire testimony in his Section 2241 exhibits, *see* R.1-33, but fails to include this page of the transcript, ending his exhibit on the prior page, page 129. The government would be happy to provide a copy of this page to the Court upon request.

R.13 at 165. Because the court had already asked those questions, there was no reason for the prosecutor to ask them.

Finally, Hall contends that the government did not strike non-Black jurors who gave similar answers as the above-listed Black jurors on the death penalty. This is untrue. In fact, AUSA Roper exercised peremptory strikes on several non-Black jurors who expressed views similar to the views expressed by the jurors discussed here. *Cf. United States v. Hendrix*, 509 F.3d 362, 370-71 (7th Cir. 2007) ("Strock—a Caucasian—was also struck for the same reason as Jurors Woodland and Hairston, which further illuminates the non-discriminatory nature of the prosecution's strikes and erodes notions of pretext in the prosecution's motive for the strikes.").

For instance, AUSA Roper struck Patsy Duvall, who said she did not "find a problem with the death penalty" but believed it was appropriate in "very few circumstances" such as a serial-killer situation, R.13 at 1-4; R.1-15, and Carla Cannon, who expressed similar reticence and also identified serial or mass murders as an appropriate use of it. R.13 at 84-85; R.1-15. These answers were similar to those given by Lee. R.1-29 at 9. He also struck Corrina Goldsmith, who supported the death penalty but said that her husband "would have a harder time giving a death penalty sentence than I would," R.13 at 23; R.1-15—a circumstance similar to Evans and her minister husband. AUSA Roper struck Paul Long, who,

50

like Bennett, expressed severe hesitance to ever recommend the death penalty and said he could only impose it if he believed without a doubt that it was necessary. R.13 at 86-111, 145, 149, 154. And he struck Temple Griffin, whose son and sister were police officers and who initially seemed supportive of the death penalty but later said she would favor life without parole over a death sentence, R.13 at 112-22—similar to Evans's answer on her questionnaire, R.1-14 at 10. As this exhaustive summary demonstrates, the decision by Hall's attorneys to forego further review of the district court's *Batson* ruling in his appeal, Section 2255 motion, and other collateral proceedings was well founded. It also demonstrates that his last-ditch attempt days before his execution to patch together a *Batson* claim through misleading claims about the record falls flat.

Finally, Hall overreaches in continuing to make the inflammatory claim that (1) he was convicted by an "all-white" jury, and (2) suggesting that such circumstance was the intended result of the prosecution's strikes or the decision to prosecute in the Northern District of Texas. In fact, the race or ethnicity of some of the jurors who were selected is unclear. For example, juror Cindy Boggess declined to state her race on her jury questionnaire. R.13 at 180-81; R.1-9 at 35. And the questionnaire asked only about "race," not also ethnicity, and thus Hall's jury might have included Latinx or Hispanic jurors who identified as white on the

questionnaires.[10] Further, Hall's jury did include a self-identified Black individual—Kelvin Johnson, who was an alternate.

Imprecise at best and inaccurate at worst, Hall's repeated emphasis that he was convicted by a jury composed of no persons of color also ignores that the court excused some non-white or self-identified Hispanic/Latinx potential jurors for cause—sometimes on Hall's counsel's own motion—because of objectively unacceptable views about the death penalty or the beyond-a-reasonable-doubt standard. During voir dire, the Court excused a Black potential juror, Paula Moore, and a potential juror who identified as Hispanic, Sylvia Medina-Tercero, because both said they could never vote to impose the death penalty. R.13 at 3-22, 176-78; R.1-9 at 7, 99. Conversely, the Court also struck for cause Talat Hussein, a juror who identified as non-white on his questionnaire and was from Pakistan, because of his strongly pro-death-penalty views, and Rosana Galdos-Bridgewater, a Hispanic immigrant from Peru, because she did not agree with the concept that a jury would have to acquit a defendant who might be guilty if the guilt was not shown beyond a reasonable doubt. R.13 at 24-55, 77-83; R.1-9 at 14, 30. Finally, as Hall's counsel acknowledged in voir dire, the jury would have included another

---

[10] For instance, some jurors identified as both "white" and "Hispanic." R.1-9 at 15, 30, 94. Other jurors might have also been Latinx or Hispanic but might not have been so specific and identified themselves only as white. *See generally* https://www.census.gov/topics/population/race/about.html.

Black juror if not for Hall's counsel's strike of Natalie Harris, potential juror number 14, because of her strongly pro-death-penalty views. R.13 at 56-76; R.1-11 at 9.

Relatedly, it is baseless (and absurd) for Hall to continue to suggest, *see* Br. at 31-32, that the Department of Justice's decision to charge this case in the Northern District of Texas was influenced by the relative percentage of minority populations in north Texas versus central Arkansas. The U.S. Attorney's Office for the Northern District of Texas prosecuted Hall because he kidnapped and raped his 16-year-old victim there and because the girl he brutalized and buried alive was part of that community, as were the family members who survived her.

   ii. Hall's claim that his death sentence violates the Fifth and Eighth Amendments and the FDPA is meritless.

