IN THE

# United States Court of Appeals
# For The
# Seventh Circuit

No. 20-3229

ORLANDO CORDIA HALL,

*Petitioner-Appellant*,

v.

T.J. WATSON, WARDEN
UNITED STATES PENITENTIARY (USP) TERRE HAUTE,

*Respondent-Appellee*.

On Appeal from

The United States District Court for the Southern District of Indiana
Before the Honorable Judge James P. Hanlon

## EXECUTION SCHEDULED FOR NOVEMBER 19 AT 6PM EST

## REPLY BRIEF FOR PETITIONER-APPELLANT

PIETER VAN TOL
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
pieter.vantol@hoganlovells.com

KATHRYN MARSHALL ALI
KAITLYN GOLDEN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
kathryn.ali@hoganlovells.com
kaitlyn.golden@hoganlovells.com

November 18, 2020

*Counsel for Orlando Cordia Hall*

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 3

I.  ANY PURPORTED DELAY DOES NOT PRECLUDE
    RELIEF FOR MR. HALL .......................................................................... 3

II. MR. HALL'S CLAIMS ARE COGNIZABLE ON § 2241
    REVIEW ..................................................................................................... 7

    A.  The Evidence Mr. Hall Proffers is "Newly Discovered"
        and Counsel was Reasonably Diligent in Seeking It ...................... 7

    B.  Mr. Hall Makes a Compelling Showing that His
        Execution Arose from Racial Prejudice and Thus Is
        Cognizable Under § 2241 ................................................................. 11

    C.  Good Cause Exists To Excuse Any Delay ...................................... 13

    D.  The Petition Is Not An Abuse Of The Habeas Writ ...................... 15

III. MR. HALL IS LIKELY TO SUCCEED ON THE MERITS OF
     HIS CLAIMS ............................................................................................. 16

    A.  Mr. Hall Is Likely To Succeed On The Merits Of His
        Claims Related To His *Batson* Claim ............................................ 16

    B.  Mr. Hall Is Likely To Succeed On His Claim that the
        Federal Death Penalty, Particularly as Applied in Texas,
        Discriminates on the Basis of Race ................................................ 21

IV. THE BALANCE OF THE EQUITIES WEIGHS IN FAVOR OF
    A STAY ...................................................................................................... 23

CONCLUSION ................................................................................................... 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Anraout v. Marberry*,
351 F. App'x 143 (7th Cir. 2009) ......................................................15

*Buck v. Davis*,
137 S. Ct. 759 (2017) ......................................................................14

*Bucklew v. Lombardi*,
572 U.S. 1131 (2014) ....................................................................3, 6

*Calderon v. Thompson*,
523 U.S. 538 (1998) ........................................................................22

*Coleman v. Thompson*,
501 U.S. 722 (1991) ...................................................................13, 14

*Day v. Watson*,
798 F. App'x 27 (7th Cir. 2020) ........................................................3

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
140 S. Ct. 1891 (2020) ....................................................................21

*In the Matter of the Fed. Bureau of Prisons' Execution Protocol Cases*,
No. 1:19-mc-00145-TSC (D.D.C. Sept. 20, 2020) ................................4

*Flowers v. Mississippi*,
588 U.S. __, 139 S. Ct. 2228 (2019)..............................................8, 17

*Foster v. Chatman*,
78 U.S. ___, 136 S. Ct. 1737 (2016)..................................................8

*Furman v. Georgia*,
408 U.S. 238 (1972)........................................................................20

*Gordon v. Holder*,
632 F.3d 722 (D.C. Cir. 2011)...........................................................5

*Gutierrez v. Saenz*,
No.19-8695, __ S. Ct. __, 2020 WL 3248349 (June 16, 2020)............................5

*House v. Bell*,
547 U.S. 518 (2006)...........................................................................14

*Lee v. Watson*,
No. 19-3399, 2019 WL 6718924 (7th Cir. Dec. 6, 2019) .....................................3

*Madison v. Alabama*,
138 S. Ct. 1172 (2018)...........................................................................5

*Madison v. Alabama*
139 S. Ct. 718 (2019)...................................................................3, 5, 6

*Miller-El v. Dretke*,
545 U.S. 231 (2005)....................................................................*Passim*

*Morales v. Bezy*,
499 F.3d 668 (7th Cir. 2007) ....................................................................3

*In re Ohio Execution Protocol*,
860 F.3d 881 (6th Cir. 2017) (Moore, J., dissenting) .........................................21

*Peña-Rodriguez v. Colorado*,
137 S. Ct. 855 (2017)...........................................................................13

*Purkey v. United States*,
964 F.3d 603 (7th Cir. 2020) ..............................................................11, 12

*Reed v. Quarterman*,
555 F.3d 364 (5th Cir. 2009) ............................................................9, 17, 18