Hall failed to make a strong showing of likely merit on his claim of racial disparity in administration of the death penalty for the additional reason that it, in fact, was not meritorious. The Supreme Court has rejected such claims predicated on these types of statistics and has instead explained that a defendant who tries to demonstrate this kind of constitutional violation "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987).

Hall acknowledges that his statistics are insufficient to sustain his claim of racial discrimination. Br. at 40 (citing *McCleskey*). He contends, however, that his *Baston* claim supplements this one to make it viable. *Id.*

For reasons discussed above, Hall's *Batson* claim cannot breathe life into what the Supreme Court has clearly held is a lifeless claim based on statistics. That is, the discussion above clarifying the record with respect to Hall's *Batson* challenge—and the reasons the Texas district court overruled it—underscore that Hall cannot show "prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey*, 481 U.S. at 292. *Accord Davis v. Greer*, 13 F.3d 1134, 1143-44 (7th Cir. 1994) (following *McCleskey* in rejecting the use of statistical studies to challenge the Illinois death penalty; noting of cited studies, "nothing in them . . . establishes any constitutional violation and certainly does not provide the exceptionally clear proof of discrimination required by *McCleskey*").

Hall's invocation of the FDPA fares no better. Indeed, as Hall himself emphasizes, the FDPA imposes numerous procedures to "prevent[] racial bias from influencing sentencing procedures" and "erects an elaborate formal process for confirming that jurors' deliberations were unaffected by . . . race." Br. at 39-40. But those formal processes were followed here,[11] helping to ensure that Hall's

---

[11] For example, the court instructed the jury that, in considering whether a death sentence was justified, it shall not consider the race of the defendant or victim and further instructed that it could not recommend a death sentence unless it concluded

penalty proceeding was fair and untainted by considerations of race. Hall does not even suggest otherwise, and therefore cannot prevail on his claim of an FDPA violation. Thus, he fails to advance a strong showing of likely merit in his claim.

3.      The remaining stay considerations do not weigh in Hall's favor, especially given his delay and that he cannot succeed on the merits.

Beyond Hall's extraordinary delay in bringing these claims and the fact that his claims cannot succeed on the merits, the equities strongly weigh in favor of the government and against Hall.

The government has a compelling interest in the timely enforcement of criminal sentences that have been upheld through extensive appellate and postconviction proceedings in federal courts. *Bucklew*, 139 S. Ct. at 1133. Once, as here, postconviction proceedings "have run their course," "finality acquires an added moral dimension." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). Consequently, delay "inflict[s] a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the State and the victims of crime alike." *Id.* (quoting *Herrera v. Collins*, 506 U.S. 390, 421 (1993) (O'Connor, J., concurring)).

---

that it would recommend a death sentence for the crime in question regardless the race of the defendant or victim. *See* 18 U.S.C. § 3593(f). (*E.g.*, R.13 at 191).)

The other stay factors similarly do not support relief here, for many of the same reasons that were true of Hall's first Section 2241 petition, which is also before this Court. That Hall faces irreparable harm from his execution is not dispositive; if it were otherwise, then no death sentence would ever be enforced. *See Chrans*, 50 F.3d at 1360. However, there can be no dispute that the public interest favors enforcement here. The public and the victim's family have an overwhelming interest in implementing the capital sentence imposed a quarter-century ago. *See, e.g., Bucklew*, 139 S. Ct. at 1133-34.

The government's interest is especially strong because of Hall's "heinous, cruel, and depraved" crime. *See Hall*, 152 F.3d at 406. His victim, 16-year-old Lisa Rene, was an innocent bystander to a dispute over a drug transaction. *See id.* Because he believed that he was out a few thousand dollars over a marijuana dispute, he and his coconspirators subjected Lisa Rene to a horrific death, including being kidnapped, repeatedly raped, and ultimately gagged, soaked in gasoline, and buried alive. *See id.* at 389-90. Her family has waited decades for the sentence to be enforced and currently is en route to Terre Haute, Indiana for the execution. Hall's current claim—in addition to being barred and meritless—has no potential to undermine that sentence, and thus does not remotely "justify last-minute intervention by" this Court. *Lee*, 140 S. Ct. at 2591.

## CONCLUSION

This Court should affirm the district court's judgment and deny Hall's motion to stay his execution.

Respectfully submitted,

ERIN NEALY COX
*United States Attorney*
*Northern District of Texas*

JOSH J. MINKLER
*United States Attorney*
*Southern District of Indiana*

By:   /s/JONATHAN BRADSHAW
*Assistant U.S. Attorney*
*Northern District of Texas*

*Special Assistant U.S. Attorney*
*Southern District of Indiana*
*10 West Market St., Ste. 2100*
*Indianapolis, Indiana 46204*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and (a)(6), as modified by Cir. R. 32(b), because I have prepared this brief in proportionally spaced typeface using Microsoft Word 2016 in 13-point (body) and 12-point (footnotes) Book Antiqua font. I further certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Circuit Rule 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 13,983 words.

/s/ JONATHAN BRADSHAW
*Assistant U.S. Attorney*

## CERTIFICATE OF SERVICE

I certify that on November 18, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ JONATHAN BRADSHAW
*Assistant U.S. Attorney*