*Roane v. Gonzales*,
No. 1:05-cv-02337-TSC (D.D.C. June 11, 2007), ECF No. 68 .........................4

*RoDa Drilling Co. v. Siegal*,
552 F.3d 1203 (10th Cir. 2009) ................................................................6

*Roundtree v. Krueger*,
910 F.3d 312 (7th Cir. 2018) ................................................................15

*Ty, Inc. v. Jones Group, Inc.*,
237 F.3d 891 (7th Cir. 2001) ................................................................6

*United States v. Taylor*,
636 F.3d 901 (7th Cir. 2011) ...............................................................18

*Wainwright v. Sykes*,
433 U.S. 72 (1977)................................................................................14

*Webster v. Daniels*,
784 F.3d 1123 (7th Cir. 2015) (en banc) .................................10, 11, 12

*Webster v. Watson*,
975 F.3d 667 (7th Cir. 2020) .................................................................7

*Williams v. Taylor*,
529 U.S. 420 (2000)................................................................................7

**STATUTES:**

18 U.S.C. 3593(f)..................................................................................20

18 U.S.C. § 3595 (c)(1)..........................................................................21

# INTRODUCTION

Absent intervention, Mr. Hall will be executed without any court ever adjudicating his meritorious constitutional race-based claims. This is a fundamental miscarriage of justice that must be remedied.

The district court's decision relies on its own investigation to conclude that because it could find relevant evidence with the benefit of technology available in 2020, then counsel in 1995 likewise should have been able to find such evidence. This places an unreasonable burden on counsel—and one the Supreme Court has expressly rejected—and must be remedied.

Mr. Hall has raised new evidence touching on two fundamental constitutional errors in both his sentence and administration of the death penalty. The "extremely serious" claims that Mr. Hall has raised are based on precisely the sort of new evidence that this Court has held permits § 2241 review.

*First*, evidence that was unavailable until after Mr. Hall's § 2255 petition was denied shows that Paul Macaluso, who was a key member of Mr. Hall's prosecution team and played a pivotal role in the selection of Mr. Hall's jury, had a history of committing *Batson* violations. Specifically, Mr. Macaluso has been found by both the Supreme Court and the Fifth Circuit to have violated *Batson* by giving pretextual justifications for striking Black jurors. And *second*, recent studies demonstrate that the death penalty is applied in manner that

1

disproportionately and overwhelmingly impacts racial minorities. It offends the very notions of fairness and equal protection under the law for the government to explain these facts away so casually.

Indeed, the whole of the government's brief repeatedly attempts to downplay the severity of Mr. Hall's important consitutional clams, characterizing them as "hyperbolic." The government largely ignores the historic practices of Mr. Maclauso, charactarizing them as "pre-*Batson*." And it disregards the impact of an all-White jury convicting and sentencing Mr. Hall to death.

It would be a fundamental miscarriage of justice for Mr. Hall to be executed without his important constitutional claims ever being considered, much less adjudicated. Mr. Hall has demonstrated a likelihood of success on the merits, irreparable harm would result in the absence of a stay, and the balance of the equities tilt sharply in his favor. The lower court thus abused its discretion in declining to stay Mr. Hall's execution to allow him to litigate the "extremely serious" claims he has raised, and that decision should be reversed. For the same reasons, this Court shouldgrant a stay of Mr. Hall's execution to allow him the opportunity to litigate his claims.

# ARGUMENT

## I.     ANY PURPORTED DELAY DOES NOT PRECLUDE RELIEF FOR MR. HALL.

The government argues that delay alone is a sufficient basis to deny Mr. Hall's case.  Opp. Br. 14-20.  The government identifies no bar that would preclude Mr. Hall from raising his claims in a satisfactory Section 2241 petition.  Because no statute of limitations applies to Section 2241 petitions, Mr. Hall's petition is timely.  *See Day v. Watson*, 798 F. App'x 27, 29 (7th Cir. 2020); *see also Morales v. Bezy*, 499 F.3d 668, 672 (7th Cir. 2007).

Instead, the sole basis for the government's delay argument is that Mr. Hall could have raised claims of racial discrimination long ago.  This argument is wrong on both the facts and the law.

First, the law.  The government relies on wholly inapposite cases to suggest delay "dooms" Mr. Hall's motion.  Opp. Br. 15.  But *Bucklew*, plaintiff waited until just 12 days before his execution to challenge the state's lethal injection protocol, 139 S. Ct. 1112, 1120, and received a last-minute stay.  *Bucklew v. Lombardi*, 572 U.S. 1131 (2014).  Only after five more years of litigation on the same claims, including two appeals and two "11th-hour" stays, did the Supreme Court find further delay unwarranted.  139 S. Ct. at 1134.  Mr. Hall has received no such process here.  Likewise, in *Lee*, petitioner delayed bringing his claims until two months after he received notice of his execution.  *Lee v. Watson*, No. 19-3399,

3

2019 WL 6718924, at *2 (7th Cir. Dec. 6, 2019). Unlike Mr. Lee, who received notice of his execution four and a half months in advance, Mr. Hall only received 50 days of notice. And for Mr. Hall, such notice came just 10 days after an order staying his execution lifted—an order that had been in place for 13 years and to which the government had consented. Order, *Roane v. Gonzales*, No. 1:05-cv-02337-TSC (D.D.C. June 11, 2007), ECF No. 68; *In the Matter of the Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC (D.D.C. Sept. 20, 2020), ECF Nos. 265 & 266.

Second, the facts. As set forth in detail below, evidence of racial bias in the selection of Mr. Hall's jury and evidence on the application of the death penalty in Texas did not emerge until after Mr. Hall's § 2255 proceedings commenced. Despite the district court's *post hoc* research, Mr. Hall's counsel could not have reasonably discovered evidence of Macaluso's track record of *Batson* violations until he was named in *Miller-El*.

The government suggests that "a prisoner always has incentive to challenge his conviction . . . ." Opp. Br. 18. This, of course, ignores the good reasons why Mr. Hall did not bring these claims until now. For one, Mr. Hall's attorneys were repeatedly stymied when they sought court approval, and compensation, to perform investigative activities they saw as necessary to pursue certain claims. Dist. Ct. Dkt. 15-1 ("Owen Decl."); Dist. Ct. Dkt. 15-2 ("Widder Decl."). The

4

court repeatedly rejected funds that would have allowed Mr. Hall's attorneys to investigate the claims, including thosepresented in this habeas petition. *See* Owen Decl. ¶¶ 6, 17, 19-21, 28; Widder Decl. ¶ 8. So, irrespective of Mr. Hall's "incentive" to bring his claims, he was forclosed from investigating his claims at every turn. The government's position amounts to a suggestion that Mr. Hall should have pursued claims he had been *unable to investigate*. Once Mr. Hall did become aware of Macaluso's misdeeds, he was by then protected by an injunction, to which the government consented, barring his execution. Under a court order protecting him from execution and without the resources to investigate his claims, Mr. Hall was by no means dilatory.

Regardless, the government attempts to lure the Court into applying a rigid rule prohibiting the grant of a stay when a petitioner's request is brought close in time to his execution. But no such rule exists. *See, e.g.*, *Gutierrez v. Saenz*, No.19-8695, __ S. Ct. __, 2020 WL 3248349 (June 16, 2020) (granting stay of execution one day prior to scheduled execution); *Madison v. Alabama*, 138 S. Ct. 1172 (2018) (granting stay on date of execution); *see also Madison v. Alabama* 139 S. Ct. 718, 726 (2019) ("We ordered the stay on the scheduled execution date and granted the petition a few weeks later.").

Indeed, delay alone cannot serve as a basis for denying Mr. Hall's stay application. *See, e.g.*, *Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir.

5

2011). Rather, it serves merely as a potential counterweight to irreparable harm. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing [interim relief] may raise questions regarding the plaintiff's claim that he or she will face irreparable harm . . . ."); *see also RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) ("[D]elay is but one factor in the irreparable harm analysis . . . ."). Even the delay confronted by the Court in *Bucklew* was coupled with tactics the Court characterized as involving "carr[ying] on for five years and yield[ing] two appeals to the Eighth Circuit, two 11th-hour stays of execution, and plenary consideration in [the] Court." *Bucklew*, 139 S. Ct. at 1134. Here, absent any attendant circumstances like those implicated in *Bucklew*, however, there can be no dispute that irreversible harm—death—will result absent a stay such that any delay does not undermine the stay application.

The government's position that "dilatory tactics alone warrant denial of [a] stay motion," Opp. Br. 14, is untenable. While Mr. Hall was protected from execution by an injunction, and during a period when his attorney's resources were significantly constrained, it is entirely reasonable that he did not pursue the claims raised here. His attorney's attempts to gain funding were repeatedly stymied. Owen Decl. ¶¶ 6, 17, 19-22, 28, 30; Widder Decl. ¶ 8. As a result, Mr. Hall's lawyers made the reasonable decision to use their limited resources to pursue Mr. Hall's existing claims.

## II.   MR. HALL'S CLAIMS ARE COGNIZABLE ON § 2241 REVIEW.

### A.   The Evidence Mr. Hall Proffers is "Newly Discovered" and Counsel was Reasonably Diligent in Seeking It.

The government's argument that Mr. Hall could have brought the claims presented in this petition in his initial § 2255 motion, Opp. Br. 22-23, ignores the fact that the evidence supporting Mr. Hall's claim here was not available until after his § 2255 motion was denied.  The district court nevertheless determined that because some of the information at issue was purportedly in the public domain, Mr. Hall's counsel should have discovered it.  App. 013.  This imposes an undue burden on defense counsel, and is inconsistent with the idea that "[d]ue diligence . . . means reasonable diligence, not the maximum feasible diligence."  *Webster v. Watson*, 975 F.3d 667, 683 (7th Cir. 2020) (quotation omitted); *see also Williams v. Taylor*, 529 U.S. 420, 435 (2000) (diligence in the context of procedural default means "a reasonable attempt, in light of the information available at the time, to investigate.").

That the district court was able to find evidence in the public record using the Internet in the year 2020 does not bear on whether counsel in the late 1990s or early 2000s could or should have been able to find it at that time.  *Williams*, 529 U.S. at 443 (reversing decision finding lack of diligence by habeas counsel and stating that "[w]e should be surprised, to say the least, if a district court . . .  were

7

to hold that in all cases diligent counsel must check public records"). Hindsight may be 20/20, but it should not be the basis for denying Mr. Hall the opportunity to litigate what the district court acknowledged to be "extremely serious" claims. App. 021.

Nor is Mr. Hall's *Batson* claim a situation involving "new lawyers looking at the same evidence," as the district court and the government have contended. App. 014; Opp. Br. 24. While it is true that Mr. Hall's trial counsel raised a *Batson* challenge at trial, and that the trial record contains strong evidence supporting a *Batson* claim, this traditionally has not been enough, as courts have been reluctant to conclude that a prosecutor intentionally discriminated on the basis of race without something more than a cold trial record. In *Foster v. Chatman*, for example, this "something more" was a set of prosecution notes that came to light many years after Foster's trial showing that the prosecution had flagged all of the Black jurors on their strike sheets, written "No Black Church," and made a recommendation for who to pick if they "had to pick a black juror," 78 U.S. ___ , 136 S. Ct. 1737 (2016). In the Supreme Court's most recent *Batson* decision, *Flowers v. Mississippi*, the "something more" was evidence that across its history of six trials prosecuting Flowers, prosecutor Doug Evans struck 41 of 42 prospective Black jurors. 588 U.S. __139 S. Ct. 2228 (2019). And in *Miller-El*, the "something more" was new evidence that the prosecution office at issue had

8

adopted a formal policy to exclude racial minorities from jury service and that the specific prosecutors who tried Miller-El had been trained to strike Black jurors via the infamous "Sparling Manual." *Miller-El v. Dretke*, 545 U.S. 231, 264 (2005)

Here, the Court need not search for "something more" because one of the very same prosecutors that the Supreme Court (and later the Fifth Circuit, in a different case) concluded had violated *Batson* on the basis of the office policy and Sparling Manual in *Miller-El* helped pick the jury that convicted and sentenced Mr. Hall. And just as in *Miller-El*, this evidence bears directly on the Court's inquiry into the genuineness of the prosecution's stated reasons for its strikes of 80% of the qualified Black venire members at Mr. Hall's trial. *Batson*, 476 U.S. at 96-97 ("all relevant circumstances" must be considered in determining whether a violation has occurred). As the Supreme Court noted in *Miller-El II*, "[i]f anything more is needed for an undeniable explanation of what was going on, history supplies it." 545 U.S. at 266. That is doubly so given that the "history" here is the very same piece of history on which the Supreme Court relied in *Miller-El* to find that Paul Macaluso violated the Equal Protection Clause in that case. *See also Reed v. Quarterman*, 555 F.3d 364, 371 n.3 (5th Cir. 2009) ("One of the same lawyers that conducted the voir dire in Miller–El's case, Paul Macaluso, also questioned prospective jurors for Reed's trial"); *id.* (given "the historical evidence of racial bias among the[] prosecutors," including Macaluso, "we view this exact same

9

evidence as persuasive here."). And it dispatches any notion that the jury selection process at Mr. Hall's trial was race neutral, as the Constitution requires.

But none of this evidence emerged until after Mr. Hall's § 2255 motion had been denied. The district court erred in discounting this critical fact.

Moreover, until this Court decided *Webster v. Daniels*, Mr. Hall had no procedural avenue through which to pursue his *Batson* claim, as the prior case law interpreting savings clause of § 2255(e) foreclosed the possibility of filing a § 2241 motion like this one. 784 F.3d 1123 (7th Cir. 2015) (en banc).

The district court's findings with respect to the statistical evidence of discriminatory application of the death penalty would foreclose use of this category of evidence in any collateral attack other than an initial motion under § 2255. The court would prohibit such evidence from introduction on the basis that, simultaneously, the underlying factual material was available and at the time of the initial proceeding and the statistical analysis was unavailable at such time. App. 016-017. There would then seem to be no possible time when this evidence could be introduced. Such a rule is overbroad and inappropriate, especially in the context of evidence probative of systemic racism in the legal system.

**B. Mr. Hall Makes a Compelling Showing that His Execution Arose from Racial Prejudice and Thus Is Cognizable Under § 2241.**

The scope of the savings clause in § 2255(e) remains open, as recently recognized by this court in *Purkey v. United States*, 964 F.3d 603, 611–12 (7th Cir. 2020). Though the district court appeared to accept this fact, it did not make a serious attempt to analyze whether Mr. Hall's petition sought to cure a "fundamental problem," *id*. at 615, and instead focused on questions of venue and judicial economy in the legislative history of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). App. 018–019.

This Court, sitting en banc in *Webster v. Daniels*, recognized that constitutional claims can be brought under § 2241 in exceptional circumstances. 784 F.3d at 1139. In *Webster*, the Court was compelled to permit the petition to proceed when faced with the alternative of "condoning an execution that violates the Eighth Amendment" based on the petitioner's categorical ineligibility for such sentence. *Id*. at 1139–40. The concern resonated with the Court as within the "core purpose of habeas corpus" and thus the decision was reached that "there is no reason to assume that our procedural system is powerless to act in such a case." *Id*. at 1139. A case with the exact facts of *Webster* would be "rare," 784 F.3d at 1141, but the Court does not require strict adherence to a "rigid category[y]," *Purkey*, 964 F.3d at 614. Though the government, too, admits that *Purkey* would

11

allow a new set of facts to permit reliance on the savings clause, Opp. Br. 22, it attempts to minimize the gravity of the evidence, by which "the very integrity of the courts is jeopardized," *Miller-El*, 545 U.S. at 238.

Mr. Hall's case presents a variation on *Webster*, as anticipated by *Purkey* and it is well within the power of the Court to resolve with a writ of habeas corpus obtained by way of the savings clause. The evidence sought to be presented here is, like Mr. Webster's, grounded in the vindication of constitutional rights and attacks the validity of his death sentence. Unlike Mr. Webster's evidence, the evidence Mr. Hall seeks to present addresses a wrong based not on the petitioner's intellectual capacity but the color of his skin. Allowing Mr. Hall's to challenge his execution, based on a sentence handed down by an all-White jury fabricated on the basis of racial prejudice, is within the "core purpose of habeas corpus." *Webster*, 784 F.3d at 1139.

And the evidence now available to Mr. Hall shows that the racially motivated misconduct tainting his trial was unfortunately not an isolated incident. Here, the evidence would expose systemic failings of the death sentence the government seeks to impose on Mr. Hall, despite its roots in the race of the Black defendant and the Black men and women stricken from the venire panel as part of a campaign to ensure no Black defendant like Mr. Hall had a true jury of his peers. The Court is not "powerless to act in such a case." *Id.* To the contrary, "the § 2241

safety valve is available when, as here, a petitioner facing execution by the United States has presented compelling evidence that his sentence of death is tainted by racism." Amicus Curiae Br. 15; *see also generally id.* 4-5.

### C. Good Cause Exists To Excuse Any Delay.

Even if the Court were to find that Mr. Hall should have brought these claims sooner, it nevertheless should grant a stay and permit him to litigate them because declining to do so would "result in a 'fundamental miscarriage of justice.'" *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991) (internal quotation omitted); *see also* Amicus Curiae Br. 2 ("It would be a fundamental miscarriage of justice for the United States to carry out an execution without providing courts an opportunity to consider and resolve the merits of Mr. Hall's substantial claims that his death sentence is unlawfully tainted by racial discrimination."); *id.* at 11-14. Racial bias in a criminal trial is so antithetical to constitutional values that the Supreme Court has gone to great lengths to repeatedly condemn it. *See, e.g.*, *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 868 (2017) ("The unmistakable principle underlying these precedents is that discrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice.'") (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)).

The government would prefer to characterize the racial discrimination faced by Mr. Hall—and practices of Macaluso—as "hyperbolic." Opp. Br. 29. But this

13

argument ignores that "[s]ome toxins can be deadly in small doses." *Buck v. Davis*, 137 S. Ct. 759, 777 (2017) (finding prejudice where testimony appealing to racial stereotypes was introduced during the penalty phase). And here, the toxins were more than small. The all-White jury that convicted Mr. Hall and sentenced him to death was selected by a prosecutor found *twice* to have violated *Batson*.

Because the execution of a death sentence imposed on the basis of racial discrimination works a fundamental "miscarriage of justice" upon that defendant, *see Wainwright v. Sykes*, 433 U.S. 72, 91 (1977), a habeas petitioner may prevail if he puts forth evidence tending to show that his case satisfies the "miscarriage-of-justice exception." *See House v. Bell,* 547 U.S. 518, 536 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). The racial animus that infected Mr. Hall's capital trial is a "fundamental miscarriage of justice" that can be corrected on habeas review despite any claimed procedural bar. *Coleman*, 501 U.S. at 750. Indeed, because "[c]laims that racial discrimination has infected a death sentence are different in kind than other constitutional harms," courts have not hesitated to "relax procedural requirements" where serious substantive allegations of racial discrimination exist, as is the case here. Amicus Curiae Br. 3, 6 (discussing cases).

**D.    The Petition Is Not An Abuse Of The Habeas Writ.**

The government further resorts to the abuse-of-the-writ doctrine, Opp. Br. 20-21, but this argument fares no better than its others.  In its no-holds-barred effort to stop Mr. Hall's petition, the government invokes this distinctive doctrine reserved for cases that are identical to those already filed by a habeas petitioner. The district court did not brand Mr. Hall's petition an abuse of the writ, and neither should this Court.

Undeterred, the government cites cases that look nothing like Mr. Hall's. The government relies on *Roundtree v. Krueger*, 910 F.3d 312, 314 (7th Cir. 2018), where this Court rejected a habeas petitioner's "attempt to relitigate a theory" that had already unsuccessfully brought in his earlier section 2255 petition. Opp. Br. 21.  But as the government acknowledges, Mr. Hall's *Batson* claim has never before been adjudicated on habeas review.  Opp Br. 6.  *Anraout v. Marberry*, 351 F. App'x 143, 144-45 (7th Cir. 2009), is similarly unhelpful to the government's case.  There, the Seventh Circuit dismissed a successive § 2241 petition raising claims identical to those brought in an earlier § 2241 petition that was dismissed just ten months prior.  *Id.*  Neither the district court nor the government asserts that is what Mr. Hall has done.  His claim is based on colorable, new evidence of equal protection violations in his trial.    The government's reliance on abuse of the writ reveals that its procedural cupboard is

bare; nothing prevents this Court from considering Mr. Hall's claims as a matter of law. And given the gravity of his claims, the case for hearing them is compelling.

## III. MR. HALL IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.

### A. Mr. Hall Is Likely To Succeed On The Merits Of His Claims Related To His *Batson* Claim.

The government's attempt to minimize Mr. Hall's showing of substantial violations under *Batson v. Kentucky* fails for at least three reasons: (1) the government completely ignores Paul Macaluso's undeniable record of impermissibly striking minorities from juries; (2) the *post hoc* rationalizations offered by the government for striking prospective Black jurors is discredited; and (3) the government has not meaningfully the disparate treatment of Black and White prospective jurors identified by Mr. Hall.[1]

---

[1] Seeking to avoid confronting this uncomfortable history, the government further contends it is "unclear what the final/racial ethnic composition of the jury was . . . ." Opp. Br. 31. The government recites a string of irrelevant—and misleading—considerations that risk distracting the Court from the clear racial bias displayed by the prosecution at Mr. Hall's trial. Opp. Br. 52-53. First, the fact that one potential juror did not identify her race in no way undermines Mr. Hall's claims. At the Batson colloquy at trial, the prosecution agreed with the defense's characterization that prosecutors had exercised peremptory strikes against "four out of five potential black jurors," Dist. Ct. Dkt. 1-11 at 7:21-22, 8:6. The government also did not contest the defense's statement that "the only person . . . of the black race that is a potential juror . . . is . . . Kelvin Johnson, who is the third alternate juror. *Id.* at 6:19-2, 8:13-15. Second, the government's arguments that Latinx or Hispanic jurors may have served or that the trial court "excused some non-white or self-identified Hispanic/Latinx potential jurors for cause," Opp. Br. 52, are wholly

First, the government largely ignores Macaluso's track record of *Batson* violations. As the Supreme Court and Fifth Circuit have made clear, Macaluso was well-versed in eliminating racial minorities from the jury pool. *Miller-El,* 545 U.S. 231 (mentioning Macaluso by name ten times); *Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009) (mentioning Macaluso by name). That history cannot be ignored here. *See Reed*, 555 F.3d at 371 n.3 (noting that, given "the historical evidence of racial bias among the[] prosecutors," including Macaluso, "we view this exact same evidence as persuasive here"); *see also Flowers*, 139 S. Ct. at 2246 ("The State's actions in [prior] trials necessarily inform our assessment of the State's intent going into [the trial on review.] We cannot ignore that history. We cannot take that history out of the case."). No matter the government's sanctimonious statement that it "condemns any racially discriminatory jury-selection process, including the Dallas District Attorney's Office pre-*Batson* voir dire practices," Opp. Br. 32, it cannot avoid that Macaluso was trained in those "pre-*Batson*" voir dire practices, applied those practices, and that the record here suggests he continued to engage in those practices post-*Batson*. It further ignores

---

irrelevant to the government's conduct in striking Black jurors, as is the defense's predictable use of a peremptory strike on Natalie Harris, *id.* at 53. Third, it is preposterous to say that Mr. Hall's "jury did include a self-identified Black individual—Kelvin Johnson," *id.* at 52, where the government itself admits Mr. Johnson "was an alternate" and therefore did not actually serve on the jury, *id.*

that for more than a century," *i.e.* long before *Batson*, the Supreme Court has held "consistently and repeatedly . . . that racial discrimination by the State in jury selection offends the Equal Protection Clause." *Miller-El*, 545 U.S. at 238 (citing cases). Dallas County prosecutors surely knew that their race-based jury selection practices were improper. Perhaps that accounts for the fact that Paul Macaluso, when accused of striking Black jurors because of they were Black, *lied* about what he did. *See Miller-El*, 545 U.S.at 265; *Reed*, 555 F.3d at 380. Macaluso's history as both a repeat *Batson* violator *and* as a repeat *Batson* prevaricator has obvious bearing here, despite the government's efforts to wipe it away as an inconsequential relic of a bygone era. This history is unquestionably relevant. *See Flowers*, 139 S. Ct. at 2246. And it bears directly on the strength of Mr. Hall's *Batson* claim here. Dkt. 3-1 at 6-9.

And *second*, the government's *post hoc* attempts to justify the prosecution's exercise of peremptory strikes at trial fare no better. "Accepting new, unrelated reasons extending well beyond the prosecutor's original justifications for striking Watson amounts to clear error under the teaching of *Miller-El II*." *United States v. Taylor*, 636 F.3d 901, 906 (7th Cir. 2011); *see also Miller-El*, 545 U.S. at 252 ("[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.")). In fact, the Seventh Circuit has instructed that the government's

18

invocation of such post-hoc rationales *itself* "raises the specter of pretext." *Taylor*, 636 F.3d at 906. That is the case here. So, the government's claim that prospective Black juror Amy Evans was struck because "her husband was a minister and likely opposed . . . the death penalty," Opp. Br. 41, is plainly irrelevant.  Under *Taylor*, the Court can and should consider the fact that the government felt the need to search outside of the prosecution's stated justifications for its strikes as evidence of pretext.  636 F.3d at 906.  At the very least, the Court must disregard any post-hoc explanations and "consider only the reasons initially given to support the challenged strike" by the prosecution at trial.  *Id.*

*Finally,* the government asserts that the "comprehensive jury-selection record created in this case" "explains" both "why none of Hall's counsel ever raised . . . a *Batson* claim" and also "why . . . Hall's argument rests primarily on innuendo he draws from *Miller-El* and *Reed* . . . ."  Opp. Br. 32.  This argument ignores the detailed side-by-side juror analysis proffered by Mr. Hall for potential Black jurors Amy Evans and Billie Lee.  Dist Ct. Dkt. 1 at 29-37; Dist. Ct. Dkt. at 15-17; Br. 34-36.

That analysis, at a minimum, shows that Ms. Evans and Ms. Lee were struck on grounds for which other potential jurors, who were White, were not struck. Both Ms. Evan and Ms. Lee were purportedly struck for reasons the government never questioned them about during voir dire.  Br. 34-35.  The failure to ask those

19

questions "is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Miller-El II*, 545 U.S. at 246. The government also claimed to strike both Ms. Evans and Ms. Lee for their relationships to individuals who were either in prison or practicing defense attorneys. Br. 34-35. Again, White jurors with similar relations were not struck. This disparate treatment among similar White and Black jurors too is indicative of pretext.[2] *Miller-El II*, 545 U.S. at 241. Taken together, there is considerable evidence of a Batson violation.

In light of the Supreme Court's decision in *Miller-El II*—both the legal principles it articulated and its specific finding that one of the very same prosecutors responsible for seating the all-White jury that convicted and sentenced Mr. Hall had discriminated on the basis of race and then tried to conceal that discrimination by offering pretextual justifications—Mr. Hall has established a

---

[2] The government tries to claim that Ms. Evans and Ms. Harrell were like the jurors in *Davis v. Ayala*, whom the Court found "were by no means 'indistinguishable.'" Opp. Br. at 42 (quoting *Davis v. Ayala*, 576 U.S. 257, 273 (2015)). But, as the Supreme Court explained in *Ayala*, one juror "initially voiced unequivocal opposition to the death penalty" and "revealed that he had one thought it was 'completely wrong,'" whereas the comparator juror "wrote on the questionnaires that she '*probably* would not be able to the vote for the death penalty,'" but "later said at *voir dire* that she could vote for a verdict of death." *Id.* Here, by contrast, Ms. Evans and Ms. Harrell may have used different words, as different people are wont to do, their words expressed the same views about the death penalty.

likelihood of success of establishing, at a minimum, that Ms. Lee and/or Ms. Evans were impermissibly struck on account of their race, in violation of *Batson*.

**B.     Mr. Hall Is Likely To Succeed On His Claim that the Federal Death Penalty, Particularly as Applied in Texas, Discriminates on the Basis of Race.**

As with the rest of the merits of Mr. Hall's claims, the government does not meaningfully dispute that the data attached to Mr. Hall's petition demonstrates death penalty is racially biased in its application.  Opp. Br. 52-55.  Nor could it.  These data show that the death penalty was nearly **eight times** more likely to be authorized in cases with a Black defendant than a non-Black defendant.  Dist. Ct. Dkt. 1-7 ¶ 7.  And a death verdict was nearly **sixteen times** more likely to be rendered in a case with a Black defendant than a non-Black defendant.  *Id.*  When coupled with the biased jury selection process, Mr. Hall's case presents a compelling claim that the proceedings were tainted from start to finish.

The government's only substantive rebuttal to the data is to suggest that factors other than race may have influenced the jury's decision to hand down the death penalty.  Opp. Br. 55.  But had Mr. Hall not been tried by an all-White jury seated through a deliberate effort by the prosecution—including serial *Batson* violator Paul Macaluso—to eliminate Black jurors, there is a reasonable probability that the case might have ended differently.  *See Buck*, 137 S. Ct. at 776

21

(noting that a crime may call for a sentence of death, but race-based testimony improperly influenced jury's determination); *Strauder v. West Virginia*, 100 U.S. 303, 309 (1879) ("[H]ow can it be maintained that compelling a [Black] man to submit to trial for his life by a jury drawn from a panel from which the State has expressly excluded every man of his race, because of his color alone, however well qualified in other respects, is not a denial to him of equal legal protection?"). This is precisely the type of arbitrariness and discrimination that the Fifth and Eighth Amendments and the Federal Death Penalty Act forbid. *See Furman v. Georgia*, 408 U.S. 238, 310 (1972) (Stewart, J., concurring in the judgment); *see also Pena-Rodriguez*, 137 S. Ct. at 867–68 (discussing the Supreme Court's continuing commitment to eliminating racism in legal proceedings); 18 U.S.C. 3593(f) ("[T] the court * * * shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be."); 18 U.S.C. § 3595 (c)(1) (appellate courts must "address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the

sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor . . . .").

## IV. THE BALANCE OF THE EQUITIES WEIGHS IN FAVOR OF A STAY.

Lastly, the equities tip in favor of an injunction. Mr. Hall's interest in having the merits of his substantial claims adjudicated, "particularly when so much is at stake," means that, at a minimum "'the Government should turn square corners.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020) (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)). When a death-sentenced citizen alleges violations of his constitutional rights—"[t]his is not the case for cutting corners[.]" *See id.* at 1909-10. Mr. Hall faces execution while important constitutional considerations are oustanding. "[I]t is always in the public interest to prevent violation of a party's constitutional rights." *In re Ohio Execution Protocol*, 860 F.3d 881, 901 (6th Cir. 2017) (Moore, J., dissenting) (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001)). Were Mr. Hall's execution to go forward, the government risks putting to death a man without ever having allowed his claims to be fully and fairly litigated. No doubt, that would be a an undesirable result for all involved.

23

Citing *Calderon v. Thompson*, the government contends that Mr. Hall's proceedings "have run their course." 523 U.S. 538 (1998). But the Court in *Thompson* determined petitioner's proceedings had come to an end of the line when the Court was faced with the state's application for mandamus "almost one year after [petitioner] filed his petition for reahearing and suggestion for rehearing en banc, a full 53 days after issuance of the mandate denying relief, and a mere two days before" the execution date. *Id.* at 557. Mr. Hall has been unable to pursue his important constitutional claims in the same manner as the petitioner in *Thompson*, and so the finality the government alludes to has not yet crystallized.

Accordingly, the balance of the equities tips in favor of a stay of execution so that this Court can considered Mr. Hall's critical constitutional claims.

## CONCLUSION

The decision of the District Court should be reversed and a stay of execution should be entered to permit Mr. Hall to pursue his constitutional claims regarding the imposition of his death sentence.

Respectfully submitted,

PIETER VAN TOL
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
pieter.vantol@hoganlovells.com

KATHRYN MARSHALL ALI
KAITLYN GOLDEN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
kathryn.ali@hoganlovells.com

kaitlyn.golden@hoganlovells.com

November 18, 2020          *Counsel for Orlando Cordia Hall*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.  Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 5,927 words.

2.  The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 2010 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


s/ Kathryn Marshall Ali
KATHRYN MARSHALL ALI

November 18, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of November, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*s/ Kathryn Marshall Ali*
KATHRYN MARSHALL ALI